# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**ZION CLARKE,**<br>**RICARDO DE FOUR,**<br>**KEVON DEMERIEUX,**<br>**KEVIN NIXON, and**<br>**ANDERSON STRAKER,**<br><br>**Defendants.** | **Criminal Action No. 06-102 (JDB)** |

## MEMORANDUM OPINION

Defendants are citizens of the Republic of Trinidad and Tobago ("Trinidad") charged

with conspiracy to commit hostage taking resulting in death and hostage taking resulting in death

in violation of 18 U.S.C. § 1203.  The charges stem from the abduction and death of a United

States citizen, Balram Maharaj, in Trinidad in April 2005.  Twelve defendants have been

extradited to face charges related to Maharaj's kidnapping and seven defendants are scheduled to

stand trial in May 2009.[1]  Five of those defendants have motions to suppress currently pending

before the Court and, after a two-day evidentiary hearing held on March 5 and 6, 2009,[2] the

motions are now ripe for decision.  Anderson Straker and Kevin Nixon move to suppress out-of-

---

[1]  In addition to the seven defendants facing trial in May 2009, four have pled guilty and one was acquitted at a trial held in June 2007 (prior to the extradition of the seven defendants presently facing trial).  For a description of how the hostage taking and death of Maharaj allegedly unfolded, see United States v. Suchit, 480 F. Supp. 2d 39, 41-49 (D.D.C. 2007).

[2]  Citations to the hearing transcript ("Tr.") refer to the volume for the March 5 and 6, 2009 proceedings unless otherwise noted.  Due to the numerosity of the briefs filed, the Court will cite to the parties' memoranda with an abbreviated description of the filing and the ECF document number.  Exhibits will also be referred to with an abbreviated description and exhibit number.

court photographic identifications made by one of their alleged co-conspirators. Zion Clarke moves to suppress three statements he made to the Federal Bureau of Investigation ("FBI") during interviews in Trinidad and during his extradition to the United States, as well as one statement he made to the Trinidad police. Ricardo De Four and Kevon Demerieux move to suppress statements they made to the Trinidad police and Demerieux also moves to suppress a statement that he made to the FBI while being interviewed in Trinidad. For the reasons that follow, the Court will deny defendants' motions.

## <u>DISCUSSION</u>

The resolution of the pending motions requires the Court to make factual findings concerning the identifications and statements that defendants seek to suppress. The Court must first look to the circumstances surrounding the photographic identification procedure used to identify Straker and Nixon in order to determine whether it was sufficiently reliable so as not to violate defendants' due process rights under the Fifth Amendment. The Court heard testimony from FBI Special Agent William T. Clauss, the lead FBI investigator on the case and the individual who conducted the photographic identification procedure with Russel Joseph, a witness and alleged co-conspirator. Clauss's testimony on this subject went unrebutted and the Court found him to be a credible and forthright witness.

The Court must also make factual findings concerning the background and circumstances in which the statements of Clarke, De Four and Demerieux were taken, in order to determine whether they were provided with notice of any <u>Miranda</u> warnings under the Fifth Amendment, how they responded to the notices, and whether their statements were voluntarily given. To make these findings, the Court again heard testimony from Special Agent Clauss, who conducted three of the interviews at issue here (two with Clarke and one with Demerieux) and acted as the

FBI's primary liaison with the Trinidad police.  The Court also heard testimony from FBI Special

Agent Edgar Cruz, who offered testimony on the limited topic of Clarke's extradition to the

United States and the statement Clarke made during his extradition.  Five officers from the

Trinidad police force presented testimony as well -- Wendell Lucas, Kendell Abraham, Michael

Seales, Larry Lodhar and Eric Park.  The Court also heard testimony from Alexis Persad, a

Justice of the Peace in Trinidad who was present while Demerieux gave a statement to the

Trinidad police.  The testimony of the FBI, the Trinidad officers and Persad went unrebutted,

and the Court found them to be credible and forthright witnesses, albeit with some uncertainty as

to the specifics of a few events due to the passage of time.

Defendants did not present any witnesses, instead relying on the testimony, including

cross-examination, of the FBI agents and the Trinidad officials to support their suppression

motions.  Only De Four presented additional testimonial evidence, in the form of a sworn

affidavit from his Trinidad attorney, John Larry Williams, on the issue of the alleged promise of

leniency made to De Four by the Trinidad police.[3]  Def. Ex. 16 (Williams Aff.).  With this

preface, the Court turns to the task of making the factual determinations necessary to resolve the

motions.

---

[3] Although the government did not object to the admission of Williams's affidavit, the
Court notes that the affidavit contains De Four's hearsay statements regarding promises of
leniency made to him by Seales.  It is well-settled that hearsay evidence may be considered in
resolving a motion to suppress evidence.  United States v. Raddatz, 447 U.S. 667, 679 (1980)
("At a suppression hearing, the court may rely on hearsay and other evidence, even though the
evidence would not be admissible at trial.") (citing United States v. Matlock, 415 U.S. 164, 172-
74 (1974), and Fed. R. Evid. 104(a)); United States v. Foster, 986 F.2d 541, 543 (D.C. Cir. 1993)
(recognizing that "hearsay is generally admissible" at suppression hearings).  Hearsay
statements, like all evidence, should be considered in light of their trustworthiness and reliability
(see Matlock, 415 U.S. at 174-75), and the Court has considered those factors here in relying
upon this and other hearsay statements proffered in this matter.

## I.      Motions to Suppress Photographic Identifications -- Straker and Nixon

Straker and Nixon were both identified by Russel Joseph -- an alleged co-conspirator who has already pled guilty -- during a photographic identification procedure conducted by FBI Special Agents Clauss and Christopher Carbonneau at the Federal Courthouse in Washington, D.C. on August 11, 2006.  Straker and Nixon contend that admission of those out-of-court identifications would violate the Fifth Amendment because the identification procedure was impermissibly suggestive and, therefore, unreliable.  Based on Clauss's testimony at the suppression hearing, and the exhibits admitted in connection therewith, the Court makes the following findings.

### A.      Factual Findings

Prior to conducting the photo identification procedure on August 11, 2006, Clauss met with Joseph on four separate occasions.  Tr. at 123, 132.  During those meetings, Joseph explained his role in the plot to abduct Maharaj and he also gave details about the roles of his co-conspirators.  Id. at 105.  Joseph indicated to Clauss that he would not have difficulty identifying any of the individuals whom he had discussed.  Id. at 112.

Joseph met Straker on two separate occasions.  Id. at 125.  The first was at the Mellow Moods bar on the day of Maharaj's kidnapping.  Id. at 106.  Joseph observed Straker at the Mellow Moods bar during the group meeting prior to the kidnapping.  Id. at 126.  Then, later the same day, after Maharaj had been abducted and delivered to his captors, Joseph returned to the Mellow Moods bar and once again observed Straker.  Id. at 106, 126.  Joseph's second interaction with Straker occurred several days after the kidnapping.  At that time, Joseph met Straker in Santa Cruz and the two men walked together to the forest campsite where Maharaj was being held.  Id. at 106.  After they arrived, Joseph watched Straker interrogate Maharaj.  Id.

At the conclusion of Straker's questioning, Straker and Joseph descended the hill together and carried on a conversation until they reached the bottom and parted ways. Id. at 106-07.

Joseph's interactions with Nixon (a.k.a. Shaka) were confined to the day of the kidnapping. Id. at 135. When the group departed from the Mellow Moods bar, Joseph and two others, including Nixon, got in what would be the getaway car and proceeded to the Samaan Tree bar to abduct Maharaj. Id. at 107. As Nixon exited the vehicle, he instructed Joseph to wait for the signal. Joseph then parked the car in a position where he could observe the bar. Id. Once in position, he observed another individual enter the bar and he then observed Nixon give the signal to bring the car around. Id. Nixon and the other individual then forced the victim into the car and Joseph drove away with all three men in the back seat. Id. As they left the scene, Nixon held a gun to Maharaj's head. Id. at 108. They returned to the area near the Mellow Moods bar and left the victim near a cocoa field. Id. Shortly thereafter, however, Joseph and Nixon went back to the cocoa field to retrieve the victim. Id. After dropping off another unidentified individual, Joseph and Nixon proceeded up Grand Curacaye Road and gave custody of Maharaj to two other individuals. Id. Joseph and Nixon then drove back to the Mellow Moods bar to rejoin the others. Id.

Clauss testified that based on Joseph's experience with the defendants, he considered doing a one photograph identification for each individual, but ultimately "came to the conclusion that despite the fact that Mr. Joseph had identified several individuals by name, at length and in detail . . . to lend a little bit more objectivity to it, we decided to place the photographs of the individuals we believed he had identified into a six-person photographic lineup." Id. at 109-10. A total of ten six-person photo arrays were prepared by the FBI with the help of the South Florida High Intensity Drug Trafficking Area ("HIDTA"). Id. at 110-11. Although Clauss did

not prepare all of the lineups himself, he testified that he reviewed each of them critically before showing them to Joseph.  Id. at 111.  The lineups contained six photographs of black males, arranged in two rows of three.  Gov't Ex. 37a (scanned copy of Straker photo array); Gov't Ex. 38 (scanned copy of Nixon photo array).  None of the photographs appear to be more recently taken than the others and all were taken from the neck up and from a full-face viewpoint.  Id.  The men appear to be approximately the same age and have approximately the same physical build, hair color, hair length and hair style.  Id.  Each lineup contained only one suspect and the suspects' photographs were not placed in the same location in each lineup -- they were placed randomly.  Tr. at 139-40.  In Straker's lineup all of the men pictured had facial hair (as does Straker), Gov't Ex. 37a; Gov't Ex. 37b (computer printout of Straker photo array), whereas in Nixon's lineup several of the men pictured did not have facial hair (Nixon does), Gov't Ex. 38.

The identification procedure took place at the Federal Courthouse in Washington, D.C., on August 11, 2006.  Tr. at 111; Gov't Ex. 39 (FBI summary of Aug. 11, 2006 identification procedure).  In addition to Clauss and Joseph, FBI Special Agent Christopher Carbonneau, Assistant U.S. Attorney Bruce Hegyi and Joseph's attorney Allen Orenberg were also present at the outset of the interview.  Id.  After Clauss and Carbonneau advised Joseph of their identities and the purpose of the interview, Hegyi and Orenberg left the room.  Tr. at 129-30; Gov't Ex. 39. Only Clauss, Carbonneau and Joseph were present in the room during the identification procedure.  Tr. at 111-12; Gov't. Ex. 39.  Before showing Joseph the lineups, Clauss advised Joseph that he "was going to be showing him a series of photographs, that each page would contain six photographs, and [he] advised him to take his time, review the lineups, and advise [him] if he recognized anybody that he saw in the page."  Tr. at 112.  Clauss testified that in conducting the identification procedure, he placed the stack of ten lineups in front of him face

down.  Id.  One at a time, Clauss then proceeded to turn over the lineups and place them in front of Joseph.  Id.  Each time Joseph inspected a new lineup, he would point to a photograph and verbally identify the individual by name.  Id. at 113.  Once Joseph positively identified an individual, Clauss instructed him to circle the number below the photograph and place his initials and the date.  Id.  Clauss testified that Joseph had no hesitation whatsoever in identifying the suspects from the photo arrays.  Id.  Joseph also indicated to Clauss that "[h]e was absolutely positive" about the identifications that he made.  Id.

At the hearing, the government was unable to produce the actual lineups that were presented to Joseph because their whereabouts are unknown.  Id. at 114.  Instead, Clauss reviewed scanned copies of the lineups that contained photographs of Straker and Nixon.  Gov't Exs. 37a, 38.  Clauss also examined a printout of Straker's lineup generated from the original computer file.  Gov't Ex. 37b.  Clauss testified that, in terms of color and clarity, the computer printout of Straker's lineup was identical to what was shown to Joseph.  Tr. at 118.  With respect to Nixon's lineup, Clauss stated that the colors in the photographs shown to Joseph were much clearer and more vibrant than the colors reflected in the scanned copy, which were faded in appearance.  Id. at 120-21, 142-43; Gov't Ex. 38.  After reviewing the first scanned photo array, Gov't Ex. 37a, Clauss verified that he had watched Joseph circle the number two (beneath Straker's photograph), write his initials "RJ" and the numbers "11.8.06" (i.e., Aug. 11, 2006) next to the circled number, and indicate verbally that the individual in the photo was Straker.  Tr. at 117-18.  Likewise, after examining the second scanned lineup, Gov't Ex. 38, Clauss stated that he had watched Joseph circle the number four (beneath Nixon's photograph), write his initials "RJ" and the numbers "11.8.06" next to the circled number, and indicate verbally that the individual in the photo was Shaka (Nixon's alias).  Tr. at 119-20.

**B.    Legal Analysis**

When a defendant challenges an out-of-court identification as a violation of due process under the Fifth Amendment, the court must assess the sufficiency of the identification procedure using a two-part test.  Initially, the court must determine whether "'the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'"  Neil v. Biggers, 409 U.S. 188, 197 (1972) (quoting Simmons v. United States, 390 U.S. 377, 384 (1968)); United States v. Washington, 12 F.3d 1128, 1134 (D.C. Cir. 1994).  "Factors to consider in assessing suggestiveness include the 'size of the array, the manner of presentation by the officers, and the array's contents.'"  United States v. Cooper, 85 F. Supp. 2d 1, 36 (D.D.C. 2000) (quoting United States v. Concepcion, 983 F.2d 369, 377 (2d Cir. 1992)).  However, if the court concludes that the identification procedure was suggestive, that alone "does not violate due process so long as the identification possesses sufficient aspects of reliability."  Manson v. Brathwaite, 432 U.S. 98, 106 (1977).  Step two of the inquiry, then, requires the court to examine "whether, under the totality of the circumstances, the identification was sufficiently reliable to preclude a substantial likelihood of misidentification."  Washington, 12 F.3d at 1134.  Reliability is assessed by considering a number factors, including:  "'the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation.'"  Id. (quoting Manson, 432 U.S. at 114).

Here, there is nothing in the record to support defendants' contention that the identification procedure or the photo arrays themselves were suggestive.  Clauss's testimony establishes that the procedure used to conduct the photographic identification with Joseph on

August 11, 2006 was not suggestive.  In fact, the record leads to precisely the opposite conclusion -- the procedure was unquestionably fair and Clauss took great pains to conduct the identification in a deliberate and impartial manner.

As for the contents of the photo arrays themselves, there is also no evidence that they were suggestive.  The arrays were of a sufficient size (six photographs, in two rows of three) so as to prevent any signaling to the witness, and the photographs of the suspects were placed at random in each of the ten arrays that Joseph examined.  None of the photographs appeared to be more recently taken than the others and all were taken from a full-face viewpoint.  All of the men pictured shared the same general physical characteristics as defendants with respect to skin color, age, physical build, hair color, hair length and hair style.  Nevertheless, Nixon contends that his lineup was suggestive "because other subjects . . . differed substantially in appearance from Mr. Nixon with regard to complexion and facial hair."  Nixon Mot. at 2 (ECF #289).  With regard to complexion, the Court does not agree that there is a "substantial difference" between Nixon's complexion and the complexions of those pictured along with him such that the lineup is in any way suggestive.  As for facial hair, it is true that not all of the subjects pictured with Nixon had facial hair, as he did, but this alone is insufficient to make the photo array impermissibly suggestive.  See, e.g., United States v. Hines, 455 F.2d 1317, 1329-30 (D.C. Cir. 1971) (finding that a lineup was not suggestive when three of four lineup subjects had facial hair, but defendant did not); Schawitsch v. Burt, 491 F.3d 798, 803 (8th Cir. 2007) ("Reasonable variations in hair length and facial hair are not impermissibly suggestive, especially as they can vary on any given person at different times.").  Straker has no claim that facial hair had any bearing on his identification because all of the men pictured in his photo array, including him, had facial hair.

Even if the procedure had been suggestive in this case, Joseph's identifications were clearly reliable in light of the circumstances. Joseph did not identify two men with whom he had a brief, split-second encounter; rather, he identified two men who were his alleged co-conspirators. Joseph spent a substantial amount of time with both men on the day of the crime and, in Straker's case, Joseph had another sustained interaction with him several days later as they hiked to and from the campsite where Maharaj was being held. Clauss also testified that prior to the identification procedure, Joseph indicated that he would not have difficulty identifying any of his co-conspirators. Joseph's confidence was confirmed by the procedure itself, as he was "absolutely positive" of his identifications and identified both Straker and Nixon by name, and without hesitation, when he was shown the photo arrays. Under these circumstances, there is no question that Joseph's identifications of Straker and Nixon were reliable. Because the identification procedure was not impermissibly suggestive and the identifications were sufficiently reliable, defendants' motions to suppress their photographic identifications will be denied.

## II.    Clarke's Motion to Suppress

Clarke has moved to suppress three statements he made to the FBI -- two of which were made during interviews conducted in Trinidad, on January 4 and 6, 2006, shortly after his arrest, and one which was made to Special Agent Cruz on August 4, 2008 during Clarke's extradition to the United States. He has also moved to suppress a statement that he made to the Trinidad police on January 5, 2006. Clarke contends that all four statements are inadmissible because he was not properly advised of his Miranda rights. He asserts that Miranda warnings were required prior to his January 5, 2006 statement because that statement was the product of a joint venture between the FBI and the Trinidad police. Clarke also argues that his statements should be suppressed

because they were not made voluntarily. Four witnesses gave testimony about the circumstances surrounding Clarke's statements -- from the FBI, Special Agents Clauss and Cruz, and from the Trinidad police, Sgt. Lucas[4] and Constable Abraham. Based on that testimony and the relevant exhibits admitted in evidence, the Court makes the following findings.

### A.    Factual Findings

After making an initial trip to Trinidad in late 2005 to meet Sgt. Lucas and inform him of the FBI's ongoing investigation into Maharaj's kidnapping, Clauss returned to Trinidad, accompanied by Cruz, on January 3, 2006 to conduct follow-up investigation. Tr. at 15-17. Shortly after their arrival, the FBI learned from Lucas that the Trinidad police were planning to make two arrests related to the Maharaj case in the early morning hours of January 4, 2006. Id. at 17-18. The FBI had no prior knowledge that the Trinidad police were planning to conduct arrests and the Trinidad police did not ask the FBI to participate in the arrests. Id. at 18, 81-82, 99. Further, there was no discussion between the FBI and Trinidad law enforcement officials about the specifics of the investigation, nor was there any discussion that they would divide tasks or work together. Id. at 81 (Clauss), 243-44 (Lucas). As Clauss testified, the FBI and the Trinidad police were conducting "parallel investigations that were clearly similar in nature, but I didn't feel a need to tell them what they should or shouldn't do, nor would I be in a place to do that. I'm a guest in their country." Id. at 81.

One of the individuals arrested on the morning of January 4, 2006 was Zion Clarke. Clarke was arrested at his home by a team of Trinidad police officers led by Lucas. Id. at 154-55. When they arrived at the home, Lucas identified himself as a Trinidad police officer and

---

[4] Several of the Trinidad police officers, including Lucas, have attained higher ranks since the relevant events transpired in 2006. For ease of reference, the Court will refer to each officer by his current rank.

informed Clarke that he was investigating the Maharaj kidnapping.  Id. at 156.  Lucas then advised him of his rights under Trinidad law, which include, among other things, the right to remain silent, the right to communicate with a legal representative, relative or friend, and a caution that statements may be put into writing and used against the accused in court.  Id. at 156-57, 239; see also Gov't Ex. 1 (Judges' Rules and Administrative Directions to the Police, Home Office Circular No. 89/1978); Gov't Ex. 1a (Judges' Rules and Administrative Directions to the Police, Ministry of Home Affairs Circular No. 1/1965) (collectively, "Judges' Rules");[5] Gov't Ex. 2 (Trinidad & Tobago Police Service, "Reminder to Law Enforcement Officers Re: Cautions").[6] Clarke did not seek to invoke his rights at that time.  Tr. at 157.  He was then taken to the Arouca police station.  Id. at 18-19.  Later that day, at approximately 7:45 p.m., Clarke was brought to the homicide office, where he met with Lucas.  Id. at 166.  Lucas once again identified himself, explained the purpose of his investigation and re-advised Clarke of his rights under Trinidad law.

---

[5] On day one of the suppression hearing, the government introduced Gov't Ex. 1 through Sgt. Lucas.  On day two, Sgt. Seales clarified that Gov't Ex. 1 is a version of the Judges' Rules that is sometimes used in Trinidad, but is more commonly used in the United Kingdom.  Tr. at 297.  The government then introduced Gov't Ex. 1a, which is the official version more commonly used in Trinidad.  Id. at 296-97.  Although there are seven rules in the Trinidad version, compared to six in the U.K. version, and there are minor textual differences throughout, the substance of the rules are identical in the two versions.  Compare Gov't Ex. 1 with Gov't Ex. 1a.  There are, however, no textual differences between the caution that is given under Rule II to those suspected of a crime ("You are not obliged to say anything unless you wish to do so but what you say may be put into writing and given in evidence.") and Rule III(a) to those who have been or may be charged with a crime ("Do you wish to say anything?  You are not obliged to say anything unless you wish to do so but whatever you say will be taken down in writing and may be given in evidence").  Unless otherwise noted, any reference herein to the Judges' Rules is meant to refer to the rules and text that are common to both versions.

[6] In addition to one of the cautions from Rules II or III(a) of the Judges' Rules, the Trinidad police also convey the following before questioning:  "You have a right to communicate with your legal representative, relative or friend of your choice."  Gov't Ex. 2.  The right to communicate with a lawyer, relative or friend is considered a "constitutional" right in Trinidad and it does not originate under the Judges' Rules.  See Tr. at 308.

Id. at 166, 241; Gov't Exs. 1, 1a.  After being apprised of his rights, Clarke agreed to give a statement to the Trinidad police, but he asked if he could first take a rest.  Tr. at 167-68.  He was then brought to his holding cell by Constable Abraham.  Id. at 168, 271.  Abraham testified that at the time he accompanied him to his cell, Clarke did not appear to be injured or ill.  Id. at 271.  Shortly thereafter, Lucas checked on Clarke to ask whether he was comfortable or wanted anything to eat or drink.  Id. at 168-69.  Clarke indicated that he was comfortable, but he declined food and drink at that time.  Id. at 169.

Later that night, at approximately 8:30 p.m., Clauss and Cruz arrived at the Arouca station and requested access to Clarke in order to conduct an interview.  Id. at 31.  Lucas told Clauss that if Clarke was willing to speak to the FBI, he would allow them to conduct an interview.  Id. at 170.  Abraham went to Clarke's cell to make the inquiry and Clarke indicated that he would be willing to speak to the FBI.  Id. at 170, 272.  Clarke was then brought to the homicide bureau office where he was seated in a cubicle.  Id. at 31-32, 170-71.  At that time, Clauss and Cruz identified themselves as FBI agents and informed Clarke that they too were conducting an investigation regarding the Maharaj kidnapping.  Id. at 32.  Clauss then presented Clarke with an international "notification of rights" form.  Id.; Gov't Ex. 7 (notification of rights form signed by Clarke on Jan. 4, 2006); Gov't Ex. 8 (FBI summary of interview with Clarke on Jan. 4, 2006).  That notification informs a suspect of his Miranda rights -- most notably, the right to remain silent and the right to have counsel present during questioning -- but states that appointment of counsel cannot be effectuated by the United States in a foreign country for a person not in U.S. custody.  See Gov't Ex. 7.  It states in full:

> We are representatives of the U.S. government.  According to our laws, you are entitled to certain rights.  Before we ask you any questions, we want to be certain that you understand such rights.

You do not have to speak to us nor do you have to answer any questions. Even though you may have spoke[n] to the Trinidad authorities, you do not have to speak to us right now. If you do speak to us, everything that you say can be used against you in a court of law, in the United States or anywhere else.

In the United States, you would have the right to seek advice from an attorney before we asked you any questions and to have an attorney with you during interrogation. If you were in the United States and could not afford an attorney, you would be provided an attorney at no cost before submitting any questions, if you so desired. Since you are not in our custody, nor are we in the United States, we cannot assure that you will have access to an attorney, nor can we assure that you will be provided with an attorney before we ask you any questions, or when we are asking such questions. If you wish to have an attorney but Trinidad authorities do not allow you access to one, or if they refuse to provide you an attorney at this time, you may opt not to speak to us. If you decide to speak to us without an attorney present, you reserve the right to decline to answer our questions at any time.

Moreover, you should understand that if you choose not to speak to us, that fact may not be used as evidence against you in a court of law in the United States.

It ends with the following acknowledgment and waiver of rights:

I have read this notice of my rights and understand what my rights are.

I am prepared to give a statement and to answer questions.

I do not wish to have an attorney at this time.

I understand and I know what I am doing.

I have received no promises or threats nor have I been subject to pressure or coercion of any sort.

Id. Before reading the form to Clarke, Clauss explained to him, in plain English, "that he did not have to speak with us, he had the right to remain silent." Tr. at 32. Clauss further explained that "because we were in Trinidad, we could not guarantee him access to an attorney, that that was a decision made by the Trinidad authorities, but if he wanted one and they would not provide one to him, he was under no obligation to speak to us." Id. at 32-33. Lastly, Clauss informed Clarke "that anything he did say to us could be used as evidence against him." Id. at 33. Once Clarke

had received those basic warnings, Clauss read the entire form to him, aloud and verbatim.  Id. at 32, 87.  Clauss then handed the form to Clarke to allow him to review it and told him to initial and sign if he understood his rights and agreed to continue with the interview.  Id. at 34-35. Clarke initialed and signed the form, Gov't Ex. 7, and Clauss testified that Clarke did not hesitate in waiving his rights and agreeing to continue with the interview without an attorney present. Tr. at 36.

The interview lasted for approximately two hours and mainly concerned Clarke's role as a guard during Maharaj's captivity at the forest campsite.[7]  Id. at 38-39; Gov't Ex. 8.  During the interview, conditions in the homicide bureau office were comfortable -- the room was well lit and the temperature was not noticeably hot or cold.  Tr. at 37.  No Trinidad police personnel participated in the interview.  Id. at 37 (Clauss), 171 (Lucas).  Clauss testified that neither he nor Cruz had any weapons visible during the interview and they did not threaten Clarke in any way. Id. at 37-38.  The agents also made no promises to Clarke during the interview.  Id. at 38.  Clarke was offered food and water during the interview, but he declined.  Id. at 37; Gov't Ex. 8.  Clauss also testified that Clarke appeared to be alert and attentive throughout the interview and he did not show any signs of fatigue, illness or physical injury.  Tr. at 38.  Clarke did not ask to stop the interview for any reason, nor did he ask for an attorney.  Id.  Clauss described Clarke's demeanor as "quite calm" and "relaxed," like "he wanted to get the information off his chest."  Id.

At the conclusion of the interview, Clarke was taken back downstairs and placed in his holding cell.  Id. at 39.  Both Lucas and Abraham testified that they observed Clarke at that time

_____

[7] Generally, the Court has limited its reliance on the statements in controversy to establish objective circumstances of the interviews (i.e., date and time, participants, conditions). However, where appropriate, the Court makes limited use of the statements that are in controversy to establish context for its factual findings.

and his physical condition appeared to be fine.  Id. at 171 (Lucas), 272 (Abraham).  On their way

out of the Arouca station, the FBI agents had a brief discussion with the Trinidad authorities,

including Lucas, and conveyed their belief that the interview had been successful.  Id. at 39

(Clauss), 172 (Lucas).  Apart from this brief discussion, there was no further discussion of the

case and the FBI did not provide the Trinidad police with any details about the substance of their

interview with Clarke.  Id. at 39, 88-89 (Clauss), 172-73, 243-44 (Lucas).  Lucas testified that

the FBI did not provide him with a list of questions or provide any guidance or instructions with

respect to possible subsequent interviews that he was planning to conduct.  Id. at 172-73, 252-53.

On the morning of January 5, the Trinidad police interviewed Clarke with the intention of

taking a formal statement from him.  In accordance with Trinidad police procedure, Lucas

contacted Justice of the Peace Asquith Clarke[8] and asked him to be present at the Arouca station

during the recording of Zion Clarke's statement.  Id. at 173.  Before the Justice of the Peace

arrived, Clarke was brought up to the homicide office and Lucas again cautioned him in

accordance with the Judges' Rules informing him that he was not obliged to say anything unless

he wished to do so, but what he did say would be put into writing and given in evidence.  Id. at

174.  He also told Clarke that he had a right to have an attorney, relative or friend present during

the recording of the statement.  Id.  In response, Clarke again indicated that he was willing to

make a statement and he did not ask Lucas to contact anyone on his behalf.  Id. at 174-75.  Once

Justice of the Peace Clarke arrived at the station, he had a private conversation with Zion Clarke

outside the presence of the Trinidad police.  Gov't Ex. 13a (handwritten version of Clarke's Jan.

5, 2006 statement as recorded by Lucas); Gov't Ex. 13b (typewritten version of Clarke's Jan. 5,

---

[8] Lucas testified that he is unaware of any familial relationship between Justice of the
Peace Asquith Clarke and Zion Clarke.  Tr. at 178.

2006 statement).  Based on that conversation, Justice of the Peace Clarke made the following

written certification:

> I spoke with the suspect alone and he informed me that he was willing to give a
> statement.  Since he has been in custody he was treated well.  He was not
> threatened abused or promised anything.  He was giving the statement on his free
> own will.

Id.

At approximately 9:00 a.m., once Justice of the Peace Clarke finished his meeting with

the suspect, the Trinidad police were ready to begin taking Clarke's statement.  Tr. at 175; Gov't

Ex. 13a; Gov't Ex. 14 (station diary extract, entry no. 20).[9]  Rather than write it himself, Clarke

requested that Lucas record his statement by hand.  Tr. at 175; Gov't Ex. 13a.  It took

approximately an hour and a half to record Clarke's statement.  Tr. at 181; Gov't Ex. 14 (station

diary extract, entry no. 21); Gov't Ex. 13b (indicating that Lucas finished taking Clarke's

statement at 10:20 a.m.).  Justice of the Peace Clarke and Constable Abraham were also present

while the statement was being recorded.  Tr. at 178; Gov't Ex 14 (station diary extract, entry no.

20).  Lucas testified that based upon his personal observations that morning, Justice of the Peace

Clarke did not appear to be intoxicated, rather "[h]e was alert, he was looking and listening

carefully to what was taking place, and very attentive."  Tr. at 179; see also Tr. at 247 ("Q: Isn't

it true that he was intoxicated even that morning, as early as 9:00 in the morning? A: That is

totally incorrect.").  Lucas also observed that Zion Clarke's demeanor was "comfortable" and he

did not appear to be in any distress.  Id. at 178, 184.  Clarke was provided a meal before giving

his statement and Lucas said that he seemed alert throughout the process.  Id.  While the

---

[9] A "station diary extract" refers to reproductions of the station diary kept at each police
station in Trinidad.  For a more detailed explanation of how station diary extracts are typically
used and reproduced, see United States v. Straker, 596 F. Supp. 2d 80, 84 n.5 (D.D.C. 2009).

statement was being recorded, none of the Trinidad officials had weapons visible and Clarke was not handcuffed. Id. at 178-79. Lucas testified that Clarke was not physically harmed while giving his statement, nor did the Trinidad police make any promises to Clarke in exchange for his statement. Id. at 184. Clarke did not refuse to answer any questions and he did not seek to stop the process or request an attorney. Id.

Clarke was also allowed to review his statement and correct any errors. Id. at 181. To facilitate the correction process, the statement was read aloud to Clarke and he was also given the opportunity to read it himself. Id. at 182-83. Clarke did in fact locate several errors and where changes were made he acknowledged the alteration by signing his initials "ZC." Id. at 182; Gov't Ex. 13a. Justice of the Peace Clarke and Constable Abraham also initialed any corrections. Id. At the conclusion of the statement, Clarke also wrote, in his own hand, the following acknowledgment: "I have read the above statement and I have been told that I can correct, alter or add anything I wish. This statement is true. I have made it of my own free will." Gov't Ex. 13a. Clarke then signed this acknowledgment, as did Justice of the Peace Clarke and Abraham. Id.

The following day, on January 6, the Trinidad police arranged for Clarke to take them to the Santa Cruz forest in order to locate the campsite where Maharaj had been held captive.[10] Tr. at 44, 99, 103 (Clauss), 185-86 (Lucas); Gov't Ex. 17 (station diary extract, entry no. 15). That morning, Clarke led a large group of Trinidad police officers and others (including Clauss and

---

[10] Clauss testified that at the conclusion of the FBI's January 4 interview, he asked Clarke if he would be willing to take law enforcement officials to the location of the campsite and Clarke indicated his willingness to do so. Tr. at 102-03. Lucas later testified that on the morning of January 6, he spoke to Clarke in his holding cell and Clarke said "that he was willing to take [Lucas] to the burial site, or where they were holding the victim." Id. at 250. When questioned on cross-examination, Lucas was adamant that he did not make any promises of leniency to Clarke in exchange for information about the location of the campsite. Id.

Cruz) to the location.  Id. at 44, 92, 94, 103, 187; Gov't Ex. 17.  During that time, Clarke remained in the custody of the Trinidad police and for at least portions of the day he was in handcuffs.  Tr. at 91-93, 103.  On the morning of January 6, prior to revealing the location of the campsite, Clarke was not re-advised of his rights by the FBI.[11]  Id. at 92-93, 97.  Clauss testified that at the time, he regarded Clarke as still being under the advice of rights that was provided to him two days prior, on January 4.  Id. at 103.  Lucas testified that he did re-advise Clarke of his rights under Trinidad law on a number of occasions during the course of the day.  Id. at 185-87, 248-51.

Later on January 6, at approximately 6:00 p.m., Clauss and Cruz encountered Clarke back at his Arouca station holding cell.  Id. at 44.  They informed him that they would like to return to the station later that evening to speak with him for a second time and he, in turn, agreed to another interview.  Id.  Once again, the FBI agents sought permission from the Trinidad police to interview Clarke and it was granted.  Id.  The FBI's second interview of Clarke was conducted under circumstances that were substantially similar to the first interview.  See Gov't Ex. 15 (FBI summary of interview with Clarke on Jan. 6, 2006).  Clarke was brought up from his holding cell to the homicide bureau office and seated in a cubicle.  Tr. at 44-45.  This time, Marvin Freeman (at the time, the FBI assistant legal attache at the U.S. Embassy in Trinidad) was also present for the interview along with Clauss and Cruz.  Id. at 45; Gov't Ex. 15.  No Trinidad police personnel

---

[11] At the motions hearing, the government represented that it would likely seek to introduce evidence of Clarke's conduct in leading the authorities to the campsite, but it would not seek to introduce evidence of any statements he made while doing so.  Tr. at 93-94.  Although Clarke's counsel did not formally move to suppress evidence related to this event, it became apparent during the hearing that the Court should also consider whether Clarke's conduct, or any statements made during the trip to the campsite, should be suppressed on the same bases asserted in Clarke's memorandum in support of his motion to suppress statements -- i.e., that he was not given proper Miranda warnings and that his statements were involuntary.

participated in the interview. Tr. at 45.

At the outset of the interview, Clauss "readvised [Clarke] that the rights that we had presented to him on the initial interview again were still in effect, and he waived those rights and said that he would continue speaking with us." Id. at 45; Gov't Ex. 15. Clauss testified that he verbally reminded Clarke of the substance of his rights, but he did not present him with a new notification of rights form to read and sign. Tr. at 45. Clauss said that he was comfortable advising Clarke of his rights verbally -- rather than providing him with another form -- because he had remained in the custody of the Trinidad police since their first interview. Id. at 46-47, 97. By Clauss's account, Clarke appeared to understand his rights and he agreed to continue the interview without an attorney present. Id. at 45-46.

The FBI's January 6 interview lasted for approximately three and a half hours. Id. at 47. Like the January 4 interview, the conditions in the office were comfortable and, according to Clauss, Clarke seemed "relaxed" and he exhibited no signs of physical distress, illness or injury. Id. at 46-48. He was offered food and water and the opportunity to use the restroom, but he declined. Id. at 47; Gov't Ex. 15. Clauss was also clear that no threats (implicit or explicit) or promises were made to Clarke and he was not handcuffed or otherwise restrained during the interview. Tr. at 47-48. Clarke did not refuse to answer any questions, nor did he attempt to stop the interview for any reason. Id. at 48.

Moving forward to August 2008, Special Agent Cruz offered testimony about the circumstances surrounding Clarke's extradition and the statement that Clarke made to the FBI while en route to the United States. Cruz traveled to Trinidad on August 4, 2008 to take custody of Clarke from the Trinidad police at Piarco International Airport. Id. at 498. When Cruz first encountered Clarke at the airport, there was nothing unusual about Clarke's appearance and he

did not appear to be physically uncomfortable in any way.  <u>Id.</u> at 498-99.  Cruz testified that

Clarke was later evaluated by a FBI medic who was on board the flight and there were no issues

noted.  <u>Id.</u> at 499.  Prior to boarding, Clarke was placed in handcuffs attached to a belt chain and

he was searched and given an opportunity to use the restroom.  <u>Id.</u> at 498-99.  Cruz took him

aboard the FBI aircraft at approximately 4:40 p.m and once on board Clarke was offered food

and water (he accepted water).  <u>Id.</u> at 499.  The plane then departed Trinidad for Manassas,

Virginia.  <u>Id.</u>

At approximately 5:21 p.m., while still in flight, Cruz attempted to initiate an interview

with Clarke.  <u>Id.</u>  Cruz first identified himself as an FBI agent and explained the purpose of the

interview.  Gov't Ex. 35 (FBI summary of interview with Clarke on Aug. 4, 2008).  Cruz then

advised Clarke of his rights verbally by reading a standard FBI "advice of rights" form (Form

FD-395).  <u>Id.</u>; Tr. at 499; Gov't Ex. 33 (FD-395 advice of rights form signed by Clarke on Aug.

4, 2008).  That notification informs a suspect of his <u>Miranda</u> rights -- most notably, the right to

remain silent and the right to have counsel present during questioning.  <u>See</u> Gov't Ex. 33.  In full,

the form reads:

> Before we ask you any questions, you must understand your rights.
>
> You have the right to remain silent.
>
> Anything you say can be used against you in court.
>
> You have the right to talk to a lawyer for advice before we ask you any questions.
>
> You have the right to have a lawyer with you during questioning.
>
> If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.
>
> If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.

It ends with the following acknowledgment and waiver of rights:

> I have read this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present.

Id. Cruz testified that he read the entire form aloud to Clarke and then provided the form to him so that he could read and sign it. Tr. at 499, 501. Cruz also testified that after apprising Clarke of his rights verbally, it appeared to him that Clarke understood his rights. Id. at 501. Cruz then watched Clarke review the form and sign it. Id. at 501-502.

Once Clarke signed the form, Cruz commenced the interview, which lasted approximately an hour and a half. Id. at 502, 504. Although a number of other FBI agents and defendant Demerieux were seated in the front of the aircraft, the interview was conducted in a seating area toward the rear of the plane where there was a group of four seats together -- two seats facing forward across from two seats facing backward. Id. at 503. FBI Special Agent Alexandra Montilla also participated in the interview, but there were no other FBI personnel in the immediate vicinity. Id. at 502-03; Gov't Ex. 35. Clarke was handcuffed, and the handcuffs were attached to a belt chain, for the duration of the interview, but the conditions were otherwise comfortable -- the temperature on the aircraft was normal, Clarke was seated in a large, leather chair and he was given water. Tr. at 503. Cruz described Clarke's demeanor during the interview as "[v]ery cooperative, calm. No issues." Id. at 504. Cruz also said that at no point did Clarke seek to stop the interview. Id. at 522.

Cruz also testified that neither he nor any other FBI personnel made any threats or promises to Clarke during the interview. Id. at 503-04. On cross-examination, Cruz acknowledged that he did tell Clarke "that if he cooperated, it may be something that would be helpful to him down the road." Id. at 519. However, Cruz was clear that "[t]here were no

specific guarantees" made and Cruz "definitely did not promise him [that his cooperation] would help him." Id. Cruz further explained: "I never said that this would happen if he cooperated or he wouldn't be charged or his sentence would be lower. I simply said that whatever he said to me to help the investigation, I would relay to the prosecutors and they would make a decision on that cooperation." Id.

**B.     Legal Analysis**

**1.     Clarke's statements to the FBI on January 4 and 6, 2006**

**a.     Miranda warnings**

It is by now well-established that the Fifth Amendment privilege against self-incrimination protects nonresident aliens facing a criminal trial in the United States even where the questioning by United States authorities takes place abroad. See In re Terrorist Bombings of U.S. Embassies in East Africa, 552 F.3d 177, 198-201 (2d Cir. 2008); United States v. Yousef, 327 F.3d 56, 145-46 (2d Cir. 2003) (noting that where United States law enforcement agents participate in questioning abroad, Miranda warnings may be required); Straker, 596 F. Supp. 2d at 90; Suchit, 480 F. Supp. 2d at 52 n.21. This proposition is based on the status of the privilege against self-incrimination as a "fundamental trial right," as to which a violation occurs not at the moment of custodial interrogation, but at the time a defendant's statement is used against him at an American criminal proceeding. See In re Terrorist Bombings of U.S. Embassies in East Africa, 552 F.3d at 200 (quoting United States v. Verdugo-Urquidez, 494 U.S. 259, 264 (1990)). The government thus concedes the applicability of the Fifth Amendment to the FBI actions at issue. Gov't Opp'n to Clarke Mot. at 20 (ECF #353) ("The admissibility at trial of statements made overseas to U.S. agents by foreign nationals held in foreign custody is determined by the Fifth Amendment.").

Because the Fifth Amendment guides the admissibility at trial of statements made overseas to U.S. agents, the Court will assume that <u>Miranda</u> warnings were also required.[12]  In <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), the Supreme Court held that the Fifth Amendment prohibition against compelled self-incrimination requires that custodial interrogation be preceded by advice to the defendant that he has the right to remain silent and the right to the presence of an attorney, and that if the defendant invokes those rights, the interrogation must cease.  <u>Id.</u> at 479.  However, the <u>Miranda</u> Court cautioned that its "decision in no way creates a constitutional straitjacket" and that "other procedures which are at least as effective in apprising accused persons of their right of silence and in assuring a continuous opportunity to exercise it" could pass constitutional muster.  <u>Id.</u> at 467.  The Supreme Court has since made clear that it established a flexible rule because "the Constitution does not require police to administer the particular <u>Miranda</u> warnings."  <u>Dickerson v. United States</u>, 530 U.S. 428, 440 n.6 (2000); <u>see also</u> <u>Duckworth v. Eagan</u>, 492 U.S. 195, 202 (1989) ("<u>Miranda</u> warnings [need not] be given in the exact form described in that decision."); <u>California v. Prysock</u>, 453 U.S. 355, 359 (1981) ("<u>Miranda</u> itself indicated that no talismanic incantation [i]s required to satisfy its strictures.").

---

[12] Although the government equivocates with regard to the question whether <u>Miranda</u> warnings were required prior to the FBI's interviews of Clarke in Trinidad, it argues that Clarke was warned by the FBI in accordance with <u>Miranda</u> nonetheless.  Gov't Opp'n to Clarke Mot. at 20 ("To the extent that Mr. Clarke, a foreign national, had rights outside the United States under <u>Miranda</u> . . . those rights were observed.").  Recently, the Second Circuit observed that the Supreme Court has never ruled on the question "of <u>Miranda</u>'s applicability to overseas interrogations conducted by U.S. agents."  <u>In re Terrorist Bombings of U.S. Embassies in East Africa</u>, 552 F.3d at 201.  Nevertheless, the Second Circuit "[p]roceed[ed] on the assumption that the <u>Miranda</u> framework generally governs the admissibility of statements obtained overseas by U.S. agents," at least in part because it found that the twin policy concerns animating <u>Miranda</u> -- <u>i.e.</u>, ensuring trustworthiness and deterring misconduct -- apply with equal force whether U.S. agents are interrogating suspects at home or abroad.  <u>Id.</u> at 202-03.  The Court agrees and, in light of the government's position that the FBI complied with <u>Miranda</u>, it will proceed on the same assumption here.

Such flexibility aids U.S. officials in conducting investigative activities abroad because "where Miranda has been applied to overseas interrogations by U.S. agents, it has been so applied in a flexible fashion to accommodate the exigencies of local conditions." In re Terrorist Bombings of U.S. Embassies in East Africa, 552 F.3d at 205. This is especially true with regard to informing suspects of their right to counsel -- a right that may be difficult, if not impossible, for a U.S. official to effectuate when a suspect is in a foreign country in the custody of a foreign government. See, e.g., id. at 204-05; Cranford v. Rodriguez, 512 F.2d 860, 862-63 (10th Cir. 1975) (finding that a variation of the standard Miranda warnings given to a suspect in Mexico "was unavoidable [due to the lack of availability of a U.S. lawyer in Mexico] and not prejudicial"); United States v. Dopf, 434 F.2d 205, 207 (5th Cir. 1970) (finding that warnings were adequate when U.S. agent informed suspects, inter alia, "that he could not furnish them with a lawyer in Mexico but offered to contact the American Consul on their behalf"). Moreover, the practical obstacles that may hinder a suspect's access to counsel in a foreign country do not impose any heightened duty on the investigating U.S. official, for as the Second Circuit explained:

> Miranda requires government agents to be the conduits of information to detained suspects-both as to (1) their rights under the U.S. Constitution to the presence and appointment of counsel at custodial interrogations and (2) the procedures through which they might be able to vindicate those rights under local law. It does not compel the police to serve as advocates for detainees before local authorities, endeavoring to expand the rights and privileges available under local law.

In re Terrorist Bombings of U.S. Embassies in East Africa, 552 F.3d at 208.

In this case, the record establishes that immediately prior to making statements to the FBI on January 4 and 6, 2006, Clarke was given Miranda warnings by the FBI, which were appropriately adapted to the non-U.S. setting. As detailed above, Clauss presented Clarke with

an international notification of rights form at the outset of the January 4 interview, which informed Clarke that he had the right to remain silent and that if he did choose to speak to the FBI, anything he said could be used against him in a court of law in the U.S. or elsewhere. Gov't Ex. 7. It also informed Clarke that in the U.S. he would have the right to seek advice from an attorney, have any attorney present with him during the interrogation and, if he could not afford an attorney, one would be appointed for him if he wished. The notification of rights form also explained that since they are in Trinidad, and he is in the custody of the Trinidad authorities, the FBI cannot assure that he will be provided with access to an attorney, but if he wishes to have an attorney and he is not provided one by the Trinidad authorities, he may decline to speak to the FBI.

Not only did Clauss testify that he read the entire notification of rights form to Clarke on January 4, before he presented it to him to review and sign, he also testified that he recited the substance of the warnings to Clarke in an abbreviated fashion, using plain English. Two days later, prior to the January 6 interview, Clauss re-advised Clarke of the substance of his rights verbally. This included warnings that Clarke had the right to remain silent, that he had the right to an attorney (but that any request for an attorney at that time would have to be made through the Trinidad authorities), and that anything he said could be used against him in court. Clauss testified that he did not feel it was necessary to present Clarke with a new notification of rights form because he had been presented with one just two days earlier and had remained in the custody of the Trinidad police since that time.

The warnings given to Clarke -- both the notification of rights form and Clauss's verbal warnings -- were fully consistent with <u>Miranda</u>. The variation on the traditional <u>Miranda</u> warnings accounts for the need "to accommodate the exigencies of local conditions," with regard

to access to counsel.  In re Terrorist Bombings of U.S. Embassies in East Africa, 552 F.3d at

205.  As other courts have recognized, such a variation is entirely reasonable when U.S. officials

are conducting investigations abroad and does not offend the flexible constitutional rule

established by the Supreme Court in Miranda.  See, e.g., id. at 208-09; Cranford, 512 F.2d at

862-63; Dopf, 434 F.2d at 207.

> **b.**     **Voluntariness of Clarke's Miranda waivers and statements**

Having concluded that Clarke was properly apprised of his Miranda rights when

interviewed by Clauss and Cruz in Trinidad, the Court next turns to the question whether his

waiver of those rights, and the statements made thereafter, were voluntary.  Clarke argues that

his "statements were not made voluntarily and [he] did not knowingly, intelligently and

voluntarily waive his right not to make the statements."  Clarke Mot. at 7 (ECF #308).  The

standard for the voluntariness of a Miranda waiver is the same as the standard for voluntariness

of a confession.  Colorado v. Connelly, 479 U.S. 157, 170 (1986).[13]  Hence, the Court will

conduct one single inquiry to determine whether Clarke's Miranda waivers and his statements to

the FBI on January 4 and 6, 2006 were involuntary.  Under either standard, the defendant's

statement -- his waiver or his confession -- must be "the product of a free and deliberate choice

rather than intimidation, coercion or deception" or some other police overreaching.  Id. (quoting

Moran v. Burbine, 475 U.S. 412, 421 (1986)).  Under both circumstances, the government bears

the burden of proving voluntariness by a preponderance of the evidence.  Id.  Based on the

evidence adduced at the suppression hearing, the government has carried its burden here.

---

[13]  Although the voluntariness of a confession, on the one hand, and the validity of a
Miranda waiver, on the other, are typically discrete inquiries (see United States v. Bradshaw,
935 F.2d 295, 299 (D.C. Cir. 1991)), the analyses collapse into a single one where, as here, a
Miranda waiver is challenged on the basis that it is involuntary, supported by the same
circumstances that allegedly demonstrate the confession itself is involuntary.

Clarke's assertion that his waivers and statements were not voluntary due to "his relative lack of sophistication regarding the American criminal justice system, his limited education and the linguistic differences between him and the agents," Clarke Mot. at 4, has no support in the record.[14]  In fact, at the suppression hearing, all evidence was to the contrary.  Clauss testified that Clarke appeared to understand his rights -- which were presented to him orally and in writing -- and he waived his rights without hesitation on both January 4 and 6.  Moreover, Clauss's testimony establishes that there is absolutely no evidence of coercive or deceptive conduct on the part of the FBI in securing Clarke's waivers or his statements.  On both occasions, the conditions in the interview room were comfortable, no threats or promises were made by the FBI, and Clarke was offered food and water.  Clauss also described Clarke's demeanor as calm and relaxed and he appeared to be alert throughout the interviews even though both were several hours in length.[15]  In short, no evidence was proffered to suggest that Clarke's waivers or statements were anything but "the product of a free and deliberate choice."  Connelly, 479 U.S. at 170.  Therefore, the Court will deny Clarke's motions to suppress his January 4 and 6, 2006 statements to the FBI.

---

[14] In support of his argument, Clarke cites Sims v. Georgia, 389 U.S. 404 (1967).  In Sims, the Supreme Court found that a confession was involuntary when the defendant was illiterate and had only a third-grade education and had been in continuous police custody for over eight hours during which time he had been subjected to physical violence, had been deprived of food and had not been given access to family, friends or counsel.  Id. at 405-07.  The record here does not even hint at anything approaching the parade of horribles documented in Sims.  And, in fact, Clarke produced absolutely no evidence at the suppression hearing to support his proffer regarding his lack of sophistication with the criminal justice system, limited education and linguistic difficulties.

[15] Clarke suggests that because "he was questioned [] repeatedly and at length by law enforcement from both his own country and agents of the FBI in three successive days" his statements were involuntary.  Clarke Mot. at 6.  However, there is nothing in the record to suggest that the length or number of interviews made Clarke ill, or even fatigued, or that his actions and statements were anything but voluntary.

### 2.    Clarke's statement to the FBI on August 4, 2008

At the hearing, Clarke's counsel attempted to establish, through cross-examination of Special Agent Cruz, that improper promises were made to Clarke in exchange for his August 4, 2008 statement.  In response, Cruz flatly denied this accusation and testified that he made "no specific guarantees" to Clarke and he "definitely did not promise him [that his cooperation] would help him."  Tr. at 519.  Because the Court credits Cruz's testimony, and Clarke produced no independent evidence to support his contention, this argument is a non-starter.  There is little left, then, to Clarke's challenge because, as set forth above, the record clearly establishes that he was given proper <u>Miranda</u> warnings aboard the FBI aircraft, voluntarily waived his rights and made a voluntary statement.  As Cruz sought to initiate an interview with Clarke he apprised him of his rights verbally by reading a standard FBI advice of rights form, which contains the full <u>Miranda</u> warnings.  Cruz then presented the form to Clarke and watched as he reviewed and signed it.  Despite being in handcuffs for the duration of the flight, there is no evidence that the conditions aboard the aircraft were anything but comfortable and, further, the record contains no evidence that Clarke was threatened, coerced, or deceived by the FBI in order to secure his <u>Miranda</u> waiver or statement.  Accordingly, the Court will deny Clarke's motion to suppress his August 4, 2008 statement to the FBI.

### 3.    Clarke's statement to the Trinidad police on January 5, 2006

Clarke first argues that his January 5, 2006 statement to the Trinidad police should be suppressed because he was never given <u>Miranda</u> warnings and "[a]t all times that [he] was interrogated and made his statements, the Government of the United States and Trinidad . . . were engaged in a joint venture with regard to the investigation of the kidnapping of Balram Maharaj."  Clarke Mot. at 3.  As this Court recently noted in <u>Straker</u>, statements to foreign officers abroad "generally are not governed by <u>Miranda</u> unless, under the 'joint venture' doctrine,

United States law enforcement agents actively participate in the questioning of the defendant or the foreign officials act as agents or virtual agents of the United States." Straker, 596 F. Supp. 2d at 106; see In re Terrorist Bombings of U.S. Embassies in East Africa, 552 F.3d at 203; United States v. Abu Ali, 528 F.3d 210, 228-29 (4th Cir. 2008); United States v. Karake, 281 F. Supp. 2d 302, 308 (D.D.C. 2003). The Court will not belabor what is obvious from the record -- there is no evidence that the FBI had any involvement, much less "actively participated," in the January 5 interview conducted by the Trinidad police. Nor, for that matter, is there any evidence that the FBI and the Trinidad police were working together in a more comprehensive fashion to conduct a joint investigation at the time Clarke was arrested and questioned in early January 2006. The only testimony on the issue presented at the hearing (from Clauss and Lucas) made clear that the FBI and the Trinidad police were working cooperatively in the most general sense, but they were not sharing information and the FBI was in no way directing the investigative activities of the Trinidad police. Based upon the record, then, the Court concludes that Clarke's January 5, 2006 interview was not the product of a joint venture between the FBI and the Trinidad police.[16]

---

[16] Had there been a joint venture here, Clarke's January 5 statement would still be admissible at trial because the Trinidad police provided warnings that were functionally equivalent to those required by Miranda. Lucas testified that immediately before Clarke gave his statement, and on two separate occasions the previous day, he advised Clarke of his right to remain silent and his right to retain a legal adviser, and also informed him that his statements could be used in evidence against him. Clarke signed a statement acknowledging that he had been so advised, and then voluntarily, knowingly, and intelligently waived his rights. As this Court noted in Straker, the lack of warnings regarding appointment of counsel do not create a problem because appointment of counsel to the indigent during interrogation is not required under Trinidad law and no such warnings were required. 596 F. Supp. 2d at 107 n.24; see In re Terrorist Bombings of U.S. Embassies in East Africa, 552 F.3d at 198-99 ("If the suspect chooses to make a knowing and voluntary waiver of his rights after a warning adapted to the circumstances of questioning overseas and chooses to speak with a U.S. agent, then neither the Fifth Amendment nor Miranda will bar the admission of his statement at trial.").

Because <u>Miranda</u> warnings were not required prior to Clarke's January 5 interview, the only remaining question is whether Clarke's statement to the Trinidad police was voluntary under the Due Process Clause.[17]  A statement is involuntary under the Due Process Clause if it was "extracted by . . . threats of violence" or "obtained by . . . direct or implied promises" or "the exertion of . . . improper influence."  <u>Hutto v. Ross</u>, 429 U.S. 28, 30 (1976).  Hence, courts must look at the totality of the circumstances to determine whether the subject's "will has been overborne and his capacity for self-determination critically impaired" by police coercion. <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 225 (1973); <u>see</u> <u>United States v. Bradshaw</u>, 935 F.2d 295, 299 (D.C. Cir. 1991).  In this case, the government easily satisfies its burden to show by a preponderance of the evidence that Clarke's statement to the Trinidad police was voluntary. <u>United States v. Bourdet</u>, 477 F. Supp. 2d 164, 179 (D.D.C. 2007).

The record contains no support for Clarke's contention that his statement was involuntary.[18]  Instead, the record shows that Clarke was treated fairly and humanely while in the custody of the Trinidad police.  After Clarke initially indicated, on January 4, that he would be

---

[17] In the absence of any U.S. involvement in a foreign interrogation, it is an open question whether the admissibility of a defendant's statement should be assessed under the Due Process Clause by the traditional "voluntariness" standard or a "shocks the conscience" standard, or instead is admissible without regard to either standard.  <u>See</u> <u>Straker</u>, 596 F. Supp. 2d at 106; <u>Karake</u>, 443 F. Supp. 2d at 52-53 & nn.73-74 (discussing whether the standard is "shocks the conscience" or voluntariness, suggesting the latter is correct); <u>Abu Ali</u>, 528 F.3d at 231-33 (applying a voluntariness standard); <u>United States v. Wolf</u>, 813 F.2d 970, 972 n.3 (9th Cir. 1987) (questioning whether constitutional protection against involuntary confessions applies to confessions coerced by foreign police in light of <u>Colorado v. Connelly</u>, 479 U.S. 157 (1986)). Here, the government does not press for a "shocks the conscience" standard, arguing instead that Clarke's statement to the Trinidad police satisfies the traditional voluntariness standard; hence, the Court will evaluate his statements, and those of his co-defendants, on that basis.  <u>See</u> Gov't Opp'n to Clarke Mot. at 9-16.

[18] The Court has already concluded that there is no record evidence to establish several "facts" proffered in support Clarke's involuntariness argument.  <u>See</u> note 14, <u>supra</u>.

willing to make a statement, he asked for an opportunity to rest. His request was granted by Sgt. Lucas and he was returned to his holding cell. Then, before giving his statement the next morning, Clarke was apprised of his rights by Lucas, including the right to remain silent, and he was given the opportunity to contact a friend, family member or attorney, but he declined to do so. He also met in private with a Justice of the Peace who discussed the implications of making a formal statement to the police.[19] The interview conditions themselves raise no red flags, nor does Lucas's account of Clarke's physical condition and demeanor during the interview. Lastly, at the conclusion of the interview, Clarke was given the opportunity, and indeed he took it, to review and amend his statement before signing it. In sum, Clarke was well advised of his rights, he understood his rights, he was not subject to any coercive tactics by the Trinidad authorities, and he chose to waive his rights voluntarily, knowingly, and intelligently. Clarke has not mustered a shred of evidence to suggest that his will was "overborne" by the actions of the Trinidad officials, Schneckloth, 412 U.S. at 225, and, consequently, the Court will deny Clarke's motion to suppress his January 5, 2006 statement.

**4.      January 6, 2006 trip to the forest campsite**

Lastly, the Court turns its attention to the expedition by the Trinidad police and the FBI, guided by Clarke, to the forest campsite on the morning of January 6. Although no formal motion was made, Clarke's counsel expressed concern during the hearing that the admission of evidence related to Clarke's role in this investigative activity is problematic because he was never given Miranda warnings and he was not taking law enforcement to the campsite voluntarily. Initially,

_____

[19] Zion Clarke has alleged that Justice of the Peace Asquith Clarke was intoxicated at the time he met with him on the morning of January 5, 2006. Clarke Mot. at 2. Although it is unclear how this allegation is relevant, it is ultimately of no moment because no evidence was produced at the suppression hearing to support the contention that the Justice of the Peace was in fact intoxicated.

the Court notes that the government represented at the hearing that it would likely seek to introduce evidence of Clarke's conduct in leading the authorities to the campsite, but it would not seek to introduce evidence of any statements he made while doing so. Tr. at 93-94.

Assuming arguendo, however, that Clarke's "conduct" in directing the authorities to the campsite would be considered a statement for purposes of the Fifth Amendment, the Court concludes that this evidence should not be suppressed for three reasons. First, because the Court has already concluded that Clarke was given proper Miranda warnings by Clauss on January 4, and voluntarily waived his rights, it also concludes that Clarke was still operating under those same warnings and the same waiver at the time he led authorities to the campsite two days later. Moreover, Clauss testified that at the conclusion of the January 4 interview he asked Clarke if he would be willing to take law enforcement to the campsite and Clarke answered in the affirmative. Id. at 102-03. Thus, leading the authorities to the campsite was the completion of a task he voluntarily agreed to undertake after voluntarily waiving his Fifth Amendment privilege against self-incrimination. Second, even if the Court concluded that the FBI's Miranda warnings were too remote, this evidence would still be admissible because, based on Lucas's testimony, id. at 185-87, 248-51, the Trinidad police provided warnings that were functionally equivalent to those required by Miranda.[20] Third, despite the fact that Clarke was in handcuffs for at least part of the day, there is no evidence that his conduct was involuntary. Not only did Clauss and Lucas both testify that Clarke indicated a willingness to lead them to the campsite, but there is nothing in the record to suggest that Clarke was coerced or improperly induced to direct them based on any promises that he would not be prosecuted or the like. Based on the foregoing, the Court finds that there is no basis to suppress any statements made by Clarke, whether express or through conduct,

_____

[20] See note 16, supra.

related to activities that occurred during the January 6, 2006 trip to the forest campsite.

### III.    De Four's Motion to Suppress

De Four has moved to suppress his statement made to the Trinidad police during an interview on January 27, 2006.  The gravamen of De Four's motion is his allegation that during a critical stage of the interview, when he may have otherwise been inclined to stop answering questions, the Trinidad police promised him that he would not be charged if he continued to cooperate and provide them with additional information.  This inducement, argues De Four, prompted him to continue with the interview and makes his statement involuntary under the Fifth Amendment's Due Process Clause.  Three witnesses from the Trinidad police force gave testimony about the circumstances surrounding De Four's statement -- Sgt. Lucas, Sgt. Seales and Acting Corporal Lodhar.  Based on that testimony and the relevant exhibits admitted in evidence, the Court makes the following findings.

#### A.    Factual Findings

De Four was arrested by the Trinidad police on January 27, 2006.  Tr. at 305.  Seales and Lodhar both participated in the arrest.  Id. at 305-06, 350, 385.  At the time of his arrest, Seales informed De Four that he was a suspect in the Maharaj kidnapping and he cautioned him under Rule II of the Judges' Rules, informing him that he was not obliged to say anything unless he wished to do so, but what he did say will be taken down in writing and may be given in evidence. Id. at 308, 351.  In accordance with Trinidad law, Seales also informed De Four that he had the right to contact a friend, relative or lawyer.  Id. at 308.  De Four then told Seales that he would be willing to speak to the police and he did not request that anyone be contacted on his behalf.  Id.

Soon thereafter, De Four was brought to the Barataria police station.  Id. at 308-09.  When Seales arrived at the Barataria station later that day, De Four was in a holding cell on the first

floor.  Id. at 310.  At that time, Seales approached De Four and asked again whether he wished to make a statement to the police.  Id.  De Four said that he was willing to give a statement.  Id.  He was then taken out of his cell and brought to an enclosed area used to conduct interviews.  Id. at 311.  Seales described the area as a small room with a desk, three chairs and a window.  Id.  De Four was not handcuffed while being transported to the room or while being interviewed.  Id.

The interview began at approximately 7:49 p.m.  Gov't Ex. 21 (station diary extract, entry no. 98).  Seales was the primary questioner and he sat in a chair directly opposite De Four.  Tr. at 315.  Lodhar sat at the desk and took handwritten notes of the interview.  Id.; Gov't Ex. 18a (Lodhar's handwritten notes of Jan. 27, 2006 interview with De Four); Gov't Ex. 18b (typewritten version of Lodhar's interview notes).  Lodhar's notes were intended to be comprehensive -- i.e., they were intended to record everything that took place during the interview.  Tr. at 316, 362, 387.  Seales testified that during the interview they never went "off the record" to discuss matters that are not reflected in the interview notes.  Id. at 364-65.

At the outset, Seales informed De Four that he was a suspect in the Maharaj kidnapping, asked him several general questions about his personal background (e.g., age, children, marital status) and inquired whether he had been given anything to eat (he had, chicken).  Id. at 311, 319; Gov't Exs. 18a, 18b.  Seales then cautioned De Four in accordance with Rule II of the Judges' Rules and also informed him of his right to communicate with a lawyer, friend or relative.  Tr. at 312, 319-20, 383; Gov't Exs. 18a, 18b.  De Four made no requests at that time and the interview proceeded.  Gov't Exs. 18a, 18b.  Seales testified that at the start of the interview there were no signs that De Four was in physical discomfort or had been physically assaulted while in custody.  Tr. at 312-13.  Lodhar confirmed that De Four did not appear to be experiencing any pain, illness or discomfort during the interview and on two separate occasions, De Four was given water.  Id.

at 386-87; Gov't Exs. 18a, 18b.  Neither Seales nor Lodhar was in possession of a weapon during the interview and Seales testified that no threats were made to De Four at any point.  Tr. at 313-14, 386.  Still, Seales described De Four's demeanor as "passive" and "a little nervous."  Id. at 312-13.

After the initial background inquiry, Seales questioned De Four about various individuals to determine whether he was acquainted with them.  Id. at 320; Gov't Exs. 18a, 18b.  This went on for some time and De Four answered each question.  Id.  Eventually, however, there reached a point when Seales began asking more pointed questions about the kidnapping.  Lodhar's notes set forth the following exchange:

Q: Do you know Balliram [sic] Maharaj?

A: Yes by seeing him on the news.

Q: On 6th April 2005 you together with others made a plan to kidnap Balliram [sic] Maharaj?

Suspect folds hands and sits back.

A: Suspect did not respond.

Gov't Ex. 18a at 3; Gov't Ex. 18b at 3.  Seales testified that when De Four failed to respond to his question:  "I remember he kind of raised his head and looked up to the sky very briefly, and he bent his head and looked down.  He was staring between the area that I sat and he sat, just between his legs."  Tr. at 321.  Following this pause, De Four never indicated to the officers that he wished to terminate the interview nor did he make a request to contact a lawyer, relative or friend.  Id. at 321-22, 387.  On cross-examination, Seales unequivocally denied that when De Four hesitated in responding to his question about Maharaj, Seales promised him that he would not be charged if he continued with the interview.  Id. at 365-66, 376-77.  Lodhar also testified

that Seales made no promises to De Four.  Id. at 387, 397, 404.  Rather, Seales testified that he

next asked, "What was your motivation for participating in the crime?"  Id. at 322; Gov't Exs.

18a, 18b.  De Four responded and Seales followed-up with:  "What can you tell me of this crime

of the kidnapping of Balram Maharaj?"  Id.  De Four answered by giving details about his role,

and the roles of others, in planning the kidnapping.  Id.  The remainder of the interview proceeded

in this fashion, with De Four responding to all of Seales's questions and providing details about

the planning and execution of Maharaj's kidnapping.  Gov't Exs. 18a, 18b.  The interview

concluded at approximately 11:05 p.m. and at that time Lodhar read his notes to De Four who

signed the notes to confirm that they were accurate, after he initialed some minor corrections

(there were several).  Tr. at 390-91, 408-09; Gov't Ex. 18a.  Seales and Lodhar also signed the

notes.  Tr. at 355, 389-90; Gov't Ex. 18a.  At the end of the interview, De Four expressed his

willingness to give a "formal statement under caution"[21] and Seales left the station that night

intent on taking his formal statement the following morning.  Tr. at 324, 391; Gov't Exs. 18a, 18b.

The next day, Seales arrived at the Barataria station at approximately 11:00 a.m.  Tr. at

328-29.  Upon his arrival, Seales found De Four meeting with his lawyer, John Larry Williams, in

an office near the entrance of the station.  Id. at 329, 346, 392.  Williams had been contacted and

hired by a member of De Four's family.  Williams Aff. ¶¶ 4-5.  Williams did not testify at the

suppression hearing, but his sworn affidavit was admitted in evidence and read into the record by

De Four's counsel.  Williams Aff.; Tr. at 526-28.  In his affidavit, Williams asserts that during his

meeting with De Four on the morning of January 28, he learned the following:  "Mr. De Four told

---

[21] A "formal statement under caution" is taken in accordance with specific procedures set
forth by the Judges' Rules.  Gov't Exs. 1, 1a.  As Sgt. Lucas explained, "[t]he formal statement
under caution is written on a prescribed sheet, and the information that is recorded in that formal
statement is information that is dictated by the person for whom the statement is being taken."
Tr. at 259.

me that he had been told by Constable Seales that if he gave a statement and agreed to cooperate as a state witness, he would be released to go home.  Mr. De Four said that he then agreed to give a statement."  Williams Aff. ¶ 7.  Williams says that he confronted Seales with this allegation and "Constable Seales neither admitted nor denied Mr. De Four's claim.  He said, 'If that is what [Mr. De Four] said, you know what can be done.'"  Id. ¶¶ 8-9.

Around this time, Seales provided Williams with a copy of the interview notes and left him alone to speak with his client.  Tr. at 330-31, 393.  Not long after, Seales and Lodhar returned to the interview room and asked Williams if his client would still be willing to give a formal statement under caution.  Id. at 331, 393-94.  Williams told the officers that he had advised De Four not to give a formal statement.  Id.  De Four then confirmed that he no longer wanted to give a formal statement when Seales asked him directly.  Id. at 331, 394.  Nevertheless, Seales asked whether De Four and Williams wished to have a Justice of the Peace authenticate De Four's statement from the previous night and they indicated that they would.  Id. at 332, 394.  Seales located Justice of the Peace Abrahim Ali and asked him to meet with De Four to authenticate his statement.  Id.; Gov't Ex. 21 (station diary extract, entry no. 22).

Following a brief discussion with Seales and Lodhar, Ali met with De Four and Williams in the interview room.  Gov't Exs.18a, 18b; Gov't Ex.19 (Feb. 28, 2009 statement by Justice of the Peace Abraham Ali regarding his interview with De Four on Jan. 28, 2006); Gov't Ex. 21 (station diary extract, entry no. 22).  Soon thereafter, Williams left the room and Justice of the Peace Ali and De Four remained to talk in private.  Id.  After several minutes, Ali asked De Four if he had wanted to give the statement and De Four claimed that Seales "said to him that he should give the statement and he will try to assist him from being charged."  Gov't Ex. 18a at 7; Gov't Ex. 18b at 7.  Ali immediately called Seales and Lodhar into the room to question them.  Id.; Tr. at 334-35,

395.  When Ali asked about De Four's allegation, Seales denied that he had made any promises or inducements to De Four in exchange for his statement.  Id.  Lodhar also denied that any promises had been made.[22]  Tr. at 395, 398-99.  Through a subsequent signed statement that was introduced during the suppression hearing,[23] Justice of the Peace Ali confirmed that "their denial was immediate and unqualified."  Gov't Ex. 19.  Moreover, De Four did not respond to the denials. Id.; Gov't Ex. 18a at 7; Gov't Ex. 18b at 7; Tr. at 335.  The Justice of the Peace then asked the officers to leave the room and he resumed questioning De Four about the circumstances of the interview.  Gov't Ex. 18a at 7; Gov't Ex. 18b at 7; Gov't Ex. 19; Tr. at 334.  After the officers departed, there was no further discussion regarding De Four's accusation.  Gov't Exs. 18a, 18b, 19.  In his written statement, Justice of the Peace Ali states:  "Mr. De Four's demeanor, eye movement, body language and silence, confirmed to me that [the] allegation was not factually accurate and that Mr. De Four had effectively withdrawn his allegation, I had no doubts."  Gov't Ex. 19.  He also asserts:  "Had there been any doubt in my mind that Mr. De Four was maintaining his prior allegation, I would have questioned him further and would have so noted in my certificate."  Id.

Outside of the interview room, Williams was on the phone with his colleague Keith Scotland, the attorney who had first been contacted to represent De Four.  Tr. at 334; Williams

---

[22] Seales testified that Lodhar said nothing to the Justice of the Peace when they were summoned to respond to De Four's accusation, Tr. at 335, 378, but Lodhar later testified that he offered a verbal denial of the allegation, id. at 395, 398-99.

[23] De Four's counsel objected to the admission of Justice of the Peace Ali's written statement because he argued that it takes on the form of an affidavit, but it was not signed or notarized as an affidavit.  Tr. at 191-92.  Over counsel's objection, the Court admitted Gov't Ex. 19.  The Court notes that Justice of the Peace Ali's statement was introduced through Sgt. Lucas who testified that he personally witnessed Ali sign, date and affix his official stamp to the statement.  Id. at 191.

Aff. ¶¶ 4-5.  Seales and Scotland are acquaintances and Williams asked Seales if he would speak to Scotland.  Tr. at 334.  Seales testified that Scotland said, "Sealesy boy, you gave [De Four] assurances, that why he gave the interview."  Id. at 336.  Seales flatly denied that he gave De Four any assurances and replied, "I would not do something like that.  It's not in my power to do that. Absolutely not."  Id. at 337.  Shortly after Seales's conversation with Scotland ended, Justice of the Peace Ali exited the interview room and handed Seales the original handwritten copy of Lodhar's interview notes.  Id. at 338, 396-97.  At the conclusion of the notes, Ali had certified that the statement was authentic.  Id.; Gov't Exs. 18a, 18b.

    Before turning to the merits of De Four's motion, the Court must first resolve the core factual issue regarding the alleged promise made by Seales to De Four during the January 27 interview.  In support of its position -- that no promise was made -- the government presented the testimony of Seales and Lodhar, the written statement of Justice of the Peace Ali, and the interview notes themselves with the authenticating signatures and certifications.  De Four supported his position -- that a promise was made -- through cross-examination of the Trinidad officers and the affidavit of his Trinidad attorney, Williams.  The Court first notes that the evidence in support of De Four's proffer is very weak because all of it emanates from his own self-serving allegation and there is no independent corroborative evidence to support that allegation.  De Four's best evidence, Williams's affidavit, is merely a recitation of De Four's own words -- it offers nothing in the way of independent corroboration.  By contrast, Seales and Lodhar were both adamant that no promises were made to De Four during the interview in exchange for his cooperation.  Despite efforts on cross-examination to establish that the officers covered-up the quid pro quo that they offered De Four, no headway was made with either witness and there is no independent evidence to support this theory.  Accordingly, the Court credits the

testimony of Seales and Lodhar on this issue. Add to that, Justice of the Peace Ali's contemporaneous certification of the statement's authenticity and his written statement -- which asserts that based on his questioning of the officers, De Four's reaction, and his own personal observations, he determined that De Four's allegation was not credible -- and the weight of the evidence tips decisively in favor of the government. Therefore, based on the record evidence before it, the Court finds that during the January 27 interview Seales did not promise De Four that he would be released and not charged if he cooperated and gave a statement.

**B.      Legal Analysis**

Because Seales never promised De Four de facto immunity from prosecution in exchange for his cooperation, De Four's primary argument has been eviscerated. The FBI played no role in De Four's January 27 interview, and hence the Court need only examine the voluntariness of the statement. Although it is true that under certain circumstances psychological coercion can be sufficient to make a statement involuntary and thus a violation of due process, see, e.g., Karake, 443 F. Supp. 2d at 50 (acknowledging that a confession may be involuntary if it is the product of psychological coercion); United States v. Johnson, 351 F.3d 254, 262 (6th Cir. 2003) ("promises of leniency may be coercive if they are broken or illusory"), there is simply no evidence to support the conclusion that there was such coercion here. Likewise, the record contains no evidence to suggest that De Four's statement was physically coerced, through actual or threatened physical violence, by the Trinidad officers. Based on the Court's factual findings, then, the Court concludes that De Four's will was not overborne by coercive tactics and, accordingly, his motion to suppress his January 27, 2006 statement will be denied.

**IV.     Demerieux's Motion to Suppress**

Finally, defendant Demerieux challenges the admissibility of two statements -- one made

to the Trinidad police on March 31, 2006 and the other made to the FBI on the following day, April 1. In support of his motion, Demerieux makes several arguments, all of which the Court has previously addressed with respect to other defendants. Demerieux first argues that both of his statements are inadmissible because he was not properly advised of his <u>Miranda</u> rights. He asserts that <u>Miranda</u> warnings were required prior to his March 31, 2006 statement because that statement was the product of a joint venture between the FBI and the Trinidad police. Demerieux also argues that his statements should be suppressed because they were involuntary. He contends that beyond the events of March 31 and April 1, circumstances surrounding his arrest in early January 2006 are also relevant to the voluntariness of the statements he gave to law enforcement nearly three months later. Four witnesses gave testimony about the circumstances surrounding Demerieux's statements -- Special Agent Clauss, Sgt. Lucas, Sgt. Eric Park, and Justice of the Peace Alexis Persad. Based on that testimony and the relevant exhibits admitted in evidence, the Court makes the following findings.

### A.    Factual Findings

Demerieux was arrested at his home by the Trinidad police on January 4, 2006. Tr. at 17-18, 157. Lucas and Park participated in Demerieux's arrest. <u>Id.</u> at 157, 216, 450. When they arrived, the police knocked on the door and they were greeted by a man who identified himself as Demerieux's brother and invited them into the house. <u>Id.</u> at 451. At the time of the arrest, Lucas told Demerieux he was a member of the Trinidad police force, informed him that he was a suspect in the Maharaj kidnapping, cautioned him under Rule II of the Judges' Rules and informed him that he had the right to contact a friend, relative or lawyer. <u>Id.</u> at 158-159, 451-452. Both Lucas and Park testified that during the arrest neither Demerieux nor any other member of his household was mistreated or physically harmed in any way. <u>Id.</u> at 159-160 (Lucas), 452-54 (Park). When

asked on cross-examination whether Demerieux's brother had been struck by an officer wielding a flashlight, Lucas denied that such an assault occurred during the arrest. Id. at 220. Park confirmed that he also did not witness anyone being struck by a flashlight. Id. at 452. After the arrest, Lucas personally transported Demerieux from his home to the Arouca police station in a police vehicle, along with two other officers. Id. at 160. Lucas testified that while in transit none of the officers struck Demerieux or threatened him in any way. Id. at 160-61.

Demerieux was later taken from Arouca to the Malabar station. Id. at 19-20, 161; Gov't Ex. 6 (station diary extract, entry no. 21). On the afternoon of January 4, he was interviewed by members of the Trinidad police force, including Lucas and Park. Tr. at 162, 455. FBI agents Clauss and Cruz arrived at the station just as the interview was getting underway and they also participated. Id. at 164-65, 232; Gov't Ex. 4 (FBI summary of interviews with Demerieux on Jan. 4 and 5, 2006); Gov't Ex. 6 (station diary extract, entry no. 59). The following day, on January 5, Demerieux was again interviewed, albeit briefly, by the Trinidad police and the FBI. Tr. at 40-41 (Clauss), 457-58 (Park); Gov't Ex. 4 (FBI summary of Jan. 5 interview);[24] Gov't Ex. 11 (station diary extract, entry nos. 54 and 61).

The testimony of Clauss, Lucas and Park, along with the relevant exhibits admitted in evidence, establishes the following about the interviews of Demerieux conducted on January 4 and 5: (i) that he was notified of his rights in accordance with U.S. law, Tr. at 20-28 (Clauss's testimony regarding notification of rights given on Jan. 4), Tr. at 41-42 (Clauss's testimony regarding notification of rights given on Jan. 5), Gov't Ex. 3 (notification of rights form signed by Demerieux on Jan. 4, 2006), Gov't Ex. 4 (FBI summary of interviews on Jan. 4 and 5); (ii) that he

---

[24] Gov't Ex. 4 indicates that the second interview was conducted on January 6, 2006, but Clauss testified that this was a typographical error and the second interview actually occurred on January 5, 2006. Tr. at 41-42.

was notified of his rights in accordance with Trinidad law, Tr. at 162 (Lucas's testimony regarding warnings given on Jan. 4), Tr. at 455, 457 (Park's testimony regarding warnings given on Jan. 4 and 5), Gov't Ex. 6 (station diary extract, entry no. 58), Gov't Ex. 11 (station diary extract, entry no. 61); (iii) that he agreed to waive his rights, Tr. at 28, 42 (Clauss's testimony regarding Demerieux's waiver of rights), Gov't Ex. 3 (notification of rights form signed by Demerieux on Jan. 4); (iv) that he did not request a lawyer, Tr. at 42 (Clauss's testimony that Demerieux never requested a lawyer), Tr. at 163 (Lucas's testimony that Demerieux never requested a lawyer), Gov't Ex. Ex. 6 (station diary extract, entry no. 58); and (v) that he was not mistreated, threatened or coerced by law enforcement, Tr. at 29 (Clauss's testimony that no threats of violence or other coercive tactics occurred), Tr. at 166 (Lucas 's testimony regarding same), Tr. at 456 (Park's testimony regarding same).

On January 6, the Trinidad police released Demerieux from custody because they believed they had insufficient evidence to hold him at that time. Tr. at 49. Subsequently, however, an arrest warrant was issued and Demerieux was eventually captured and brought into custody by the Trinidad police on March 31, 2006. Id. at 49, 459. That same day, Clauss was in Miami when he got a call from Sgt. Lucas informing him that Demerieux was back in custody. Id. at 49. Clauss and Cruz immediately planned a trip to Trinidad for the following day, April 1. Id. at 50. When they spoke on the phone, Clauss and Lucas did not discuss the substance of the investigation and Clauss did not attempt to direct the investigative efforts of the Trinidad police in any way. Id.

In the early morning hours of March 31, the Trinidad police re-arrested Demerieux. Id. at 459. Lucas and Park were part of the arrest team that initially went to Demerieux's home only to find that he was not there. Id. At the home, the police encountered Demerieux's brother who directed them to another address in Port of Spain where Demerieux was staying. Id. at 459-60.

Park testified that Demerieux's brother was not physically assaulted or mistreated in any way.  Id. at 459.  When the police arrived at the Port of Spain address, they knocked on the door, identified themselves, explained their purpose and were allowed entry.  Id. at 487.  The officers were armed at the time, but none of the officers had their weapons drawn.  Id. at 486-87, 496.  Demerieux was found in a bedroom and arrested.  Id. at 487.  At the time of his arrest, Demerieux was cautioned in accordance with the Judges' Rules and informed of his rights under Trinidad law.  Id. at 460. He did not invoke his rights at that time and he made no request to contact a lawyer.  Id.  He was then transported to the Arouca police station.  Id. at 460, 490. According to Park, when Demerieux arrived at the Arouca station his physical appearance was normal and he did not have any physical injuries.  Id. at 461.

At approximately 12:50 p.m., Demerieux asked to speak with Park and indicated that he wanted to give a statement.  Id.  Park then cautioned him in accordance with the Judges' Rules and advised him that he had the right to contact a lawyer, relative or friend.  Id. at 461-62.  After being cautioned, Demerieux told Park that he still wished to speak with him.  Id. at 462.  Park then contacted Justice of the Peace Alexis Persad who arrived at the station shortly thereafter.  Id. at 415-16, 462-63.  Once there, Persad met with Demerieux in private for approximately ten minutes.  Id. at 416, 463.  Persad testified that he questioned Demerieux about how he had been treated by the police, whether he had voluntarily agreed to give a statement and whether he had been made any promises or been subjected to any threats.  Id. at 417-19.  Demerieux indicated to Persad that he had been treated well and that he wished to make a statement.  Id.  Persad also explained Demerieux's legal rights to him, specifically that he had a right to contact an attorney and he did not have to give an incriminating statement.  Id. at 418.  When this private meeting concluded, Persad recalled Park and Constable Abraham and informed them that Demerieux was

ready to give a formal statement.  Id. at 419, 463-64.

Demerieux began giving his statement at 1:55 p.m. and it took approximately four hours to record.  Id. at 465; Gov't Ex. 25 (Demerieux's March 31, 2006 statement as recorded by Park).  Rather than write it himself, Demerieux requested that Park record his statement by hand.  Tr. at 466.  At the beginning of the statement, Park wrote a certification that expressed Demerieux's understanding of his rights, his waiver of his rights and his desire to give a statement.  Gov't Ex. 25 at 1.  The certification was also read aloud to Demerieux and he indicated that he understood it before he signed his name.  Tr. at 426-27 (Persad), 466 (Park).  The statement was taken in a cubicle at the Arouca station and Park, Abraham and Persad were the only individuals present.  Id. at 424-25, 464.  The testimony of Park and Persad, which went unrebutted, as well as Persad's written certification and his notes from his personal diary, establish that the conditions were comfortable, Demerieux was not handcuffed, he was offered food, water and restroom breaks, his demeanor was relaxed and comfortable, he was not promised anything by the police, and he was not beaten, threatened or intimidated.  Id. at 424, 428-29 (Persad), 461, 464, 470 (Park); Gov't Ex. 25 at 24 (Persad's certification); Gov't Ex. 26 (notes from Persad's diary regarding Demerieux's March 31, 2006 statement).  At the conclusion of the statement, Park gave Demerieux the opportunity to review it and makes any changes that he wished.  Tr. at 429-30, 467-68.  In response, Demerieux asked Park to read the statement to him because he claimed that he "could not read too good."  Id. at 467; Gov't Ex. 25 at 21-22.  Park obliged and after reading the entire statement to him -- during which time Demerieux suggested several corrections, which were made by Park and initialed by Demerieux -- he signed the statement and acknowledged that it was true and had been made of his own free will.  Tr. at 429-31, 469; Gov't Ex. 25 at 21-22.  Park, Abraham and Persad also signed the statement to certify its authenticity.  Gov't Ex. 25 at 21-22.

As part of his certification, Justice of the Peace Persad also summarized his earlier conversation with Demerieux, stating that Demerieux told him that he wanted to make a statement and that the police had not made any threats or promises to him.  Id. at 22-24; Tr. at 432.

Clauss and Cruz arrived in Trinidad on the following day, April 1.  Tr. at 50.  Later that evening, the agents traveled to the Arouca station where Demerieux was still being held.  Id. at 51.  Park granted the FBI access to Demerieux and he agreed to conduct an interview with them. Id. at 51, 471.  Although Clauss was aware that the Trinidad police had taken a statement from Demerieux on the previous day, he testified that he had not seen the statement nor had he discussed its substance with Park or anyone else from the Trinidad police force.  Id. at 51, 71. Clauss testified that when they first saw Demerieux sitting in a cubicle in the Arouca homicide office, he smiled at them because he recognized them.  Id at 51, 56.  Clauss and Cruz then formally re-introduced themselves, presented identification and reminded him that they were the same FBI agents who had spoken to him in January.  Id. at 51-52.  Clauss then presented Demerieux with an international notification of rights form,[25] just as he had done in January, and read the entire form to him verbatim.  Id. at 52-53; Gov't Ex. 29 (FBI summary of interview with Demerieux on April 1, 2006); Gov't Ex. 30 (notification of rights form signed by Demerieux on April 1, 2006).  In addition to reading the form in its entirety, Clauss also testified that he explained Demerieux's rights to him in a more informal way.  Tr. at 53.  After the verbal warnings, Demerieux then initialed and signed the form, waiving his rights and agreeing to speak to the agents.  Id. at 53-54; Gov't Exs. 29, 30.  Clauss was clear that Demerieux never requested, or even mentioned, an attorney.  Tr. at 55, 72-73, 75.

---

[25] The international notification of rights form referred to here is identical to the one shown by Clauss to Zion Clarke on January 4, 2006, which is quoted in its entirety above.

Clauss and Cruz conducted the interview alone -- no one from the Trinidad police force participated.[26]  Id. at 52, 74.  Based upon Clauss's unrebutted testimony, the Court finds that the FBI treated Demerieux fairly and there is no evidence of any coercive tactics.  Id. at 55-57.  According to Clauss, Demerieux's demeanor "throughout the interview was very calm and relaxed."  Id. at 56.  Clauss's interview notes also reflect that Demerieux told him that he had been treated fairly by the Trinidad police since his arrest the previous day.  Gov't Ex. 29 at 1.  Demerieux also conveyed that he had not been threatened in any way, nor was he promised anything by the Trinidad officers.  Id.  Clauss testified that when they first encountered Demerieux he did not appear to be ill or have any physical injuries.  Tr. at 55-56.  The interview lasted approximately three hours and at the conclusion Demerieux was taken back to his holding cell and the FBI agents departed the Arouca station.  Id. at 57-58.

B.      Legal Analysis

1.      Demerieux's statement to the Trinidad police on March 31, 2006

Demerieux first argues that Miranda warnings were required prior to his March 31 statement because it was the product of a joint venture.  Demerieux Mot. at 5-7 (ECF #318).  As discussed above, a joint venture requires that "United States law enforcement agents actively participate in the questioning of the defendant or the foreign officials act as agents or virtual agents of the United States."  Straker, 596 F. Supp. 2d at 106.  Although it is true that the FBI and the Trinidad police conducted joint interviews with Demerieux in January 2006, the statements made during those interviews were preceded by Miranda warnings and, in any event, the

---

[26] Clauss testified that there were some Trinidad officers in the homicide office during the interview, but he estimated that the closest "officers were maybe 10 to 20 feet away."  Tr. at 100.  In any event, Clauss was clear that no one else participated in the interview and he also testified that he did not observe anyone from the Trinidad police force attempt to intimidate Demerieux during the interview.  Id. at 100-101.

government is not seeking to introduce those statements at trial. With respect to Demerieux's March 31 statement, however, Clauss and Cruz did not even arrive in Trinidad until the following day; hence there was no active participation. Moreover, the evidence demonstrates that the two law enforcement entities were conducting independent investigations, they were not sharing information, and the FBI was in no way directing the activities of the Trinidad police. Put simply, there is no evidence that the Trinidad police were acting as agents, or virtual agents, of the FBI at the time Demerieux made his statement on March 31.[27]

Demerieux next attacks the voluntariness of his March 31 statement, alleging that his "will was overborne by the coercive and intimidating tactics of police in arresting him on January 3 or 4, 2006, and again on March 31, 2006 -- beating family members, pointing a gun at him, striking and kicking him, denying his requests for counsel." Demerieux Mot. at 7. As explained above, the record simply contains no support for the parade of horribles proffered by Demerieux. The testimony and documentary evidence paint a starkly different picture of Demerieux's treatment, and the treatment of his family members, at the hands of the Trinidad police -- i.e., there is no proof that the Trinidad police acted in anything but a professional manner and there is certainly no evidence that they acted in a violent or coercive manner. There is also no evidence that the March 31 statement itself was "extracted by . . . threats of violence" or "obtained by . . . direct or implied promises" or "the exertion of . . . improper influence." Hutto, 429 U.S. at 30. In fact, precisely the opposite is the case and the evidence thus supports the conclusion that Demerieux was well aware of his rights, voluntarily agreed to waive those rights, and gave a statement to the Trinidad police of his own free will. Accordingly, the Court will deny Demerieux's motion to

---

[27] Even if there had been a joint venture here, the statement would still be admissible because the Trinidad police provided warnings to Demerieux that were functionally equivalent to those required by Miranda. See note 16, supra.

suppress his March 31, 2006 statement to the Trinidad police.

## 2.  Demerieux's statement to the FBI on April 1, 2006

Demerieux also contends that his April 1 statement to the FBI should be suppressed. He first argues that the <u>Miranda</u> warnings given to him by Clauss, through the international notification of rights form, were not effective because he cannot read and therefore could not understand his rights. Demerieux Mot. at 7. This argument fails because Clauss testified that he read the warnings aloud and explained Demerieux's rights to him in a more informal way. Clauss also testified that Demerieux appeared to understand his rights as they were being read to him and he watched as Demerieux initialed and signed the form, acknowledging his rights. Irrespective of Demerieux's allegations about his reading ability, Clauss's verbatim recitation of the rights form together with the informal verbal warnings satisfy <u>Miranda</u>. The same evidence also establishes that Demerieux's <u>Miranda</u> waiver was knowing, intelligent, and voluntary.[28]

Having concluded that <u>Miranda</u> was satisfied, the Court must still examine whether Demerieux's statement itself was voluntary. Although he does not allege that the FBI used coercive tactics, Demerieux claims that his statement to the FBI was nonetheless involuntary because the taint of the coercive tactics employed by the Trinidad police had not dissipated. Demerieux Mot at 7-8. As discussed above, there is no evidence that the Trinidad police used coercive tactics in arresting Demerieux (in either January or March 2006) or in taking his statements on January 4, January 5 or March 31; hence, this argument also misses its mark. With no evidence to support the contention that his April 1, 2006 statement to the FBI was involuntary,

---

[28] Demerieux claims that he attempted to exercise his right to counsel, but was prevented from doing so by the FBI. Demerieux Mot. at 7. The record directly repudiates this allegation, as Clauss's testimony establishes that Demerieux never made such a request before or during the interview. No rebuttal evidence was offered.

the Court will deny Demerieux's motion to suppress that statement.

## **CONCLUSION**

For the foregoing reasons, the Court will deny the motions of Anderson Straker and Kevin Nixon to suppress their out-of-court photographic identifications.  The Court will also deny the motions of Zion Clarke, Ricardo De Four and Kevon Demerieux to suppress statements they made to the FBI and the Trinidad police.  A separate Order accompanies this Memorandum Opinion.

_____/s/_____
JOHN D. BATES
United States District Judge

Dated:   April 28, 2009