**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**UNITED STATES OF AMERICA,**

**v.**

**ZION CLARKE,**
**RICARDO DEFOUR,**
**KEVON DEMERIEUX,**
**ANDERSON STRAKER,**
**WAYNE PIERRE,**
**CHRISTOPHER SEALEY, and**
**KEVIN NIXON,**


        **Defendants.**

Criminal No.  06-102 (JDB)

---

<u>**MEMORANDUM OPINION**</u>

      Defendants Zion Clarke, Ricardo DeFour, Kevon Demerieux, Anderson Straker, Wayne

Pierre, Christopher Sealey, and Kevin Nixon were extradited from the Republic of Trinidad and

Tobago ("Trinidad") to the United States in July 2007 and August 2008 to face charges of

conspiracy to commit hostage taking resulting in death in violation of 18 U.S.C. § 1203

("Hostage Taking Act"), and aiding and abetting hostage taking resulting in death.  The charges

arise from the abduction and death of a U.S. citizen, Balram Maharaj, in Trinidad in April 2005.

In the most basic terms, defendants face trial in the United States, rather than Trinidad, because

the statute makes it a federal criminal offense for aliens abroad to take U.S. citizens hostage.

      Presently before the Court are two motions to dismiss and a related motion to stay the

trial of this matter.  The first motion, filed by Straker, contends that the hostage taking statute is

unconstitutional because it impermissibly discriminates on the basis of alienage in violation of

his constitutional rights to equal protection and due process.  The second motion, filed by

Demerieux, contends that the Court lacks jurisdiction over this case because Maharaj was not

qualified for U.S. citizenship when he was naturalized, rendering his citizenship *void ab initio*.

In a related motion, Clarke has moved to stay the trial of this matter -- presently scheduled to

commence on May 26, 2009 -- pending resolution of defendants' civil administrative and judicial

petitions seeking revocation of Maharaj's citizenship.  See 8 U.S.C. § 1451(a).  All defendants

have joined in the pending motions to dismiss and to stay.  For the reasons stated below, the

Court will deny defendants' motions.[1]  The Court will also grant the government's separate

motion in limine to preclude defendants from introducing evidence on the subject of whether

Maharaj should have been granted U.S. citizenship.

## I.      Straker's Motion to Dismiss

Straker contends that 18 U.S.C. § 1203 facially discriminates on the basis of alienage,

pointing out that aliens are singled out for prosecution.  Classification based on alienage is

evident from the text of the statute, and the courts of appeals have recognized that the statute

treats aliens differently than U.S. citizens.  See 18 U.S.C. § 1203(b)(1) and (2);[2] United States v.

---

[1]  For ease of reference, the Court will refer to defendants' briefs by the following abbreviated titles: Straker's Mot. to Dismiss (ECF #190); Demerieux's Mot. to Dismiss (ECF #390); Straker's Reply in support of Demerieux's Mot. (ECF #451); Defs.' Joint Reply and Joint Mot. for Stay (ECF #452); and Demerieux's Reply (ECF #453).  The government's responses to defendants' motions will simply be cited as "Gov't Opp'n" (ECF #250 and ECF #439).

[2]  Section 1203 provides:

(a) Except as provided in subsection (b) of this section, whoever, whether inside or outside the United States, seizes or detains and threatens to kill, to injure, or to continue to detain another person in order to compel a third person or a governmental organization to do or abstain from doing any act as an explicit or implicit condition for the release of the person detained, or attempts or conspires to do so, shall be punished by imprisonment for any term of years or for life and, if the death of any person results, shall be punished by death or life imprisonment.

(b)(1) It is not an offense under this section if the conduct required for the offense

(continued...)

2

Lue, 134 F.3d 79, 85-86 (2d Cir. 1998); United States v. Santos-Riviera, 183 F.3d 367, 372 (5th Cir. 1999); see also Gov't Opp'n at 3 ("jurisdiction is based upon the facts that the person seized was a national of the United States and the defendant is an alien").

The only issue is whether classification based on alienage in this context survives constitutional scrutiny. Five courts of appeals have considered this issue and held that the classification in § 1203 does not violate a defendant's Fifth Amendment right to due process or equal protection. See United States v. Ferreira, 275 F.3d 1020, 1025-27 (11th Cir. 2001); United States v. Montenegro, 231 F.3d 389, 394-95 (7th Cir. 2000); Santos-Riviera, 183 F.3d at 372-74; Lue, 134 F.3d at 85-87; United States v. Lopez-Flores, 63 F.3d 1468, 1471-74 (9th Cir. 1995). The deferential rational basis standard of review applies to a federal classification based on alienage, and hence the statute will be upheld if it is rationally related to a legitimate governmental interest. See, e.g., Montenegro, 231 F.3d at 395 (citing Mathews v. Diaz, 426 U.S. 67, 79-87 (1976)).[3] The courts of appeals have uniformly held that § 1203 is rationally related to

---

[2](...continued)
occurred outside the United States unless --

    (A) the offender or the person seized or detained is a national of the United States;
    (B) the offender is found in the United States; or
    (C) the governmental organization sought to be compelled is the Government of the United States.

    (2) It is not an offense under this section if the conduct required for the offense occurred inside the United States, each alleged offender and each person seized or detained are nationals of the United States, and each alleged offender is found in the United States, unless the governmental organization sought to be compelled is the Government of the United States.

18 U.S.C. § 1203.

[3] In contrast, alienage has been recognized as a suspect classification subject to strict
(continued...)

the legitimate government interest in addressing foreign policy concerns, in particular, Congress's authority to implement the terms of treaties -- here, the International Convention Against the Taking of Hostages -- and to address the international ramifications of hostage taking.  Id. at 395; Ferreira, 275 F.3d at 1027 ("Congress passed the Hostage Taking Act [18 U.S.C. § 1203] to implement the International Convention Against the Taking of Hostages" and "because it believed that kidnapping involving foreign nationals has serious international ramifications"); Santos-Riviera, 183 F.3d at 373 ("The legislative history of the Hostage Taking Act demonstrates that the Act was passed to address legitimate foreign policy concerns" and, in particular, "to meet its obligations as a signatory state to the Hostage Taking Convention").

Straker attempts to achieve a different result here, based on his contention that § 1203 was designed to combat acts of terrorism, in contrast to "purely local kidnappings that could be prosecuted in the nation where the crime occurred."  Mot. to Dismiss at 9.  Nothing on the face of § 1203 indicates such a limitation, and the courts of appeals have recognized that § 1203 is not limited to terrorist acts.  See, e.g., Santos- Riviera, 183 F.3d at 373 ("'[The Hostage Taking Convention] provided states with the discretion to assert jurisdiction when their nationals were taken hostage.  Congress' voluntary decision to adopt this permissive basis of jurisdiction underscores its intent to exercise broad jurisdiction over any offender who threatens American nationals.'") (quoting United States v. Carrion-Caliz, 944 F.2d 220, 224 (5th Cir. 1991));

---

³(...continued)
scrutiny where a state or local government has sought to employ the classification to disadvantage foreign nationals.  See Lue, 134 F.3d at 86.  As explained by the Second Circuit, "[t]he situation is different when it is the federal government that is drawing the distinction between citizens of the United States and those of foreign countries" because of the federal government's recognized "national interests when dealing with aliens," which differ markedly from the interests of individual states.  Id. (citing Diaz, 426 U.S. at 79-81).

Montenegro, 231 F.3d at 395 ("The classification drawn by the Hostage Taking Act covers all aliens involved in hostage-taking incidents."); see also United States v. Yunis, 924 F.2d 1086, 1091 (D.C. Cir. 1991) (explaining that "the statute [§ 1203] . . . reflects an unmistakable congressional intent, consistent with treaty obligations of the United States, to authorize the prosecution of those who take Americans hostage abroad no matter where the offense occurs or where the offender is found" in response to defendant's objections based on international law). Like the five courts of appeals that have addressed the same constitutional challenge, this Court concludes that the alienage classification in § 1203 is rationally related to Congress's legitimate foreign policy interests. Therefore, Straker's motion to dismiss will be denied.

## II.    Demerieux's Motion to Dismiss

Demerieux moves to dismiss the indictment on the ground that the Court lacks subject matter jurisdiction. He contends that the Court's jurisdiction over this case is premised on the victim's status as a "national of the United States" under 18 U.S.C. § 1203, and that Maharaj fails to qualify as a "national of the United States" because he was ineligible for citizenship at the time of his application for naturalization and obtained citizenship through fraud and misrepresentation.[4]  See Demerieux's Mot. to Dismiss at 2-17.  In other words, Demerieux believes the government got it wrong when it granted Maharaj's application for naturalization, and he has the evidence to prove it.  To that end, he and his co-defendants have recently petitioned Jeffrey Taylor, the United States Attorney for the District of Columbia ("U.S. Attorney" or "Taylor"), to institute a civil judicial proceeding to revoke Maharaj's citizenship;

---

[4]  Demerieux contends that the evidence would show that Maharaj deserted the U.S. military, entered the United States illegally, obtained a "green card" through misrepresentation and concealment of material facts, failed to disclose criminal conduct, and was otherwise not of good moral character.  See Demerieux's Mot. to Dismiss at 2-17 & Exhibits A-L.

5

they have also filed a petition for writ of mandamus seeking an order compelling the U.S.

Attorney to act on the request before the trial date and to initiate citizenship revocation

proceedings under 8 U.S.C. § 1451(a). See Clarke v. Holder, Civil Action No. 09-0753 (D.D.C.

filed Apr. 23, 2009) (hereinafter, "Clarke Mandamus Petition").

In response, the government contends that the Court possesses jurisdiction over this

criminal case because Maharaj's formal citizenship status at the time of the hostage taking was

undisputedly that of a U.S. citizen and, furthermore, at no time has that citizenship ever been

revoked. See Gov't Opp'n at 5-6, 11-18.[5] The government also contends that, in light of the

exclusive process for revocation of naturalization set up by 8 U.S.C. § 1451 and 8 C.F.R. §§

340.1 and 340.2, this Court is without authority to make a determination as to the legitimacy of

Maharaj's citizenship. Id. at 13-19. Having fully considered the parties' briefs, exhibits, and the

arguments presented at the motions hearing held on May 1, 2009, the Court has determined that

there is no dispute that Maharaj possessed an authentic certificate of naturalization and U.S.

passport at the time of the hostage taking, that his U.S. citizenship has never been revoked, and

that this Court lacks the authority to declare his citizenship void. Therefore, the Court will deny

Demerieux's motion to dismiss, including his request for an evidentiary hearing on whether

---

[5] The government recognizes that, because the offense occurred outside of the United
States, it must rely on subsection (A), (B), or (C) of § 1203(b)(1) to support the Court's assertion
of jurisdiction over defendants. See United States v. Yunis, 924 F. 2d 1086, 1090 (D.C. Cir.
1991) (holding that § 1203(b)(1) offers the "bases of jurisdiction where 'the offense occurred
outside the United States'"). Here, the government relies on subsection (A), authorizing
jurisdiction where the victim is a national of the United States.
    The government notes that the indictment also charges defendants with conspiracy to
kidnap Dinesh Maharaj, the child of Balram Maharaj, who also is a U.S. citizen. See Gov't
Opp'n at 3 n.2. However, the government seeks a conviction against defendants based on the
kidnapping of Balram Maharaj and, thus, as the government acknowledges, the fact that the child
was also an object of the conspiracy is not material to the resolution of Demerieux's motion. Id.

Maharaj was qualified for U.S. citizenship.

To frame the array of issues, the Court begins with the statute governing revocation of naturalization. The Immigration and Nationality Act of 1952 provides that the United States attorneys are charged with instituting judicial proceedings to revoke the citizenship of a naturalized U.S. citizen as follows:

> It shall be the duty of the United States attorneys for the respective districts, upon affidavit showing good cause therefor, to institute proceedings in any district court of the United States in the judicial district in which the naturalized citizen may reside at the time of bringing suit, for the purpose of revoking and setting aside the order admitting such person to citizenship and canceling the certificate of naturalization on the ground that such order and certificate of naturalization were illegally procured or were procured by concealment of a material fact or by willful misrepresentation, and such revocation and setting aside of the order admitting such person to citizenship and such canceling of certificate of naturalization shall be effective as of the original date of the order and certificate . . . . If the naturalized citizen does not reside in any judicial district in the United States at the time of bringing such suit, the proceedings may be instituted in the United States District Court for the District of Columbia or in the United States district court in the judicial district in which such person last had his residence.

8 U.S.C. § 1451(a). Revocation of naturalization may also occur through administrative proceedings instituted by the U.S. Citizenship and Immigration Service. See 8 C.F.R. §§ 340.1 and 340.2. Demerieux has submitted the affidavits of Reita Pendry and George Steel to both the U.S. Attorney for the District of Columbia and the U.S. Citizenship and Immigration Service, including a proffer of evidence of "illegal procure[ment]," "concealment of . . . material fact[s]," and "willful misrepresentation," and based on that profffer, contends that Maharaj's citizenship was *void ab initio* -- that is, void as of "the original date of the order and certificate" as provided under § 1451(a). See Clarke Mandamus Pet. Attach. at 2-9.

Before turning to Demerieux's arguments in support of his motion, the Court first addresses Clarke's contention that the Court should not consider the government's opposition to

the motion to dismiss because the U.S. Attorney has a conflict of interest.  See Defs.' Joint Reply at 2.  Clarke points out that the U.S. Attorney now has before it two matters pertaining to Maharaj's citizenship -- this criminal prosecution and defendants' petition dated March 23, 2009, requesting the institution of proceedings to revoke Maharaj's citizenship under § 1451(a).  Id.  In Clarke's view, because the U.S. Attorney will "be able to go forward with an improper prosecution" if it fails to pursue revocation proceedings under § 1451(a), the government has a conflict of interest and should not be permitted to oppose Demerieux's motion to dismiss the criminal case.  Id.  The government responds that there is no conflict of interest in this criminal action or in the related civil case, citing Community for Creative Non-Violence v. Pierce, 786 F.2d 1199, 1202 (D.C. Cir. 1986) ("CCNV").  See Clarke v. Holder, Civil Action No. 09-0753, Gov't Mot. to Dismiss at 1 n.1 (D.D.C. filed Apr. 28, 2009).

In CCNV, the court of appeals rejected a plaintiff's attempt to disqualify the U.S. Attorney from acting as counsel in a civil case where the plaintiff had also requested that the U.S. Attorney initiate an investigation into whether one of the U.S. Attorney's witnesses had committed perjury in the course of defending the civil suit.  786 F.2d at 1200-01.  CCNV is of limited value, however, because it rejected the claim based on the plaintiff's lack of standing to raise the issue, rather than a determination on the merits of the alleged conflict.  But the case nonetheless provides guidance strongly indicating that the U.S. Attorney has no conflict of interest in acting as counsel in the criminal and civil matters before this Court.  The D.C. Circuit suggested that, to find a conflict, the aggrieved party must show a "reason to think that the United States Attorney's determination [concerning the prosecution] . . . is flawed or tainted."  786 F.2d at 1202.  Here, defendants have not made such a showing.  They only speculate that Taylor's inaction on their administrative petition requesting initiation of denaturalization proceedings is

spurred by the allegedly improper motive of keeping the prosecution of this case moving forward. But the inaction at issue is entirely consistent with -- indeed, foretold by -- the government's longstanding policy of not pursuing denaturalization proceedings when the subject is deceased. See Decl. of Eli M. Rosenbaum (Gov't Opp'n, Attach. No. 3). Whether such inaction is permissible under § 1451(a) remains to be determined (see infra at 14-17), but it cannot be seriously disputed that the current inaction stems from that policy, in contrast to any alleged conflict of interest. Moreover, if defendants are concerned about Taylor's conflict of interest, they may submit the same administrative petition to the U.S. Attorney for the Southern District of New York, who is not involved in this prosecution. See 8 U.S.C. § 1451(a) ("If the naturalized citizen does not reside in any judicial district in the United States . . . , the proceedings may be instituted in . . . the United States district court in the judicial district in which such person last had his residence."); see also Letter from Reita Pendry to CIS, dated Mar. 23, 2009 (Maharaj "last resided in Westchester County, New York") (Clarke Mandamus Pet. Attach. A at 6).[6]

With that threshold issue resolved, the Court turns to the main point of contention between the parties -- whether, as Demerieux contends, the Court has the authority to make a determination about the legitimacy of Maharaj's U.S. citizenship through an evidentiary hearing resolving jurisdictional facts, or whether, as the government contends, absent revocation of

---

[6] Indeed, assuming arguendo that a conflict of interest exists, the logical result would be for the U.S. Attorney to recuse himself from resolving defendants' § 1451 administrative petition and to transfer action on that petition to the U.S. Attorney for the Southern District of New York. Indeed, the Court is hard-pressed to understand why defendants sought action from Taylor, instead of the appropriate U.S. Attorney in New York, if they were genuinely concerned about Taylor's alleged conflict of interest. It also bears noting that defendants have submitted a parallel administrative petition seeking Maharaj's denaturalization to the Citizenship and Immigration Service in New York. See Clarke Mandamus Pet. Attach. A at 6-7.

citizenship pursuant to 8 U.S.C. § 1451, the matter of citizenship is conclusively established by Maharaj's certificate of naturalization and U.S. passport. To begin with, the record plainly establishes that, at the time he was taken hostage, Maharaj possessed an authentic certificate of naturalization and authentic U.S. passport,[7] each of which are deemed by statute to be proof of United States citizenship. See 8 U.S.C. § 1449 (certificate of naturalization); 22 U.S.C. § 2705 (providing that a passport, during its period of validity, "shall have the same force and effect as proof of United States citizenship as certificates of naturalization . . ."). Indeed, defendants do not dispute that the Attorney General granted Maharaj's application for naturalization in or around 1995. See Clarke Mandamus Pet. at 4 ("[Maharaj] obtained a green card in 1986 and became a citizen in 1994").[8] Instead, they contend that the Attorney General's order of naturalization should be considered void because Maharaj did not meet the statutory requirements for citizenship and procured the citizenship through fraud. Id.; Demerieux's Mot. to Dismiss at 3-17.

Defendants cast their current motion as seeking resolution of a "jurisdictional fact" -- whether Maharaj was a U.S. citizen for the purpose of this prosecution under 18 U.S.C. § 1203 -- rather than a revocation of citizenship, which must proceed under 8 U.S.C. § 1451. But their request for an opportunity to prove that Maharaj's citizenship is void is, in principle, no different

_____

[7] Maharaj's passport and certificate of naturalization bear the name "Aladdin Barlow John." See Gov't Opp'n, Attach. No. 1 and No. 2. Defendants have acknowledged that Balram Maharaj was formerly known as Aladdin Barlow John, prior to a name change in 2000. See Demerieux's Mot. to Dismiss at 3 n.3; see also Clarke Mandamus Pet. at 2 (asking the Court to issue a writ of mandamus requiring the U.S. Attorney to institute proceedings . . . for the purpose of revoking and setting aside the order admitting Balram Maharaj's (formerly known as Alladin Barlow John) citizenship . . .").

[8] The mandamus petition refers to the date of naturalization as 1994. However, the certificate of naturalization bears the date January 18, 1995. See Gov't Opp'n, Attach. No. 2. This difference in the official date of naturalization is of no consequence to the pending motions.

than a motion to revoke Maharaj's citizenship. This is apparent from their reliance on § 1451(a) to support their request for a "jursidictional" finding that his citizenship is *void ab initio*. See Demerieux's Mot. to Dismiss at 2 (requesting evidentiary hearing to show that Maharaj "illegally procured naturalization and a certificate of citizenship" citing 8 U.S.C. § 1451(a)); id. at 12 ("Maharaj's citizenship is void under 8 U.S.C. § 1451(a)"); id. at 16 ("he procured his naturalization illegally, as defined by 8 U.S.C. § 1451(a)"). But the case law and regulations do not permit such an end-run around the process set forth in § 1451 for declaring the citizenship of a naturalized citizen void.

As the Ninth Circuit has recognized, § 1451 "safeguard[s] citizenship from abrogation except by a 'clearly defined' procedure -- 'clearly defined,' that is, by statute." Gorbach v. Reno, 219 F.3d 1087, 1097 (9th Cir. 2000) (en banc). The process for setting aside citizenship under § 1451 is "'a self-contained, exclusive procedure' that 'covers the whole ground.'" Id. (quoting United States v. Zucca, 351 U.S. 91, 95 (1956)) (emphasis added). Based on the exclusivity of § 1451(a), the Ninth Circuit proceeded to hold that the Attorney General does not have the authority to promulgate regulations authorizing revocation of naturalization through the administrative process at 8 C.F.R. part 340. Id. at 1097-99. The Ninth Circuit's rationale is particularly pertinent here, as defendants have, in effect, asked the Court to engage in a process that circumvents the § 1451 process for determining the validity of citizenship. "Congress has provided one way to revoke the citizenship of a naturalized American citizen: that is for a United States Attorney to file a petition in a United States District Court. There is no statutory warrant for a second way . . . ." Id. at 1099 (emphasis added).

Defendants' contention that citizenship can be deemed void without going through the § 1451 process is also contradicted by the Citizenship and Immigration Service regulation stating

the self-evident principle that a naturalized citizen "shall be considered to be a citizen of the United States until a decision to reopen proceedings and deny naturalization becomes final."  8 C.F.R. § 340.1(g)(4).[9]  Defendants' bald assertion that Maharaj's citizenship is void, "by operation of law," without a final order issued pursuant to § 1451 (see Demerieux's Reply at 3), entirely fails to reckon with a key aspect of the § 1451 regime established by Congress for declaring citizenship void -- that citizenship remains valid until a final order revoking and canceling the certificate of naturalization is issued under § 1451.

Defendants baldly assert that obtaining an order from this Court declaring Maharaj's citizenship *void ab initio* would not affect the rights of any other persons, presumably because Maharaj is deceased and there would be no formal order of revocation of citizenship.  But the Supreme Court has stated the contrary -- "[e]ven if [one's] citizenship is not cancelled, his reputation is tarnished and his standing in the community damaged" -- and hence, has required strict compliance with § 1451 in actions brought by the U.S. attorneys.  See Zucca, 351 U.S. at 99-100.

To summarize, the Court holds that § 1451 sets forth the exclusive process for declaring the citizenship of a naturalized person void and one's citizenship remains valid until an order setting aside citizenship has been issued in compliance with § 1451.  Because no order revoking Balram Maharaj's citizenship has been issued, his certificate of naturalization and U.S. passport conclusively establish that he was, until his death, a citizen of the United States.  This Court has

---

[9]  Gorbach found no flaw in this specific provision, although invalidating the authority of the Attorney General to create an administrative denaturalization process generally.  Indeed, the rationale of Gorbach strongly indicates that citizenship must be accepted as valid absent a final order setting aside a denaturalization order pursuant to § 1451(a), as the decision repeatedly emphasizes the fatal flaw in any approach that would authorize "the terrible power to take citizenship away" without explicit authorization by Congress.  Gorbach, 219 F.3d at 1099.

no authority to conclude otherwise in this criminal case.[10]  Hence, the jurisdictional requirement under § 1203 that the victim is a U.S. citizen is satisfied.  The criminal prosecution of defendants under 18 U.S.C. § 1203 for hostage taking of a citizen of the United States may therefore proceed, and Demerieux's motion to dismiss will be denied.

### III.  Clarke's Motion to Stay the Trial

In a motion closely related to Demerieux's motion to dismiss, Clarke, on behalf of all defendants, moves to stay the trial of this case based on the pending petition for writ of mandamus filed in <u>Clarke v. Holder</u>, Civil Action No. 09-0753 (D.D.C.).  He contends that a stay of the trial is warranted because, if the petition for writ of mandamus is granted, the U.S. Attorney will be required to institute proceedings to revoke Maharaj's citizenship pursuant to 8 U.S.C. § 1451(a), those proceedings will result in a final judgment revoking Maharaj's citizenship *ab initio*, and that lack of citizenship would vitiate this Court's exercise of jurisdiction over this criminal action.  <u>See</u> Defs.' Joint Reply and Joint Motion for Stay at 1-3.  The government counters that the U.S. Attorney has no duty to act on defendants' request to institute revocation proceedings because the decision to pursue revocation of citizenship under § 1451(a) is committed to its enforcement discretion.  <u>See</u> Gov't Opp'n at 11-13.  Moreover, the government submits that, acting pursuant to that enforcement discretion, there is a longstanding policy not to bring post-mortem denaturalization actions.  <u>Id.</u> at 17-19.  The government thus represents that the U.S. Attorney will not bring a denaturalization action against Maharaj, and thus there is no reason to stay the criminal prosecution to wait for that to happen.  <u>Id.</u> at 19.

The motion to stay is closely intertwined with defendant's mandamus action, and hence it

---

[10]  The status of Maharaj as a U.S. citizen ("a national of the United States") is a legal status and can only be altered by a court through a proper § 1451 process.

is necessary to evaluate the likelihood of success on that action in deciding whether to stay the criminal prosecution. Under the Mandamus Act, 28 U.S.C. § 1391, a court has jurisdiction to grant mandamus relief only if "(1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to plaintiff." Fornaro v. James, 416 F.3d 63, 69 (D.C. Cir. 2005) (quoting Power v. Barnhart, 292 F.3d 781, 784 (D.C. Cir. 2002)); accord In re Medicare Reimbursement Litig., 414 F.3d 7, 10 (D.C. Cir. 2005). "[I]f there is no clear and compelling duty under the statute as interpreted, the district court must dismiss the action." In re Cheney, 406 F.3d 723, 729 (D.C. Cir. 2005) (en banc). Even if the petitioner satisfies all three elements, whether the extraordinary remedy of mandamus should issue is discretionary. Id.

The linchpin of Clarke's argument is that the U.S. Attorney has a "clear duty" to pursue revocation of Maharaj's citizenship because the statute provides that "[i]t shall be the duty of the United States attorneys" to institute such proceedings "upon affidavit showing good cause"[11] -- here, the affidavits of Reita Pendry and George Steel. See Clarke Mandamus Pet. at 4 & Attach. A; Demerieux's Mot. to Dismiss at 12; Straker's Reply in support of Demerieux's Mot. to Dismiss at 1-2. But in Heckler v. Chaney, 470 U.S. 821, 835 (1985), the Supreme Court has instructed that when "shall" is used in an enforcement provision, it should be construed to confer discretion on an agency unless the statute or regulations provide substantive standards that

---

[11] Clarke also contends that this duty must be executed before the commencement of trial and that failure to do so would constitute unreasonable delay warranting mandamus relief under Telecommunications Res. and Action Ctr. v. FCC, 750 F.2d 70 (D.C. Cir. 1984). See Clarke Mandamus Pet. at 6-9. That claim of unreasonable delay is spurious. Defendants submitted their request to the U.S. Attorney by letter dated March 23, 2009, and only six weeks have passed since then. Furthermore, the statute sets forth no deadline for action by the U.S. Attorney or any other indication as to the timeframe for taking action on an affidavit.

constrain the exercise of discretion.[12] Id. (holding that statute providing that violators "shall be imprisoned . . . or fined" did not mandate prosecution); see Dubois v. Thomas, 820 F.2d 943, 948-49 (8th Cir. 1987) (deferring to agency interpretation that "shall" should be construed to confer discretion); City of Yakima v. Surface Transp. Bd., 46 F. Supp. 2d 1092, 1099-1100 (E.D. Wash. 1999) (same). More recently, the Supreme Court addressed whether "shall" imposed a mandatory duty to take enforcement action in Town of Castle Rock v. Gonzales, 545 U.S. 748 (2005). The Court declined to interpret "shall" as imposing a mandatory duty in the context of determining when citizens have an entitlement to enforcement of laws under the due process clause. See 545 U.S. at 760-61. The Court reaffirmed "the deep-rooted nature of law-enforcement discretion even in the presence of seemingly mandatory legislative commands," and recognized that those charged with enforcing the law "must use some discretion in deciding when and where to enforce." Id.[13] Considering the Supreme Court's admonition that the government "carries a heavy burden of proof in a proceeding to divest a naturalized citizen of citizenship" -- that is, "clear, unequivocal, and convincing evidence" (Fedorenko v. United States, 449 U.S. 490, 505 (1981)) -- a U.S. attorney must necessarily possess discretion under § 1451(a) to determine,

---

[12] Heckler v. Chaney indicates that the Clarke mandamus action also should be dismissed because it concerns the agency's failure to take enforcement action -- a category of actions that are presumptively unreviewable under § 701(a)(2) of the APA, which precludes judicial review when "agency action is committed to agency discretion by law." 470 U.S. at 831. Although the presumption may be overcome where the substantive statute or regulation provides guidelines for the agency to follow in exercising its enforcement authority (id. at 832-33), the Court is doubtful that the petitioners can overcome the presumption in the Clarke mandamus action.

[13] Straker relies on United States v. Al-Banna, 2006 WL 3203745, at *2 (6th Cir. Nov. 7, 2006) (unpublished decision), as demonstrating that § 1451(a) creates a mandatory duty to act. See Straker's Reply at 1-2. However, Al-Banna addressed only the interpretation of subsection (e), holding that, where a defendant is convicted of unlawfully procuring naturalization under 18 U.S.C. § 1425, the sentencing court is required by § 1451(e) to declare the criminal defendant's citizenship void. Id. That holding provides no guidance on whether a U.S. Attorney, acting under § 1451(a), is constrained in exercising traditional enforcement discretion.

15

at a minimum, in which cases he or she is likely to meet that burden. In short, § 1451(a) does not create a mandatory duty to institute proceedings to revoke naturalization and, therefore, Clarke has no likelihood of success on his petition for writ of mandamus.

The record also overwhelmingly establishes that the Department of Justice is unlikely to exercise its enforcement discretion to pursue a denaturalization proceeding with respect to Balram Maharaj, in light of its longstanding policy not to bring post-mortem denaturalization actions. As reported in a well-regarded treatise:

> It is the policy of the Department of Justice not to bring suit or to continue a pending suit for the purpose of revoking the naturalization of a person who is deceased (assuming such a suit could be brought or continued), even though there is reason to believe the naturalization was improperly procured.

Gov't Opp'n at 17 (quoting 3 Charles Gordon & Harry N. Rosenfield, Immigration Law and Procedure, § 20.5c (Matthew Bender 1984)); see also Simons v. United States, 333 F. Supp. 855, 865 (S.D.N.Y.) (citing 3 Hackworth, Digest of Int'l Law 101-02 (1942)), aff'd, 452 F.2d 110 (2d Cir. 1971).

The declaration of Eli M. Rosenbaum, the Director of the Office of Special Investigations ("OSI") at the U.S. Department of Justice, confirms that this policy remains firmly in place.[14] He states:

> Based on my years of experience at OSI, and after consulting with several other longtime staff members, I can state with confidence that OSI has never instituted denaturalization proceedings against a deceased individual and has never continued to pursue denaturalization proceedings if a defendant died prior to their conclusion.
>
> Upon learning of the death of a suspect in a denaturalization investigation, OSI routinely closes the investigation.

---

[14] The Office of Special Investigations is responsible for, inter alia, bringing suits to denaturalize those who participated in acts of persecution before and during World War II on behalf of Nazi Germany and its allies. See Rosenbaum Decl. ¶ 2.

Upon learning of the death of a defendant against whom a denaturalization proceeding has been commenced, OSI routinely dismisses its denaturalization complaint or does not oppose the motion of defense counsel that the case be dismissed with prejudice.

Rosenbaum Decl. ¶¶ 5-7 (citations omitted).  Defendants' rejoinder that a court has the authority to entertain a post-mortem denaturalization action under § 1451(a) (see Straker Reply at 2-3) does not advance his cause, since the government consistently exercises its enforcement discretion not to pursue such actions.

Even if defendants could establish a "clear duty to act" entitling them to mandamus relief, the Court would not stay the trial.  See In re Cheney, 406 F.3d at 729 ("[E]ven if [petitioner] overcomes all these hurdles, whether mandamus relief should issue is discretionary.").  In the unlikely event that defendants prevail on their mandamus petition, they are not without an adequate remedy -- they may raise the lack of citizenship in post-trial motions before this Court or, if convicted, on their direct appeal.[15]  And in the event a revocation order is issued after their appeal has concluded, they may move to set aside their convictions under 28 U.S.C. § 2255.[16]  In any of these settings, they could assert the same jurisdictional argument they raise now.  For the

---

[15]  The Court is also concerned that a lengthy delay would vitiate defendants' rights to a speedy trial under the Speedy Trial Act and the Sixth Amendment.  It could be a year or longer before denaturalization proceedings concluded.  That is, resolution of the mandamus petition would initially only lead to more time-consuming litigation -- first, the denaturalization proceedings before a district court, which would likely require an evidentiary hearing, and subsequently, a possible appeal of an adverse decision by Clarke or the government. Anderson Straker has made known to this Court on previous occasions his strong desire to proceed to trial at the earliest possible date, and it is not clear that he or any other defendant intends to waive their speedy trial rights.

[16]  At the motions hearing, the government submitted that, even if Maharaj's citizenship were to be revoked post-mortem, and deemed void ab initio, the Court would still have jurisdiction over this criminal action because Maharaj was cloaked in U.S. citizenship at the time of the hostage taking events.  The Court need not address that question to resolve the pending motions because, on the present record, there has been no revocation of citizenship and there is no prospect of revocation.

foregoing reasons, then, the Court concludes that defendants are unlikely to succeed on their mandamus petition.  Therefore, there is no reason to stay the trial of this case.

## IV.    Government's Motion in Limine

The government moves for an order in limine precluding the defendants from introducing evidence at trial on the matter of whether Balram Maharaj was qualified to become a U.S. citizen, arguing that whether he should have been granted citizenship is irrelevant to these proceedings.  Gov't Opp'n at 20-21.  Defendants oppose the motion on the ground that excluding their evidence would deprive them of their Sixth Amendment right to present a defense.  See Defs.' Joint Reply at 4.  They also suggest that the Court defer ruling on the government's request until an unspecified later date.  See Demerieux Reply at 3.  With jury selection scheduled to begin in less than 10 days, the Court finds it imprudent to delay ruling on this important issue. Having fully considered the scope of this Court's authority to declare Maharaj's citizenship void, the Court has before it all the information it needs to resolve this evidentiary matter.

As foreshadowed by the Court's discussion of § 1451(a) above, the Court will grant the government's motion in limine.  It is undisputed that the United States granted Maharaj's application for naturalization in or around 1995 and that he possessed in April 2005 an authentic certificate of naturalization and U.S. passport documenting his citizenship.  The only dispute is whether Maharaj's citizenship should nonetheless be found void because he allegedly was not qualified for citizenship and procured it by fraud.  The Court has held, however, that "§ 1451 sets forth the exclusive process for declaring the citizenship of a naturalized person void and one's citizenship remains valid until an order setting aside citizenship has been issued in compliance with § 1451"; hence, because no order revoking Maharaj's citizenship has been issued, his certificate of naturalization and U.S. passport conclusively establish that he was, until his death, a

citizen of the United States. <u>Supra</u> at 10-12. It necessarily follows, then, that the jury may not decide the validity of Maharaj's citizenship, as that is a question of one's legal status. Indeed, because the certificate of naturalization and U.S. passport conclusively establish his citizenship, evidence contesting the validity of his citizenship is irrelevant.

The determination that the Court, rather than the jury, decides the status of the victim's citizenship under these circumstances is consistent with this Circuit's recognition in at least one other context that a question involving the legal status of a person is a question of law for the court. <u>See</u> <u>United States v. Madeoy</u>, 912 F.2d 1486, 1494 (D.C. Cir. 1990) (Whether "the defendants were public officials . . . is not a question for the jury . . . . [W]e hold that whether an individual is a public official within the meaning of the [bribery] statute is a question of law, and as such, a matter for judicial resolution"); <u>see</u> <u>also</u> <u>United States v. Anton</u>, 546 F.3d 1355, 1357-58 (11th Cir. 2008) (holding that, in a felon-in-possession prosecution, the defendant's status as a convicted felon presented a question of law for the court, rather than a question of fact for the jury). Moreover, creating a role for the jury to determine the legality of a person's citizenship is wholly inconsistent with the exclusivity of the § 1451(a) process and the Supreme Court's clear recognition that a naturalized citizen, having acquired the precious right of American citizenship, is entitled to the safeguards provided under § 1451(a) before his citizenship can be declared void by a court.[17] <u>See</u> <u>Fedorenko</u>, 449 U.S. at 505; <u>Zucca</u>, 351 U.S. at 100.

The Court finds no merit in defendants' generalized contention that the Sixth Amendment right to present a defense requires the Court to admit defense evidence contesting the validity of

---

[17] It bears noting that, where the U.S. Attorney does initiate denaturalization proceedings, a court, not a jury, makes the determination whether to revoke one's citizenship under § 1451(a). <u>See</u> <u>United States v. Ciurinskas</u>, 148 F.3d 729, 735 (7th Cir. 1998) (citing <u>Luria v. United States</u>, 231 U.S. 9 (1913), and <u>Schneiderman v. United States</u>, 320 U.S. 118 (1943)).

Maharaj's citizenship. It is well-settled that "[a] defendant's right to present . . . evidence is not unlimited, but rather is subject to reasonable restrictions," and that rulings excluding evidence from trial "do not abridge an accused's right to present a defense so long as they are not arbitrary or disproportionate to the purposes they are designed to serve." United States v. Scheffer, 523 U.S. 303, 308 (1998) (citation omitted); see also Lannert v. Jones, 321 F.3d 747, 753-54 (8th Cir. 2003) ("A defendant does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence") (citation omitted); United States v. Libby, 475 F. Supp. 2d 73, 90-91 (D.D.C. 2007) ("although the Constitution entitles a defendant an opportunity to present his version of the facts . . . to the jury so it may decide where the truth lies, that guarantee extends only to relevant evidence," and also is "subject to reasonable restrictions, including restrictions imposed by the other rules of evidence") (citations omitted). Generally, there is no right to present evidence to the jury on questions that are reserved for the court to resolve, including legal questions, and indeed, that have already been resolved. See Anton, 546 F.3d at 1357-58 (holding that the Sixth Amendment right to present a meaningful defense does not entitle a defendant to present evidence on a question of law); see also United States v. Gordon, 641 F.2d 1281, 1288-89 (9th Cir. 1981) (holding that Sixth Amendment right to have jury determine essential elements of the offense does not encompass determination of questions of law). In short, the exclusion of irrelevant evidence, as the Court has decided here, is fully consistent with the Sixth Amendment. Accordingly, the Court will grant the government's motion in limine and enter an order prohibiting defendants from introducing evidence on the matter of whether Balram Maharaj was qualified for U.S. citizenship

or whether his citizenship was otherwise void.[18]

## CONCLUSION

For the foregoing reasons, Straker's and Demerieux's motions to dismiss and Clarke's motion to stay the trial will all be denied. The Court will grant the government's motion in limine to preclude defendants from introducing evidence on the matter of whether Balram Maharaj was qualified for U.S. citizenship or whether his citizenship was otherwise void. A separate Order accompanies this Memorandum Opinion.

_____/s/_____
JOHN D. BATES
United States District Judge

Date:  May 8, 2009

---

[18] It is conceivable that in presenting evidence concerning the victim (Maharaj) beyond his legal status as a U.S. national or citizen (for example, his record of U.S. military service in Vietnam), the government could open an issue that defendants might seek to respond to with some of the same evidence proffered on the citizenship issue. The Court will address that situation if and when it arises.