# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**UNITED STATES OF AMERICA,**

**v.**

**Criminal No. 06-102 (JDB)**

**ZION CLARKE,**
**RICARDO DEFOUR,**
**KEVON DEMERIEUX,**
**ANDERSON STRAKER,**
**WAYNE PIERRE,**
**CHRISTOPHER SEALEY, and**
**KEVIN NIXON,**

**Defendants.**

## MEMORANDUM OPINION

## TABLE OF CONTENTS

Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Discussion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

I.  Severance
    A.  General Severance Issues. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    B.  Sixth Amendment Confrontation Clause Issues . . . . . . . . . . . . . . . . . . . . . . . . . 22

II.  <u>Brady</u>/Jencks Violations
    A.  The Alleged <u>Brady</u>/Jencks Violations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
    B.  Summary of Legal Standards. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
    C.  Analysis of the Individual <u>Brady</u> Violations
        1.  Evidence Pertaining to the X-ray of the Victim's Skull. . . . . . . . . . . . . . 42
        2.  Russel Joseph's January 17, 2006 Statement to Trinidad Police. . . . . . . . 45
        3.  Clauss's Grand Jury Testimony Concerning Ricardo Stevenson. . . . . . . . 59
        4.  The False Campsite Testimony and Diagram. . . . . . . . . . . . . . . . . . . . . . 61
        5.  Cumulative Impact of Late Disclosures. . . . . . . . . . . . . . . . . . . . . . . . . . 69

III    Other Due Process Issues
    A.    Limitations on Challenging the Citizenship of Balram Maharaj . . . . . . . . . . . . 74
    B.    *Napue* Violations Arising from the False Testimony of
        Cooperating Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85
    C.    Trial in U.S. Court for Crimes Occurring in Trinidad . . . . . . . . . . . . . . . . . . . 93

IV    Other Evidentiary Issues
    A.    Government Fingerprint Expert Dawn Schilens . . . . . . . . . . . . . . . . . . . . . . . . 96
    B.    Dismemberment Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

V.    DeFour's Alibi Defense
    A.    Denial of DeFour's Motion to Continue the Trial; New Evidence . . . . . . . . . . 101
    B.    Denial of Alibi Instruction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

VI.    Closing Arguments
    A.    Vouching . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117
    B.    Prejudicial Reference to Criminal Organization . . . . . . . . . . . . . . . . . . . . . . . . 123
    C.    Alternative Theory of Guilt Offered by the Government
        With Respect to Sealey and Nixon . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129

VII.  Sufficiency of the Evidence
    A.    Sufficiency of the Evidence - Issues Common to All Defendants . . . . . . . . . . . 135
    B.    Sufficiency of the Evidence - Evidence Supporting
        Each Defendant's Convictions
        1.    Anderson Straker . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138
        2.    Ricardo DeFour . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 141
        3.    Wayne Pierre . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 142
        4.    Christopher Sealey . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 146
        5.    Kevin Nixon . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 147
        6.    Zion Clarke . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 149
        7.    Kevon Demerieux . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 150

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 155

## INTRODUCTION

This case arises from the abduction and death of a U.S. citizen, Balram Maharaj, in the

Republic of Trinidad and Tobago ("Trinidad") in April 2005. Twelve defendants were extradited

from Trinidad to the United States over the course of two years, to face charges of conspiracy to

commit hostage taking resulting in death in violation of 18 U.S.C. § 1203 ("Hostage Taking

Act"), and aiding and abetting hostage taking resulting in death. Seven defendants went to trial in May 2009: Zion Clarke, Ricardo DeFour, Kevon Demerieux, Anderson Straker, Wayne Pierre, Christopher Sealey, and Kevin Nixon.[1]

Several rounds of pretrial motions were briefed, including motions to dismiss the charges, motions to suppress statements, motions to exclude other crimes evidence, motions for severance, and motions concerning the matter of Maharaj's U.S. citizenship. The Court issued five written opinions and an oral opinion from the bench, and also entered a series of orders on other matters as they were presented at trial. See United States v. Straker, 567 F. Supp. 2d 174 (D.D.C. 2008) (decision on other crimes evidence, Rule 15 depositions, and discovery); United States v. Straker, 596 F. Supp. 2d 80 (D.D.C. 2009) (decision on legality of extradition and suppression motions filed by Straker and Sealey); United States v. Clarke, 611 F. Supp. 2d 12 (D.D.C. 2009) ("Clarke I") (decision on admissibility of out-of-court photographic identifications and suppression motions filed by Clarke, DeFour, and Demerieux); United States v. Clarke, 628 F. Supp. 2d 1 (D.D.C. 2009) ("Clarke II") (decision addressing issues related to the U.S. citizenship of the victim); United States v. Clarke, 628 F. Supp. 2d 15 (D.D.C. 2009) ("Clarke III") (second decision addressing issues related to the U.S. citizenship of the victim); Oral Opinion, Preliminary Tr. at 2-24 (May 1, 2009) (denying motions for severance). See also ECF #454, 509, 519, 568, 602, 603 (orders on issues arising during the course of trial).

Jury selection commenced on May 22, 2009, and the trial of the case began on May 27, 2009. The case was submitted to the jury on July 27, 2009. The jury returned a unanimous

---

[1] Of the remaining defendants, four pled guilty, and one who was extradited years earlier -- David Suchit -- was acquitted after a trial held in June 2007.

verdict of guilty as to all seven defendants on both counts of the indictment on July 31, 2009.

Defendants have submitted lengthy post-trial motions arguing that various legal errors require dismissal of the charges against them or, in the alternative, a new trial, and also renewing their earlier motions for judgment of acquittal based on the sufficiency of the evidence.[2]  A hearing on the motions was held on April 16, 2010.

## BACKGROUND

The indictment charges the defendants with participating in a conspiracy -- beginning on or about February 1, 2005, and ending on or about April 15, 2005 -- to seize and detain Balram Maharaj and his son Dinesh, in order to compel the payment of ransom money for their release, in violation of 18 U.S.C. § 1203.[3]  The evidence presented at trial showed that the conspirators'

---

[2]  The pending post-conviction motions are:  Demerieux's Mot. for J. of Acquittal, ECF #589; Demerieux's Suppl. to Mot. for J. of Acquittal, ECF #693; Demerieux's Mot. for New Trial, ECF #698; Pierre's Renewed Mot. for J. of Acquittal and Severance and Alternative Request for New Trial, ECF #694; Nixon's Mot. for New Trial, ECF #699; Straker's Mot. for New Trial, ECF #700; Clarke's Mot. for J. of Acquittal, ECF #701; Sealey's Mot. for New Trial, ECF #706; DeFour's Mot. for New Trial, ECF #707.  During trial, the Court reserved ruling on DeFour's Mot. to Dismiss the Indictment or for Mistrial, ECF #545, and defendants' oral motions for judgment of acquittal (heard in open court on July 6, 2009), all of which are addressed in this opinion.  This opinion also resolves a sealed motion for sanctions filed by Clarke on March 12, 2010.  For ease of reference, the Court will cite to the parties' briefs using an abbreviated title and ECF document number.

[3]  Section 1203(a) provides:

Except as provided in subsection (b) of this section, whoever, whether inside or outside the United States, seizes or detains and threatens to kill, to injure, or to continue to detain another person in order to compel a third person or a governmental organization to do or abstain from doing any act as an explicit or implicit condition for the release of the person detained, or attempts or conspires to do so, shall be punished by imprisonment for any term of years or for life and, if the death of any person results, shall be punished by death or life imprisonment.

18 U.S.C. § 1203(a).  The statute further provides that, where the offense occurs outside the

(continued...)

4

initial plan was to kidnap 5-year old Dinesh, but that the target instead became Balram Maharaj due to complications involved with kidnapping his child. After a series of planning meetings at the Mellow Moods Bar and other locations, the kidnapping took place on April 6, 2005, at the Samaan Tree Bar. Maharaj was taken at gunpoint, forced into a waiting vehicle, and driven to a cocoa field. From there, he was taken to a forested area where he was held for seven days under the watch of two guards. During that time a series of ransom calls was made to the victim's family, demanding $3 million Trinidad dollars -- approximately $500,000 U.S. dollars -- and the captors attempted to obtain "proof of life" from the victim to advance their ransom demands. During the period of captivity, Maharaj, a diabetic, did not have access to medication, and his health took a precipitous decline -- he turned pale, had difficulty speaking and breathing, and began hallucinating. On April 13, 2005, Maharaj died. After his death, several co-conspirators dismembered the body with a machete, hid the body parts in two containers -- a blue barrel and a white styrofoam cooler -- and buried the containers.

Trinidad police and the FBI both were involved in the investigation. The case went cold after the victim's death on April 13, but by the fall of 2005, the Trinidad police had found sources of information, including Winston Gittens (a cooperating co-defendant), about those involved in the kidnapping. This led to a series of arrests in early 2006, and confessions from five

_____

[3](...continued)
United States, there must be one of three enumerated connections to the United States in order for the statute to cover the conduct, one of which is that "the person seized or detained is a national of the United States." Id. § 1203(b).

defendants: Clarke, Demerieux, Straker, DeFour, and Sealey.[4]  During that period, there were

also arrests of three other defendants -- Russel Joseph, Jason Percival, and Leon Nurse -- who,

like Gittens, eventually pled guilty and entered into cooperation agreements with the U.S.

government.  Soon after Clarke's arrest, he led the Trinidad police and FBI to a place he

identified as the camp site where Maharaj was held, and on January 6, 2006, he then led them to

---

[4]  The arrests and confessions occurred as follows:

• Zion Clarke was arrested on January 4, 2006, and subsequently made four
statements to law enforcement -- two statements to the FBI on January 4 and 6,
2006, a statement to Trinidad police on January 5, 2006, and a statement to the
FBI on August 4, 2008, admitting his participation in the hostage taking as one of
two guards who held Maharaj captive.

• Kevon Demerieux was arrested on January 4, 2006, released on January 6, and
then rearrested on March 31, 2006.  He then made a statement that day to Trinidad
police admitting his involvement as one of the guards, and made a separate
statement to the FBI on April 1, 2006.

• Anderson Straker was arrested on January 6, 2006.  Shortly thereafter, he denied
his involvement in two statements to Trinidad police, and declined to make a
statement to the FBI, but later he admitted his involvement in a statement to the
FBI during his extradition on July 29, 2007.

• Ricardo DeFour was arrested on January 27, 2006, and made a statement to
Trinidad police on the same date admitting his involvement.

• Christopher Sealey was arrested on August 8, 2006, and provided separate
statements to the Trinidad police and FBI on the same date admitting his
involvement as one of the two persons who entered the Samaan Tree Bar and
abducted the victim at gunpoint.

Each of these five defendants moved to suppress his confessions.  The Court held evidentiary
hearings on the motions to suppress on December 2-3, 2008, and March 5-6, 2009.  The Court
ultimately found that the confessions were obtained consistent with defendants' Miranda rights
and also were voluntary.  See Straker, 596 F. Supp. 2d at 84-111 (factual findings and analysis on
Straker and Sealey suppression motions); Clarke I, 611 F. Supp. 2d at 21-45 (factual findings and
analysis on Clarke, Demerieux, and DeFour suppression motions).

the burial site and showed them where the two containers holding the victim's remains were buried. The FBI recovered the remains, which were positively identified as Maharaj's through dental and other medical records. Although the state of Maharaj's body precluded a conclusive determination of a cause of death, the medical evidence indicated that the likely cause of death was deprivation of his diabetes medications while being held in captivity.

Based largely on the defendants' confessions and the testimony of the cooperators, the evidence presented at trial established the co-conspirators' roles as follows. Anderson Straker was one of the originators and leaders of the conspiracy. He had a close relationship with Doreen Alexander -- Dinesh's mother and Maharaj's former lover -- who originally came up with the kidnapping for ransom plan. Straker enlisted the assistance of Leon Nurse -- a longtime friend and member of the Trinidad military -- in carrying out the plan, and he participated in virtually all of the planning meetings. Straker relied on Nurse to bring in others, including Percival and DeFour, both of whom had military experience and experience with other hostage takings. Straker also made or assisted in several ransom calls and visited the victim during the period of captivity to obtain proof of life recordings.

Percival and Pierre also had leadership roles in the conspiracy. They assigned roles to the various co-conspirators including the "snatchers," the drivers, the guards, the ransom negotiator, and the recorder of proof of life; they led planning meetings at Pierre's home and the Mellow Moods Bar; and they made the significant decisions, such as the date for executing the abduction (Percival and Pierre), the site for holding the victim hostage (Pierre), the strategy for conducting ransom negotiations (Percival and Pierre), and disposal of the victim's body (Pierre). Their leadership roles were similar to the roles they played in three other hostage takings that occurred

close in time to the Maharaj hostage taking.

As the hostage taking plan developed, all of the charged defendants participated in one or more planning meetings at Wayne Pierre's house, his brother Kenneth's house, and/or the Mellow Moods Bar to further the hostage taking conspiracy. The plan included surveillance of the victim at his neigborhood bar to ensure they all had identified the correct target, arrangements to obtain a getaway car and a clearing car, arrangements for obtaining and distributing the guns, and the above-mentioned roles.

The abduction took placed on April 6, 2005, with Sealey, Nixon, Joseph, DeFour, and Percival handling the actual abduction and getaway. They drove first to Maharaj's neighborhood bar, and then to the Samaan Tree Bar in Lower Santa Cruz, with Joseph driving one car with Sealey and Nixon as passengers, and Percival and DeFour driving separately. After arriving at the bar, DeFour provided Sealey and Nixon each a gun -- a 9 mm and a .357. DeFour and Percival then waited in DeFour's vehicle on the street, close to the bar where they could see what was going to happen. Joseph pulled up near the bar, where Sealey and Nixon got out and entered the bar. Sealey grabbed Maharaj from his seat and pulled him out of the bar. Nixon waved to Joseph to come forward, and Sealey and Nixon then forced Maharaj into the back seat of the vehicle between them. Joseph then drove off, with DeFour and Percival's vehicle in front. DeFour's role was to "clear the roads" -- that is, to clear traffic and deal with any police officers or roadblocks that might hamper the kidnapping.

At Nixon's direction, Joseph drove to a cocoa field in Upper Santa Cruz. Sealey and Nixon then took the victim out of the car and left him somewhere in the cocoa fields. Joseph then dropped Sealey off at his father's store on his way back to the Mellow Moods Bar. There,

Joseph and Nixon met up with DeFour, Nurse, Straker, Pierre, and Percival. Pierre and Percival instructed Joseph and Nixon to move the victim to another location, finding the first location unsafe. Joseph, Nixon, and Percival drove back to the cocoa fields, where Nixon retrieved Maharaj. From there, Joseph and Nixon drove the victim up Gran Curacaye Road, and handed the victim over to Demerieux and Clarke. Nixon gave one of the guns -- the .357 -- to Clarke, and Joseph and Nixon then left. That night, Joseph returned to the Mellow Moods Bar, where he met again with DeFour, Nurse, Percival, Pierre, and Straker, and further plans were made for holding the victim and proceeding with ransom demands.

Clarke and Demerieux acted as guards during the period of captivity from April 6-13, 2005. During that period, they kept Maharaj bound and/or gagged, and waited while Joseph, Straker, and other co-conspirators came to the site to obtain proof of life from the victim and to obtain information from the victim about how to get the ransom money. Gittens was the primary ransom negotiator, making telephone calls to the Maharaj family from various locations to further their ransom demand of $3 million Trinidad dollars. Maharaj's health was visibly and rapidly deteriorating due to his being deprived of his medications for diabetes or other ailments -- his breathing became heavy and labored, he had difficulty speaking, he was hallucinating, and, in his captors' words, appeared "in bad shape." Several co-conspirators, including Pierre, Percival, Joseph, and DeFour, had discussions by cell phone and in person during the period of Maharaj's captivity about concerns such as whether they had the right person, problems that arose during ransom negotiations, and the victim's failing health. Maharaj was held in captivity until April 13, 2005, when he died.

Several co-conspirators, including Percival, DeFour, Nurse, Pierre, and Joseph, then met

at the Mellow Moods bar where they discussed the victim's death and plans to dispose of the body. The group resolved to bury the body, based on Pierre's assessment that this was their best chance of avoiding prison -- "no body, no evidence, no case." Clarke, Demerieux, Pierre, Percival, and Joseph then gathered at Pierre's house to make further plans. From there, they drove the body to a forested area where Pierre and Clarke dismembered the body with a machete, and then, along with the others, placed the body parts in two containers and buried them.

In addition to the cooperator testimony and confessions, the government presented other evidence to support its case. For purposes of resolving the post-trial motions, the following evidence is most relevant. The government presented evidence of three other hostage takings committed by Pierre, DeFour, Clarke and the cooperators (Percival, Joseph, Gittens, Nurse) in the months before and after the Maharaj abduction: (1) the hostage taking of Dexter Jagdeo which began on Thursday, December 16, 2004; (2) the hostage taking of Robin Ramadar, which began on March 4, 2005; and (3) the hostage taking of Sita Ragoonanan, which began on June 21, 2005. Pierre and DeFour were involved in all three hostage takings, with Pierre playing a leadership role in those crimes and DeFour taking on primarily a surveillance and driving role. Clarke was involved in the Jagdeo and Ragoonanan hostage takings, serving as a guard in each. The other crimes evidence was introduced for the legitimate purpose of proving "the background of the conspiracy and how the relationships between the participants developed, as well as defendants' motive, intent, knowledge, preparation, and plan." See Clarke I, 567 F. Supp. 2d at 179; Jury Instructions at 38-39. Evidence about the other crimes was presented primarily through the testimony of the cooperating witnesses -- Percival, Joseph, Nurse, and Gittens -- who also had participated in one or more of those other crimes, and also came through the testimony of

one victim, Sita Ragoonanan.

The government also presented evidence of Maharaj's U.S. citizenship. This consisted primarily of his certificate of naturalization (Gov't Ex. 303-F) and a U.S. passport dated September 28, 2000 (Gov't Ex. 306), presented through officials from the U.S. Citizenship and Immigration Service. See Clarke III, 628 F. Supp. 2d at 17-24. Defendants sought to present evidence to show that the government should not have granted Maharaj citizenship because he was not actually qualified to become a U.S. citizen.[5] However, the Court held that Congress created an exclusive process for declaring the citizenship of a naturalized person void, as set forth in 8 U.S.C. § 1451(a), and that one's citizenship remains valid until an order setting aside citizenship has been issued in compliance with § 1451(a). See id. at 22-24; see also Clarke II, 628 F. Supp. 2d at 5-10. Therefore, the Court denied defendants' request to present evidence that Maharaj was not qualified to become a naturalized U.S. citizen or that Maharaj obtained his citizenship by fraud.[6]

The government also presented evidence that Straker had several conversations with Jason Percival while they were incarcerated in close proximity to each other. At that time, Straker made several incriminating statements, including a request that Percival lie on the

---

[5] Defendants contended that the evidence would show that Maharaj deserted the U.S. military, entered the United States illegally, obtained a "green card" through misrepresentation and concealment of material facts, failed to disclose criminal conduct, and was otherwise not of good moral character. See Demerieux's Mot. to Dismiss, ECF #390 at 2-17 & Exhibits A-L.

[6] The Court also rejected defendants' argument that the certificate of naturalization and passport were inadmissible hearsay, holding that Congress had, by statute, provided that certificates of naturalization and passports are admissible in judicial proceedings to prove citizenship and that, in any event, both documents were admissible under the public records exception, Fed. R. Evid. 803(8)(A). Clarke III, 628 F. Supp. 2d at 17-22 (citing 8 U.S.C. § 1143(e) and 22 U.S.C. § 2205).

witness stand, and attempted to convince Percival not to cooperate further with the government. To this end, Straker sent Percival a note with a news article suggesting that the U.S. Attorney's Office did not have the power to ensure that a court would grant him leniency for his cooperation.  <u>See</u> Trial Tr. at 2221-2231 (June 10, 2009).  With respect to the note, the government presented the testimony of FBI Fingerprint Examiner Dawn Schilens, who identified the fingerprints on the note as Straker's, which corroborated Percival's testimony about Straker's statements to him.  <u>See</u> Trial Tr. at 2980-89 (June 15, 2009).

## <u>STANDARD OF REVIEW</u>

In considering a motion for judgment of acquittal under Fed. R. Crim. P. 29, a court must view the evidence in the light most favorable to the government and must determine whether the evidence presented at trial is sufficient to sustain a conviction as a matter of law; in other words, the court must decide whether a reasonable jury could conclude that the government met its burden of proving each element of the offense beyond a reasonable doubt.  <u>See</u> <u>United States v. Treadwell</u>, 760 F.2d 327, 333 (D.C. Cir. 1985); <u>see also</u> <u>United States v. Gomez</u>, 431 F.3d 818, 819 (D.C. Cir. 2005) ("As always with a defendant's claims of insufficient evidence, we review de novo, viewing the evidence in the light most favorable to the government.  We affirm if a rational fact-finder could have found guilt beyond a reasonable doubt.").

With respect to a motion for new trial, "the [C]ourt may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a).  "In considering a motion for a new trial, a district judge weighs the evidence and evaluates the witnesses' credibility and decides whether 'a serious miscarriage of justice may have occurred.'"  <u>United States v. Rogers</u>, 918 F.2d 207, 213 (D.C. Cir. 1990) (quoting <u>Tibbs v. Florida</u>, 457 U.S. 31, 38 n.11 (1982)).

"Unlike a motion for judgment of acquittal, when ruling on a motion for a new trial 'the Court need not accept the evidence in the light most favorable to the government.'" United States v. Howard, 245 F. Supp. 2d 24, 30 (D.D.C. 2003) (quoting United States v. Edmonds, 765 F. Supp. 1112, 1118 (D.D.C. 1991)).  Ultimately, "[a] motion for a new trial is committed to the sound discretion of the trial judge, and should be reversed only for abuse or misapplication of the law." United States v. Mangieri, 694 F.2d 1270, 1285 (D.C. Cir. 1982) (quoting United States v. Reese, 561 F.2d 894, 902 (D.C. Cir. 1977)).

Where the defendant fails to object, or state the specific ground of an objection, plain error review applies.  See United States v. Brown, 508 F.3d 1066, 1071 (D.C. Cir. 2007); Fed. R. Crim. P. 52(b).  Under the plain error standard, the defendant must demonstrate: "(1) a legal error that was (2) 'plain' (a term that is synonymous with 'clear' or 'obvious'), and that (3) affected [his] substantial rights." Id. (quoting United States v. Sullivan, 451 F.3d 884, 892 (D.C. Cir. 2006)).  Additionally, relief for plain error is available only if the error "seriously affects the fairness, integrity, or public reputation of judicial proceedings." Id.  The defendant bears the burden of proving each element of the plain error standard.  Id.

## DISCUSSION

### I.      Severance

#### A.      General Severance Issues

Prior to trial, each of the defendants moved for severance pursuant to Fed. R. Crim. P. 14 based on the potential for prejudice from a joint trial, focusing on the disparity of the evidence, the potential spillover impact of other crimes evidence concerning some co-defendants, and the Sixth Amendment problems presented by admission of the confessions of nontestifying co-

defendants. The Court denied those motions in an oral ruling from the bench on May 1, 2009. See Order, ECF #462, at 1 (memorializing bench ruling). Defendants now seek a new trial invoking largely the same arguments. The Court addresses each argument in turn, with a separate section on the Sixth Amendment issues.

First, it is useful to summarize the individual arguments pertaining to prejudice. Sealey contends that he was entitled to a separate trial because his role in the conspiracy -- 30 minutes, he says -- was limited in comparison to the other defendants, there was a great disparity in the evidence between himself and his co-defendants, and the admission of substantial other crimes evidence concerning his co-defendants prevented the jury from making a reliable judgment about his individual guilt or innocence. See Sealey's Mem., ECF #706, at 1, 9-12. Straker and Nixon contend that severance is required because of the prejudicial spillover effect from the other crimes evidence, with Straker focusing on the emotional testimony of "other crimes" victim Sita Ragoonanan. See Straker's Mem., ECF #700, at 54-55, 61-65; Nixon's Mem., ECF #699, at 5. Pierre contends that he is entitled to a new trial because of the disparity in evidence and spillover impact, emphasizing that he was tried with "five confessing defendants," whereas there was no similar type of evidence against him. See Pierre's Mem., ECF #694, at 1-2.

The Court begins with Rule 8 of the Federal Rules of Criminal Procedure. Rule 8 permits joinder of defendants who "are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b). Once joined under Rule 8, defendants may seek relief from joinder under Rule 14, which provides that "[i]f the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant . . . , the court may . . . sever the

defendants' trials, or provide any other relief that justice requires." Fed. R. Crim. P. 14(a). "The Supreme Court has instructed district courts to grant severance 'only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.'" United States v. Celis, 608 F.3d 818, 844 (D.C. Cir. 2010) (quoting Zafiro v. United States, 506 U.S. 534, 539 (1993)). Furthermore, "there is a preference in the federal system for joint trials of defendants who are indicted together" because joint trials "promote efficiency and serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts." Zafiro, 506 U.S. at 537. "This preference is 'especially strong' when 'the respective charges require presentation of much the same evidence, testimony of the same witnesses, and involve two defendants who are charged, inter alia, with participating in the same illegal acts.'" United States v. Wilson, 605 F.3d 985, 1015 (D.C. Cir. 2010) (quoting United States v. Ford, 870 F.2d 729, 731 (D.C. Cir. 1989)). In this case, the preference for a joint trial is especially strong because all seven defendants are charged with being members of the same conspiracy -- a conspiracy to commit hostage taking resulting in death (Count One) -- and with aiding and abetting that hostage taking (Count Two); hence, the charges require presentation of much of the same witness testimony and other evidence.

In this context, the Court reviews each of defendants' arguments of unfair prejudice. Defendants Sealey, Straker, Nixon, and Pierre each contend that the "spillover effect" from a disparity in the evidence between each defendant demonstrates misjoinder. It is true that severance may be appropriate where there are "large disparities in the amount of evidence being offered against each defendant." See United States v. Edelin, 118 F. Supp. 2d 36, 44 (D.D.C.

2000).  But courts have generally recognized that "the nature of a conspiracy, or of any criminal trial, is that there are different quanta of evidence against various defendants. . . .  Severance is not appropriate merely because some co-conspirators were more active in the conspiracy, nor because some co-conspirators played a more central role."  Id. at 43.  The key to determining whether severance is warranted is "whether the jury could reasonably compartmentalize the evidence introduced against each individual defendant."  Celis, 608 F.3d at 844.

The Court has carefully considered the evidence presented at trial and concludes, as it did before, that this case was not so complex that the jury could not carefully compartmentalize the evidence against each defendant.  With regard to Straker, the evidence against him includes his own detailed confession to the FBI of his involvement in the conspiracy and hostage taking, the testimony of co-conspirators Russel Joseph, Leon Nurse, and Jason Percival as to his involvement in the crimes, cell phone records linking him to other co-conspirators, and his testimony at trial (which was extensively impeached).  For Sealey, the evidence included his detailed confession to Trinidad police of his involvement in the crimes, a separate confession to the FBI, and the testimony of Joseph and Percival, which overwhelmingly established his participation as one of the abductors at the Samaan Tree Bar.  As to Nixon, the primary evidence against him also was the testimony of Joseph and Percival, which likewise overwhelmingly established Nixon's participation as one of the abductors at the Samaan Tree Bar, and which was corroborated by testimony from Gittens and an eyewitness.  And with respect to Pierre, the primary evidence against him consisted of the testimony of Joseph, Gittens, and Percival, each of whom testified as to Pierre's leadership role in the crime.  In short, the nature of the evidence was readily subject to being compartmentalized by the jury.  More importantly, the disparity of

evidence was not actually great. To the extent there was some disparity, moreover, it was no more than in a typical conspiracy case.

Furthermore, the Court carefully instructed the jury on how to compartmentalize and weigh the evidence, and on the jury's responsibility to determine -- independently -- the guilt or innocence of each defendant on the basis of that evidence. Concerning any disparity in the evidence, instructing the jury on their duties and the evidence is generally sufficient "to cure any possibility for prejudice or jury confusion in all but the most extreme cases." United States v. Gray, 173 F. Supp. 2d 1, 11 (D.D.C. 2001). The instructions in this case included an instruction to render a verdict based on each defendant's "own conduct and from the evidence that applies to him as if he were being tried alone," as well as a separate instruction that the statements made by the confessing defendants could be considered "only with respect to the particular defendant who made the statement" and the jury "must not consider it in any way in [the] deliberations with respect to the other defendants." See Jury Instructions at 40 (Redbook 2.54); 42 (Redbook 2.55). The Court finds that, considering the nature and quantity of evidence and the limiting instructions given, the alleged disparity of evidence presented at trial does not warrant a new trial.

Nor does the Court find that the alleged spillover impact from other crimes evidence warrants a new trial. This argument is not appreciably different from defendants' argument concerning the alleged disparity in evidence. The presentation of other crimes evidence at a joint trial is permissible if the jury could reasonably "compartmentalize" the other crimes evidence introduced against each defendant and follow limiting instructions. See United States v. Manner, 887 F.2d 317, 325 & n.7 (D.C. Cir. 1989). Here, the government's other crimes evidence consisted of three other hostage takings allegedly committed by Pierre, DeFour, and Clarke in the

months before and after the abduction in this case -- that is, the hostage takings of Dexter Jagdeo (December 2004); Robin Ramadar (March 2005); and Sita Ragoonanan (June 2005). The Court gave a limiting instruction both orally during trial and in the final instructions, directing the jury to compartmentalize its consideration of the evidence only as to those defendants the jury found to be involved and emphasizing the limited purpose for which the evidence was admitted:

**OTHER CRIMES EVIDENCE**

You have heard evidence that some of the defendants engaged in other hostage takings not charged in the indictment. It is up to you to decide whether to accept this evidence.

Specifically, the government presented evidence that defendants Wayne Pierre, Ricardo DeFour and Zion Clarke were involved in the hostage taking of Dexter Jagdeo which began on Thursday, December 16, 2004. The government also presented evidence that defendants Ricardo DeFour and Wayne Pierre were involved in the hostage taking of Robin Ramadar which began on Friday, March 4, 2005. The government also presented evidence that defendants Wayne Pierre, Ricardo DeFour and Zion Clarke were involved in the hostage taking of Sita Roogananan which began on Tuesday, June 21, 2005.

If you decide that a particular defendant was involved in another hostage taking, consider that evidence only for the limited purposes that I am about to describe. This evidence is to be considered only against those defendants that you find were involved. If I did not name a particular defendant or you find that a defendant was not involved, then you are not to consider the evidence against him. You may consider the evidence to inform you of the background of the conspiracy charged in this case, and to help you decide whether there was a relationship between the defendants that you find were involved and the other cooperating co-conspirators involved in the hostage taking of Balram Maharaj. You may also consider this evidence in determining whether any of the defendants that you find were involved had motive, intent, knowledge, or a plan to commit the offenses charged in the indictment in this case, and to decide whether any of these defendants joined the conspiracy charged in the indictment inadvertently as the result of an accident or mistake.

It is up to you to decide whether to accept this evidence. If you decide not to accept it, then ignore it. If you decide to accept it, you may only use it for the purposes that I have mentioned and only against the defendants that you find were involved. You may not consider this evidence to conclude that a defendant has a bad character, or that a defendant has a criminal personality, or that it is more likely that, because he may have engaged in other acts or committed other offenses, he committed the offenses charged in the indictment in this case. The

law does not allow you to convict a defendant simply because you believe that he may have done bad things not specifically charged as crimes in this case. These defendants are on trial for the crimes charged, and you may not consider this evidence in deciding whether the government has proved that any of the defendants that you find were involved committed the acts constituting the charged offenses, and you may not conclude from this evidence that because a defendant may have committed other offenses he also committed the acts charged in the indictment.

See Jury Instructions at 38-39 (emphasis added); see also Trial Tr. at 874-76 (June 2, 2009) (identical instruction to the jury on the fourth day of trial); Trial Tr. at 51 (May 27, 2009) (abbreviated limiting instruction given on first day of trial after opening statements); Trial Tr. at 644-45 (May 29, 2009) (abbreviated limiting instruction given after Joseph testimony on Jagdeo kidnapping).

None of the defendants contends that this instruction is flawed. Instead, they rely largely on the conclusory allegation that the other crimes evidence was unfairly prejudicial. But that is an argument that turns on the admissibility of the evidence in the first instance. The Court considered early in the pretrial proceedings whether other crimes evidence pertaining to Jagdeo and Ramadar should be excluded pursuant to the balancing required under Fed. R. Evid. 403, and concluded that the probative value of the other crimes evidence was not "substantially outweighed" by the danger of unfair prejudice or other considerations under Rule 403:

> [T]he probative value is strong because the other crimes would show how the relationships between [certain] alleged co-conspirators developed and their motives for acting, within the relevant time frame. The danger of unfair prejudice is fairly low because, except perhaps for the [excluded] Gopaul hostage taking, the other crimes evidence "adds no emotional or other pejorative emphasis not already introduced by the evidence" of the charged offense.

Straker, 567 F. Supp. 2d at 177-79 (emphasis added) (quoting United States v. Lawson, 410 F.3d 735, 742 (D.C. Cir. 2005)); see also United States v. Cheng, No. 97-1016, 1997 WL 738588, at

*1 (2d Cir. Nov. 21, 1997) (holding that the Rule 403 balancing favored admissibility where "the uncharged kidnapping was not more sensational or inflammatory than the charged crimes while tending to show how the relationships formed among the conspirators"). The Court reached the same conclusion for the Ragoonanan and two other hostage takings. See Order, ECF # 454 (Apr. 24, 2009). This rationale applies to defendants' present objections concerning unfair prejudice as well. Moreover, the Court further minimized the potential for prejudice from the other crimes evidence by restricting the government's evidence to three (of five) other hostage takings, and strictly limiting the government's trial time concerning other crimes evidence. See Trial Tr. at 814-16 (June 2, 2009) (colloquy with prosecution on excessive time spent on other crimes evidence, and bench ruling imposing time limit on prosecution of three hours of direct testimony for each 404(b) hostage taking). These measures kept the focus of the trial on the charged hostage taking and, along with the limiting instruction, ensured that the jury did not use the other crimes evidence for an improper purpose.

Only Straker and Demerieux offer any new or particularized arguments of unfair prejudice. Straker focuses on the testimony of Sita Ragoonanan, which he calls "chilling" in the intensity of its emotional presentation. See Straker's Mem., ECF #700, at 54-55, 61-65. Ms. Ragoonanan testified that she was abducted from her driveway by three men, blindfolded, and held in a shack for six days and six nights, and forced to make a recorded plea for ransom money. Trial Tr. at 3895-3903 (June 22, 2009). But this account was no more sensational or inflammatory than the charged crime in this case -- the hostage taking of an American citizen who was allegedly held for seven days, endured tremendous physical suffering, ultimately died, and had his body dismembered and buried. Furthermore, Straker's contention that the

Ragoonanan testimony was unnecessary in light of testimony on that hostage taking from cooperating witnesses is without merit.  As the government points out, the defendants repeatedly challenged the credibility of each of the cooperating witnesses, making it appropriate for the government to provide further evidentiary support for the Ragoonanan hostage taking.  <u>See</u> Gov't Mem., ECF #712, at 83.

Demerieux argues that he, in particular, was unfairly prejudiced because the government failed to present evidence linking him to the Jagdeo hostage taking, though stating to the jury in its opening statement that it would show Demerieux served as a guard in the Jagdeo hostage taking and received payment of $1,500 Trinidadian dollars for that role.  <u>See</u> Demerieux's Mem., ECF #698, at 14-17.  The Court finds no unfair prejudice resulting from the government's failure of proof.  First, the government did attempt to present evidence linking Demerieux to the Jagdeo hostage taking, through Gittens' testimony, but the substance of Gittens' testimony turned out to be not what the government expected.  <u>See</u> Trial Tr. at 3138-39 (June 16, 2009) (Gittens' repeated testimony that he did not remember why Demerieux was given $1,500 from Percival after the Jagdeo hostage taking).  The government's unexpected failure to present sufficient evidence of Demerieux's involvement was more of a benefit, rather than a harm, to Demerieux.  In any event, the jury was specifically instructed that it could not consider the other crimes evidence against Demerieux.  Between the government's failure to present sufficient evidence of Demerieux's connection to the Jagdeo kidnapping, and the instruction to the jury that it could not consider the other crimes against Demerieux, the Court sees no unfair prejudice to Demerieux.

In summary, because the other crimes evidence was neither sensational nor inflammatory in the context of the hostage taking charged in this case, and did not otherwise result in any

unfair prejudice to the defendants, and the Court's jury instructions appropriately limited the jury's consideration of the evidence, defendants' renewed requests for severance and a new trial are denied.

### B.    Sixth Amendment Confrontation Clause Issues

Defendants also seek a new trial on the ground that the joint trial violated their Sixth Amendment rights of confrontation -- that is, to cross-examine witnesses.  They complain that the government admitted into evidence the pre-trial confessions of five co-defendants -- Straker, Sealey, Clarke, Demerieux, and DeFour -- who could not be cross-examined on the portions of their statements allegedly implicating their co-defendants in the crimes charged because of their Fifth Amendment privilege against self-incrimination.[7]  The gist of the argument is that under Bruton v. United States, 391 U.S. 123 (1968), and its progeny, the confession of a non-testifying co-defendant that implicates another defendant in the crime cannot be admitted into evidence without violating the Confrontation Clause.  Defendants acknowledge that the government used statements that were redacted to shield the identities of the non-declarant defendants, but they contend that the redactions were inadequate to serve that function in light of the evidence ultimately presented at trial.  See Pierre's Mem., ECF #694, at 1-2; Nixon's Mem., ECF # 699, at 1-9; Clarke's Mem., ECF #701, at 28-29; Sealey's Mem., ECF # 706, at 2.  In response, the government submits that the introduction of a non-testifying co-defendant's confession does not violate the Confrontation Clause where, as occurred here, the statement is redacted to exclude explicit or obvious references to other defendants and the jury is given a proper limiting

---

[7]  Pierre, Nixon, Clarke, and Sealey have filed motions for new trial based on this argument.  The Court will treat the argument as having been adopted by all defendants.

instruction.  See Gov't Mem., ECF #712, at 104-110, 132-33.

The Court considered these same arguments in detail at a pretrial motions hearing held on April 24, 2009.  In a ruling from the bench on May 1, 2009, the Court determined that properly redacted statements, coupled with appropriate limiting instructions, would provide the safeguards necessary to protect defendants' rights under the Confrontation Clause during a joint trial.  See Order, ECF #462 (filed May 1, 2009) (summarizing bench rulings).  Nothing that happened during trial has caused the Court to reach a different conclusion.  A brief recitation of the history of the Court's approach to the Bruton issues and the limitations imposed on the redacted confessions admitted into evidence is in order before addressing the specific contentions made in defendants' post-trial briefs.

The Court earlier recognized that admitting the pretrial confessions into evidence would present Bruton problems if appropriate redactions were not made, taking into account the standards established by the Supreme Court in Bruton, Richardson v. Marsh, 481 U.S. 200 (1987), and Gray v. Maryland, 523 U.S. 185 (1998).  Bruton held that "a defendant is deprived of his rights under the Confrontation Clause when his nontestifying codefendant's confession naming him as a participant in the crime is introduced at their joint trial, even if the jury is instructed to consider that confession only against the codefendant."  Richardson, 481 U.S. at 201-02.  The Supreme Court later clarified in Richardson that "Bruton can be complied with by redaction," and held that "the Confrontation Clause is not violated by admission of a nontestifying codefendant's confession with a proper limiting instruction when, as here, the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence."  481 U.S. at 211.  However, "[r]edactions that simply replace a name with an obvious

blank space or a word such as 'deleted'. . . or other similarly obvious indications of alteration" are considered to "so closely resemble <u>Bruton's</u> unredacted statements" that they cannot be admitted. <u>Gray</u>, 523 U.S. at 192.

In reaching its decisions in <u>Richardson</u> and <u>Gray</u>, the Supreme Court drew an important distinction between confessions that are directly inculpatory of a co-defendant and those that are only indirectly so. In <u>Richardson</u>, it contrasted the inadmissible statement in <u>Bruton</u>, which "expressly implicated" the defendant, with the admissible statement in <u>Richardson</u>, which "was not incriminating on its face and became so only when linked with evidence introduced later at trial." <u>Id.</u> Hence, in <u>Gray</u>, the Supreme Court acknowledged that "<u>Richardson</u> placed outside the scope of <u>Bruton</u>'s rule those statements that incriminate inferentially." 523 U.S. at 195; <u>accord</u> <u>United States v. Wilson</u>, 160 F.3d 732, 740 n.5 (D.C. Cir. 1998). At the same time, the Supreme Court cautioned in <u>Gray</u> that statements that "obviously refer directly to [the defendant]" will still pose a <u>Bruton</u> problem if "a jury could ordinarily make [the inference] immediately." 523 U.S. at 195.

An abundance of case law has since developed on the types of redactions that will satisfy <u>Bruton</u>, <u>Richardson</u>, and <u>Gray</u>. The use of neutral pronouns or other general identifiers, such as "other guys," has been recognized by several circuits as a type of redaction that satisfies <u>Bruton</u>.[8] Prior to trial, the Court considered redactions of this nature, and many others, to ensure that the redacted confessions would not be directly accusatory, or contain obvious pointers to any specific

---

[8] <u>See</u> <u>United States v. Sutton</u>, 337 F.3d 792, 799 (7th Cir. 2003); <u>United States v. Akinkoye</u>, 185 F.3d 192, 198 (4th Cir. 1999); <u>United States v. Vasilakos</u>, 508 F.3d 401, 407-08 (6th Cir. 2007); <u>United States v. Logan</u>, 210 F.3d 820, 821-23 (8th Cir. 2000); <u>United States v. Verduzco-Martinez</u>, 186 F.3d 1208, 1214 (10th Cir. 1999).

co-defendant, or invite direct inferences of any particular co-defendant's involvement in the offense.

With those principles in mind, the Court held that the government may introduce out-of-court statements with redactions and substitutions as follows:

- "Whenever possible, the government shall omit references to the activities of non-declarant co-defendants."

- "The government shall substitute neutral pronouns for non-declarant co-defendant names, such that there is no obvious reference to them."

- "Substitutions shall not include aliases or nicknames, terms that identify the non-declarant co-defendant's alleged role in the crime, terms that identify the non-declarant co-defendant's relationship to the declarant defendant, terms that provide identifying information about the non-declarant co-defendant, or terms that quantify the number of people involved in the specific conduct. Substitutions can include neutral pronouns or identifiers such as "someone," "guy(s)," "individual(s)," "person," "people," "another person," or "others."

See Order, ECF #462, at 2-3 (May 1, 2009). The Court also directed the government to ensure that the redacted statements did not create an "inevitable association" with a particular defendant when the statement is viewed with other evidence, recognizing that a redacted statement may, in some circumstances, give rise to an immediate and direct inference of a particular defendant's involvement. See United States v. Washington, 952 F.2d 1402, 1406-07 (D.C. Cir. 1991) (holding that when "all references to the defendant in a codefendant's statement are replaced with indefinite pronouns or other general terms, the Confrontation Clause is not violated by the redacted statement's admission if, when viewed together with other evidence, the statement does not create an inevitable association with the defendant, and a proper limiting instruction is

given") (emphasis added).[9] All of these rulings were designed to ensure that the pretrial out-of-court statements would be offered in evidence solely against the individuals who made them, without incriminating any co-defendant.

The Court also ordered other precautions to safeguard against prejudice to defendants. First, the Court prohibited the admission of the written statements themselves, noting that Gray cautioned that prejudice results when it is readily apparent to the jury from the "face" of the confession that it has been altered or redacted to mask the identity of a co-defendant. Instead, the Court allowed the introduction of the contents of the statements through live witness testimony so that the redactions would not be apparent to the jury. See United States v. Logan, 210 F.3d 820, 823 (8th Cir. 2000) (noting that introduction of a confession through live testimony is preferred to "the less ephemeral and potentially more damaging form of a writing"). The Court also required the government to provide defense counsel with Bruton statements complying with the Court's Order one week before trial, to ensure that any objections could be addressed before trial began.

The Court also fully considered whether introduction of the statements created a Confrontation Clause problem under Crawford v. Washington, 541 U.S. 36 (2004). In Crawford, the Supreme Court held that an out-of-court "testimonial" statement offered against an accused is inadmissible if the witness is unavailable unless the defendant had a prior opportunity to cross-examine the witness. 541 U.S. at 68-69. Based on that proposition, defendants argued that the Confrontation Clause categorically barred the introduction of their co-defendants' pretrial out-of-

_____

[9] The "inevitable association" standard is consistent with Gray and has been recognized as controlling law after Gray. See United States v. Brodie, 326 F. Supp. 2d 83, 95 (D.D.C. 2004).

court statements, based on the presumption that those statements are "testimonial" hearsay against the non-declarant defendants. The Court determined, however, that Crawford was not implicated with respect to the "Brutonized"statements. See Mot. Hr'g Tr. (May 1, 2009). Although Crawford was clear that "testimonial" statements include those given during police interrogations (541 U.S. at 68), which are precisely the types of statements at issue here, no Crawford problem was presented because the testimonial statements would not be offered against co-defendants -- they were offered solely against the declarants themselves. Indeed, the very purpose of the extensive redactions ordered by the Court was to ensure that the out-of-court statements would be offered in evidence solely against the individuals who made them. Where the out-of-court statements are redacted as required by Bruton, Richardson, and Gray, no Crawford problem arises because the statements do not constitute "testimonial" statements against the non-declarant defendants. See United States v. Lung Fong Chen, 393 F.3d 139, 150 (2d Cir. 2004) ("The same attenuation of [defendant's] statements from [his co-defendant's] guilt that prevents Bruton error also serves to prevent Crawford error.").

Consistent with the Bruton and Crawford pretrial rulings, the Court gave the following limiting instruction to the jury at trial: "Each statement of a defendant was admitted only with respect to that defendant himself, and it was not admitted against the other defendants. You may consider such evidence only with respect to the particular defendant who made the statement. You must not consider it in any way in your deliberations with respect to the other defendants." Jury Instructions at 42.

Against this backdrop, the Court now considers the specific arguments from Pierre, Nixon, Clarke, and Sealey that their Confrontation Clause rights were nonetheless violated.

27

Pierre and Sealey have provided no new arguments in support of their Bruton contention. They summarily assert that the redactions were insufficient to comply with Bruton because other evidence presented at trial -- evidence extrinsic to the out-of-court statements -- made it possible for the jury to identify the "other guy" or "other person" in the statements. See Pierre's Reply, ECF #714, at 6-10; Sealey's Mem., ECF #706, at 2. But as the Court explained in its pretrial rulings, Bruton is limited to statements that facially incriminate a co-defendant -- either because the statement is directly accusatory, contains an obvious pointer to the nondeclarant co-defendant, or invites a direct and immediate inference of a co-defendant's guilt. In other words, extrinsic evidence is only relevant to the extent the statement combined with extrinsic evidence creates an "inevitable association" with a particular defendant. Washington, 952 F.2d at 1406-07. Here, Pierre and Sealey have fallen well short of demonstrating that their co-defendants' redacted statements and other trial evidence resulted in an "inevitable association" with them, and having reviewed the trial record, the Court sees no such "inevitable association."

Clarke and Nixon have made a more detailed submission in support of their arguments. For his part, Clarke contends that witness testimony describing Demerieux's redacted statement violated Bruton because he and Demeriuex were accused of acting as the only two guards at the campsite during the hostage taking and, hence, replacing Clarke's name with the term "the other guy" was the equivalent of inserting his name in Demerieux's statement. See Clarke's Mem., ECF #701, at 29. The Court disagrees. Seven defendants were tried before the jury, and there were several unindicted co-conspirators. The participants had different, but often overlapping, roles. The evidence established that other persons were present at or near the campsite during the course of the hostage taking, including Russel Joseph, Jason Percival, and Anderson Straker.

See, e.g., Trial Tr. at 691-93 (May 29, 2009); Trial Tr. at 2051-52 (June 9, 2009).  Hence, Demerieux's redacted statement, even when combined with the other trial evidence, did not create a direct and immediate link -- an "inevitable association" -- with Clarke.

Nixon contends that witness testimony describing three statements made by Sealey incriminated Nixon and hence violated Bruton:  one statement to the Trinidad police on August 8, 2006, another to the FBI on the same date, and a third to Leon Nurse while awaiting trial in 2009.  See Nixon's Mem., ECF #699, at 2-9.  Nixon contends that the 2009 Sealey statement, introduced through Nurse's testimony, expressly names Nixon as a participant in the hostage taking, and that the 2006 statements were Bruton error because they created an "inevitable association" between Nixon and Sealey.  Ultimately, the government concedes a Bruton violation with respect to Nurse's trial testimony about Sealey's statement, but denies that any other Bruton error occurred as a result of testimony concerning Sealey's other statements.  The government contends that the Bruton violation stemming from Nurse's testimony was harmless error because the prejudicial impact was low and other evidence overwhelmingly established Nixon's guilt.

As a threshold matter, the Court must decide what Bruton errors, if any, occurred.  The government effectively concedes a Bruton violation resulted from Nurse's testimony, acknowledging that Nurse momentarily let Nixon's name slip into his testimony about Sealey's statement.  See Gov't Mem., ECF #712, at 64, 150-53 (citing Trial Tr. at 1572-77 (June 4, 2009)).  Hence, the Court will first focus on whether there also was Bruton error from testimony concerning Sealey's 2006 confessions.  Two witnesses -- Constable Mitchell-Gosyne and Marvin Freeman from the FBI -- testified that Sealey had confessed to the Trinidad police and the FBI in 2006 that he and "another man" went to the Samaan Tree Bar and abducted Maharaj.  Trial Tr. at

4813 (June 29, 2009) (Mitchell-Gosyne); Trial Tr. at 4909 (June 29, 2009) (Freeman). In Nixon's view, introduction of those statements -- even though redacted to eliminate any reference to Nixon -- nonetheless made Sealey a witness against Nixon because the government's theory of the case was that only two gunmen abducted Maharaj from the Samaan Tree Bar and hence it was "patently obvious" to the jury that Sealey's redacted statement referring to "another man" was, in fact, referring to Nixon. He also contends that Nurse's testimony concerning the third Sealey confession in 2009 -- discussed in more detail below -- had already directly named Nixon as the "[]other man." The Court has reviewed the trial testimony and concludes that there is nothing in the testimony concerning Sealey's 2006 statements that incriminates Nixon. There were simply so many references to "other men" and other unidentified persons at or near the Samaan Tree Bar that there was no "inevitable association" with Nixon being the person described as "another man" who entered the bar with Sealey.[10]

---

[10] The following exchange illustrates how the multiple references to "other men" and "another man" in several contexts (not always the same "man") does not incriminate Nixon as a participant or lead to an "inevitable association" that Nixon was the one who entered the Samaan Tree Bar with Sealey:

Q. What if anything did he [Sealey] say happened upon arriving at the bar?

A. Upon arriving at the bar, he observed the first vehicle drive around the bar and park in an area that provides full view of the bar. He said that as the first vehicle passed the bar, Soldier Number Three, who was alone in the first vehicle, pointed towards the bar, and <u>another person</u> in the vehicle said, "That's the man in there with the pink shirt."
. . . .
Q. And then what did he say happened next?

A. He said that he <u>and some other men</u> were in the second vehicle. He said the second vehicle drove around the bar. And upon making a second approach toward the bar, they parked across the street from the bar.

(continued...)

The next question is whether the <u>Bruton</u> error resulting from Nurse's testimony requires a new trial. It is well-settled that <u>Bruton</u> error is not ground for a new trial where "the properly admitted evidence of guilt is so overwhelming, and the prejudicial effect of the codefendant's admission is so insignificant by comparison, that it is clear beyond a reasonable doubt that the improper use of the admission was harmless error." <u>Schneble v. Florida</u>, 405 U.S. 427, 428 (1972); <u>accord</u> <u>United States v. Jass</u>, 569 F.3d 47, 64 (2d Cir. 2009) (reviewing <u>Bruton</u> error for harmlessness beyond a reasonable doubt, citing <u>Schneble</u>); <u>United States v. Lewis</u>, 557 F.3d 601, 611 (8th Cir. 2009); <u>United States v. Hardwick</u>, 544 F.3d 565, 574 (3d Cir. 2008); <u>United States v. Schwartz</u>, 541 F.3d 1331, 1354 (11th Cir. 2008); <u>United States v. Nash</u>, 482 F.3d 1209, 1219 (10th Cir. 2007). In other words, whether the error was harmless depends on "whether the jury

---

[10](...continued)
Q. What did he say happened after that?

A. Shortly thereafter, Soldier Number Three entered the second vehicle and gave Mr. Sealey <u>and another person</u> each a gun. Soldier Number Three had both guns in his waistband. Soldier Number Three gave Mr. Sealey a nine-millimeter pistol and a .38-caliber revolver to the other person.

Q. And what if anything did Mr. Sealey indicate that he did at that point?

A. Mr. Sealey said he exited the second vehicle and went into the bar. <u>As another man stood behind the victim</u>, Mr. Sealey approached the victim and stated, "We come for you." . . . The victim eventually complied with Mr. Sealey's demand. And as the victim walked out of the bar -- Mr. Sealey <u>and another man</u> walked out of the bar with Mr. Sealey <u>and another man</u>; Mr. Sealey kept the gun pointed into the victim's back. And when Mr. Sealey returned to the second vehicle, <u>another man</u> took control of the victim and placed the victim in the middle of the back seat . . . .

<u>See</u> Trial Tr. at 4908-10 (June 29. 2009) (Freeman's testimony describing Sealey's confession) (emphasis added); <u>see also</u> Trial Tr. at 4812-13 (June 29, 2009) (Gosyne's testimony describing Sealey's confession as referring to multiple participants at the Samaan Tree Bar before stating that Sealey confessed "I end up sticking the man up, me and another man, and after we took him to the car we went up Santa Cruz and hand him over to the man.").

would have returned the same verdict absent the error." Nash, 482 F.3d at 1219. Factors to consider in this assessment are "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." See Delaware v. Van Arsdall, 475 U.S. 673, 684 (1986); accord Mason v. Allen, 605 F.3d 1114, 1123-24 (11th Cir. 2010) ("notwithstanding the Confrontation Clause violation, we cannot reverse a conviction or order a new sentencing hearing if the error is harmless").

The Bruton error at issue here occurred early in the trial, through the testimony of Leon Nurse. Nurse was permitted to testify about Sealey's statement to him in 2009 while they were incarcerated pending trial, in which Sealey admitted participating in the hostage taking at the Samaan Tree Bar. The Court cautioned Nurse, out of the presence of the jury, not to mention any other defendant's name when recounting Sealey's statement to him.[11] However, when Nurse testified, he nonetheless made a passing reference to Nixon as follows:

> Q: While Mr. Sealey was one of your cell mates . . . did Mr. Sealey have a conversation with you about his role in the kidnapping of Balram Maharaj?
>
> A. Yes, he did, sir.
>
> Q. What did he tell you?
>
> A. Well, he said at the scene -- at the scene of the kidnapping, sir,

---

[11] The Court' stated: "I'm instructing you that in answering the questions with regard to that incident, you are not to mention any other name. If you feel that an answer needs to include a reference to some other person, you should use the term 'someone else' or 'another guy' or 'another person.' But you are not to mention another name. You can mention Mr. Sealey's name, but no one else." Trial Tr. at 1571 (June 4, 2010).

he said that Mr. Nixon didn't really want to come out of the --

Trial Tr. at 1573 (June 4, 2009).  At this point, Nixon's counsel moved to strike Nurse's

testimony, and the Court instructed the jury to disregard that testimony.  Id. Questioning then

continued as follows:

> Q. Mr. Nurse, what did Mr. Sealey tell you happened?
>
> A. That someone who was with him at the point in time on the scene of the crime, sir, at the abduction, didn't -- was a bit hesitant in coming out of the car to approach the person and that he did have to, more or less, take the bull by the horn. He ended up using initiative and made the moves then, sir.
>
> Q. Did he indicate what he needed to do? . . . What, if anything, he needed to do as a result of the other person hesitating.
>
> A. Yes, sir. He [Sealey] felt that he had to get ahold of the situation, sir, and take charge of the situation. So he proceeded into the bar, sir.

Id.  Because Nurse testified that Sealey had identified Nixon as the other person in the car, it was

apparent from Nurse's subsequent "Brutonized" testimony about Sealey's statement that the

"someone" and "the other person hesitating" was Nixon.

The Court first assesses the prejudicial impact of Nurse's reference to Nixon, and

concludes that the prejudicial impact was not substantial.  The reference to Nixon was limited to

a single passing oral statement in the second week of a ten-week trial.  Nurse was not even

permitted to finish his sentence when he uttered Nixon's name.  The sentence, standing on its

own, amounted to testimony that Nixon was present at the scene of the hostage taking without

describing what Nixon did -- an incriminating reference, to be sure, but without any details as to

Nixon's specific actions.  Additionally, the Court immediately instructed the jury to disregard

Nurse's testimony (Trial Tr. at 1573), and the next trial day again instructed the jury to disregard

Nurse's reference to Nixon.[12]  Furthermore, the government made no reference to Sealey's jailhouse confession to Nurse in either its closing or rebuttal arguments.  Hence, it is clear that Nurse's testimony concerning Sealey's statement about Nixon did not form any part of the prosecution case.

The Court weighs this brief reference to Nixon in Nurse's testimony against the other evidence of Nixon's guilt -- that is, whether "the properly admitted evidence of guilt is so overwhelming . . . that it is clear beyond a reasonable doubt that the improper use of the admission was harmless error."  Schneble, 405 U.S. at 428.  The evidence used to prove Nixon's role in the hostage taking came primarily from Russel Joseph and Jason Percival.  Joseph provided detailed testimony establishing that he drove Nixon (along with Sealey) to the Samaan Tree Bar on the day of the abduction, that Nixon wore a Rasta hat and was armed with a gun, that Nixon entered the bar and then moments later opened the bar door while Sealey pulled the victim out, and that Nixon then helped Sealey force the victim into the back seat of the car, where Nixon sat next to him and instructed Joseph to drive to a cocoa field in Upper Santa Cruz.  See Trial Tr. at 675-95 (May 29, 2009); Trial Tr. at 749-52 (June 2, 2009).  Joseph further testified that Nixon and Sealey walked the blindfolded victim into the field and then drove back to the Mellow Moods bar to meet with the other co-conspirators where Percival and Pierre demanded that the victim be taken to a different location.  Joseph testified that he and Nixon then returned to the

---

[12]  The limiting instruction stated as follows: "Last Thursday Mr. Nurse was questioned -- he's the last witness we just heard from -- Mr. Nurse was questioned regarding a statement made to him by Christopher Sealey while they were cellmates at the D.C. jail. In response to one question, Mr. Nurse testified that Christopher Sealey told him that Kevin Nixon was at the scene of the kidnapping. I sustained an objection to that testimony, and I instructed you to disregard the answer. I again instruct you now to disregard any reference to Kevin Nixon in Mr. Nurse's answer and to treat that answer as if it were never given."  Trial Tr. at 1946-47 (June 9, 2009).

cocoa field, that Nixon retrieved the victim while Joseph remained in the car, and that they together drove to the end of Gran Curacaye Road where Nixon handed the victim over to Demerieux and Clarke. Trial Tr. at 682-83 (May 29, 2009).

Percival's testimony corroborated Joseph's account of the abduction. He testified that the co-conspirators took three vehicles to the Samaan Tree Bar on the date of the abduction, that they obtained guns for Nixon and Sealey, that he saw Nixon in Joseph's car, and that he parked near the bar as the abduction took place so that he could see what was happening. Trial Tr. at 2080-83 (June 9, 2009). He testified that he saw Nixon exit Joseph's vehicle with Sealey, that he saw them walk towards the bar, observed Sealey grabbing the victim, and then saw Nixon and Sealey both forcing the victim into Joseph's car and driving away. Id. at 2083, 2086. Percival testified that later that night there was a meeting at the Mellow Moods bar with DeFour, Pierre and himself, at which Nixon and Joseph arrived late. Id. at 2096. At the meeting, Pierre demanded that the victim be taken to another location where Clarke was waiting, and Nixon, Joseph, and Percival then returned to the cocoa field to do so. Id. at 2097-98. He also corroborated the physical description of Nixon, noting, as Joseph did, that Nixon wore a Rasta hat on the date of the abduction. Trial Tr. at 2064-65, (June 9, 2009).

There was further corroboration of Nixon's involvement in the abduction from an array of other sources. Gittens testified that Wayne Pierre had informed him that the abductors on the day of the snatch would be "Shaka" (Nixon) and "Boyie" (Sealey), and that they would be provided weapons. See Trial Tr. at 3193 (June 16, 2009). An eyewitness at the Samaan Tree gave an account of the abduction that matched the accounts provided by Joseph and Percival: two men entered the bar with guns, one of them wearing a Rasta hat colored red, green, and yellow; they

grabbed the victim and pulled him out; one of the men signaled a car, and then the two of them forced him into the back seat and sped away. Trial Tr. at 356-59 (May 28, 2009).

In short, there was overwhelming evidence of Nixon's guilt from the other evidence presented at trial. Nurse's stricken testimony -- a fleeting reference to Nixon early in the trial -- was of no significance when compared with the substantial testimony concerning Nixon's participation in the abduction provided by Joseph and Percival. Assuming <u>arguendo</u> that the jury even considered Nurse's stricken testimony, it was cumulative to the detailed testimony presented by Joseph and Percival, each of whom was subject to extensive cross-examination. Accordingly, having considered "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case," <u>Van Arsdall</u>, 475 U.S. at 684, the Court concludes that it is clear beyond a reasonable doubt that the <u>Bruton</u> error arising from Nurse's testimony was harmless. For the same reason, the Court concludes that any <u>Crawford</u> error arising from Nurse's testimony -- that is, Nurse's recitation of Sealey's "testimonial" hearsay statement against Nixon -- was harmless beyond a reasonable doubt. <u>See</u> <u>Van Arsdall</u>, 475 U.S. at 684 (Confrontation Clause errors are subject to harmless error analysis); <u>United States v. Lee</u>, 549 F.3d 84, 89-90 (2d Cir. 2008) (applying harmless error analysis to <u>Crawford</u> error).

## II. Brady/Jencks Violations

### A. The Alleged Brady and <u>Jencks</u> Violations

Defendants Demerieux, Clarke, Sealey, and DeFour each move for a new trial or dismissal of the case based on the government's failure to make timely disclosure of information favorable to the defense in violation of the government's obligations under the Due Process Clause and <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), <u>Giglio v. United States</u>, 405 U.S. 150 (1972), <u>United States v. Bagley</u>, 473 U.S. 667 (1985), and <u>Kyles v. Whitley</u>, 514 U.S. 419 (1995). To be sure, the government's delayed disclosures of <u>Brady</u> material were significant and recurring throughout the trial, causing the Court repeatedly to caution the government that it should disclose those materials more expeditiously and to express concern that the many eleventh-hour disclosures of potential <u>Brady</u> material could potentially threaten the case. As the trial wound its way to conclusion, it became apparent that defendants' counsel were able to make use of most, if not all, of the materials that were belatedly disclosed, as witnesses were recalled and portions of the trial were delayed to give counsel time to review new materials that became available. The question remains whether any of those delayed disclosures resulted in <u>Brady</u> violations. Defendants now focus on four alleged violations:

- **Evidence pertaining to an x-ray of the victim's skull.** Demerieux contends that, weeks into the trial, the government belatedly disclosed two pieces of evidence that showed that the victim's skull was not fractured -- evidence that allegedly would have impeached cooperator testimony indicating that Demerieux had dented the victim's head with a large stone. <u>See</u> Demerieux's Mem., ECF #698, at 2-11. The government did not disclose until June 29, 2009 (five weeks into trial), Clauss's grand jury testimony that he had learned from Trinidad police that an x-ray of the victim's skull had been taken in 2006 and indicated no fracture to the skull. The government also did not disclose until on or about July 2, 2009, the x-ray at issue (taken by Hughvon Des Vignes, the Trinidadian pathologist who examined the victim's remains). Demerieux contends that this

evidence is significant for two reasons: (1) it would have undermined Percival's testimony that Demerieux struck the victim with a stone or that Demerieux was otherwise a willing participant in the conspiracy and hostage taking, by suggesting that Demerieux did not hit the victim's skull; and (2) it would have shown that the Trinidad police had doubts about Percival's credibility that were confirmed by the x-ray of the skull.

- **Russel Joseph's January 17, 2006, Statement to Trinidad Police**. DeFour and Sealey contend that the government failed timely to disclose Russel Joseph's January 17, 2006 statement to Trinidad police -- a statement that the government did not disclose to defendants until the end of the first week of trial, about May 29, 2009. In that statement, Joseph identified Ricardo Stevenson -- rather than DeFour -- as the driver of the second car (the "clearing car") used by the co-conspirators at the Samaan Tree Bar. See DeFour's Mem., ECF #707, at 20-21. DeFour contends that, if disclosure had been timely made, he could have used it to further investigate and bolster his third-party perpetrator defense.

  The statement also identified the two abductors at the Samaan Tree Bar as Nixon and an individual nicknamed "T," without any mention of Sealey. See Sealey's Mem., ECF #706, at 8-9. Sealey contends that the statement has obvious exculpatory value in showing that he was not one of the abductors at the Samaan Tree Bar.

- **Clauss's Grand Jury Testimony Concerning Ricardo Stevenson.** DeFour also contends that the government's failure timely to disclose Clauss's grand jury testimony gave rise to a Brady violation in one other respect. See DeFour's Mem., ECF #707, at 21. Clauss testified before the grand jury on April 7, 2006, regarding his interview of Percival, and stated that Percival's cousin, Ricardo Stevenson, is "also known as DeFour." DeFour contends that the late disclosure prevented him from using that information as part of a third-party perpetrator defense -- that is, that it was Stevenson, rather than DeFour, who participated in the hostage taking.

- **The False Campsite Testimony and Diagram.** Clarke and Demerieux contend that the government failed timely to disclose evidence that reflected its belief that, when Clarke was arrested, Clarke had led Agent Clauss to a campsite where Clarke falsely claimed the victim was held -- the so-called "false campsite."[13] See

---

[13] Clarke's opening motion refers to two other delayed disclosures as Brady violations, but fails to describe the contents of the evidence with any reasonable specificity or to explain how any delay in disclosure was prejudicial. See Clarke's Mem., ECF #701, at 15-16 (citing "as examples" of Brady violations failure to timely disclose (1) "the 302 prepared by Agent Cruz and

(continued...)

Clarke's Mem., ECF # 701, at 15-16, 21; Clarke's Reply, ECF # 716, at 3-4, 12-22. The evidence at issue consists of (1) the government's longstanding belief that, on January 26, 2006 when Clarke led the police to the purported campsite where Maharaj was held, the government believed Clarke had led them to a false campsite; and (2) a diagram with the notation "believed to be Clauss diagram from false campsite." See Trial Tr. at 4353-4355 (June 23, 2009). For Clarke's part, he contends that this evidence is exculpatory because, during Clauss's testimony, the jury was left with the erroneous impression that Clarke had led the police to the true campsite. Clarke's Mem., ECF #701, at 21. In other words, the fact that Clarke led the police to a false campsite is, in his view, evidence that he did not know where the real campsite was. Clarke's Reply, ECF #716, at 14. For Demerieux's part, he contends that he was prejudiced by the delayed disclosure because, in his opening statement, his counsel promised the jury that it would hear that Trinidad police and the FBI scoured the campsite for evidence and found no link to Demerieux. See Demerieux's Mem., ECF #698, at 13.

**B.      Summary of Legal Standards**

Under Brady, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. The Supreme Court held in Giglio v. United States that the prosecution's Brady obligation extends to evidence affecting the credibility of a witness. Giglio, 405 U.S. at 154. Disclosure is mandatory regardless of whether a defendant requests it. United States v. Agurs, 427 U.S. 97, 107 (1976).

---

[13](...continued)
Agent Clauss prior to Clauss's testimony" without describing the contents of the 302 that is exculpatory, and (2) "the approximately 200 pages of background files of Jencks material until Sunday, June 28, 2009," without describing the contents that might be exculpatory). Clarke proffers a longer list of other late disclosures and Court "admonishments" to the government in his reply brief -- 12 other events to be exact, and various reiterations of the four Brady violations described above -- again without describing the contents of the documents or how the delayed disclosure was prejudicial to him. Clarke's Reply, ECF # 716, at 4-8. Because Clarke has not sufficiently described the foregoing alleged Brady material, or otherwise made a proffer to meet his burden of showing that the delayed disclosure resulted in prejudice to him, the Court is unable to consider those Brady issues, except to the extent the Court has considered the separate Brady arguments of his co-defendants and the overall fairness of the trial.

There are, then, three elements to a Brady violation.  "'The evidence at issue must [1] be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must [2] have been suppressed by the [government], either willfully or inadvertently; and [3] prejudice must have ensued."  Wilson, 605 F.3d at 1005 (brackets in original; quoting Strickler v. Greene, 527 U.S. 263, 281-82 (1999)).  To establish the prejudice element, a defendant must show a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  Strickler, 527 U.S. at 280 (internal quotation marks omitted).  In other words, prejudice exists if "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."  Kyles, 514 U.S. at 435.  As this Circuit noted in United States v. Oruche, 484 F. 3d 590, 597 (D.C. Cir. 2007), "the question is not whether the defendant would more likely than not have received a different verdict, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."  In assessing whether the verdict is worthy of confidence, a court considers, among other things, the other evidence that supports the government's case.  See Celis, 608 F.3d at 837 (considering the "overwhelming" evidence against defendants in finding no Brady violation).

All of the alleged Brady violations raised by defendants relate to evidence that was not technically "suppressed" -- the second element -- but rather was disclosed to defendants in the middle of trial.  Hence, the Court must also consider whether the timing of the government's disclosures resulted in a Brady violation.  As this Circuit recognized most recently in Celis, "the timing of the government's disclosure of Brady and Giglio evidence and information is important":

In United States v. Pollack, 534 F.2d 964 (D.C.Cir.1976), this court instructed that "[d]isclosure by the government must be made at such a time as to allow the defense to use the favorable material effectively in the preparation and presentation of its case, even if satisfaction of this criterion requires pre-trial disclosure." Id. at 973. Similarly, in Bagley, 473 U.S. at 678, the Supreme Court had observed that "[t]he constitutional error, if any, in this case was the Government's failure to assist the defense by disclosing information that might have been helpful in conducting the cross-examination."

Celis, 608 F.3d at 835. At the same time, the Circuit emphasized that delayed disclosure is not equated with suppression, for even mid-trial disclosures may be effectively used by defense counsel, especially if the court provides counsel additional time to address the late-disclosed evidence or makes some other accommodation such as reopening the examination of a witness. Id. at 835-37. "[T]he critical point is that disclosure must occur in sufficient time for defense counsel to be able to make effective use of the disclosed evidence." Id. at 836 (emphasis added); accord United States v. Andrews, 532 F.3d 900, 907 (D.C. Cir. 2008) ("[A] new trial is rarely warranted based on a Brady claim where the defendant[] obtained the information in time to make use of it."). Furthermore, when a claim of delayed disclosure is at issue, the defendant "'must establish that had the information or evidence been disclosed earlier, there is a probability sufficient to undermine our confidence in the actual outcome that the jury would have acquitted.'" Celis, 608 F.3d at 835 (quoting United States v. Tarantino, 846 F.2d 1384, 1417 (D.C. Cir. 1988)). If defense counsel was able to make effective use of the tardily disclosed evidence at trial, then a Brady violation will not be found. See id. at 836-37 (holding that defense counsel had made effective use of the materials, and hence the tardy disclosure of cooperating witness's prior statements, on the eve of the witness's testimony, did not constitute a Brady violation).

In addition to the disclosure obligations under Brady, the prosecution has independent disclosure obligations under the Jencks Act, 18 U.S.C. § 3500 -- obligations that may overlap to

41

some extent.  See Oruche, 484 F.3d at 597.  The Jencks Act requires disclosure of all statements

of a prosecution witness relating to the witness's testimony after the witness has testified on

direct examination, in a manner allowing the defense a reasonable opportunity to examine the

material and prepare for its use in the trial.  See 18 U.S.C. § 3500(b), (e); Celis, 608 F.3d at 835

(internal citations omitted).

### C.     Analysis of the Individual Brady Violations

#### 1.     Evidence Pertaining to X-ray of the Victim's Skull

The Court first turns to Demerieux's contention that the evidence pertaining to the x-ray

of the victim's skull was exculpatory and that the late disclosure requires a new trial.  As noted

earlier, this evidence consisted of, first, Clauss's grand jury testimony that Trinidad police had

taken an x-ray of the skull in 2006 that showed no skull fracture and, second, the x-ray itself.

Demerieux's theory is that the x-ray evidence was exculpatory because (1) it would have

undermined Percival's testimony that Demerieux was a willing participant in the conspiracy and

hostage taking, by negating Percival's testimony that Demerieux had struck the victim's head with

a rock; and (2) it would have shown that the Trinidad police had doubts about Percival's

credibility that were confirmed by the x-ray of the skull.  The government does not dispute that

the evidence was favorable to Demerieux, and the Court assumes without deciding that it was.

Demerieux's Brady argument cannot succeed, however, because the evidence was

disclosed in time for his counsel to make effective use of it.  Demerieux had Clauss's grand jury

testimony about the existence of the x-ray by June 29, 2009, about the mid-point of the trial, and

he was able to use that grand jury testimony to acquire the underlying x-ray.  See Demerieux's

Mem., ECF #698, at 7. The government obtained the x-ray from Trinidad police days later, and it

was admitted into evidence on July 2, 2009. <u>See</u> Trial Tr. at 5621-22 (July 2, 2009) (admitting the x-ray as Demerieux's Ex. 11). Dr. Hughvon Des Vignes -- the government's expert in forensic pathology who testified about the physical state of the victim's body -- provided testimony about the x-ray on both cross-examination and re-cross. During the first cross-examination by Demerieux, counsel did not yet have the x-ray, but elicited testimony from Dr. Des Vignes based on his involvement in taking and examining the x-ray, which unequivocally established that the victim's skull was not fractured:

> Q. Sir, did you have occasion in February of 2006 to order an X-ray of the skull that was recovered among the remains on January 8th, 2006?
>
> A. Yes, I did.
>                . . .
>
> Q. Sergeant or -- Corporal Lucas, Wendell Lucas, do you know who that is?
>
> A. Yes, I know who that is.
>  . . . .
>
> Q. Did you have any conversation with Wendell Lucas at all about X-raying this skull?
>
> A. Yes, I did.
>
> Q. And in that conversation -- that was also in February of 2006?
>
> A. Yes, it was.
>
> Q. And in that conversation -- well, as a result of that conversation, did you do the X-ray or did you -- did that not play a part at all in your decision to do the X-ray?
>
> A. Yes. As a result of my conversation with Officer Lucas, I did perform an X-ray after examining the skull.
>
> Q. And you didn't perform the X-ray yourself? You had one of your technicians do it?

A. Yes, I had my technician perform the X-ray.

Q. And that X-ray showed, didn't it, that there was no damage to the skull?

A. Yes, the X-ray showed that there was no damage to the skull.

Q. And, in fact, an X-ray would have revealed a hairline fracture, wouldn't it have?

A. Yes, an X-ray would have revealed a hairline fracture. But I would have been able to diagnose that easily with a hand lens and the skull in front of me, an examination that would have been done previously.

Q. And when you looked at the skull, you saw no evidence of damage at all. Is that right?

A. No, there was no evidence of damage when I examined the cleaned-up skull with the naked eye and a hand lens.

Id. at 5608-10. Later that morning, the x-ray arrived and was provided to defense counsel. Id. at

5620. Demerieux's counsel was allowed to re-cross examine Dr. Des Vignes with the x-ray in

hand, and elicited testimony supporting the defense position that Percival's statement concerning

Demerieux striking the victim's head was not credible in light of the absence of a fracture:

Q. Doctor, could you look in that exhibit and tell us what's there, please.

A. . . . . These are X-rays of the skull of Balram Maharaj, looking from front to the back and looking from side to side.

Q. So are those the X-rays about which you testified a moment ago?

A. Yes, they are.

Q. And would you consider that a full set of X-rays since it shows the entire circumference of the

A. . . . [I]n this situation, it would be considered a full set.
. . . .

Q. . . . [L]et's assume that someone picked up a big rock and hit a

> person so hard that it caused a dent to the head. Would you then
> expect the X-ray to show that damage?
>
> A. Yes. If there was a dent in the head, the X-ray would show that
> damage.

Id. at 5622-23.  Through this line of cross and re-cross, Demerieux's counsel effectively

established, with the government's own witness, that there was "no evidence of damage" to the

skull, and that such damage would be expected to appear on an x-ray if the victim's head were

"dented" with a rock, thus incontrovertibly establishing the same fact that he now says he would

establish in a new trial -- i.e., that there was no physical evidence of skull trauma, thus supporting

Demerieux's contention that he did not hit the victim in the head with a stone.  Demerieux's

counsel also established that Lucas was involved in the decision to take the x-ray shortly after

Percival had been interviewed, the second function he now wishes to use the evidence for -- that

is, that Lucas was testing Percival's crediblity.  Because Demerieux's counsel was able to make

effective use of both Clauss's grand jury testimony and the x-ray evidence, no Brady violation

occurred.  See Celis, 608 F.3d at 836; Andrews, 532 F.3d at 907

**2.      Russel Joseph's January 17, 2006, Statement to Trinidad Police**

DeFour and Sealey contend that the government's late disclosure of Russel Joseph's

January 17, 2006 statement to Trinidad police constituted a Brady and Jencks violation, noting

that Joseph was an important witness for the government and the statement was not disclosed to

defendants until the end of the first week of trial, about May 29, 2009.  See Trial Tr. at 107 (June

3, 2009) (discussing counsel's representation that they received Joseph's January 2006 statement

the preceding Friday, May 29, 2009).  Two portions of the statement are at issue.  DeFour

focuses on Joseph's statement that Ricardo Stevenson -- rather than DeFour -- was the driver of

the second car (the "clearing car") used by the co-conspirators at the Samaan Tree Bar on April 6, 2005.  See DeFour's Mem., ECF #707, at 20-21.  DeFour contends that, if disclosure had been timely made, he could have used the statement to further investigate and bolster his third-party perpetrator defense.  Sealey  focuses on Joseph's statement that the two abductors at the Samaan Tree Bar were Nixon and an individual nicknamed "T," without any mention of Sealey.  See Sealey's Mem., ECF #706, at 8-9. Sealey contends that statement has obvious exculpatory value in showing that he was not one of the abductors at the Samaan Tree Bar and that the late disclosure precluded meaningful investigation and use of the information at trial.

Defendants cast their challenge as both a Brady and Jencks Act issue, but the government correctly points out that the timing of disclosure is consistent with the Jencks Act.  Joseph's testimony began on May 29, 2009, and continued through June 3, 2009.  Hence, disclosure of Joseph's January 2006 statement on May 29, 2009, comported with the government's obligation under the Jencks Act to disclose Joseph's January 2006 statement when he testified on direct examination.  Defendants are correct that the government did, however, falter with respect to complying with the Court's oral directive to provide Jencks material faster than required by the Act.  See Clarke's Mem., ECF #701, at 13.  Specifically, on the first day of trial, the Court instructed the government to provide Jencks material to defense counsel two days prior to the presentation of each of its witnesses.  Trial Tr. at 226-28 (May 27, 2009).  Obviously, this timetable was not met with respect to Joseph (a two-day lapse), but that does not amount to a violation of the Jencks Act.

The more substantial issue is whether the timing of the disclosure gave rise to a Brady violation.  Joseph's January 2006 statement was clearly exculpatory as to DeFour and Sealey

because, if believed, his statement suggests that persons other than DeFour and Sealey played the roles ascribed to each of them in the kidnapping. The Court thus proceeds to consider whether the evidence was "suppressed" -- which, in the context of delayed disclosure, means whether it was disclosed too late for counsel to make effective use of it. Considering the timing of the disclosure early in a two-month long trial, and a lengthy continuance mid-trial that provided an opportunity for defendants to conduct further investigation, the Court concludes that disclosure occurred in time for defense counsel to use it effectively. That is not to excuse the government's tardy disclosure, but merely to conclude that no violation warranting relief under Brady occurred.

First, as noted above, disclosure occurred on May 29, 2009, during the first week of trial, while Joseph was still on the stand. He was fully cross-examined by DeFour's counsel immediately after the government's direct examination, with much of the focus being on his January 2006 statement identifying Stevenson, rather than DeFour, as the clearing car driver. DeFour's extensive cross-examination pointedly and repeatedly highlighted Joseph's identification of Stevenson in the role Joseph later assigned to DeFour, and also tested Joseph's credibility on the matter. Among other things, cross-examination resulted in Joseph admitting that he initially identified Stevenson as driving the "lead car" (the clearing car) and that there are similarities between Stevenson and DeFour, in the following exchange:

> Q. You accused someone else of doing what you -- of what now you're saying my client [DeFour] did. Right? Driving the lead car. Right?
>
> A. No, sir.
>
> Q. You didn't accuse someone else?
>
> A. I can't recall right now.
> . . .
> Q. And you can't recall who you put in there, who you accused, even though you

47

looked at it Friday, huh?

A. There's a name in my head, but I'm not sure if it's the right. I think it was Stevo.

Q. Stevo?

A. Yes, sir.
. . .
Q. . . . [Y]ou described the person who drove the lead car as being a big guy. Right?

A. Yes, sir.

Q. So you weren't describing De Four then, were you?

A. No, sir.

Q. And Stevo's real name is Ricardo Stevenson. Right?

A. That's correct.

Q. And my client's name is Ricardo De Four. Right?

A. That's correct.

Q. And they're both soldiers. Right?

A. That's correct.

See Trial Tr. at 879-82, 891-93 (June 2, 2009). This cross-examination shows that DeFour had

Joseph's January 2006 statement in time to pursue his third-party perpretator theory on cross-

examination. DeFour also effectively challenged Joseph's credibility by obtaining an admission

that Joseph had lied to the police in January 2006, and that he would accuse an "innocent man" of

committing the offense in order to save himself. Id. at 879-82.[14]

---

[14]  The following excerpts from DeFour's cross-examination are illustrative:

Q. You've acknowledged that you lied to the police when you first came in, in this case.
Isn't that correct?

(continued...)

Sealey's counsel, too, had the January 2006 statement in time to conduct effective cross-examination. Sealey's counsel elicited extensive testimony from Joseph that underscored the fact that Joseph had identified "T" as the person who entered the Samaan Tree Bar with Nixon and took the victim by force, making no mention of Sealey:

> Q. In fact, when you spoke with them [the Trinidad police], you told them, "I'm going to tell you, all you, what I know." Correct?
>
> A. Yes, sir.

---

[14](...continued)
A. Yes, sir.
Q. And you say that the reason you've lied -- and that was on January 17th, 2005 [sic, 2006]. Correct?
A. Yes, sir.
 . . .
Q. You left all the soldiers out -- you left Ricardo De Four out because Roger Gibbs told you to leave out all the soldiers. Right?
A. Yes, sir.
Q. And then you substituted another soldier in his place. Right?
A. Yes, I did.
Q. So did you lie to us this morning about why you left Mr. De Four out?
A. No, sir.
Q. Well, why did you put another soldier in his place?
A. Stevo was still in custody, and I just needed to put someone there.
Q. Well, I thought you -- okay. Stevenson was in custody. You needed to put someone there, so you accused an innocent man in a capital offense. Right?
A. Fair to say.
. . .
Q. And what were you talking with the police about? Why were you talking to them? Because you wanted to do what for yourself?
A. I was trying to save myself.
Q. So in order to save yourself, you accused an innocent man?
A. Yes, sir.
. . .
Q. Were you confused when you met with the justice of the peace and the police officer, or are you intentionally lying about who did what?
A. It was intentional to protect myself.

Trial Tr. at 879-82 (June 2, 2009).

Q. And then you went on for -- after breakfast, through the morning, and into early afternoon with them. Correct?

A. That's right.

Q. And during that period of time, you talked about Tee. Correct?

A. That's right.

Q. And that whole morning you didn't mention the name Boyie. Right?

A. Not at all.

Q. And you didn't mention the name Christopher Sealey?

A. No, sir.

Q. You didn't mention the name [Sealey's alias] Michael Bourne?

A. No, sir.
. . .

Q. You didn't talk about the person you call Mr. Sealey's brother, did you?

A. No, sir.

Q. You talked about Tee. Correct?

A. That's right.
. . .

Q. In your statement to Lucas and Pinder in that three or four or five hours that day, you told them that it was Tee that was sitting behind you in the car when it left Mellow Moods to go do the kidnapping. Correct?

A. Yes, I did.

Q. And you told them it was Tee that went in and grabbed that man and pulled him out. Correct?

A. Yes.

Q. And you told them it was Tee that went to the cocoa field.  Right?

A. That's right.

Q. And you told them it was Tee that went back to Mellow Moods. Correct?

A. That's right.

Q. And you told them that you met Tee that night?

A. That's right.

Trial Tr. at 1208-11 (June 3, 2009). Joseph repeated virtually the same answers when Sealey's counsel questioned him about his affirmation of that statement to a Trinidad Justice of the Peace on the same day. Id. at 1214-16. On further cross-examination, Joseph confirmed yet again that he had told Trinidad police and the Justice of the Peace that "Tee was the one with me and Shaka that night" and that "Tee pulled the man out of the bar." Id. at 1215-16. Indeed, it is difficult to imagine how Sealey's counsel could have conducted a more thorough examination on the subject of "Tee."

Furthermore, like DeFour's counsel, Sealey's counsel also effectively challenged Joseph's credibility with the January 2006 statement, eliciting, inter alia, testimony from Joseph that he "didn't have any trouble lying" to the police in January 2006 "to save myself," and persuasively suggesting in that cross-examination that Joseph would also lie on the witness stand to save himself from a sentence of life without parole. See id. at 1234 ("Q. And you were lying to Trinidad police [in January 2006] to, quote, "protect" yourself. Correct? A. That's right. Q. Now, are you telling these ladies and gentlemen of the jury that you wouldn't stretch the truth right now a little bit to save yourself from life without parole? A. No."); see also id. at 1220-33 (cross-examination suggesting that Joseph's meetings with Trinidad police and the U.S. prosecution team affected his testimony concerning Sealey).

51

In addition to effective cross-examination, defense counsel had time to investigate the information set forth in Joseph's January 2006 statement. Again, the statement was disclosed on May 29, 2009. The trial was recessed from July 9, 2009, through July 13, 2009, to provide all counsel and defense investigators time to travel to Trinidad for various Rule 15 depositions requested by defendants. Indeed, some investigators were authorized to travel earlier and to stay longer.[15] Closing arguments were presented on July 23 and 24, 2009 -- almost two months after the disclosure. Neither DeFour nor Sealey have explained why the investigations they propose now, after trial, could not have been done during the recess period. Indeed, DeFour's trial counsel acknowledged during trial that DeFour's prior counsel and investigator had already interviewed Ricardo Stevenson in Trinidad about the Maharaj kidnapping. See DeFour's Response to Gov't's Opp'n to DeFour's Mot. to Dismiss, ECF #555, at 5. In short, the additional time that was provided for defense counsel to process the late-disclosed January 2006 statement and to conduct further investigation confirms that defendants had the statement in time effectively to use it in their defense. See Celis, 608 F.3d at 834.

Even if the delayed disclosure of Joseph's January 2006 statement came too late for defendants effectively to use it, defendants must show prejudice to prevail on their claim of a Brady violation. To meet that burden, defendants must show a "reasonable probability that, had the evidence been disclosed to the defense [earlier], the result of the proceeding would have been different," Strickler, 527 U.S. at 280 -- that is, the late disclosure must be sufficient to "undermine confidence in the verdict," Kyles, 514 U.S. at 435. The Court concludes that DeFour

---

[15] According to the Court's travel authorization forms, Sealey's investigator was authorized to travel to Trinidad from July 6-13, 2009. DeFour's investigator was authorized to travel to Trinidad from July 1-7, 2009.

and Sealey have failed to make this showing. In addition to counsel's effective use of the late-disclosed evidence at trial, the evidence of guilt against DeFour and Sealey was overwhelming. As to DeFour, there is, of course, his own confession to Trinidad police on January 27, 2006, that he participated in the planning of Maharaj's abduction and also served as the driver of the lead car that cleared the roads on the date of the hostage taking.[16] Trial Tr. at 4534-4559 (June 25, 2009). His confession was introduced through Michael Seales, a police constable at the time of the confession, who testified that DeFour confessed, inter alia, to being involved in the planning of the abduction as well as the actual abduction on April 6, 2005:

> My question: What can you tell me of this crime of the kidnapping of Balram Maharaj?
>
> His answer: Well, my boy [unnamed] mentioned something about he and another fella [unnamed]. Two of them is the men who organized the plan to snatch the man Balram. Me and a fella was liming. Another fella came and they started to talk about it. I was

---

[16] DeFour filed a pretrial motion to suppress this statement, arguing that he made the statement as a result of a promise by Trinidad police not to charge him if he cooperated. See DeFour's Mot. to Suppress, ECF #314. The Court held an evidentiary hearing on that motion on March 5-6, 2009, and denied DeFour's motion, finding, inter alia, that "based on the record evidence before it . . . during the January 27 interview [Constable] Seales did not promise De Four that he would be released and not charged if he cooperated and gave a statement." Clarke I, 611 F. Supp. 2d at 39. In DeFour's motion for new trial, he contends that testimony was elicited at trial that undermines the Court's decision. See DeFour's Mem., ECF #707, at 25-36. The Court has reviewed the record, and concluded that nothing in the trial record alters the credibility determinations or other factual findings set forth in its prior suppression opinion.

On the contrary, the evidence presented at trial on DeFour's background reinforced the Court's determination the DeFour's confession was voluntary. DeFour testified at trial that he was a member of the "Special Forces . . . the most elite group of the Trinidad and Tobago Defense Force" from 1998 through the date of his arrest. See Trial Tr. at 6516-18 (July 15, 2009). He further testified that he had extensive training in prisoner of war training, during which he was trained to resist providing information under stressful conditions, including being blindfolded, tied up, sleep deprived, threatened with torture and death, and subject to psychological pressure. Id. at 6617-18. His background further indicates that the circumstances surrounding his statement did not result in an involuntary confession.

just listening. Then we came up with the plan, me and them fellas. Then when they came up with the plan, I was already there, so I just went along.

. . .

My question: Tell me about the day [of the abduction].

His answer: I came off work around 4 that day, and Percival called me to meet him by Scotiabanks San Juan. I went and pick him up and he went by the bar where the man [Maharaj] was. I was driving my Elantra, PBA2711. The man was not there. He went by some bar in El Soccoro Plaza, Aranguez . . . .Then when we confirm that the man was there, Percival called his people and they came down. The individual who was Maharaj was taken.

. . . .

My question: What was your purpose that evening [of the hostage taking]?

His answer: My purpose was just to clear the roads.

My question: What do you mean by clear the roads?

His answer: When they took the man from the bar, I was just to drive forward and clear the traffic or if the place was hot.

My question: What do you mean by the place hot?

His answer: Like police traffic.

My question: Can you describe Balram?

His answer: An Indian man, slim, bald-headed, fair skin.

My question: After clearing the road, where did you go?

His answer: I went back to Mellow Moods bar. . . .

Id. at 4537-41. This confession was powerful evidence of DeFour's guilt.

The testimony of the cooperating witnesses corroborated this confession and further established DeFour's guilt. Nurse confirmed DeFour's role in making the preparations for the abduction, explaining that, after Straker informed him that Maharaj would soon be returning to

54

Trinidad, he initiated contact with DeFour to create a plan of action:

> Q: What did you do in order to start putting things in place?
>
> A: I spoke to Ricardo de Four, sir. . . . I told him what was happening. . . I told him that I wanted a meeting set up with Jason Percival, sir, because I had him [Percival] as a person, based on the past transaction what we did before [referring to the Jagdeo kidnapping] where I provided a vehicle, I knew that he was doing that stuff, so I told him I would like Straker to meet Jason Percival.
>
> Q: Why did you tell that to Ricardo DeFour?
>
> A: Because I didn't know how to contact Percival, sir. . . . DeFour is the person that knew him, sir.  So I liaised with DeFour in order to get that done, sir.
> . . . .
>
> Q: And after you liaised with DeFour asking him to arrange a meeting with Percival --
>
> A: A meeting was arranged, sir.
>
> Q: And where did that meeting take place?
>
> A: Mellow Moods Bar, sir.

Trial Tr. at 1441-42 (June 4, 2009).  Percival also testified that DeFour called him about the

Maharaj kidnapping, and participated in planning meetings at the Mellow Moods bar.  Trial Tr.

at 2050-55 (June 9, 2009).

Percival, as well as Joseph, identified DeFour as the driver of the lead car that cleared the

roads.  Indeed, Percival testified extensively on his personal knowledge of DeFour's involvement

on the date of the hostage taking.  Trial Tr. at 2058-96.  This included meeting with DeFour at

the Mellow Moods Bar, observing DeFour receive two guns (the 9 mm and the .357), caravaning

with DeFour to find Maharaj at the Open House Bar and later the Samaan Tree Bar, observing

DeFour pass the guns to Nixon and Sealey right before the abduction, and sitting in DeFour's

silver Elantra afterwards as DeFour drove the clearing car.  Id.  Joseph testified to substantially

the same version of events.  See Trial Tr. at 675-79 (May 29, 2009).

Leon Nurse also testified that DeFour reported to him on the night of April 6, 2005, that

Maharaj had been kidnapped that day as planned.  Trial Tr. at 1455 (June 4, 2009).  Additionally,

DeFour's cellular telephone records show that DeFour communicated with Percival on April 6,

2005, consistent with DeFour's January 2006 confession to Trinidad police about calls to and

from Percival that day.  In short, even assuming that DeFour's counsel could have made more

effective use of the late-disclosed Joseph statement had he received it earlier, the government's

evidence against DeFour was overwhelming.  There is simply no reasonable probability that, had

Joseph's January 2006 statement been disclosed to DeFour earlier, the result of the proceeding

would have been different.

Sealey, too, has failed to demonstrate prejudice from the late disclosure of the Joseph

statement.  The evidence of his guilt introduced at trial was overwhelming, and hence there is no

reasonable probability that earlier disclosure would have changed the verdict.  The evidence

included Sealey's detailed confession to Trinidad police of his involvement in the crimes, a

separate confession to the FBI, and the testimony of Joseph and Percival which clearly

established Sealey's participation as one of the abductors at the Samaan Tree bar.  Sealey

confessed that, on the date of the Maharaj abduction, he met several other co-conspirators at the

Mellow Moods Bar, accepted a gun, and then departed to Aranguez where the abduction then

took place.  Constable Gosyne, who recorded the confession, testified that Sealey stated:

> And after we drive down Aranguez, he [another unnamed man] drive around and
> show me where the man is inside the bar. After we leave and come out the car and
> went inside the bar, and after we reach in the bar, I end up sticking the man up, me
> and another man, and after we took him to the car we went up Santa Cruz and

hand him over to the man. After we hand him over, they take him and go away with him. I leave and went home, and then the man come up the road by me in the night for the gun.

Trial Tr. at 4813 (June 29, 2009). Sealey later added that, when he said "sticking him up," he was referring to his taking Maharaj at gunpoint: "I walk in and tell the man that we come for him. And after I tell him, then we walk. I had the gun in my hand. That was a dummy gun. It was empty." Id. at 4815. Sealey further explained that the other man put the victim in the car, and "after, I jump in, and [we] went up the road." Id.

In his separate confession to the FBI on the same date, Sealey reiterated that account of events. Marvin Freeman, who took the statement, testified that Sealey confessed as follows:

Q. What if anything did [Sealey] say happened upon arriving at the bar?

A. Upon arriving at the bar, he observed the first vehicle drive around the bar and park in an area that provides full view of the bar. He said that as the first vehicle passed the bar, Soldier Number Three, who was alone in the first vehicle, pointed towards the bar, and another person in the vehicle said, "That's the man in there with the pink shirt."
. . .

He said that he and some other men were in the second vehicle. He said the second vehicle drove around the bar. And upon making a second approach toward the bar, they parked across the street from the bar
. . . .

Shortly thereafter, Soldier Number Three entered the second vehicle and gave Mr. Sealey and another person each a gun. . . . Soldier Number Three gave Mr. Sealey a nine-millimeter pistol and a .38-caliber revolver to the other person.
. . . .

Q. And what if anything did Mr. Sealey indicate that he did at that point?

A. Mr. Sealey said he exited the second vehicle and went into the bar. As another man stood behind the victim, Mr. Sealey approached the victim and stated, "We come for you." He stated that as he pointed the gun into the victim's back, the victim stood up and said, "Not me," and pointed to someone else in the bar. The victim eventually complied with Mr. Sealey's demand. And as the victim walked

out of the bar -- Mr. Sealey and another man walked out of the bar . . . Mr. Sealey kept the gun pointed into the victim's back. And when Mr. Sealey returned to the second vehicle, another man took control of the victim and placed the victim in the middle of the back seat so that the victim would be seated between Mr. Sealey and -- seated between him and Mr. Sealey.

Trial Tr. at 4909-10 (June 29, 2009). The consistency and coherency of Sealey's two confessions -- and the consistency with the confessions of the other co-conspirators who were in the vehicles that day (DeFour, Joseph, and Percival) -- render them powerful evidence of Sealey's guilt.[17]

Percival's testimony provided persuasive corroboration of Sealey's confession. See Trial Tr. at 2083 (June 9, 2009) (describing the abduction as involving two vehicles, DeFour's role in providing guns to Sealey and Nixon, and Sealey and Nixon's entry into the Samaan Tree Bar to take Maharaj at gunpoint). In particular, Percival gave substantially the same account of events of the actual "snatch" as Sealey did during his two confessions: "Sealey advanced to the area where Mr. Balram [Maharaj] was sitting, stretched out his hand, and grabbed him from the seat where he was sitting, pulled him out of the bar. And Russel came and parked in front of the bar, and him and Shaka bundled him into the back of the vehicle."). Hence, even putting aside Joseph's trial testimony, the Sealey confessions were strongly corroborated by Percival's testimony. Of course, a jury could reasonably credit Joseph's trial testimony, notwithstanding his prior inconsistent statement from January 2006, and indeed, Joseph's trial testimony also provided powerful corroboration of Sealey's two confessions. See Trial Tr. at 750-51 (June 2,

---

[17] As the Court noted following the suppression hearing, there was absolutely no indicia of coercive circumstances surrounding the confession. Indeed, the evidence was compelling that Sealey initiated his statement to the Trinidad police, in order to dispel any suggestion that he was involved in any intentional killing of the victim. See Trial Tr. at 4839 (June 29, 2009) (Gosyne's trial testimony that Sealey said he wanted to make a statement "to clear his name"); 596 F. Supp. 2d at 102 (factual finding based on evidentiary suppression hearing that Sealey initiated communication with Gosyne, stating that he wished to talk "to clear himself").

2009) (testifying that Joseph drove Sealey and Nixon from Aranguez to the Samaan Tree Bar, that they entered the bar armed with guns, and that when they forced Maharaj out of the bar, he drove up to the bar where "Sealey was pulling the victim out of the bar, and Kevin Nixon opened the door, I went around to the other side, opened the other door while they pulled him into the car. They both got in. Kevin [Nixon] was on the left, Christopher [Sealey] on the right, the victim in the center, and I drove off.").  Having considered the evidence against Sealey presented at trial, the Court finds that there is no reasonable probability that earlier disclosure of Joseph's January 2006 statement would have changed the verdict or that it otherwise undermines confidence in the verdict.

### 3.  Clauss's Grand Jury Testimony Concerning Ricardo Stevenson

DeFour contends that the late disclosure of Clauss's grand jury testimony constituted a Brady violation because -- as with the Joseph statement discussed above -- the late disclosure allegedly impaired his ability effectively to mount a third-party perpetrator defense -- that it was Stevenson, not DeFour, who participated in the hostage taking.  See DeFour's Mem., ECF #707, at 21.  The relevant portion of Clauss's grand jury testimony states that Percival's cousin, Ricardo Stevenson, is "also known as DeFour."  The government responds that there was no Brady violation because disclosure was made in time to allow DeFour's counsel to examine Clauss on that portion of his grand jury testimony, and counsel was also given an opportunity to recall Clauss to the witness stand later in the trial.  See Trial Tr.at 6361 (July 14, 2009); Order, ECF #603 (July 14, 2009).

The Court has reviewed the transcripts, and finds it abundantly clear that, during DeFour's re-cross of Clauss, DeFour was fully able to use the late-disclosed grand jury testimony.  Indeed,

Clauss admitted that he stated to the grand jury that DeFour was known as Stevenson during the following exchange, and once counsel obtained that admission, he closed his questioning of Clauss.

> Q. Agent Clauss, isn't it true that at one point you claimed that Percival said that Ricardo Stevenson and Ricardo De Four were one and the same person?
>
> A. I don't recall that, no.
> . . . .
>
> Q. You recognize this document, don't you, sir?
>
> A. Yes.
>
> Q. And in fact, it's your grand jury testimony in this same case, given on April 7th, 2006, is it not?
>
> A. It appears so.
>
> Q. And you've had an opportunity to review it, have you not?
>
> A. Yes.
> . . .
>
> Q. Directing your attention, benefit of counsel, page 30, line five, question from Mr. Hegyi: "Could you just very briefly for us, and I know this is a -- it's a lengthy interview that you have there, and it is marked as an exhibit for the grand jurors. Could you very briefly just tell us what it was that Jason Percival told you on the date of this interview by you?" Answer: "Okay. Very briefly, Percival said that on one occasion he had been driving with his cousin Ricardo Stevenson. <u>That's</u>," and you spell out Ricardo and Stevenson, "<u>also known as De Four</u>. He was driving with Stevenson to the Trinidad and Tobago Defence Force headquarters." And then you go on to talk about the initial meeting of the kidnapping, planning the kidnapping. Isn't that correct, sir?
>
> A. Yes, that's what it says.
>
> Q. And in fact, that's what you said, isn't it, sir?
>
> A. That is what I said, but it is incorrect.

Q. Thank you.

MR. ZUCKER: No other questions at this time.

Trial Tr. at 5142-43 (June 30, 2009). This passage shows that DeFour's counsel was able to cross-examine Clauss on the grand jury testimony, and introduced into evidence Clauss's prior statement that Stevenson was known as DeFour. Having introduced the grand jury testimony into evidence and obtaining Clauss's acknowledgment of it, DeFour's counsel was able to make effective use of the grand jury testimony. Moreover, during closing arguments DeFour's counsel extensively pursued the argument that it was Stevenson, rather than DeFour, who drove the "clearing car" from the Samaan Tree Bar on the date of the abduction. See Trial Tr. at 7748-52 (July 23, 2009) (highlighting Joseph's January 2006 statement identifying Stevenson as the driver of the "clearing car" in the Maharaj kidnapping and evidence that Stevenson played the same role in two of the other crimes presented by the government). Thus, the Court finds no basis for crediting DeFour's contention that, due to the late disclosure of Clauss's grand jury testimony, he was unable to argue effectively that Stevenson rather than DeFour was the driver of the clearing car. The record shows that he fully developed that argument at trial.

### 4. The False Campsite Testimony and Diagram

The Court now turns to the contention that the government violated its Brady obligations when it failed timely to disclose evidence that reflected that, when Clarke was arrested, he had led Agent Clauss to a campsite where Clarke falsely claimed the victim was held -- the so-called "false campsite." See Clarke's Mem., ECF # 701, at 15-16, 21; Clarke's Reply, ECF # 716, at 3-4, 12-22. To be sure, Clauss's testimony about that campsite caused a moment of confusion at trial, and most -- including the Court -- were left with the impression that Clauss's testimony

about the initial campsite was, in fact, a reference to the real campsite.  Trial Tr. at 4239-45 (June 23, 2009); see also id. at 4363-64, 4382-83 (June 24, 2009).  But the Brady issue must focus on the allegedly late-disclosed evidence, rather than the awkwardness of how testimony was presented.  Here, that evidence consists of (1) the government's longstanding belief that, on January 6, 2006 when Clarke led the police to the purported campsite where Maharaj was held, Clarke had led them to a false campsite; and (2) a diagram with the notation "believed to be Clauss diagram from false campsite." See Trial Tr. at 4354-4355 (June 24, 2009).

Clarke contends that this evidence is exculpatory because, during Clauss's testimony, the jury was left with the erroneous impression that Clarke had led the police to the true campsite. Clarke's Mem., ECF #701, at 21.  In other words, the fact that Clarke led the police to a false campsite is, in his view, evidence that he did not know where the real campsite was.  Clarke's Reply, ECF #716, at 14. He also contends that he had no opportunity to cross-examine Clauss with regard to the late disclosed evidence. Clarke's Mem., ECF #701, at 19.  In response, the government suggests that it had no obligation to turn over the false campsite evidence because Clarke and his counsel knew long before trial commenced that Clarke had taken the police and FBI to a false campsite.  See Gov't Mem., ECF #712, at 128-29.  Demerieux separately argues that he was prejudiced by the delayed disclosure because, in his opening statement, his counsel promised the jury that it would hear that Trinidad police and the FBI scoured the campsite -- impliedly, the real campsite  -- and found no link to Demerieux.  See Demerieux's Mem., ECF #698, at 13.

As a general matter, the government is correct that "Brady only requires disclosure of information unknown to the defendant, and then generally only upon request." See United States

v. Derr, 990 F.2d 1330, 1335 (D.C. Cir. 1993) (quoting Agurs, 427 U.S. at 103).   To state the

converse, if the defendant knows of the specific exculpatory information, Brady does not require

disclosure.  See id. ("Brady provides no refuge to defendants who have knowledge of the

government's possession of possibly exculpatory information, but sit on their hands").  But Derr

is of little use to the government on this record.  In assessing whether the government has a

Brady disclosure obligation in light of defendant's knowledge, Derr suggests that the Court is to

focus on the defendant's "knowledge of the government's possession of possibly exculpatory

information," in contrast to defendant's independent knowledge of how the offense transpired.

See Derr, 990 F.2d at 1335 (emphasis added).  The D.C. Circuit recently reiterated this in United

States v. Johnson, 592 F.3d 164,172 (D.C. Cir. 2010), holding that Derr was inapplicable where

the defendant had not been put "on notice" that the government possessed exculpatory

information that supported defendant's version of events.[18]  Here, Clarke was presumably aware

that he had taken the police and FBI to an incorrect campsite,[19] but he did not know that the

_____

[18]   In Johnson, a drug possession case, the defendant was convicted based on the presence
of drugs in his bedroom.  The defendant had put on evidence showing that other relatives used
the bedroom.  On appeal, he sought to have his conviction set aside based on the government's
failure to disclose evidence showing that another drug dealer "Blakney" -- the defendant's cousin
-- had admitted to a government informant that the drugs belonged to Blakney.  The government
argued that there was no Brady violation because "[defendant] must have known who owned the
heroin," and Brady does not require the government to disclose evidence already known to the
defense."  592 F.3d at 172.  The Circuit rejected that argument and ordered a new trial, finding
Derr inapplicable because the defendant did not have knowledge of the particular exculpatory
evidence possessed by the government.

[19]   The parties make much of whether Clarke's counsel knew of the false campsite issue
before Clauss's testimony on June 24, 2009.  The government contends that certain circumstances
strongly suggest Clarke's counsel had knowledge of the false campsite at least three months
before trial commenced, and has submitted sealed filings further bolstering that argument.  See
Gov't Mem., ECF #712, at 128.  Clarke's counsel has denied having knowledge that Clarke led
law enforcement officials to an incorrect campsite, and has submitted sealed filings further
                                                                          (continued...)

government had evidence that would prove this point for him. Indeed, the government itself was unaware of Clauss's diagram with the "false campsite" notation until the night before it was produced. See Trial Tr. at 4362. Because Clarke did not have knowledge of the government's possession of the exculpatory evidence at issue, Derr does not excuse the government's failure to disclose the evidence earlier.

But notwithstanding the government's failure to disclose the evidence earlier, Clarke was able to incorporate it into his defense. Clarke's argument that the late disclosure deprived him of an opportunity to cross-examine Clauss on the evidence at issue has no merit. The Court offered Clarke's counsel an opportunity to reopen the cross-examination of Clauss the day after Clauss finished his testimony, and counsel chose not to do so. Trial Tr. at 4356 (June 24, 2009) (colloquy with Clarke's counsel about further examination of Clauss to address the late disclosed evidence, and Clarke's counsel stating "I know the Court would give me a chance to reopen it."). Clarke's counsel chose instead to enter into a stipulation (Government Ex. 317-S) stating that the campsite Clarke led the FBI to was not the campsite at which Maharaj was held.

Furthermore, Clarke's counsel utilized and highlighted the false campsite issue in his closing argument, both to discredit the testimony of Lucas and Clauss, and also to show Clarke's lack of knowledge:

> We know that Clarke and the law enforcement crew, all the guys, the FBI from the United States and the local officers from Trinidad, all went up on the hill on the 6th of January. Lucas and Clauss both told you, the jury, told you and told us, that Zion Clarke brought them to the campsite where Maharaj had been kept and

---

[19](...continued)
attesting to this representation. The evidentiary record is inconclusive on whether Clarke's counsel knew that Clarke had taken the FBI to an incorrect campsite. However, the resolution of the Brady issue does not turn on counsel's knowledge, for the reasons discussed above.

ultimately died. Got off the stand, we all believed that that's what happened. After they got off the stand, more information came, and we ended up drafting for your consideration a stipulation, which is Exhibit 317-S of the government's, and it's a stipulation that Mr. Hegyi read to you.

"The parties stipulate and agree that the campsite that . . . FBI Agent Clauss and Sergeant Lucas testified about that was visited by Zion Clarke in the custody of the law enforcement personnel on January 6, 2006, was not a location to where Mr. Maharaj was ever taken or at which he was ever held." Contrary to what we believed when they got off the stand.

Trial Tr. at 7854 (July 24, 2009). Clarke's counsel then discussed the police's reliance on Gittens that evening, as they sought to find out why they did not find anything when they went with Clarke, suggesting that it was Gittens who ultimately supplied information in helping to locate Maharaj's body. Id. at 7854-56; see also id. at 7873 ("[Lucas] went up the hill with my client, and I submit to you we didn't hear the whole story, and he talked to Gittens just before they found the body.").

It is difficult to come up with a scenario in which Clarke could have used the false campsite issue more effectively in the presentation of his defense. Indeed, in his post-trial motion, he offers little as to what he could have done more effectively, suggesting only that "[i]t is difficult to ascertain in hindsight alternative strategies that could have been employed had disclosure been timely made." See Clarke's Mem., ECF #701, at 24. Clarke's reply brief later cursorily suggests that he would have argued as part of the defense theory that he was "instructed" by the Trinidad police to say that he guarded Maharaj, which ultimately led to his concocting the false campsite. See Clarke's Reply, ECF # 716, at 13-14. But the Court is unaware of any evidence that would have enabled him to put on such a defense, and that proffered defense has virtually nothing to do with the false campsite evidence. It is a defense that could have been pursued without it, if there was any evidence to support it.

Even if the delayed disclosure of the false campsite evidence came too late for Clarke to use it effectively, Clarke cannot prevail on his Brady claim unless he demonstrates prejudice under the "reasonable probability" standard. The Court has reviewed the evidence pertaining to Clarke and concludes that the evidence of his guilt is overwhelming; in context, then, the false campsite evidence was of de minimis exculpatory value against the backdrop of the powerful evidence of Clarke's guilt. That evidence included four exhaustive and detailed confessions to the Trinidad police and the FBI of his involvement in the kidnapping and the testimony of Joseph and Percival which solidly established Clarke's participation as one of the guards. See Trial Tr. at 3995-4020 (June 22, 2009) (Lucas's testimony concerning Clarke's confession on January 5, 2006); Trial Tr. at 4195-4237 (June 23, 2009) (Clauss's testimony concerning Clarke's confession on January 4, 2006); Trial Tr. at 4244-59 (June 23, 2009) (Clauss's testimony concerning Clarke's confession on January 6, 2006); Trial Tr. at 5182-82 (June 30, 2009) (Cruz's testimony concerning Clarke's confession on August 4, 2008). In his confessions, Clarke provided a detailed description of how he became involved in the conspiracy, his extended role as a guard during the entire period of the victim's captivity, his observations of the victim's deteriorating health and death, and his participation in the burial of the victim's dismembered body parts. See, e.g., Trial Tr. at 4195-4259 (June 23, 2009) (Clauss's testimony concerning Clarke's confessions on January 4 and 6, 2006); Trial Tr. at 3995-4020 (June 22, 2009) (Lucas's testimony concerning Clarke's confession on January 5, 2006). For example, in Clarke's statement to the FBI, he provided the following details of his involvement in the conspiracy:

> -- In early April 2005, some guys from a gang approached him on the street, saying that they were looking for a "bushman" -- an individual familiar with the woods or forested areas -- to "keep watch of" someone. After Clarke agreed, they told him to get a "camp in the bush," and they would be in touch with him later.

(Trial Tr. 4207-08).

-- Soon thereafter, "Igloo" and another guy approached Clarke on the street asking if he was ready. Clarke said yes, and got in their vehicle. They told him the individual was in the trunk of the car. They drove to the end of Gran Curacaye Road, where they stopped and opened the trunk. At this time, Clarke saw Maharaj blindfolded and secured with duct tape. Igloo and the other guy left Maharaj with Clarke. Clarke told Clauss that "his own role was to guard Maharaj at the mountain." (Trial Tr. 4213-14).

-- Clarke provided a day-by-day account of what happened during the days he spent guarding the victim, including his conversations with Maharaj about the ransom demands and the victim's medical condition, an attempt to tape record Maharaj's voice for the ransom demands, the victim's deteriorating medical condition and Clarke's attempts to get medicine for him, and the day that Maharaj stopped breathing. (Trial Tr. 4214-17, 4225-29, 4250-52)).

-- Clarke provided a detailed account of how he and the co-conspirators disposed of Maharaj's body, including Igloo's threats to kill Clarke if he did not help, the removal of the victim's body to another forested area, the dismemberment of the victim's body with a machete, storage of the body parts in two containers -- a blue plastic container (where the victim's head was found) and a white styrofoam cooler -- and the burial of the containers about six inches beneath the soil surface. (Trial Tr. 4254-57).

In his statement to Trinidad police on January 5, 2006, Clarke provided substantially the same account of events. See Trial Tr. at 4004-14 (June 22, 2009) (testimony of Wendell Lucas about Clarke's statement). Furthermore, Lucas testified that he was with Clarke when Clarke took Trinidad police to the victim's burial site and showed the police where the two containers with the body parts were located -- the same location that he had told the FBI. Id. at 4017-28.

Joseph provided testimony that corroborated the details of Clarke's confession. For example, he described his personal observations of Clarke acting as a guard during the period of captivity, the attempts to obtain proof of life from the victim, the victim's physical condition and need for medicine, and Clarke's role in the dismemberment and burial of the victim's body, including a description of the blue and white containers described by Clarke. See Trial Tr. at 683-704 (May 29, 2009); Trial Tr. at 735-39 (June 2, 2009). Percival also provided

corroborating testimony concerning Clarke's role as one of two guards, and his participation in meetings with the other co-conspirators prior to the abduction.  Trial Tr. at 2849-50 (June 15, 2009).  Having considered the totality of the evidence against Clarke presented at trial, the Court finds that there is no reasonable probability that earlier disclosure of the false campsite evidence would have made a difference in the outcome of trial, or that the delay in disclosure otherwise undermines confidence in the verdict.

Demerieux contends that late disclosure of the false campsite evidence constituted a Brady violation as to him because, in his opening statement, his counsel promised the jury that it would hear that Trinidad police and the FBI scoured the campsite for evidence and found no link to Demerieux, but then the campsite turned out to be a "false" one and the evidence recovered there had no evidentiary value at all.  Demerieux's Mem., ECF #698, at 13, 16.  However, counsel's promise to the jury remained unaffected by the false campsite evidence -- there was no physical evidence tying Demerieux to the campsite or any other aspect of the crime, a point defense counsel highlighted again during her closing argument when discussing the cooperator testimony of Jason Percival, Russel Joseph and Winston Gittens:

> That's the cast of characters that the government brings you to convict Kevon Demerieux. There's no forensic evidence. You've heard that. There's no fingerprints, there's no DNA, there's nothing.
> There was some evidence, you learned, that was gathered at the burial site. But the Trinidad authorities apparently kept that evidence, and it's never been tested. Who knows why. But nothing but these men, nothing but this rogue's gallery, links Kevon Demerieux to that campsite.

Trial Tr. at 7943 (July 24, 2009) (emphasis added).   Thus, there is no basis for finding that the government's late disclosure of the false campsite evidence was either exculpatory as to Demerieux or caused him any prejudice with respect to his argument that there was no physical

evidence linking him to the crimes charged.

### 5.    Cumulative Impact of Late Disclosures

Clarke contends that, even if none of the individual late disclosures by itself rises to the level of a Brady violation, he was prejudiced by the cumulative effect of all of the late disclosures -- i.e., that viewed cumulatively, the late disclosures raise a reasonable probability that timely disclosure would have produced a different result. Clarke's Reply, ECF #716, at 22. This Court is cognizant of its obligation to assess the cumulative impact of the late disclosures. The Supreme Court has held that, where there are multiple alleged Brady violations, a court must consider the materiality of the suppressed evidence "collectively," recognizing that the court will necessarily have to "evaluate the tendency and force of the undisclosed evidence item by item" in assessing the collective impact. Kyles, 514 U.S. at 436 & n.10 (1995); see also Celis, 608 F.3d at 836 ("One of [defendant's] objections is that so much information was being disclosed by the government that effective use was prejudiced once the redacted names were disclosed to the defense. The record indicates that the volume of materials turned over by the government presented practical difficulties for the defense."). The touchstone for determining whether the cumulative late disclosures give rise to a Brady violation is, again, "whether th[e] untimeliness was 'sufficient to undermine our confidence in the outcome of the trial." Id. at 836 (quoting Tarantino, 846 F.2d at 1417). And in making that assessment, the Court must focus, just as with each individual late disclosure, on whether counsel was able to make effective use of the late-disclosed materials.

The Court finds that the late disclosures of generally exculpatory evidence -- the Russel Joseph January 2006 statement, the x-ray evidence, the Clauss grand jury testimony, and the false

campsite evidence -- viewed collectively, do not give rise to a Brady violation.  As explained above, defense counsel were able to make effective use of all of the evidence and did not otherwise demonstrate prejudice from the delayed disclosures.  Viewed in context, this evidence was qualitatively and quantitatively a very small part of the case against each defendant.  None of that evidence went to the heart of the government's case against any given defendant.

Clarke's counsel provides a list of 12 other instances where the Court admonished the government with respect to how it handled disclosures or where the government was untimely in its disclosures, but without describing the contents of the documents or how the delayed disclosure was prejudicial.[20]  Clarke's Reply, ECF # 716, at 4-8.  Because Clarke has not sufficiently described this alleged Brady material, or otherwise made a proffer to meet his burden of showing that the delayed disclosure resulted in prejudice to him, the Court is unable to consider those Brady issues, except to the extent the Court has already considered the separate Brady arguments of his co-defendants.  A showing of prejudice is required to make out a Brady violation.  Wilson, 605 F.3d at 1005.  Clarke's list does not make that showing.

Nonetheless, the Court has considered whether, viewed cumulatively, all of the late disclosures at issue resulted in an unfair trial to any of the defendants or "put the whole case in such a different light as to undermine confidence in the verdict." Kyles, 514 U.S. at 435.  The Court has determined that, notwithstanding several missteps by the government in the timing of disclosures, defendants were provided a fair trial and the verdict is worthy of confidence.

_____

[20]  The list enumerates a total of 17 instances of alleged government error and/or admonishments, but 6 of those alleged errors related to the alleged Brady violations already discussed.  Clarke's Reply, ECF # 716, at 4-8 (items 1, 3, 4, 12, 14, 15 pertain to the Joseph statement from January 2006, Clauss's grand jury testimony, the "false campsite" evidence, and the x-ray evidence of the victim's skull)

In making this determination, the Court notes that, of all of the items on Clarke's list, the incident of perhaps the most concern was the government's discovery on Wednesday, June 24, 2009, of a "mountain of documents" that had not been searched for <u>Brady</u> or Jencks material -- 15 volumes of documents, each about an inch and a half thick. <u>See</u> Trial Tr. at 4402-04 (June 24, 2009). The Court expressed grave concern that those materials had not been searched, notwithstanding the good faith mistake made by the prosecutors, reportedly as the result of an office move mid-trial.[21] The Court dealt with the matter by ordering the government to review the documents for <u>Brady</u> and Jencks materials over a weekend, and to produce any such materials to defense counsel no later than the following Monday, June 29th. <u>See id.</u> at 4404-05. On June 29, 2009, the Court was informed that documents about "an inch thick" had been disclosed over the weekend (about 100 pages according to the government), and then heard from counsel as to the contents. <u>Id.</u> at 4735-58 (June 29, 2009); Gov't Mem, ECF #712, at 50. The Court invited counsel to file further briefs on the alleged <u>Brady</u> issue, and received one brief from DeFour, which all defendants joined. <u>See</u> DeFour's Suppl. Mem., ECF #597 (filed July 8, 2009). DeFour alleged three <u>Brady</u> violations based on the late disclosure: (1) the Clauss grand jury testimony discussed above; (2) a November 2005 report by Clauss stating that Gittens had told Lucas that Gittens (rather than DeFour) was responsible for acquiring the getaway vehicle that was used in the hostage taking; and (3) a May 2005 report by Clauss stating that Trinidad police had concluded that the voice of the negotiator in the Maharaj kidnapping -- Gittens -- matched the

_____

[21] The government proffered that the reason this group of documents had not previously been reviewed by the prosecutors was that there were renovations of the trial "war room" at the U.S. Attorney's Office after trial commenced, which resulted in support staff mistakenly separating several of the prosecutors' trial files during an office move. <u>See</u> Gov't Mem., ECF #712, at 38 n.22, 124.

voice of the negotiator in two other kidnappings, contrary to Gittens' testimony that he had not been involved in other kidnappings. Id. at 2-6. Based on the relief sought in DeFour's motion, the Court allowed defendants to recall Clauss, Gittens, Lucas, and Percival. See Order, ECF # 603 (July 14, 2009). Defendants chose to recall only Lucas and Gittens for brief examinations. See Trial Tr. at 6885-86 (July 16, 2009) (Gittens); id. at 6960-68 (Lucas). In summary, although the government's initial announcement of 15 volumes of unreviewed material raised the prospect of serious Brady issues, the material subject to disclosure turned out to be far less than expected and was adequately addressed at trial by granting counsel time to review the material, file briefs, and reopen examination of relevant witnesses.

Reviewing the entire trial, and the instances of delayed disclosure, the Court highlights the following factors that support its conclusion that defendants were provided a fair trial that resulted in a verdict worthy of confidence. First, as discussed above, for the key pieces of evidence that defendants have focused on, their counsel were able to make effective use of the evidence and have not demonstrated prejudice. Second, the Court was liberal in reopening the testimony of a witness where necessary to deal with late disclosed evidence. See, e.g.. Trial Tr. at 6361 (July 14, 2009) ("[The Court] will allow recall of Clauss, Gittens, Lucas, and Percival" to address Brady concerns arising from late disclosed evidence).

Third, the duration of the trial, along with frequent recesses granted to counsel for further trial preparation time and investigation in Trinidad, mitigated the impact of the late disclosures. The presentation of the evidence began on May 27, 2009, and trial concluded on July 24, 2009, almost two months later. During that period, trial was recessed on most Fridays to enable counsel to prepare for the coming week's evidence or catch up on other obligations. In the

middle of the trial, the Court recessed from July 9, 2009 through July 13, 2009, to enable counsel to travel to Trinidad, with their investigators, for Rule 15 depositions. The Court also provided additional recess periods where needed to enable counsel to review late disclosed evidence and incorporate it into their defense cases. Based on the Court's observations during trial, and now reviewing the trial record in hindsight, the Court finds that those lengthy breaks, over the course of a two-month trial, provided counsel the time necessary to review and investigate the late disclosures.

Finally, it bears mentioning that Clarke's list of admonishments and late disclosures is overstated in some respects. For example, he includes in his list the government's failure to give sufficient notice of Rule 404(b) evidence pertaining to the Ramadhar kidnapping with respect to Clarke and Demerieux, even though the Court ultimately precluded the government from introducing that evidence against those two defendants. See Clarke's Reply, ECF #716, at 5. He also includes the government's "late" disclosure of some of Clauss's unredacted notes, even though he acknowledges that the Court held that the government was not required to turn over the unredacted portions. Id.

To be sure, the government failed to make timely disclosures at several points in the trial, causing frustration to defense counsel and the Court. But defendants are not entitled to a new trial simply because the government made disclosures mid-trial, or even because the government made numerous errors in deciding what to disclose and when. They must prove that the evidence was exculpatory or otherwise favorable to them, and that they suffered prejudice from the late

disclosures -- a showing they have failed to make.[22]  See Celis, 608 F.3d at 847 (rejecting similar cumulative error argument, explaining that "the total effect of numerous small missteps may deprive a defendant of a fair trial," but the law "requires the defendant to make a showing of prejudice . . . which [defendant] has not done").

## III.     Other Due Process Issues

### A.     Limitations on Challenging the Citizenship of the Balram Maharaj

One of the most contested issues in this case has concerned the U.S. citizenship of Balram Maharaj because his citizenship is the basis for the case being brought in the United States, and is a key element of the offense charged.  The hostage taking statute, 18 U.S.C. § 1203, makes it a federal offense to seize or detain another person for ransom, but, where the conduct occurs outside the United States, requires a connection to the United States in order for jurisdiction to lie here.  See United States v. Yunis, 924 F. 2d 1086, 1090 (D.C. Cir. 1991) (holding that § 1203(b)(1) offers the "bases of jurisdiction where 'the offense occurred outside the United States'").  Specifically, the statute states:

> It is not an offense under this section if the conduct required for the offense occurred outside the United States unless --

---

[22]  Defendant Clarke also has moved for sanctions based on the government's late disclosures, both in his publicly filed post-trial brief and in a separate motion filed under seal. See Clarke's Mem., ECF #701, at 24; Clarke's Mot. for Sanctions or Other Appropriate Relief (filed under seal Mar. 12, 2010).  Having found that there were no Brady violations and that the late disclosures did not materially impact the fairness of the trial, the Court denies the motion for sanctions.  Clarke's sealed motion seeks sanctions based on the additional ground that the government disclosed confidential information during the course of post-trial proceedings.  He requests dismissal of the case, a new trial, and/or striking the testimony of various witnesses. The Court has reviewed the record on that allegation and finds that the disclosure of the allegedly confidential information was de minimis and inadvertent, and that no sanctions are warranted -- and certainly not the draconian sanctions sought by Clarke.

(A) the offender or <u>the person seized or detained is a national of the United States</u>;

(B) the offender is found in the United States; or

(C) the governmental organization sought to be compelled is the Government of the United States.

<u>Id.</u> § 1203(b) (emphasis added). Hence, a person's status as a "national of the United States" -- that is, a U.S. citizen or other person owing permanent allegiance to the U.S.[23] -- is one connection that will suffice. The government tried these defendants here in the United States based on Maharaj's status as a naturalized U.S. citizen, and offered as its proof an authentic certificate of naturalization and U.S. passport dated September 28, 2000.

Defendants filed a series of motions before and during trial arguing that Maharaj had procured the certificate of naturalization through fraud and misrepresentation, and hence his citizenship was void <u>ab initio</u>.[24] Based on that theory, they sought dismissal of the case for lack of jurisdiction and later sought to present evidence to the jury -- Maharaj's immigration file, known as an "A file" -- that Maharaj was not qualified for citizenship, notwithstanding the government's issuance of the certificate of naturalization. The Court addressed these motions in two separate opinions. <u>See</u> <u>Clarke II</u>, 628 F. Supp. 2d at 1-14; <u>Clarke III</u>, 628 F. Supp. 2d at 15-24. The central holding in both of those opinions was that Congress created an exclusive process for declaring the citizenship of a naturalized person void, as set forth in 8 U.S.C. § 1451(a), and

_____

[23] Section 1203(c) provides that the phrase "national of the United States" shall have the meaning set forth in 8 U.S.C. § 1101(a)(22), which in turn defines that phrase as a "citizen of the United States" or a person who owes permanent allegiance to the United States.

[24] <u>See</u> Demerieux's Mot. to Dismiss, ECF #390; Defs.' Joint Motion to Stay, ECF #452; Clarke's Mot. to Reconsider Mot. to Dismiss and Mot. in Limine, ECF #548; DeFour's Mot. to Reconsider Order Precluding Defendants from Introducing Evidence Regarding Non-Citizenship of Victim, ECF #561.

that one's citizenship remains valid until an order setting aside citizenship has been issued in compliance with § 1451(a).  See Clarke II, 628 F. Supp. 2d at 5-10; Clarke III, 628 F. Supp. 2d at 22-24.  Hence, the Court allowed the trial to go forward, and also denied defendants' request to present evidence that Maharaj was not qualified to become a naturalized U.S. citizen or that Maharaj obtained his citizenship by fraud.

Pierre now moves for a new trial on the ground that the Court improperly prohibited defendants from putting on an affirmative defense challenging Maharaj's citizenship and effectively granted a directed verdict for the government with respect to the citizenship element of the offense.  See Pierre's Mem., ECF # 694, at 9-12.  In the same vein, Clarke contends that his Sixth Amendment right to present a defense and to submit every element of the charged crime to the jury was violated.  Clarke's Mem., ECF # 701, at 4-13.  He argues that cases involving the offense of illegal reentry into the United States by an alien are instructive and show that the determination of alienage is an issue for the jury.  Id.  All defendants join in these motions.

The main problem with defendants' arguments is that they completely bypass the exclusive process created by Congress for declaring the citizenship of a naturalized person void. Simply put, the statutory framework set up by Congress leaves no room for a jury -- or even a court presiding over a criminal case -- to declare that a naturalization is void.  As the Court explained in Clarke II, the Immigration and Nationality Act of 1952, 8 U.S.C. § 1451, sets forth the process and criteria for declaring naturalization void, and provides that United States attorneys are charged with instituting judicial proceedings to revoke the citizenship of a naturalized U.S. citizen "on the ground that such order and certificate were illegally procured or

were procured by concealment of a material fact or willful misrepresentation." See 628 F. Supp. 2d at 6 (quoting 8 U.S.C. § 1451(a)).[25]  The Court observed that the Ninth Circuit, sitting en banc in Gorbach v. Reno, 219 F.3d 1087, 1097 (9th Cir. 2000), considered whether the statute authorized other means for declaring a naturalization certificate void, in the context of reviewing the Attorney General's regulations authorizing revocation of naturalization through the administrative process at 8 C.F.R. part 340.  In invalidating the regulations, the Ninth Circuit held that § 1451 provided the "exclusive process" for abrogating naturalization, and this Court agreed:

> As the Ninth Circuit has recognized, § 1451 "safeguard[s] citizenship from abrogation except by a 'clearly defined' procedure -- 'clearly defined,' that is, by statute." [Gorbach, 219 F.3d at 1097.]  The process for setting aside citizenship under § 1451 is "'a self-contained, exclusive procedure' that 'covers the whole ground.'"  Id. (quoting United States v. Zucca, 351 U.S. 91, 95 (1956)) (emphasis added).  The Ninth Circuit's rationale is particularly pertinent here, as defendants have, in effect, asked the Court to engage in a process that circumvents the § 1451

---

[25]  Section 1451(a), the operative provision, states:

It shall be the duty of the United States attorneys for the respective districts, upon affidavit showing good cause therefor, to institute proceedings in any district court of the United States in the judicial district in which the naturalized citizen may reside at the time of bringing suit, for the purpose of revoking and setting aside the order admitting such person to citizenship and canceling the certificate of naturalization on the ground that such order and certificate of naturalization were illegally procured or were procured by concealment of a material fact or by willful misrepresentation, and such revocation and setting aside of the order admitting such person to citizenship and such canceling of certificate of naturalization shall be effective as of the original date of the order and certificate . . . . If the naturalized citizen does not reside in any judicial district in the United States at the time of bringing such suit, the proceedings may be instituted in the United States District Court for the District of Columbia or in the United States district court in the judicial district in which such person last had his residence.

8 U.S.C. § 1451(a).

process for determining the validity of citizenship. "Congress has provided <u>one way</u> to revoke the citizenship of a naturalized American citizen: that is for a United States Attorney to file a petition in a United States District Court. <u>There is no statutory warrant for a second way</u> . . . ." <u>Id.</u> at 1099 (emphasis added).

<u>Clarke II</u>, 628 F. Supp. 2d at 8-9. This exclusive process reflects the high value that is placed on citizenship, and was created by Congress to "safeguard[] citizenship from abrogation except by a clearly defined procedure." <u>Gorbach</u>, 271 F.3d at 1097.

The Court further explained that defendants' contention that citizenship can be treated as void without going through the § 1451 process is also contradicted by the Citizenship and Immigration Service regulation stating the self-evident principle that a naturalized citizen "shall be considered to be a citizen of the United States until a decision to reopen proceedings and deny naturalization becomes final." 8 C.F.R. § 340.1(g)(4).[26] The Court rejected the conclusory assertion that Maharaj's citizenship could be considered void without a final order issued pursuant to § 1451 because that premise entirely failed to reckon with a key aspect of the § 1451 regime established by Congress for declaring citizenship void -- that citizenship remains valid until a final order revoking and canceling the certificate of naturalization is issued under § 1451. <u>Clarke II</u>, 628 F. Supp. 2d at 9. The exclusive process set forth in § 1451 reflects the high value placed on "safeguarding citizenship from abrogation except by a clearly defined procedure." <u>Gorbach</u>, 271 F.3d at 1097.

With this backdrop, the Court now turns to the specific arguments made in defendants'

---

[26] <u>Gorbach</u> found no flaw in this specific provision, although invalidating the authority of the Attorney General to create an administrative denaturalization process generally. Indeed, the rationale of <u>Gorbach</u> strongly indicates that citizenship must be accepted as valid absent a final order setting aside a naturalization order pursuant to § 1451(a), as the decision repeatedly emphasizes the fatal flaw in any approach that would authorize "the terrible power to take citizenship away" without explicit authorization by Congress. <u>Gorbach</u>, 219 F.3d at 1099.

motions for new trial. Clarke cursorily denies that defendants' proffered evidentiary challenge to Maharaj's eligibility for citizenship is inconsistent with § 1451 because it "would not result in denaturalization of the decedent." See Clarke's Mem., ECF #701, at 10. But an integral part of the denaturalization provision at 8 U.S.C. §1451 is that a naturalized citizen remains a citizen of the United States "until a decision to reopen proceedings and deny naturalization becomes final." Clarke II, 628 F. Supp. 2d 9. Accepting defendants' argument would mean that any entity could decline to recognize a naturalized person's U.S. citizenship, despite the safeguards provided in § 1451, on the ground that their refusal to recognize citizenship is not a formal "revocation" of citizenship. But Congress established an exclusive process in § 1451 to protect citizenship from any abrogation that does not comport with § 1451. See Gorbach, 219 F.3d at 1097-90.

Both Pierre and Clarke contend that, notwithstanding § 1451, defendants have a Sixth Amendment right to present a defense on the question of Maharaj's citizenship and to submit every element of the offense to the jury, and that exclusion of their evidence challenging Maharaj's eligibility for citizenship violated their rights. The Court previously addressed those arguments, and that analysis applies with equal force here:

> It is well-settled that "[a] defendant's right to present . . . evidence is not unlimited, but rather is subject to reasonable restrictions," and that rulings excluding evidence from trial "do not abridge an accused's right to present a defense so long as they are not arbitrary or disproportionate to the purposes they are designed to serve." United States v. Scheffer, 523 U.S. 303, 308 (1998) (citation omitted); see also Lannert v. Jones, 321 F.3d 747, 753-54 (8th Cir. 2003) ("A defendant does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence") (citation omitted); United States v. Libby, 475 F. Supp. 2d 73, 90-91 (D.D.C. 2007) ("although the Constitution entitles a defendant an opportunity to present his version of the facts . . . to the jury so it may decide where the truth lies, that guarantee extends only to relevant evidence," and also is "subject to reasonable restrictions, including restrictions imposed by the other rules of evidence") (citations omitted). Generally, there is no right to present evidence to

the jury on questions that are reserved for the court to resolve, including legal questions, and indeed, that have already been resolved. See Anton, 546 F.3d at 1357-58 (holding that the Sixth Amendment right to present a meaningful defense does not entitle a defendant to present evidence on a question of law); see also United States v. Gordon, 641 F.2d 1281, 1288-89 (9th Cir. 1981) (holding that Sixth Amendment right to have jury determine essential elements of the offense does not encompass determination of questions of law).

Clarke II, 628 F. Supp. 2d at14.

The only new legal authority that defendants have added in their post-trial motions is a line of cases addressing the alienage element in the offense of illegal entry by an alien under 8 U.S.C.§ 1326. Clarke contends that these cases stand for the proposition that a defendant is entitled to challenge the government's evidence on issues of citizenship where alienage is an element of the crime. See Clarke's Mem., ECF #701, at 5-13 (citing United States v. Smith-Baltiher, 424 F.3d 913, 922 (9th Cir. 2005); Perez v. United States, 502 F. Supp. 2d 301, 305-07 (N.D.N.Y. 2006); United States v. Garcia-Mancha, No. 2:96-CR-0021, 2001 WL 282769 (N.D. Tex. Mar. 15, 2001); United States v. Ramirez-Garcia, No. M0-00-CR-138, 2001 WL 561603 (W.D. Tex. May 22, 2001)). Clarke is correct that courts have held that a defendant is entitled to present evidence of his U.S. citizenship as a defense to the charge that he entered the country illegally. But that right to prove one's citizenship, in the illegal reentry context, does not translate into a right to challenge a third party's naturalization, considering the different statutory provisions with respect to recognition and safeguarding of citizenship.

To begin with, the processes at issue are entirely different. Unlike abrogation of naturalization -- which is addressed by § 1451 -- there is not an "exclusive" process for proving citizenship. Indeed, in all of the cases cited by Clarke, the defense theory was that the defendants were "derivative citizens" under 8 U.S.C. § 1401 based on the U.S. citizenship of one of their

parents, and no certificate was necessary under the statute for such citizenship to be recognized as long as the individual could make an ad hoc evidentiary showing of derivative citizenship. See Smith-Baltiher, 424 F.3d at 921 (explaining that 8 U.S.C. § 1401 provides that "derivative citizens are 'nationals and citizens of the U.S. at birth'" and hence, "if [the defendant] is entitled to U.S. citizenship as derived through his mother, his right to be treated as a citizen is not dependent on the award of a certificate"); accord Perez, 502 F. Supp. 2d at 305-07 (noting that defendant "automatically" became a citizen derivatively through his mother's successful naturalization); Garcia-Mancha, 2001 WL 282769, at *7-9 (discussing how a claim of derivative citizenship may be proven); Ramirez-Garcia, 2001 WL 561603, at *1-3 (same). The flexibility in proving citizenship -- and in particular, derivative citizenship -- stands in stark contrast to the formal and exclusive process for revoking the citizenship of a naturalized U.S. citizen. Hence, the illegal reentry cases are not instructive on the matter of whether the citizenship of a naturalized U.S. citizen can be challenged outside of the exclusive process set forth in 8 U.S.C. § 1451.

Moreover, those cases are completely silent on the naturalization and revocation process and provide no indication that a certificate of naturalization -- a legal document with the force of a judicial order -- is subject to abrogation in a criminal proceeding. Indeed, the statutory provisions and case law are to the contrary. Congress has provided in 8 U.S.C. § 1443(e) that a certificate of naturalization "shall have the same effect in all courts, tribunals, and public offices of the United States . . . as a certificate of naturalization issued by a court having naturalization

jurisdiction."[27]  This provision is widely recognized as establishing that certificates of

naturalization are "complete evidence" of citizenship which may not be attacked outside of the §

1451 revocation process.  See Clarke III, 628 F. Supp. 2d at 18, 23-24 (citing 7 Charles Gordon,

Stanley Mailman & Stephen Yale-Loehr, Immigration Law and Procedure, § 99.04[4] (Matthew

Bender, rev. ed. 2008)); Magnuson v. Baker, 911 F.2d 330, 333 & n.6 (9th Cir. 1990); In re

Mendiola, 647 F. Supp. 839, 842 (S.D.N.Y. 1986); and In re Olanoff, 44 F.2d 188, 189 (E.D. Pa.

1930)).  In short, the illegal reentry cases cited by defendants do not support their contention that

they are entitled to present evidence challenging Maharaj's qualifications for U.S. citizenship.

The Court now turns to the argument that the Court took the question of Maharaj's

citizenship away from the jury and effectively granted a directed verdict for the government on

that element.  That characterization of the record is incorrect.  The jury was, in fact, instructed

that citizenship was an element of the offense that the government had to prove beyond a

reasonable doubt:

> The essential elements of the offense of hostage taking resulting in death, each of
> which the government must prove beyond a reasonable doubt, are:
>> First, that Balram Maharaj was a United States national during the relevant
> time in April 2005.  A " United States national" includes any citizen of the United
> States.  A valid U.S. passport, a validly-issued U.S. passport and a certificate of
> naturalization may each be considered by you as evidence that the person to whom
> it was issued is a citizen of the United States. . . .

Jury Instructions at 53.  Furthermore, defense counsel was permitted to argue that the

government had failed to prove that Maharaj was a U.S. citizen based on the evidence that was

---

[27]  Prior to November 29, 1990, naturalization petitions were submitted for adjudication
by a court and, hence, the culmination of a proceeding for judicial naturalization was a decree of
the court and the issuance of a certificate of naturalization.  Clarke III, 628 F. Supp. 2d at 17.  In
1990, Congress enacted 8 U.S.C. § 1443(e), which provides for issuance of certificates of
naturalization by the Attorney General.  Id.

admitted, and Clarke's counsel made such an argument based on the absence of Maharaj's

signature from an older passport and from the naturalization certificate:

> [T]his case wouldn't be here if Mr. Maharaj was not a U.S. citizen. We think
> there's a reasonable doubt as to whether he's a citizen, and we're going to ask you
> to find that he wasn't.
>
> Mr. Hegyi talked about the evidence yesterday of why he is a U.S. citizen.
> And he says it's for two reasons, because he had a U.S. passport issued in 2000,
> and he had a naturalization certificate . . . issued before that. . . .  You're going to
> get an instruction on this from Judge Bates, and he's going to say you may
> consider those and you may consider whether the government has provided
> sufficient information to prove that he is a U.S. citizen.
>
> You'll remember, and you're going to get an instruction from the Court that
> the Court is striking from evidence the 1995 passport, and you'll recall the
> testimony of Tommye Grant about that piece of evidence, and that's been stricken.
>
> The reason we mention it here is for the second line here, the issuance of
> his 2000 passport was supported solely by his 1995 passport. And the certificate
> of naturalization was unsigned by him, and we think you ought to consider that
> not to be valid. The government said, well, she said they're not signed, it's too
> confusing. But if you find that you're not satisfied with the evidence presented to
> you that this man who was born in Trinidad and was a Trinidadian citizen, was a
> U.S.citizen, then it's over.
>
> And the 2000 passport, the sole document that was provided to get the
> 2000 passport, the only document that he provided was the 1995 passport, which
> has been stricken from evidence. . . .
>
> And the next slide is the naturalization certificate that we've talked about.
> You'll see prominently, not signed, and since the government's burden is to prove
> this case beyond a reasonable doubt, we ask you to find that the government from
> jump street has failed to prove its case beyond a reasonable doubt.

Trial Tr. at 7859-61 (July 24, 2009).[28]  Hence, the record amply establishes that the jury was

---

[28]  With regard to the absence of a signature on the certificate of naturalization, the
government responded in its rebuttal argument that testimony from the U.S. Citizenship and
Immigration Service showed that a signature is not required.  <u>See</u> Trial Tr. at 7976-77 (July 24-
2009) ("They say, 'It's not signed, it's not signed.' But [the CIS official] told you about that. She
explained to you that they don't sign the ones that stay in the official files, that the ones that they
hand out get signed, and the person who gets it goes home with it, and that's the end of it. So they
don't have signed ones in the files. But the one you have before you is not from Mr. Maharaj's
home; it's from the files of the Immigration and Customs Enforcement."); <u>see</u> also Trial Tr. at
206-07 (May 27, 2009) (testimony of Kristie Krebs from CIS stating the unsigned certificates are
valid).

instructed that it had to find that the government had proven beyond a reasonable doubt that Maharaj was a U.S. citizen, and that defense counsel was permitted to argue the government's failure to do so to the jury. There was no directed verdict for the government on the issue of Maharaj's U.S. citizenship.

Counsel's real argument, of course, is that the Court's exclusion of his evidence concerning Maharaj's qualifications for naturalization deprived him of the opportunity to present a different, more robust defense on the citizenship element -- i.e., that Maharaj was ineligible for citizenship at the time of his application for naturalization and that he obtained citizenship through fraud and misrepresentation. See Clarke's Mem., ECF #701, at 8, 13 (referring to "[d]efendants' evidence on the qualifications on how to become a naturalized U.S. citizen," and incorporating by reference the proffer of evidence in Demerieux's motion to dismiss for lack of jurisdiction (ECF #390)). But like defendants' earlier motions concerning U.S. citizenship, that argument "conflates two distinct issues -- whether Maharaj was qualified for U.S. citizenship and whether Maharaj was granted U.S. citizenship." Clarke III, 628 F. Supp. 2d at 24. As to the latter, the certificate of naturalization establishes that Maharaj was granted U.S. citizenship and may not be collaterally attacked except through a revocation proceeding under § 1451(a). The separate question of whether Maharaj was, in fact, qualified for U.S. citizenship (i.e., did he obtain citizenship through fraud) is irrelevant to this proceeding unless his citizenship has been revoked following the statutory revocation process. As the Court explained earlier, "although the Constitution entitles a defendant an opportunity to present his version of the facts . . . to the jury so it may decide where the truth lies, that guarantee extends only to relevant evidence," and also is "subject to reasonable restrictions." Clarke II, 628 F. Supp. 2d at 14 (quoting Libby, 475 F.

Supp. 2d at 90-91). Under § 1451, a naturalized citizen is considered to be a citizen of the United States until that citizenship is revoked; hence, any evidence concerning Maharaj's alleged failure to meet the qualifications for citizenship is irrelevant. There is no violation of the Sixth Amendment right to present a defense arising from the exclusion of irrelevant evidence.

### B. <u>Napue</u> Violations Arising from False Testimony of Cooperating Witnesses

Demerieux contends that his right to due process was violated because the cooperating witnesses -- Percival, Joseph, Gittens, and Nurse -- presented contradictory testimony on crucial points that made it "plain" that one or more of them must have testified falsely, and furthermore, that the government knew or should have known of the falsity of the testimony, yet characterized the testimony as being truthful. <u>See</u> Demerieux's Mem., ECF #698, at 17-42. He contends that under <u>Napue v. Illinois</u>, 360 U.S. 264, 269-70 (1959), <u>Giglio</u>, and <u>Agurs</u>, the use of perjured testimony requires a new trial even if it does not pertain to the central facts of the offense, but instead affects the jury's assessment of the credibility and reliability of the witness generally. Demerieux's Mem., ECF #698, at 40. He argues that a new trial is required "'if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" <u>Id.</u> at 40-41 (quoting <u>Agurs</u>, 427 U.S. at 103).

In support of this argument, Demerieux provides a 13-page summary of excerpts of about a thousand pages of cooperator testimony (covering 12 trial days), and from that highlights 14 subjects on which the testimony conflicts. <u>Id.</u> at 17-39. The highlighted conflicts in testimony include: the contents of Joseph's letters to Gittens with respect to the Jagdeo hostage taking; who distributed the ransom proceeds from the Jagdeo hostage taking (Percival or Pierre); who put the guns and fake plates in the car used in the Maharaj hostage taking (Percival or DeFour); who

asked Joseph to obtain proof of life from Maharaj (Percival or Pierre); whether or not Joseph volunteered to dismember Maharaj's body; whether or not Joseph possessed a gun during the Maharaj hostage taking; whether Percival, upon reviewing a cell phone video of Maharaj during his captivity, understood that Maharaj was seriously ill (Percival says no; Gittens says yes); whether it was Percival or Pierre who was "in charge" of the Maharaj hostage taking; whether Percival instructed Nurse to obtain a car for the hostage taking; whether Percival asked Nurse to bury Maharaj's body; and the extent of Percival's presence and participation when Gittens made ransom calls to Maharaj's family.  Id.

In response, the government contends that conflicts in testimony are to be expected because of divergent perceptions, differing recollections due to the passage of time, innocent misrecollections and other human errors, none of which give rise to a due process violation. Gov't Mem., ECF #712, at 57-62, 137-39.  The government also denies that it sponsored perjured testimony, and contends that any conflicts in testimony were properly addressed by the extensive cross-examination conducted by defense counsel as well as jury instructions, most notably the instruction on the need to consider cooperator testimony with caution because the cooperator may have a "bias" in favor of one of the parties (i.e., the government) that "may affect his willingness to tell the truth." Id. at 137-39 (citing Instruction 2.22A concerning "Witness With a Plea Agreement.").  The government further notes that the jury was given extensive instructions on evaluating inconsistent statements and evaluating the credibility of witnesses generally, which, collectively, sufficiently addressed the conflicts in the cooperator testimony.  Id. at 138.

The Court has assessed the testimony summarized by Demerieux and concludes that the conflicts in testimony do not rise to the level of a due process violation.  Demerieux correctly

states that, under <u>Napue</u>, a "conviction obtained through the use of false evidence . . . must fall under [the Due Process Clause]," and that "it is of no consequence that the falsehood bore upon the witness' credibility rather than directly upon defendant's guilt." <u>See</u> <u>Napue</u>, 360 U.S. at 269-70; <u>see</u> <u>also</u> <u>Agurs</u>, 427 U.S. at 103 (holding that a conviction obtained through the knowing, reckless, or negligent use of false testimony "must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury."). But as a threshold matter, Demerieux must first establish that the testimony at issue was, in fact, perjured. <u>See</u> <u>United States v. Duke</u>, 50 F.3d 571, 577-78 (8th Cir. 1995). This he has not done.

Instead, he has simply identified conflicts in the testimony, with no judicial determination of which of several witnesses was telling the truth on the specific matter he identifies. Indeed, many of the matters on which he has identified conflicting testimony are matters which different co-conspirators might easily perceive differently or have an innocent misrecollection about. For example, whether Percival was "in charge" of the conspiracy -- a characterization Percival disputed -- requires a subjective assessment, and in any event Percival's testimony acknowledged a major role in the offense, whether he used the label "in charge" or not. Similarly, whether or not Joseph volunteered to dismember the body also is subject to some subjective assessment -- he testified candidly that he provided the machete for the dismemberment of Maharaj's body, which, depending on one's perspective, might or might not be considered an act of volunteering with respect to the dismemberment. Additionally, the contents of several letters sent from Joseph to Gittens might easily be forgotten or misremembered. It is not enough for a defendant simply to point out inconsistencies in testimony -- nothing in <u>Napue</u> or its progeny suggest that every time

there is an inconsistency in a cooperator's testimony, a due process violation has occurred.[29]
Indeed, such an approach defies common sense -- the standard jury instructions, and this Court's
years of trial experience, confirm that inconsistencies in testimony are commonplace and happen
for many different reasons. Rather, it is defendant's burden to establish that the testimony at
issue is false, not just inconsistent, and this he has not done.

Moreover, even if a witness's testimony contains falsehoods, "cross-examination
and jury instructions regarding witness credibility will normally purge the taint of false
testimony." See United States v. Joyner, 201 F.3d 61, 82 (2d Cir. 2000). Defense counsel fully
cross-examined all four cooperating witnesses about the alleged inconsistencies in their
testimony. Furthermore, the Court instructed the jury extensively on witness credibility,
inconsistencies in testimony generally, prior inconsistent statements by witnesses, and testimony
by witnesses with a plea agreement. Two separate jury instructions highlighted the need to
weigh inconsistent statements. Instruction 2.11, captioned the "Credibility of Witnesses,"
instructed the jury to consider "whether the witness has any interest in the outcome of this case,
or friendship or hostility toward other people concerned with this case," and then informed the

---

[29] Many of the matters on which there was conflicting testimony were not relevant to
defendants' respective roles in the offense or even to any promise of leniency or other biases of
the cooperating witnesses. The Court recognizes that Napue states that false testimony may
require a new trial even where the falsehood does not bear directly upon defendant's guilt. But
that part of Napue presumes that the falsehood bears on the witness's overall credibility and, in
Napue itself, involved the crucial matter of whether the cooperating witness had been promised
leniency. See Napue, 360 U.S. at 267 (the witness "had falsely testified that he had been
promised no consideration for his testimony"); see also United States v. Iverson, 637 F.2d 799,
801 (D.C. Cir. 1980) ("when a principal prosecution witness falsely claims that no promises of
leniency were made . . . the defendant may be entitled to a new trial on due process grounds"),
modified on other grounds, 648 F.2d 737 (D.C. Cir. 1981). Nothing in Napue or its progeny
suggests that a conflict in testimony over an immaterial fact would support a due process
violation.

jury of how to evaluate inconsistencies:

> Inconsistencies or discrepancies in the testimony of a witness, or between the testimony of different witnesses, may or may not cause you to discredit such testimony. Two or more persons witnessing an incident or transaction may see or hear it differently; an innocent mis-recollection, like a failure of recollection, is not an uncommon experience. In weighing the effect of the inconsistency or discrepancy, always consider whether it pertains to a matter of important or unimportant detail, and whether the inconsistency or discrepancy results from innocent error or intentional falsehood.

Jury Instructions at 20-21. Instruction 2.22A, captioned "Witness with a Plea Agreement,"

identified Percival, Joseph, Gittens, and Nurse by name, and instructed the jury that they may

consider whether the plea agreements motivated them to testify falsely:

> You have heard evidence that Russel Joseph, Leon Nurse, Jason Percival and Winston Gittens are awaiting sentence for their participation in the offenses charged against defendants. You may consider this evidence when deciding whether the witness has a bias in favor of one of the parties that may affect his willingness to tell the truth.

> You have also heard evidence that Joseph, Nurse, Percival and Gittens entered into plea agreements with the government pursuant to which each of them agreed to testify truthfully in this case and that the government agreed to bring their cooperation to the attention of the sentencing court and consider filing papers which would permit the judge to impose a more lenient sentence than would otherwise be possible.
> . . . .

> However, you may consider whether a witness who has entered into such an agreement has an interest different from other witnesses. You may consider whether the plea agreement the witness entered into with the government has motivated him to testify falsely against the defendant. The testimony of a witness who has entered into a plea agreement should be considered with caution. You should give the testimony as much weight as in your judgment it deserves.

Id. at 27. Furthermore, Instruction 1.10, captioned "Evaluation of Prior Inconsistent Statement of

a Witness," also addressed the four cooperating witnesses by name and discussed evaluation of

prior inconsistent statements:

> You have heard evidence that Winston Gittens, Russel Joseph, Jason Percival,

[and] Leon Nurse . . . made a statement on an earlier occasion and that this statement may be inconsistent with his testimony here at trial. It is for you to decide whether the witness made such a statement and whether in fact it was inconsistent with the witness's testimony here. If you find such an inconsistency, you may consider the earlier statement in judging the credibility of the witness, but you may not consider it as evidence that what was said in the earlier statement was true.

You also have heard evidence that Winston Gittens, Russel Joseph, Jason Percival and Sgt. Wendell Lucas made an earlier statement under oath, subject to the penalty of perjury, at a prior proceeding or in the grand jury and that this statement may be inconsistent with his testimony here at trial. If you find that the earlier statement is inconsistent with the witness's testimony here in court, you may consider this inconsistency in judging the credibility of the witness. However, unlike statements not made under oath, you also may consider the earlier statement as evidence that what was said in the earlier statement was true.

Id. at 23.

Here, the jury was fully apprised of the alleged inconsistencies in testimony and potential motives of the cooperating witnesses to testify falsely, having heard the conflicting evidence on both direct testimony and during extensive cross-examinations. "[W]here the conflicting evidence is presented to the jury on cross-examination, the jury [is] entitled to . . . weigh the evidence and decide the credibility issue for itself." Bennett v. Spitzer, No. 05-CV-1399, 2007 WL 389213, at *9 (E.D.N.Y Jan. 31, 2007). Indeed, this case stands in stark contrast to the false testimony presented in Napue where the witness falsely testified that he had not been promised leniency at sentencing, and the jury was wholly unaware that, to the contrary, he had, in fact, been promised leniency by the prosecutor. See Napue, 360 U.S. at 267 (the witness "had falsely testified that he had been promised no consideration for his testimony," and "[h]ad the jury been apprised of the true facts, . . . it might well have concluded that [the witness] had fabricated testimony in order to curry the favor of [the prosecutor]"). Similarly, in United States v. Iverson, the witness falsely testified that she had already been sentenced, with "the inevitable effect of

leading the jury to the erroneous conclusion that she could not gain from cooperating with the government," and the jury remained uninformed that her testimony could be affected by the expectation of sentencing leniency. 637 F.2d at 801 ("when a principal prosecution witness falsely claims that no promises of leniency were made . . . the defendant may be entitled to a new trial on due process grounds").

Just the opposite occurred at the trial of these defendants -- the jury was apprised at length of the plea agreements and the witnesses' interest in obtaining leniency at sentencing, and defense counsel made fulsome arguments to the jury of the witnesses' motives to testify falsely to curry favor with the prosecution for subsequent sentencing. For each witness, the fact of his plea agreement was disclosed, and each acknowledged that, under his plea agreement, the departure committee of the U.S. Attorney's Office would evaluate the "extent of [his] cooperation, or lack thereof," determine whether the witness had provided "substantial assistance" under USSG 5K1.1, and make a recommendation as to whether the defendant should be sentenced below the mandatory minimum sentence of life imprisonment. See, e.g., Trial Tr. at 839-45, 991-1000 (June 2, 2009) (Joseph's testimony concerning his plea agreement); Trial Tr. at 2248-51 (June 10, 2009) (Percival's testimony concerning his plea agreement); Trial Tr. at 3333-40 (June 17, 2009) (Gittens); Trial Tr. at 1578-85 (June 4, 2009) (Nurse).[30] Furthermore, each defendant testified on

---

[30] The jury was read the full text of the plea agreements' provision concerning substantial assistance and downward departures, and each plea agreement was admitted into evidence. This provision was substantially the same for each cooperating witness, and states: "Substantial assistance. Following the completion of your client's cooperation, we will inform the departure committee of the United States Attorney's Office for the District of Columbia of the nature and extent of your client's cooperation, or lack thereof. If the departure committee, after evaluating the full nature and extent of your client's cooperation, or lack thereof, determines that your client has provided substantial assistance in the investigation or prosecution of another person who has
(continued...)

cross-examination that he hoped his testimony would result in a downward departure at sentencing and that he could not obtain a downward departure unless the government sought one based on its substantial assistance determination. See Trial Tr. at 1006 (June 2, 2009) (Joseph); Trial Tr. at 2258-59 (June 10, 2009) (Percival); Trial Tr. at 3449 (June 17, 2009) (Gittens); Trial Tr. at 1788-89 (June 8, 2009) (Nurse).

A centerpiece of defendants' closing argument was that the cooperating witnesses lacked credibility in light of bias allegedly caused by their plea agreements and the inconsistencies in their testimony. See, e.g., Trial Tr. at 7737-38 (July 23, 2009) (DeFour) ("think about the cooperators in this case: Jason Percival, Winston Gittens, Russel Joseph, Leon Nurse. . . . The only possibility they have to get out: Cooperation, 5(k) letter from the government . . . . Who amongst us in that situation would not be tempted to bear false witness against another?"); id. at 7759-60 ([Jason Percival] denies being the leader. . . . [But] Nurse, Gittens, Joseph all describe him as the shot-caller . . . Have you ever met a more conniving, manipulative person in your life than Jason Percival?"). This case is thus in stark contrast to the false testimony problem presented in Napue and Iverson.

In this case, all of the conflicting evidence and the plea agreements were presented to the jury, which was given extensive instructions to guide their credibility determinations. Under

_____

[30](...continued)
committed any offense, then the United States will file a motion pursuant to 18 U.S.C. § 3553(e) and/or USSG § 5K1.1 to afford your client an opportunity to persuade the court that your client should be sentenced to a lesser period of incarceration . . . than provided by any applicable mandatory minimum statutory sentence provision or by the sentencing guidelines. Your client understands that the determination of whether your client has provided substantial assistance is within the sole discretion of the United States Attorney for the District of Columbia and is not subject to review by any court . . . ." Trial Tr. at 3338-39.

these circumstances, there is no due process violation under <u>Napue</u>, <u>Giglio</u>, or <u>Agurs</u>.

**C.     Trial in U.S. Court for Crimes Occurring in Trinidad**

Straker contends that he was denied due process of law by being compelled to proceed to trial in the United States without the benefit of records, other evidence, and witnesses located in Trinidad. Straker's Mem., ECF #700, at 68-71. He focuses on documents covered by the Letter Rogatory that was issued by the Court on June 24, 2008, and, in particular, on Section X of the Letter Rogatory covering the Trinidadian law enforcement records, which he calls "Blue Files," that are expected to contain a summary of any charge, arrest, or conviction of persons in Trinidad, including the four cooperating witnesses (Percival, Joseph, Gittens, and Nurse) who testified against him at trial. <u>Id.</u> Impeaching their credibility was a "necessary part of [his] defense," and he was hamstrung in his impeachment efforts, he says, because Trinidad failed to provide any documents in response to the Letter Rogatory.[31] <u>Id.</u> at 70. In response, the government argues that Straker does not have a constitutional right to compel the production of items beyond the Court's subpoena power and hence, the absence of a response to the Letter Rogatory does not give rise to a due process violation. <u>See</u> Gov't Mem., ECF #712, at 133-35. The government also asserts that, apart from the Letter Rogatory, the government did, in fact, obtain and produce to defendants any arrest and conviction records of its four cooperating witnesses, and hence Straker's assertion that a due process violation occurred based on Trinidad's failure to produce the requested "Blue Files" has no merit. <u>Id.</u>

---

[31]     Straker's counsel represents that the U.S. Embassy in Trinidad informed him that the Letter Rogatory had been "denied" by Trinidad. Straker's Mem., ECF #700, at 69. Whether the Letter Rogatory was formally denied, ignored, or otherwise left unprocessed is irrelevant to resolution of Straker's motion.

The Court begins with the basic principle that the right to present a defense is "a fundamental element of due process of law," and "preclusion of all inquiry by the defense on a particular aspect of the case violates that right." See United States v. Stewart, 104 F.3d 1377, 1384 (D.C. Cir. 1997) (quoting Washington v. Texas, 388 U.S. 14, 19 (1967), and Chambers v. Mississippi, 410 U.S. 284, 302 (1973)). However, Straker has not shown that Trinidad's failure to provide "Blue Files" (or other law enforcement files on the cooperating witnesses' criminal history) in response to the Letter Rogatory materially affected his ability to impeach the credibility of the cooperating witnesses.

First, the government represents that it initiated multiple inquiries for the requested "Blue Files" with knowledgeable individuals in the Trinidadian government, and was informed that they have no files called "Blue Files." See Gov't Mem., ECF #712, at 134. Second, the government did, in fact, obtain the available arrest and conviction records for the cooperating witnesses, and disclosed those records to defendants. Id. This criminal history was used by defendants to impeach the cooperating witnesses. See, e.g., Trial Tr. at 3405-06 (June 17, 2009) (cross-examination of Gittens concerning his conviction for stealing cars, his five-year prison sentence, and his motivation to "break the law if [he] could get a financial benefit"). And as discussed above, defense counsel made extensive efforts to impeach the cooperating witnesses' credibility with their plea agreements and their hopes for leniency at sentencing. Thus, the Court sees no basis for finding that Straker was materially affected in his ability to challenge the credibility of the cooperating witnesses. See United States v. Lathern, 488 F.3d 1043, 1046 (D.C. Cir. 2007) (holding that the constitutional right to present a defense is not violated by the exclusion of a defendant's proffered evidence where he is otherwise "given the opportunity to

present his defense and cross-examine the key prosecution witnesses").

Furthermore, to the extent Straker claims an entitlement to the Trinidadian law enforcement records under the Sixth Amendment right to compulsory process, he is in error. The right the compulsory process extends only to those areas within the territorial power of the United States courts. See United States v. Sensi, 879 F.2d 888, 899 (D.C. Cir. 1989); accord United States v. Moussaoui, 382 F.3d 453, 463 (4th Cir. 2004) ("the process power of the district court does not extend to foreign nationals abroad"). Hence, this Circuit has observed that "[i]t is well-settled that a defendant's inability to subpoena foreign witnesses is not a bar to criminal prosecution." Sensi, 879 F.2d at 899.

By the same principle, a defendant's inability to obtain foreign documents is not grounds for a new trial. Indeed, in United States v. Mejia, 448 F.3d 436, 444-45 (D.C. Cir. 2006), defendants made arguments in support of a new trial similar to Straker's, based on their inability to obtain tapes and transcripts from Costa Rica concerning the trial of a co-conspirator. There, the defendants argued that a new trial was warranted because the prosecution had the power to obtain the tapes and transcipts from Costa Rica, and they were prejudiced from their lack of access to those materials. The Circuit rejected that argument because the government complied with its disclosure obligations under Fed. R. Crim. P. 16, with respect to what was in its possession, and defense counsel were able to travel to Costa Rica to obtain other relevant evidence concerning the co-conspirator. Much the same occurred here: the government provided defendants with the witnesses' criminal histories in its possession, and defense counsel and their

investigators made numerous trips to Trinidad to obtain other evidence.[32]  Under <u>Sensi</u> and

<u>Mejia</u>, it is clear that Straker's lack of access to the Trinidadian records at issue did not give rise

to a violation of his Sixth Amendment rights.

**IV.     Other Evidentiary Issues**

      **A.     Government Fingerprint Expert Dawn Schilens**

      Straker contends that a new trial is warranted because the testimony of Dawn Schilens, an

expert in the field of fingerprint identification and analysis -- or in technical terms, "friction

ridge" analysis[33] -- was improperly admitted against him in violation of Fed. R. Evid. 702 and the

standards set forth in <u>Daubert v. Merrell Dow Pharm.</u>, 509 U.S. 579 (1993).[34]  <u>See</u> Straker's

Mem., ECF #700, at 39-49, 66-68.  He argues that, under <u>Daubert</u>, one of the factors in

determining the admissibility of expert testimony concerning a particularized scientific technique

is "'the technique's known or potential rate of error,'" and Schilens' testimony failed to satisfy this

---

[32]  With respect to Straker, the Court issued authorizations to travel to Trinidad for counsel and/or his investigator as follows:  March 2008 (four days); May 2008 (nine days); November 2008 (eight days); May 2009 (eight days); and July 2009 (seven days).  All defense counsel requested and were granted authorizations to travel for comparable periods of time.  The Court did not deny any defendant's request to travel to Trinidad to conduct investigation or otherwise to develop the defense case.  Indeed, Straker's counsel agreed that all of his Trinidad trips had been accommodated.  <u>See</u> Trial Tr. at 5805 (July 6, 2009) ("[T]he Court has been especially accommodating to myself and my investigator going there back and forth to Trinidad. You've always given us the resources.  You've always given us whatever you could do to help move this case along and to help us get the evidence. . . . The problem is the Court only has so much power in Trinidad.").

[33]  The term "friction ridge" analysis comes from the analysis of the specialized skin called "friction ridge skin" on the palms of hands and soles of feet.  Trial Tr. at 2955 (June 15, 2009).

[34]  As discussed earlier, Straker allegedly sent a note to Percival in furtherance of his requests to Percival not to cooperate with the government.  Schilens identified latent fingerprints on that document as belonging to Straker.

factor because she did not articulate a rate of error.  Id. at 66-68 (quoting Daubert, 509 U.S. at 593-94).  This is the same argument he made immediately following Schilens' testimony in his motion to strike expert testimony, which was rejected by Order dated June 29, 2009.  See ECF # 568 (filed June 29, 2009) (holding that "there are no grounds under Daubert or [Fed. R. Evid.] 702 to doubt the reliability of Schilens's testimony").  In response, the government argues that the admissibility of expert testimony on fingerprint identification is well-established, and that the Court properly denied Straker's earlier motion to strike.  Gov't Mem., ECF #712, at 149-50.

Expert testimony on fingerprint evidence is "generally accepted" within the judicial system; hence, "[w]hen a district court is satisfied with an expert's education, training, and experience, and the expert's testimony is reasonably based on that education, training, and experience," a Daubert hearing is not required unless the defendant requests one.  United States v. Spotted Elk, 548 F.3d 641, 663 (8th Cir. 2008) (quoting United States v. Kenyon, 481 F.3d 1054, 1061 (8th Cir.2007)); see also United States v. Mitchell, 365 F.3d 215, 246 (3d Cir. 2004) ("a district court would not abuse its discretion by limiting, in a proper case, the scope of a Daubert hearing to novel challenges . . . or even dispensing with the hearing altogether if no novel challenge were raised").  Here, the Court received testimony from Schilens on her qualifications as an expert in the field of fingerprint identification and analysis, which included employment as a physical scientist/forensic examiner in the latent print operation unit of the FBI, her certification following an 18-month training program, and her experience in having conducted over 140,000 fingerprint comparisons.  See Trial Tr. at 2955-58 (June 15, 2009).  When the government offered Schilens as an expert in the field of friction ridge analysis, Straker made no objection, stating very plainly: "No voir dire or objection as to that particular area of

expertise." Id. at 2958. It was not until his cross-examination and the government's redirect examination were complete that he challenged her testimony as improper under Daubert based on Schilens' alleged failure to articulate an error rate. Trial Tr. at 3071 (June 16, 2009). The Court notes that, under these circumstances, there was no error in admitting the testimony without first having a Daubert hearing. See Spotted Elk, 548 F.3d at 663 (Daubert hearing not required where district court is satisfied that fingerprint expert has the requisite training, education, and experience).

More to the point, the Court has fully considered Straker's contention that Schilens' alleged failure to articulate an error rate renders her testimony inadmissible under Daubert, and finds no basis for departing from its earlier ruling that Schilens' testimony is admissible. First, Schilens did present testimony on the error rate. She testified that there are two different types of error -- the error rate in the methodology and human error. Trial Tr. at 3041 (June 16, 2009). She further testified that her "methodology, ACE-V, does not have an inherent rate of error" -- that is, "[t]here is a zero rate of error in the methodology." See Trial Tr. at 3041, 3043-44 (June 16, 2009). As to human error, she did not articulate an error rate, although acknowledging the potential for error. Id. at 3043-45. On redirect examination, she testified, however, that pursuant to the methodology, another FBI fingerprint examiner conducted an independent examination of the latent fingerprints at issue, and determined that each of the three latent fingerprints belonged to Straker. Id. at 3059-60.

Straker's objection to the absence of error rate testimony rests on Schilens' inability to provide testimony on the human error rate in the overall field of fingerprint identification. However, as the Third Circuit explained in Mitchell, while the prospect of a false positive is

troubling, it "relate[s] only to the competency of those practitioners [who made false positive

determinations], leaving undisturbed the government's evidence about the near-absence of false-

positive identifications."  Mitchell, 365 F.3d at 240 (emphasis added); see also United States v.

Havvard, 260 F.3d 597, 601 (7th Cir. 2001) (rejecting defendant's challenge to reliability of

expert on fingerprint analysis, noting that "the probability for error is exceptionally low").  In this

case, there was no evidence concerning Schilens' own error rate -- Straker instead focused his

cross-examination on whether others in the field had made "human errors."  But whether

someone other than Schilens made an error is irrelevant to the accuracy of her own fingerprint

identification.  See Mitchell, 365 F.3d at 240.  The possibility of human error in Schilens'

analysis was addressed by the fact that another FBI fingerprint expert conducted an independent

analysis and determined that the latent fingerprints belonged to Straker, confirming her separate

analysis.  Based on the foregoing, the Court rejects Straker's contention that Schilens' testimony

was inadmissible under Daubert for an alleged failure to identify an error rate.

**B.    Dismemberment Evidence**

Clarke contends that the admission of evidence, including testimony and photographs,

related to the dismemberment, storage, and retrieval of Maharaj's body parts was grotesque and

inflammatory, and its prejudicial impact outweighed any probative value because he was not on

trial for dismembering the victim's body.  See Clarke's Mem., ECF #701, at 24-25.  In response,

the government contends that the probative value of the evidence outweighed any prejudice to

Clarke because the evidence was directly relevant to show the victim's identity, to explain why

the medical examiner could not state an exact cause of death, to show Clarke's consciousness of

guilt, and to corroborate the testimony of various cooperating witness as to what happened to

Maharaj's body after he died. See Gov't Mem., ECF #712, at 154-55; Gov't Opp'n to Clarke's

Mot. in Limine to Exclude Certain Photographic and Testimonial Evidence, ECF #488, at 1-2.

The government further points out that Clarke has failed to identify any particular photograph or

testimonial passage as causing unfair prejudice, and notes that, following the Court's caution on

this issue, the dismemberment evidence was "sanitized" to keep out the more disturbing and

inflammatory images. See Gov't Mem., ECF #712, at 154-55; see also Order, ECF #519 (filed

May 26, 2009).

 The Court finds that Clarke's motion concerning the dismemberment evidence is without

merit. This Circuit has held that "photographs of the [victim's] body are admissible as long as

they have some probative value and are not intended solely to inflame the jury." See Harried v.

United States, 389 F.2d 281, 287 (D.C. Cir. 1967). While recognizing that such evidence "may

inappropriately dispose a jury to exact retribution," it also "can have immense probative value if,

for example, they confirm the prosecution's theory about the manner in which the crime was

committed." United States v. Rezaq, 134 F.3d 1121, 1138 (D.C. Cir. 1998). That was the case

here. The dismemberment evidence -- predominantly in the form of testimony, rather than visual

images  -- was admitted to show premeditation and consciousness of guilt, as well as to show that

the cooperator testimony concerning Clarke's participation in the conspiracy was credible. This

evidence was of particular relevance to Clarke because it corroborated Joseph's and Percival's

testimony that Clarke participated in the dismemberment, and showed Clarke's guilt by

demonstrating his precise knowledge of which body parts were in which containers and where

the containers were buried. In light of the probative value of the evidence, and the nature of the

evidence presented, the Court finds that the evidence was properly admitted under Fed. R. Evid.

403.

## V.  DeFour's Alibi Defense

### A.  Denial of DeFour's Motion to Continue the Trial; New Evidence

The week before jury selection was scheduled to commence, DeFour filed a motion for continuance of the trial to obtain "military attendance records which [were] expected to show that he was at work on a military base during critical times" and, hence, establish an alibi defense. See DeFour's Mot. to Continue Trial at 1, ECF #481 (filed May 14, 2009).  The Court held a hearing on the motion, and denied the motion from the bench, reasoning that there was no basis to believe that Trinidad would produce the records at any determinate time, if ever, and noting that DeFour had at least a month until it was time to present his defense case in any event.  See Preliminary Tr. at 69 (May 21, 2009).  DeFour ultimately obtained some documentary evidence from Trinidad during the trial that he used to support his alibi argument, and he also presented witness testimony in furtherance thereof. Nonetheless, he contends that a new trial is warranted because the Court erred in denying his motion for continuance, arguing that the records obtained during trial came too late to be used effectively, and that he obtained additional information on or about October 14, 2009, three months after the verdict was returned, that he believes supports a better alibi argument.  The government responds that a new trial is not warranted because DeFour did, in fact, obtain and present alibi evidence in time to use it effectively at trial and the modified alibi theory he wishes to present now is only speculation and conjecture based on incomplete records.

The Court has reviewed the trial record and the new exhibits now offered by DeFour and concludes that the denial of the continuance was appropriate and a new trial is not warranted. The Court pauses first to note that DeFour expressly disclaims any attempt to seek a new trial

based on "newly discovered evidence" under Fed. R. Crim. P. 33, but instead grounds his request

for a new trial on the allegedly erroneous denial of his motion for continuance.   See DeFour's

Mem., ECF #707, at 2-15; DeFour's Reply Mem., ECF #715, at 10.[35]   Hence, the Court will focus

its analysis on whether the denial of the continuance was error.

The Court's analysis of the continuance issue is guided by United States v. Haldeman,

559 F.2d 31, 83 (D.C. Cir. 1976).   The D.C. Circuit explained that there are competing interests

involved in the decision whether to grant a continuance based on a defendant's request for time to

obtain new evidence.   On the one hand, criminal defendants have a "substantial interest" in being

able to present evidence favorable to the defense.   Id.   At the same time, the government

generally has a "substantial interest in avoiding disruptions of a court's calendar and in having

guilt or innocence promptly adjudicated."   Id.   The court then emphasized that "no firm rules can

be articulated as to when a continuance is required," and hence the decision whether to grant a

continuance is "vested in the trial judge's discretion."   Id. The court then identified some of the

factors that the district court should consider:  (1) "the likelihood . . . that the defendant will be

able to and will produce the missing evidence if the continuance were granted"; (2) "the

likelihood . . . that the evidence will be favorable to the defense and, if so, that it will be

significant"; (3) "whether the defendant acted with diligence in attempting to secure the missing

evidence in time for trial"; and (4) "the length of the continuance being requested and the burdens

---

[35]   To be sure, DeFour's motion for new trial often implies that the "new evidence" itself
is the basis for a new trial, rather than an error in the Court's pretrial ruling.   See DeFour's Mem.,
ECF #707, at 7.   DeFour states quite plainly in his reply, however, that he is not seeking a new
trial based on "newly discovered evidence": "Contrary to the government's mischaracterization of
Defendant's motion, defendant is not seeking a new trial based on newly discovered evidence.
Rather, defendant is seeking a new trial based on the court's denial of his motion to continue."
See DeFour's Reply Mem., ECF #715, at 10.

that would be placed on the Government and the court if the request were granted." Id. at 84.

DeFour's request for a continuance failed under those factors at the time of his motion, and the evidence he has developed since that time does not change the Court's assessment. Three of the four factors overwhelmingly supported denial of a continuance. To begin with, on the eve of trial, there was little likelihood that DeFour would obtain from Trinidad authorities the evidence he described -- his "military service records including attendance records" -- in light of Trinidad's lack of response to the previous letters rogatory issued by the Court. See ECF # 237 (July 28, 2008) (Letter Rogatory for Straker); ECF # 79 (Apr. 2, 2007) (Letter Rogatory for defendant Suchit); Straker's Mem., ECF #700, at 69 ("none of the requested information was produced"). Indeed, Straker filed reports with the Court detailing his efforts to obtain responses by contacting Trinidad's Attorney General's Office, Department of Public Prosections, Ministry of Foreign Affairs, and Supreme Court, as well as the Embassy. See Straker's Third Status Report Concerning Letter Rogatory, ECF #299 (Oct. 30, 2008); Straker's Fourth Status Report Concerning Letter Rogatory, ECF #362 (Jan. 28, 2009). DeFour contends that Trinidad's earlier non-responsiveness with respect to letters rogatory should not matter because he was pursuing his documents under Trinidad's version of the Freedom of Information Act, and the provisions of that statute required a response to his FOIA request within 30 days of the request. See DeFour's Mem., ECF #707, at 9 & n.8. But there was no reason to believe that Trinidad would have been more responsive to a FOIA request than the letters rogatory, especially considering the substantial and lengthy diplomatic efforts that were undertaken to obtain responses. Additionally, DeFour's own investigator questioned whether any response would ever be forthcoming, as he recounts in his log of efforts to obtain the documents: "Around May 13,

2009, it was becoming apparent to both Jon Zucker and myself that both the Ministry of National

Security and to a lesser degree TTDF were either extremely slow in producing the documents . . .

or purposefully withholding valuable exculpatory documents from us and delaying their

production to where they could not be fully utilized effectively by the defense." See DeFour's

Mem., ECF # 707, Exhibit A, at 2-3.

DeFour fares no better under the third and fourth factors -- whether the defendant acted

with diligence in attempting to obtain the documents earlier, and the length of the continuance

requested and its impact on the Court and the government.  As for diligence, the Court finds that

DeFour did not act diligently.   He attempts to show that he acted with diligence by providing a

detailed chronology of his informal and formal attempts to obtain documents from November 21,

2008, through the date of his motion for continuance and beyond -- mostly phone calls,

correspondence, and attempted meetings.  See DeFour's Mem., ECF #707, at 2-4 & Ex. A. But

there are two problems with his "diligence" argument.  First, even as of the time he filed his

motion for continuance, he had not submitted a FOIA request to the Trinidad government.  See

DeFour's Mot. for Continuance, ECF #481, at 3 ("additional time is needed to possibly pursue a

civil FOIA request . . . or through an . .  International Letter Rogatory") (emphasis added).  The

much-highlighted FOIA request was not sent out by DeFour until May 18, 2009 -- four days after

he filed his motion for continuance.  There was no reason the FOIA request could not have been

sent out months earlier.  Second, DeFour has been represented by a Trinidadian attorney, Keith

Scotland, since at least January 2006, and Scotland has continued to assist in DeFour's defense,

including facilitating DeFour's efforts to obtain his military attendance records during the U.S.

pretrial and trial proceedings. See Gov't Mem., ECF #712, at 23-24 & n.9; DeFour's Mem., ECF

#707, Ex. A and B.  DeFour surely has been aware that he might have a potential alibi defense since the day he was indicted, three years before trial commenced.[36]  There is no excuse for waiting until the week before trial to begin formal efforts to obtain those documents.[37]

The length of the continuance requested and the burden on the Court and government also weighed against the continuance.  DeFour did not specify a fixed period of delay -- rather, he simply requested an open-ended delay while he made efforts to pursue his FOIA request and a possible letter rogatory.  See DeFour Mot. to Continue, EF #481, at 1-4.  Moreover, the burden on the Court and government would have been considerable.  Eight months earlier, the Court had blocked out two months of its trial calendar -- a formidable task -- and the government and all defense counsel had done the same.  DeFour's rejoinder to this is simply that he could have been severed.  But the Court had already determined that joinder of the defendants for trial was appropriate, and does not accept lack of diligence as a justification for severing properly joined parties -- any defendant could then manipulate the system to achieve severance simply through an asserted lack of preparedness.

The Court has also given full consideration to the second factor -- the likelihood that the evidence would have been favorable to the defense and have significance.  To assess this factor,

---

[36]  DeFour contends that "the details of DeFour's participation in the hostage taking were only made known after his extradition to the United States" -- that is in August 2008 -- and hence his Trinidadian counsel could not have anticipated what records might be relevant to his defense.  However, the first superseding indictment that was returned on May 5, 2006, clearly identifies the date of the hostage taking as April 6, 2005, and alleges that DeFour participated by, inter alia, serving as the driver who "clear[ed] the roads for the getaway car."  First Superseding Indictment, ECF #4, at 8.

[37]  DeFour had a change of U.S. counsel in March 2009.  However, his prior U.S. counsel, Joseph Beshouri, had initiated efforts to obtain his military attendance records at least by November 21, 2008.  See DeFour's Mem., ECF #707, Ex. A.  Thus, the change in U.S. counsel provides no grounds for excusing his tardiness.

the Court starts with DeFour's proffer in his motion for continuance. There, DeFour stated that he hoped to obtain "military attendance records which [were] expected to show that he was at work on a military base during critical times," and thereby establish an alibi defense. <u>See</u> DeFour's Mot. to Continue Trial, ECF #481, at 1. That general proffer, however, did not establish a likelihood that the evidence would be significant because DeFour was not charged with acts occurring at one specific moment in time but rather with participating in a months-long conspiracy to commit hostage taking that culminated in the abduction of Maharaj on April 6, 2005, and his captivity for a week thereafter. Nothing in DeFour's pretrial proffer indicated he would offer proof to negate his participation in the conspiracy.

But even accepting DeFour's assumption that only the events of April 6, 2005, are relevant to his conviction, he fares no better. With the benefit of hindsight, DeFour asks the Court to look at the documents he obtained during the course of trial and after the verdict was returned to show that he was prejudiced by the denial of the continuance -- that is, the records produced on or about July 6, 2009, and also the post-trial letter from the Ministry of National Security dated October 14, 2009. This is, perhaps, another way of assessing the second factor -- whether the evidence would have been favorable to the defense -- although the Court, of course, did not have this information at the time it ruled on DeFour's motion for continuance. In any event, the Court finds that these documents fail to show that DeFour was prejudiced by the denial of the continuance.

First, based on the records produced on or about July 6, 2009, DeFour did, in fact, argue to the jury that he had an alibi with respect to a significant part of the government's case -- <u>i.e.</u>, the government's theory that he participated in the abduction on April 6, 2005, by providing guns

to Sealey and Nixon that day, and driving the clearing car from the Samaan Tree Bar after Maharaj had been abducted. The July 6th records consisted of the "nominal roll" -- basically, an attendance sheet -- and the Special Forces Operational Detachment Training Program, which together showed DeFour's whereabouts for portions of April 6, 2005. As DeFour explained to the jury, the nominal roll showed that DeFour was present for morning muster at Camp Omega on April 6, 2005, at 6:30 a.m. See Trial Tr. at 7712 (July 23, 2009). The training program document showed that DeFour was assigned to teach courses for the period April 4, 2005, through April 16, 2005, and that on the date Maharaj was abducted, DeFour was scheduled to teach two courses that ran from 9:00 a.m. to 12:00 noon. Trial Tr. at 6051-60 (July 7, 2009). DeFour used those documents along with witness testimony to make the case that he could not have been in the vicinity of the Samaan Tree Bar when Maharaj was abducted.

DeFour's witnesses testified that according to standard operating procedures, all instructors are required to stay at Camp Omega until the last period of the day, and then attend an "end of lectures" period -- an "after action review of the day's activities" -- which typically lasts 60 to 90 minutes. See, e.g., id. at 6059. On April 6, 2005, the last scheduled class ended at 5:00 p.m., which meant that the "end of lectures" period that day ran until approximately 6:00 or 6:30 p.m. Id. According to DeFour, it was "physically impossible" for him to have been at the Samaan Tree Bar when the abduction took place at 6:45 p.m. because, as other witnesses testified, the bar is at least one hour's driving distance from Camp Omega. See Trial Tr. at 7712-17 (DeFour's closing argument); see also DeFour's Mem., ECF #707, at 4-6. The government responded to DeFour's partial alibi theory by arguing to the jury that DeFour's evidence showed only that he was present for morning muster on April 6, 2005, and that there was no evidence

that DeFour stayed for the full day, suggesting that DeFour left Camp Omega early that day. Trial Tr. at 7980 (July 24, 2009) ("His own witnesses said 'it's not unusual for him to leave early.'").

This summary of the defense argument made at trial shows that DeFour was able to make effective use of the July 6, 2009 documents -- he argued based on those documents and witness testimony that, on April 6, 2005, he was at Camp Omega, and could not have been at the Samaan Tree Bar by 6:45 p.m. DeFour contends that he was nonetheless prejudiced because he was unable to present his alibi argument to the jury during his opening statement or to cross-examine Russel Joseph, Leon Nurse, and Jason Percival about their recollections of DeFour's participation on April 6, 2005. See DeFour's Mem., ECF #707, at 11-15. Of course, it is not true that he could not have included a reference to his alibi theory in his opening statement, considering that in his motion for continuance he described his belief that he was at work on a military base during critical times of the offense. In any event, it is well-settled that the opening statement is not evidence, and hence omissions or other errors in defense counsel's opening statements are not grounds for a new trial, especially where, as here, defendant was able to fully incorporate his alibi evidence into his defense case and make closing arguments to the jury on the issue. See generally United States v. Thomas, 114 F.3d 228, 249 (D.C. Cir. 1997) (explaining, in the context of errors in the prosecution's opening statement, that opening statements are "not evidence" and that "such a general instruction suffices to render error in opening statements harmless except in particularly egregious cases") (citation and internal quotation marks omitted); United States v. Cardales, 168 F.3d 548, 557 (1st Cir. 1999) (rejecting the argument that conviction should be vacated where defense counsel stated in his opening that defendant would

testify but defendant decided not to testify, reasoning that opening statements are not evidence).

With respect to cross-examination of Joseph, Nurse, and Percival, the Court made clear to counsel throughout the trial that they could recall witnesses when late-discovered evidence arose. At no time did DeFour seek to have those witnesses recalled to conduct further cross-examination with respect to his alibi argument and the July 6, 2009 documents. In all likelihood, this was because the cross-examination he did conduct of Percival with respect to a possible alibi defense was fruitless. DeFour admits that, by June 11, 2009, fairly early in the trial, he had learned about information that identified him as assigned to teach at the training program on April 6, 2005, and hence he was able to cross-examine Percival on the accuracy and credibility of his recollection that DeFour was involved in the events of the day. See DeFour's Mem., ECF # 707, at 14. Following Percival's direct testimony that DeFour was with him all day at the Mellow Moods Bar on the day of the abduction, and was also present at the Samaan Tree Bar (Trial Tr.at 2058-59 (June 9, 2009)), counsel tried to establish that DeFour could not have been with Percival that day because DeFour was at Camp Omega, but failed in that effort:

> Q. [C]an you explain to me how my client was there in the morning and then limed with you whole day, when he was on duty at Camp Omega that morning?
>
> A. Sir, soldiers in the Trinidad and Tobago regiment leave their post several times for many different reasons. Sometimes they leave to go one place and end up the other. . . . As long as you have a connection with the guard commander, they allow them to leave as long as they are close together.
>
> Q. You agree that if he was on duty at Camp Omega at his station, he could not have been at Mellow Moods with you the morning and liming all day, could he? . . . .
>
> A. Sir, I don't know if he was supposed to be on duty, sir. All I know is how we are accustomed and how we soldiers are accustomed to operating, sir. So if it was written that he was on duty, it would have been no surprise to me, sir.

Q. My question was, you would agree, though, if he was actually on duty, he couldn't have been with you. Right?

A. I don't agree with that, sir.

. . . .

Q. How about if he was teaching a class that morning? How about if that was his duty assignment on April 6th, to be teaching a class to other soldiers?

A. On the day of the kidnapping, sir?

Q. Yes.

A. Sir, I have no answer for that, sir.

Q. Because it would mean you're lying. Right?

A. He was at the bar with me, sir, on the day of the kidnapping, sir, with Nurse, sir. I have no answer for if he was supposed to be teaching a class or he was actually teaching a class.

Trial Tr. at 2605-07 (June 11, 2009).  In light of that cross-examination, it makes sense that DeFour did not seek to reopen cross-examination of Percival on the matter of his duty assignment at Camp Omega.[38]

DeFour contends that he could have used a document dated October 14, 2009, to present a more formidable alibi defense if the Court had not erroneously denied his motion for continuance.  A review of that document does not support DeFour's argument.  Following the return of the verdict, DeFour made a second FOIA request to Trinidad on September 29, 2009, requesting arrival and departure records, and guard reports and gate slips for April 6, 2005, in an

---

[38]   The Court also notes that Nurse had completed his testimony only three days earlier (June 8, 2009), and Joseph had completed his testimony only the week before (June 4, 2009).  It would have made sense for DeFour to seek to reopen their testimony to conduct a similar cross-examination with respect to his duty at Camp Omega, if he believed that would have been favorable to him, but he did not do so.

attempt to confirm that DeFour did not leave Camp Omega on the date of the hostage taking. In

a letter dated October 14, 2009, the Ministry of National Security responded as follows:

> 1.    Request:  Arrival and Departure Records at Camp Omega for 6th
>        April, 2005 for Ricardo DeFour.
>
>        **Reply**: The name Ricardo DeFour does **not** appear on the Arrival and
>        Departure Records of the Trinidad and Tobago Regiment for the date April
>        6th 2005.
>
> 2.    Request: Gate Slips at Camp Omega for 6th April 2005, for
>        Ricardo DeFour
>
>        **Reply**: The Trinidad and Tobago Regiment is unable to provide
>        Gate Slips for the date 6th April, 2005.  These were among other
>        documents . . . flooded by rainfall, resulting in the documents
>        being severely damaged. . . . Those documents . . . were actually
>        incinerated during the period August to September 2005.

DeFour's Mem., ECF #707, Ex. C (boldface in original).  DeFour argues that, with this

document, he would have presented a somewhat different alibi defense -- that is, the fact that he

was not marked as departing on April 6, 2005, means that he stayed overnight at Camp Omega.

See Id. at 6-7.  This theory, he says, is also supported by a document dated May 20, 2009, which

reports that DeFour was marked out of camp on April 7, 2005, at 4:48 p.m.  Id. at 5-6 (describing

Lt. Ad John report) [39]

-----

[39] DeFour also proffered in his motion for new trial that, based on this newly discovered
evidence (i.e., the October 14, 2009 letter ), one or more TTDF officials would testify at the
motions hearing that "they believe DeFour remained at Camp Omega throughout the evening of
April 6, 2005 and through the following day until he was marked out as leaving at 16:48 p.m. on
April 7, 2005."  DeFour's Mem., ECF #707, at 8.  He also proffered that, at the hearing,
"supervising officers will testify that it was common practice for instructors to stay overnight
when scheduled for early morning duty," as DeFour was scheduled to do on April 7, 2005.  Id.
However, at the motions hearing, DeFour declined to present that testimony or even the affidavits
of those officials, nor has he identified who those witnesses might be.  See Preliminary Tr. at 54-
55 (Apr. 16, 2010) (during a colloquy between the Court and DeFour's counsel, the Court asked
(continued...)

DeFour's modified alibi theory is, stripped to its essence, merely a variation of the argument that he could not have participated in the events of April 6, 2005, because he was at Camp Omega.  In the version presented at trial, he argued that he was at Camp Omega until 6:00 or 6:30 p.m.  In this new version, he would argue that he stayed overnight -- a practice which he says is commonplace.  But it strains credulity to accept that DeFour could not have made the same "overnight" argument at trial.  The training program stated that he was an instructor from April 5, 2005, through April 16, 2005, and DeFour surely was as aware then as he is now that overnight stays were commonplace.

In the end, DeFour's modified alibi theory relies primarily on speculation in interpreting the lack of arrival and departure information.  As DeFour acknowledges, the lack of such information does not mean that a soldier did not arrive or depart that day.  For example, he notes his arrival on April 6, 2005, is not reflected in the October 14, 2009, letter, although he has an explanation for that based on extra-record information he has obtained as to how such records are kept.  See DeFour's Mem., ECF #707, at 6-7 ("TTDF officer have indicated that the guard reports noting arrival and departure times cover a 24 hours period beginning at 8:00 a.m. . . . continuing 24 hours until 8:00 a.m. the next day").  The government also has provided information indicating that the departure records are not complete, insofar as the names of pedestrians and passengers in vehicles are not noted in those records.  See Trial Tr. at 7649 (July 23, 2009); Gov't

---

[39](...continued)
whether "you made a decision not to present any witnesses or additional evidence," and counsel responded "That's correct," and further that he was unable to obtain affidavits in support of his motion).  Therefore, the Court has not considered that proffer in resolving this motion.  In any event, the testimony DeFour describes is only speculation as to whether DeFour stayed overnight at Camp Omega, rather than personal knowledge, and hence even if accepted it would have little weight in the Court's analysis.

Mem., ECF #712, at 164 n.100. Moreover, testimony was received at trial on the ability of a soldier to leave Camp Omega informally if he had a close relationship with the guard. See Trial Tr. at 2606-07 (June 11, 2009). Considering the speculative value of DeFour's new post-trial evidence, it plainly does not show that the denial of a continuance was error. Furthermore, DeFour was able to present alibi evidence to the jury, as noted earlier, further undercutting his claim that the denial of a continuance was in error.

**B.       Denial of Alibi Instruction**

DeFour contends that based on the evidence of his duties at Camp Omega on April 6, 2005, he was entitled to an alibi instruction, and the Court erred in denying his request for one. See DeFour's Mem., ECF #707, at 16-20. He acknowledges that a defendant can be convicted of a substantive offense committed by others without being present at the scene of a crime, based on aiding and abetting or co-conspirator liability, but argues that this was not the government's theory of the case with respect to him. Id. at 18. In response, the government contends that its theory of the case always encompassed DeFour's actions in furtherance of the crime that preceded April 6, 2005, including planning meetings at Nurse's home as well as at the Mellow Moods Bar. See Gov't Mem., ECF # 712, at 37.

DeFour's argument is premised on a mischaracterization of the government's case against him as being based solely on his participation in the abduction on April 6, 2005 -- the date that he alleges he was at Camp Omega. If that premise were correct, DeFour might have been entitled to an alibi instruction. However, as the government correctly points out, the evidence concerning DeFour's participation in the offenses charged -- conspiracy to commit hostage taking result in death, the substantive offense of hostage taking resulting in death, and aiding and abetting those

113

offenses -- was not limited to the acts that occurred on April 6, 2005. In the government's

opening statement, it referred to DeFour as one of the early planners, stating:

> Leon Nurse . . . took it [Doreen Alexander's kidnapping plan] to Ricardo DeFour,
> . . . the man responsible for the guns and the clearing of the roads in this case.
> And Ricardo DeFour took the idea to a man named Jason Percival, who used to be
> in the military but was kicked out and was a friend of Ricardo DeFour's.

Trial Tr. at 28-29 (May 27, 2009). In closing arguments, the government reiterated the theme

that Nurse brought the plan to DeFour who then brought it to Percival, and clearly relied on

DeFour's participation in the weeks preceding the abduction to make its case for a guilty verdict:

> And so at that point we have Ricardo DeFour bringing this to Jason Percival.
> There's a meeting at the Mellow Moods bar. There's a discussion between Leon
> Nurse, Ricardo DeFour, and Jason Percival about was this really possible, was
> this really going to work.
> They wanted Anderson Straker there. Anderson Straker came, and he sat
> down, and there was a discussion with him . . . And, ultimately, a decision is made
> that they will -- their crew will take this on.

Trial Tr. at 7599-7601 (July 23, 2009). Then, after summarizing the evidence concerning

DeFour's actions on the date of the abduction, the government returned to evidence of DeFour's

involvement in the planning phase:

> [DeFour] says I never spoke to Anderson Straker. And yet when you have in front
> of you . . . Government's Exhibit 401-E, you're going to see that during this time
> frame, from February to May of 2005, Ricardo DeFour calls Anderson Straker
> nine times. . . . You'll see that in the month of February there are no calls between
> them. But then in the month of March as things are getting ready, Ricardo
> DeFour calls Straker once in that month. Ricardo DeFour's calling Percival 43
> times. Percival is calling him 18 times during that same time frame. . . .
> Then we go to April. . . . Ricardo DeFour calls Anderson Straker eight
> times. Eight times in April. And we have Anderson Straker calling Ricardo
> DeFour once. . .

Trial Tr. at 7665-66 (July 23, 2009).

In light of the government's argument that DeFour should be convicted of the offenses

based on his actions prior to April 6, 2005, as well as his actions on that date, the Court correctly rejected DeFour's proposed alibi instruction. As the Court explained in making that ruling, it is generally recognized that "the alibi instruction would not be appropriate in a case in which conviction of an offense charged could legitimately be accomplished without showing the defendant's presence at a particular place at a particular time, and . . . that is often the case in prosecutions involving an aiding and abetting theory and in prosecutions involving a conspiracy charge." Trial Tr. at 7511 (July 22, 2009) (citing O'Malley, Grenig & Lee, Federal Jury Practice and Instructions § 19.07, at 881 (5th ed. 2000)). Case law overwhelmingly supports the principle that an alibi instruction is not appropriate where defendant's presence at the scene of the crime is not necessary to support conviction. United States v. Thomas, 34 F.3d 44, 50 (2d Cir. 1994) (affirming refusal to give alibi instruction where the "evidence fully justified [defendant's] conviction on the accomplice or conspiracy theory, regardless of whether he was [at the scene of the crime]"); United States v. Agofsky, 20 F.3d 866, 871-71 (8th Cir. 1994) (holding that "an alibi instruction would not have been appropriate" where the government offered "both direct participation and accessory theories" explaining that a conviction may be based on "aiding and abetting even if [defendants] offered persuasive alibis"); United States v. Anderson, 654 F.2d 1264, 1271 (8th Cir. 1981) (holding that, where defendant was charged with drug conspiracy, "it was unnecessary for the government to prove [defendant's] presence at the sales," and hence, "the alibi defense was not supported by the law, and no instruction was required"); United States v. Lustig, 555 F.2d 737, 750-51 (9th Cir. 1977) (holding that alibi instruction was properly denied because "even if [defendant] had presented evidence of an alibi, it would not have rebutted the government's evidence" concerning conspiracy because "[p]resence need not be shown to prove

conspiracy"); United States v. Beck, 431 F.2d 536, 539 (5th Cir. 1970) ("the district court was correct in declining to instruct on the defense of alibi because the appellant's physical presence at the distillery [the scene of the crime] would not have been necessary to a finding of guilt"); see also United States v. McGonagle, 137 Fed. Appx. 373, 377 (1st Cir. 2005) ("Various courts have held that, because a conspiracy or accomplice charge ordinarily does not require proof of physical presence at the crime scene, the failure to give an alibi instruction with regard thereto is harmless error (or not error at all)."). DeFour attempts to distinguish the facts of Thomas, Beck, and Anderson, but the factual differences between those cases and his own situation are irrelevant to the basic principle that, where the government offers conspiracy or aiding and abetting as the basis for conviction (even where direct participation is also in evidence), an alibi instruction is not appropriate because presence at the scene of the crime is not required for conviction.

DeFour's proposed alibi instruction was in direct conflict with this well-established principle, as it would have instructed the jury that "[t]he defendant may not be convicted of the offense with which he is charged unless the government proves . . . that the defendant was present at the time when, and at the place where the offense allegedly was committed," while defining that time and place as April 6, 2005, in the Bourg Moulatrase area. See DeFour's Proposed Jury Instruction, ECF #607 (July 22, 2009). Under that instruction, DeFour would have been entitled to an acquittal even if the jury found that DeFour participated in the early planning meetings described by the government, brought Percival into the conspiracy, and participated in phone calls with Percival and Straker in furtherance of the conspiracy. That, of course, is directly contrary to the law on conspiracy and aiding and abetting. Accordingly, it was

116

appropriate to deny DeFour the alibi instruction he requested, or any similar alibi instruction.[40]

## VI.    Closing Arguments

### A.    Vouching

Defendants contend that the government violated their right to a fair trial during closing arguments by allegedly improperly vouching for the credibility of cooperating witnesses and placing the imprimatur of the Court behind the truthfulness of the cooperators' testimony.  See Clarke's Mem., ECF #701, at 26-27; Pierre's Mem., ECF #694, at 8-9.  In response, the government contends that its remarks during closing argument did not constitute vouching for the credibility of the witnesses, but rather was a permissible reference to the contents of the plea agreements to support an argument that those witnesses had an incentive to testify truthfully.  See Gov't Mem., ECF #712, at 142-44.  The government further notes that none of the defendants raised a vouching objection at trial, and hence this issue is subject to plain error review.  Id. at 142 n.93.

As the court of appeals observed in United States v. Brown, 508 F.3d 1066, 1075 (D.C. Cir. 2007), "[t]he rule against vouching is well-established."  Improper vouching occurs when the prosecutor provides a personal assurance of a witness's veracity or indicates that information not presented to the jury supports the witness's testimony.  Id. at 1075.  The purpose of the rule is to protect "the integrity of the trial process and ensure that judgments and verdicts are grounded in evidentiary facts."  Id.  Vouching poses two significant dangers:  first, it can "jeopardize the

_____

[40]  DeFour also contends that a new trial is warranted because the government failed to make timely disclosures of certain witness statements that would have supported a "third-party perpetrator defense" -- that is, that Ricardo Stevenson played the role in the offense ascribed to Ricardo DeFour.  See DeFour's Mem., ECF #707, at 20-25.  This is the Brady/Jencks issue addressed earlier in Section II.C.2, and is separate and distinct from the alibi issue.

defendant's right to be tried solely on the basis of the evidence presented to the jury" by suggesting that other evidence not admitted but known to the prosecutor supports the charges against the defendant; and second, "the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence."  Id.

Defendants characterize several statements by the prosecution as placing the imprimatur of the Court behind the cooperators' testimony and thereby vouching for that testimony.  First, during the government's initial closing argument, it emphasized that the cooperating witnesses had a strong incentive to tell the truth because this Court would consider the truthfulness of their testimony at the time of sentencing.

> And even if they tell you the truth and we give them a substantial assistance letter, they still get life without possibility of release unless Judge Bates decides that they get something less than that. And what do you think Judge Bates would do, what do you think they think Judge Bates would do if he thought they hadn't told the truth?
>
> Any deviation, they don't get a substantial assistance letter, and the only thing left to do is for them to actually be sentenced to life without possibility of release, which is the only sentence they can get unless they get a substantial assistance letter from the government. And even, again, even with that substantial assistance letter, if Judge Bates thinks something is amiss, he does not have to give them one day off of life without possibility of parole. So they have an enormous, an enormous incentive to tell you nothing but the truth, however bad it may look, whatever warts that have to be exposed to tell you the truth as they remember it.

Trial Tr. 7593, 7608 (July 23, 2009).  In the prosecution's rebuttal argument the next day, counsel returned to the credibility of the cooperator witnesses' testimony and the role the Court would play at their sentencings:

> [E]very single one of their cooperation agreements requires them to come here and tell you the truth, the truth, good or bad for the government; the truth, consistent with what they said in the past or not; the truth, consistent with one

another or not.

> . . . [T]he defense lawyers, they've said a lot about: Well, it's the prosecution's truth. They're telling you the government's truth. . . . Well, the problem with that, ladies and gentlemen, is the government doesn't have the final word. So even if there were a government's truth, which there isn't, but even if there were, Judge Bates has the final word. If the government does file a 5(k) motion and does ask for those prosecutors to get something less than mandatory life imprisonment in jail, and Judge Bates thinks that that's a load of malarkey that they were making up on the stand just to get themselves out of this all, Judge Bates doesn't have to grant the motion. They can't withdraw their pleas, and they go to jail for the rest of their lives. That, ladies and gentlemen, is a pretty significant motivation to tell the truth, whatever it may be, isn't it?

Trial Tr. 7967 (July 24, 2009).

The prosecution's closing argument is fairly characterized as arguing to the jury that the cooperating witnesses had a strong motivation to tell the truth because of the Court's role at each cooperator's future sentencing -- that is, the consequence of untruthful testimony is likely to be a decision by the Court not to depart downward from mandatory life imprisonment. Nothing in the prosecution's statements represented or even implied that the Court had yet made an assessment of the cooperators' testimony.  And such a focus on a defendant's motivation to be truthful is not improper vouching.

This Circuit recently considered whether similar remarks by the prosecution in the context of cross-examination of a cooperating witness constituted vouching.  See Wilson, 605 F.3d at 1021-23.  Applying plain error review, as this Court does here, Wilson held that, where the prosecution's cross-examination focused on the witness's understanding of the plea agreement, including the consequences of presenting false testimony to the trial and sentencing judge, the prosecution's remarks did not constitute improper vouching.  That holding is directly applicable here, and indeed the factual context of Wilson is strikingly similar to that here.  In

<u>Wilson</u>, defense counsel challenged the cooperating witness's credibility, arguing during cross-examination that, "in effect, based on this 10, 11 page plea agreement the government is pulling the strings today, right?" and "you have to keep them happy so that they'll file those [downward departure] motions, right?" <u>Id.</u> at 1021. On redirect by the prosecution, the following occurred, which the defendant characterized as implying the trial court was monitoring the truthfulness of the testimony:

> [T]he prosecutor walked Moore [the cooperating witness] through the details of the plea agreement again, highlighting the fact that the government's recommendation would not bind the judge at sentencing. Referring to the judge, the prosecutor then asked, "What do you think she'd [the trial judge] do if you lied?" Moore responded, "I'd be locked up."

<u>Id.</u> The D.C. Circuit in <u>Wilson</u> determined that these comments legitimately focused on the witness's "state of mind" -- her motivation to tell the truth -- and "did not express the prosecutor's personal opinion about [the witness's] credibility." <u>Id.</u> at 52. The court then emphasized "this was hardly vouching, but was in fact a proper rejoinder to the cross-examination concerning the motive of the witness." <u>Id.</u> at 1023.

The circumstances are substantially the same here. In response to defendants' closing arguments challenging the credibility of the cooperating witnesses[41] -- and the focus, in

---

[41] Defendants challenged the credibility of the cooperating witnesses on numerous occasions, highlighting their motivation to lie in favor of the government to obtain leniency at sentencing, as demonstrated in the following closing argument:

> [Y]ou think about the cooperators in this case: Jason Percival, Winston Gittens, Russel Joseph, Leon Nurse. . . . they've only got one way out, and they all know it. . . . The only possibility they have to get out: Cooperation, 5(k) letter from the government, from the prosecutors. Okay? . . . and those cooperation agreements do tell them that they have to tell the truth, they have to testify truthfully. . . . But they also get them only if they provide what? Substantial assistance in the investigation and prosecution of criminal
> (continued...)

particular, on the motivation to testify favorably for the government to obtain a motion for leniency at sentencing -- the government stated: "the problem with that, ladies and gentlemen, is the government doesn't have the final word. . . . Judge Bates has the final word. If the government does file a 5(k) motion . . . and Judge Bates thinks that that's a load of malarkey that they were making up on the stand just to get themselves out of this all, Judge Bates doesn't have to grant the motion. They can't withdraw their pleas, and they go to jail for the rest of their lives. <u>That, ladies and gentlemen, is a pretty significant motivation to tell the truth, whatever it may be,</u> <u>isn't it</u>?" Trial Tr. 7967 (July 24, 2009) (emphasis added). In defendants' view, those references to the judge indicated that "not only did the government believe the cooperating witnesses, but the Court did as well." <u>See</u> <u>e.g.</u> Clarke's Mem., ECF #701, at 28. But it is readily apparent from the face of the remarks, and the analysis of similar remarks in <u>Wilson</u>, that the prosecution's

_____

[41](...continued)
conduct by other persons.

      Break it down into plain English. What's their one way out? They have to assist the prosecution in the hopes of putting somebody else in. The only way out is to put someone else in. That's it, and that's why they're here.

      . . . The only benefit of the plea agreement is, you might get out. If you don't get the plea agreement, if you don't do whatever is necessary to get the 5(k) letter, you're no worse off. You're still in for life without the possibility of release, life without parole, whatever you want to call it. Why not gamble? What's the down side to doing whatever you need to do to try and get that 5(k) letter? Who amongst us in that situation would not be tempted to bear false witness against another? That's your only way out. This whole system of cooperation, I suggest to you.

Trial Tr. at 7738 (July 23, 2009); <u>see also</u> Trial Tr. at 7955 (July 24, 2009) ("the government's got its head stuck in the sand because they've come in here and said, "Oh, they're all telling the truth. And if they don't tell the truth, there are dire consequences to be had. And those dire consequences are the deal is off. . . . Ladies and gentlemen, you can't trust that. . . . They've lied, and there are no consequences for it. . . .There is no guarantee that those men are telling the truth.").

reference to the Court simply focuses on the state of mind of the witnesses in testifying, and hence, as in Wilson, was " a proper rejoinder to the cross-examination concerning the motive of the witness." Nothing in the prosecution's remarks implies that the Court had made any assessment as to the witnesses' truthfulness.[42] Hence, the prosecution's closing argument did not constitute vouching.

To the extent that the prosecution's remarks could have been misconstrued by the jury as vouching -- an interpretation that is not borne out by the record -- the remarks were harmless. The jury received instructions that reiterated that they alone were to judge the credibility of the witnesses: "You are the sole judges of the facts. While it is my responsibility to decide what is admitted as evidence during the trial, you alone decide what weight, if any, to give to that evidence. You alone decide the credibility or believability of the witnesses." Jury Instructions at 6. The jury was also provided specific instructions on evaluating the testimony of cooperating witnesses, which further underscored that the jurors must assess the credibility of the cooperating witnesses:

> You have heard evidence that Russel Joseph, Leon Nurse, Jason Percival and Winston Gittens are awaiting sentence for their participation in the offenses charged against defendants. You may consider this evidence when deciding whether the witness has a bias in favor of one of the parties that may affect his willingness to tell the truth.

> You have also heard evidence that Joseph, Nurse, Percival and Gittens

---

[42] As the court held in Brown, "plea agreements can be introduced by the prosecution and referred to in their entirety, because doing so does not improperly bolster the witness who signed the plea agreement." Brown, 508 F.3d at 1074. The truthfulness portion of the plea agreement -- and by logical implication, recitation of consequences of testifying falsely before the sentencing judge -- "becomes impermissible vouching . . . when the prosecutors explicitly or implicitly indicate that they can monitor or accurately verify the truthfulness of the witness's testimony." Id. That assurance of verification of the testimony did not occur here.

entered into plea agreements with the government pursuant to which each of them agreed to testify truthfully in this case and that the government agreed to bring their cooperation to the attention of the sentencing court and consider filing papers which would permit the judge to impose a more lenient sentence than would otherwise be possible.

The government is permitted to enter into this kind of plea agreement. You, in turn, may accept the testimony of such a witness and convict a defendant on the basis of this testimony alone, if it convinces you of a defendant's guilt beyond a reasonable doubt. A witness who has entered into a plea agreement is under the same obligation to tell the truth as is any other witness; the plea agreement does not protect him against a prosecution for perjury or false statement, should he lie under oath.

However, you may consider whether a witness who has entered into such an agreement has an interest different from other witnesses. You may consider whether the plea agreement the witness entered into with the government has motivated him to testify falsely against the defendant. The testimony of a witness who has entered into a plea agreement should be considered with caution. You should give the testimony as much weight as in your judgment it deserves.

Jury Instructions at 27.

For the foregoing reasons, the Court holds that the prosecution did not vouch for the witnesses in closing arguments.  Moreover, assuming <u>arguendo</u> that the remarks could be characterized as vouching, any error was harmless.

### B.     Prejudicial Reference to Criminal Organization

Defendants contend that they were denied a fair trial when the government referred to the defendants as members of a criminal "organization," of which Pierre was the "godfather."  <u>See</u> Pierre's Mem., ECF #694, at 3-7; Sealey's Mem., ECF #706, at 6-7.  In their view, those references were inflammatory and an unfair characterization of the evidence; furthermore, the references to a criminal "organization" undermined the Court's limiting instructions to the jury to consider the "other crimes" evidence only as to specific defendants and for a limited purpose. The government responds that, viewed in context, the references were a fair characterization of

the evidence and consistent with the limiting instructions.  <u>See</u> Gov't Mem., ECF #712, at 144-46.

In determining whether the government's closing violated defendants' right to a fair trial, "the relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  <u>Darden v. Wainwright</u>, 477 U.S. 168, 181 (1986) (quoting <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637, 643 (1974)).  In conducting this inquiry, the Court must consider the larger context in which those references were made, including whether the comments were supported by the evidence presented at trial and whether the comments responded to arguments made by defense counsel.  <u>See id.</u> at 181-82.  The prosecution presented evidence that, if believed, showed the existence of a conspiracy among over a dozen individuals who joined the conspiracy from two different communities -- the lower Santa Cruz forest area and the Trinidad military -- and demonstrated extensive planning over months, including surveillance and intelligence gathering efforts and assignment of distinct roles (getaway driver, guards, etc.) to each defendant.  The evidence also showed that Pierre participated in three other hostage takings in the months before and after the Balram Maharaj hostage taking, and brought that experience to the Maharaj hostage taking.  DeFour and Clarke were involved in one or more of those hostage takings as well.  From that and other evidence, the prosecution's closing argument characterized the relationships between the many individuals involved as "an organization" and further labeled Pierre the leader, or the "godfather." Those characterizations were used by the prosecution in its closing arguments.

> Now, what's the crew? . . . What [evidence] do we have here when
> you think about it and separate things out? We have one group of
> people that are connected with the Santa Cruz forest area, Bourg
> Mulatresse. And those people, the evidence showed, are really

under the most intense influence of that man right there, Wayne Pierre. *He's the godfather*.

The next person down -- so we have Zion Clarke who lives there, we have Kevon Demerieux who lives there, we have Christopher Sealey who lives two or three streets away, we have Kevin Nixon who lives in Upper Santa Cruz, which isn't very far from there. So we have all of these people. Don't forget Russel Joseph. Russel Joseph is there too, and you heard from him on the stand.

But we have this group that is from the Santa Cruz forest area. Most of them from Lower Santa Cruz and Bourg Mulatresse, Nixon being a friend in Upper Santa Cruz, not that far away. And we have them under the influence and direction of Wayne Pierre.

Then we have this group of soldiers, Ricardo Stevenson, Ricardo de Four, Leon Nurse. And what's the bridge between the soldiers, who had been doing things they oughtn't to have done, and the people over here from the Lower Santa Cruz forest, Bourg Mulatresse, who were doing things they oughtn't to have done, but Jason Percival. Jason Percival knows the soldiers. He was a soldier. . . .

His cousin, Ricardo Stevenson, Stevo, remained a soldier. He remained with the Trinidad and Tobago Special Forces. He was one of the very best friends of Ricardo de Four. There's your bridge between these two groups. And then who brings this particular kidnapping into the mix but that man right there, Anderson Straker, with and on behalf of himself and Doreen Alexander.

So that's how we end up with the play of it.

Trial Tr. at 7601-02 (July 23, 2009).

In response, Pierre's closing addressed the "godfather" comment and the "organization" characterization.

They also indicate to you that there were other individuals involved in the carrying out of the plan, and that Mr. Pierre is the so-called -- they used the phrase "godfather." You all know from your own experience that's not true. That's a slur. There is no indication, there's nothing to indicate that this is some kind of organized crime family or anything like that. Take that expression from the

government for what it is. That's just a slur. It isn't appropriate in your thinking or your decision-making in this case. Look at the evidence in this case.

. . . .

Mr. Pierre wasn't masterminding, wasn't telling people what to do, not calling the shots. You have evidence that this is not with Mr. Pierre but is with Mr. Percival running the show. . . .

Trial Tr. at 7821, 7836 (July 24, 2009).

The prosecution then returned to the theme of an "organization" in its rebuttal closing, focusing on Pierre's contention that the evidence was insufficient to establish his guilt.

. . . What do all the cooperators say about Wayne Pierre that show that he's guilty beyond a reasonable doubt? That, contrary to what Mr. Carney said, this is an organization. No, he's not in the military part of the organization, though it was run with some military precision. But it's an organization. Jason Percival is the link between the military half and the half that Wayne Pierre is running. And that Wayne Pierre, he's not just involved in the Balram Maharaj kidnapping. No, he's the one who's running the show in every single kidnapping: In Dexter Jagdeo, in Robin Ramadhar, in Balram Maharaj, and then again in Sita Ragoonanan. It's all him. He approves the plan, he picks the people, he picks the snatchers, he picks the people who are going to do the guarding in the jungle. That's what all the cooperators tell you.

Trial Tr. at 7991 (July 24, 2009) (emphasis added).

Based on this review, the Court concludes that the "godfather" and "organization" references are not unfairly prejudicial. First, the prosecution's characterization of Pierre as the "godfather" was used only on a single occasion during the prosecution's closing and was framed literally seconds earlier as showing that Pierre was the person with "the most intense influence" over the other co-conspirators. See Trial Tr. at 7601 (July 23, 2009) ("those people, the evidence showed, are really under the most intense influence of that man right there, Wayne Pierre. He's the godfather."). The prosecution immediately followed its comment with a description of an

126

abundance of evidence showing that Pierre functioned alongside Percival as the head of an organized and sophisticated group of conspirators. Hence, use of the term "godfather" -- commonly understood in the criminal context to mean "the leader of an organized crime syndicate" -- was a fair characterization of the evidence. See Merriam-Webster's Collegiate Dictionary 500 (10th ed. 1993).[43]

Nor was the prosecution's use of the term "organization" to describe the relationship among the co-conspirators unfairly prejudicial. Again, it was a fair characterization of the evidence, used to describe the relationships among the various players -- the Santa Cruz forest area group and the military group, the roles of planners, gunmen, drivers, guards, and ransom callers. See, e.g., Trial Tr. at 7991 (July 24, 2009) ("[C]ontrary to what Mr. Carney said, this is an organization. No, [Pierre's] not in the military part of the organization, though it was run with some military precision. But it's an organization. Jason Percival is the link between the military half and the half that Wayne Pierre is running.. . . [Pierre] approves the plan, he picks the people, he picks the snatchers, he picks the people who are going to do the guarding in the jungle. That's what all the cooperators tell you.").

Defendants raise a second issue with respect to the reference to "organization." Sealey contends that the reference to "organization" attributed to him the "other crimes" evidence that was not admissible against him. See Sealey's Mem., ECF #706, at 7; Sealey's Reply, ECF #717,

---

[43] The D.C. Court of Appeals found "repeated" references to a defendant as "the godfather" and "the self-proclaimed Godfather" as requiring a new trial, where the prosecution used the term by taking it out-of-context from a single sentence of a witness's testimony. Mathis v. United States, 513 A.2d 1344, 1348 (D.C. 1986). That stands in marked contrast to the present case, where the prosecution used the term only once, based on extensive evidence showing that Pierre had a leadership role in an organized series of hostage takings. In light of the significantly different factual records, this resolution is entirely consistent with Mathis.

at 5.  This argument, of course, applies with equal force to each defendant who was not involved in one of the other hostage takings.  But the fatal flaw  in this argument is that the reference to the "organization" simply does not attribute the other crimes to the nonparticipating defendants.  Instead, the prosecution framed its reference to "this is an organization" with an explicit reference to <u>Pierre's</u> role in the other hostage takings:  "Wayne Pierre, he's not just involved in the Balram Maharaj kidnapping. No, he's the one who's running the show in every single kidnapping: In Dexter Jagdeo, in Robin Ramadhar, in Balram Maharaj, and then again in Sita Ragoonanan. <u>It's all him</u>."  Trial Tr. at 7991 (July 24, 2009) (emphasis added).  Moments later, the prosecution reiterated the limited manner in which the jury could consider those three other hostage takings, focusing (appropriately) only on the defendants involved in the other crimes (Pierre, DeFour, and Clarke) and how the jury could use the evidence with respect to those individuals.

> [Pierre] says, "Don't consider that evidence just to say that my client is guilty of all those other kidnappings." And ladies and gentlemen, the government agrees that that's right. And that's what the instruction says: Just because Wayne Pierre participated in three other kidnappings doesn't mean you should find him guilty of the Balram Maharaj kidnapping.

> But what you can look at those three kidnappings for, those three kidnappings that cooperators say he was involved in every single one of them, is that he had a motive to do the Balram Maharaj kidnapping because of the $200,000 from Robin Ramadhar, because of the 15 kilos of cocaine from Dexter Jagdeo; that he knew people that were involved in the Balram Maharaj kidnapping and that's why he trusted them and employed them to be involved in the Balram Maharaj kidnapping; because Zion Clarke had already successfully guarded Dexter Jagdeo at Wayne Pierre's father's house in Upper Santa Cruz; because Ricardo De Four had already participated and done surveillance and cleared the roads in other kidnappings.

Trial Tr. at 7992 (July 24, 2009).  Hence, neither standing alone, nor by implication, did the reference to an "organization" attribute the other crimes evidence to the nonparticipating defendants.  In short, the Court concludes that the reference to an organization was not unfairly

prejudicial and did not exceed the limited purpose for which other crimes evidence could be used under Fed. R. Evid. 404(b).[44]

### C.   Alternative Theory of Guilt Offered by the Government with Respect to Sealey and Nixon

Sealey contends that, in its rebuttal closing, the government advanced an alternate factual theory of guilty against Sealey that was inconsistent with the evidence presented at trial and the government's own initial closing argument. See Sealey's Mem., ECF #706, at 4-6; Sealey's Reply, ECF #717, at 2-4. According to Sealey's characterization of it, the government's evidence (if credited) established that only one person -- Sealey -- entered the Samaan Tree Bar to "snatch" the victim, and that this one person was a "muscular" man wearing a Rasta hat. Id. The unfairness, says Sealey, came when the prosecution, in rebuttal closing, offered an alternate theory of two gunmen entering the bar -- Sealey and Nixon -- and for the first time proffering that the muscular man with the Rasta hat was Nixon, hence explaining away the discrepancy between Sealey's appearance and the eyewitness's physical description of the muscular Rasta-clad gunman. Id. The government responds that Sealey's characterization of the trial evidence, and the government's own closing arguments, is grossly inaccurate, and that its closing arguments were consistent with the evidence against Sealey and Nixon. Gov't Mem., ECF #712, at 146-48. The Court has reviewed the transcripts of the closing arguments and witness testimony in detail, and finds that Sealey's contentions are wholly lacking in merit, and the government's rebuttal

---

[44]   As discussed at length earlier, the Court instructed the jury on multiple occasions during the course of trial, and in the final instructions, on the limited purpose for which other crimes evidence could be used.

closing argument was consistent with both the evidence presented at trial and its initial closing.[45]

First, in stark contrast to Sealey's insistence that the evidence showed only one gunman in the bar, the government produced ample evidence establishing that two gunmen -- Sealey and Nixon -- were in the Samaan Tree Bar. One of the eyewitnesses in the bar, Zyroon Gahadhar, testified repeatedly and in detail about the presence and participation of two gunmen in the bar:

> [The first gunman] was standing there toward me; another one coming from the other side of the street, into the bar on the other side of the gate, and come towards where Balo were. . . . Then both of them grabbed Balo, and while grab Balo, he hold onto the chair. And they pull him out of the gate, the bar, and into the road; the other one signal the car to come this way. . . .
>
> And then, when the car drove towards the front of the bar, they both hold Balo, pull him up from the bar; he was holding on to the chair, and one of them hit him . . . .

Trial Tr. at 357-58 (May 28, 2009) (emphasis added).

That testimony of two gunmen entering the bar was corroborated by the testimony of other witnesses. Russel Joseph was the driver of the car transporting Sealey and Nixon to the bar, and he testified based on personal knowledge that Nixon and Sealey both entered the bar:

> Kevin Nixon and Christopher Sealey got out of the car and walked towards the bar. . . . Nixon was wearing a hat . . . It was like a knitted hat, rasta colored hat . . . After a couple of minutes Nixon came back out the bar and waved me to come forward. I drove forward and stopped in front of the bar. When I got in front of the bar, Sealey was pulling the victim out of the bar, and Nixon later joined him and they put him in the back seat of the car.

Trial Tr. at 679 (May 29, 2009). Moreover, according to Sealey's own statement to the Trinidad

---

[45] In his reply brief, Nixon raises a similar argument, contending that the government presented inconsistent theories relating to Nixon's alleged involvement in the abduction in its rebuttal closing by hypothesizing that Nixon could have been the person who grabbed the victim. See Nixon's Reply, ECF #720, at 4-5. Assuming arguendo that Nixon may properly raise this argument for the first time in his reply brief, the Court rejects it for the reasons stated above.

police (introduced through the testimony of Constable Gosyne), he drove to the bar with another man -- revealed in other evidence to be Nixon -- and "we leave and come out the car <u>and went inside the bar, and after we reach in the bar, I end up sticking the man up, me and another man</u>." Trial Tr. at 4813 (emphasis added). Sealey's separate statement to an American representative reiterated that he was in the bar with another conspirator:

> Mr. Sealey said he exited the second vehicle and went into the bar. As another man stood behind the victim, Mr. Sealey approached the victim and stated "We come for you." . . . And as the victim walked out of the bar -- Mr. Sealey and another man walked out of the bar . . . Mr. Sealey kept the gun pointed into the victim's back.

<u>See</u> Trial Tr. at 4909 (June 29, 2009).

True, two eyewitnesses at the Samaan Tree Bar testified they saw only one gunman. <u>See</u> Anand Gajadhar Depo., ECF #407, at 9-10 (Jan. 27, 2009); Gayadeen Boodhoo Depo., ECF #389, at 5 (Jan. 27, 2009).[46] But the jury could reasonably find their recollection of only one gunman to be inaccurate, considering that one witness testified that "I didn't really pay attention too long" because of the "commotion" and "panic," and the other witness testified that the entire event happened in a few seconds and he was "in shock." <u>See</u> Anand Gajadhar Depo. at 9, 13; Guyadeen Boodhoo Depo. at 4. In short, Sealey's first point -- that the evidence showed only one gunman entering the bar -- is unfounded. The fact that witnesses have inconsistent recollections on some points is no surprise, but does not support Sealey's challenge to the verdict.

Sealey's second point is that the government argued in its initial closing that only one gunman -- Sealey -- entered the Samaan Tree Bar and fundamental fairness should preclude the

---

[46] These witnesses provided testimony at trial through depositions taken in Trinidad pursuant to Fed. R. Crim. P. 15.

government from arguing, in its rebuttal closing, that Nixon was the actual snatcher. But the government's initial closing was not limited to a "one gunman" theory. The government's initial closing made the point several times that both Sealey and Nixon were at the Samaan Tree Bar. For example, in the introduction of their initial closing, the government stated:

> So that's how we end up with the play of it . We've got two men. So we have Kevin Nixon, Shaka, we have Christopher Sealey, Boyie . . . and they're going to be the ones that actually go in.

Trial Tr. at 7602 (July 23, 2009). The government later reiterated the two gunmen theory with a description of Percival's testimony:

> Jason Percival tells you that he [Sealey] was one of the two gunmen. <u>He and Kevin Nixon were the two gunmen that went in and dragged him [the victim] out</u>. A, that was the plan, B, he, Jason Percival, was on the other side of the savanna . . . looking right across the savanna at the Samaan Tree Bar, and he could see it.

<u>Id.</u> at 7618 (emphasis added).

It is certainly true that some aspects of the government's initial closing describe Nixon as standing at the entrance of the bar and then shoving the victim into the car with Sealey. <u>Id.</u> ("Percival sees Christopher Sealey and Kevin Nixon get out [of the car]. He sees that it is Nixon who's got the rasta hat on. He sees that Nixon goes to the front but doesn't immediately go in, and it's actually Boyie who goes in. And he sees that he [the victim] is being dragged out to the front."). And to be sure, the government at times made the argument that Sealey was the one that "marched" or "dragged" the victim out of the bar -- indeed, it was constrained to do so where the particular evidence it was referencing portrayed the events in that light. <u>Id.</u> at 7596, 7618. But as noted in the above-quoted passages, the government just as often portrayed the evidence as showing that <u>both</u> gunmen dragged the victim out, a portrayal supported by other pieces of evidence.

In short, a fair characterization of the government's initial closing is that two gunmen were at the bar and participated in the snatching, with the possibility that one gunman was more engaged with the victim in the bar than the other was. Hence, Sealey's contention that the government's initial closing was limited to the theory that only "one gunman" entered the bar, or that only one gunman "snatched" the victim, is not an accurate characterization of the record.

In light of the evidence and the "two gunmen" theory proffered in the government's initial closing, it was fair for the government to address the alleged discrepancies between the eyewitness's physical description of one of the gunmen (a "muscular," Rasta-clad person) and Sealey, by arguing that the descriptions did not match only because the eyewitnesses were referring to the second gunman -- a theory fully consistent with Sealey's presence at the bar. This is particularly so because, as Sealey emphasizes, he argued in his closing that he could not have been the individual described by the eyewitnesses because "he did not come physically close to matching the description of the individual, the 5-6 muscular weight lifter with the Rasta hat who did the actual abduction." Sealey's Mem., ECF #706, at 5; Sealey's Reply, ECF #717, at 3. Indeed, the government prefaced its argument with the caution that it placed little reliance on the eyewitness testimony to identify any of the defendants in the first instance, and was only responding to Sealey's closing that the eyewitness testimony exonerated him.

> . . . The eyewitnesses I'm talking about are the eyewitnesses at the bar: Anand Gajadhar, Guyadeen Boodhoo, and Zyroon Gajadhar. The government never called any of those witnesses to tell you that one of these defendants participated in this crime. Never did it, never relied on any of them to identify a single participant in this crime. That was not what the government put them on for.
>
> The government put them on to give you an idea of what happened at that kidnapping scene. The government clearly understood, and you heard from the witness' testimony, that these witnesses could never identify anyone. This

happened in a flash, there were guns, they were terrified, they were scared out of their minds. Zyroon Gajadhar was covering her face. Guyadeen Boodhoo sat there in a chair for 10 or 15 minutes afterwards, not moving, in shock.

The government didn't bring you these people to identify any defendants. But since the defense has raised it, trying to say: Well, based on what they said, you know that our clients didn't do the snatch. You know that Nixon didn't do the snatch. You know that Sealey didn't do the snatch.

Trial Tr. at 8003-04 (July 24, 2009). Only then did the government proceed to argue why the

testimony of the eyewitnesses nonetheless did not constitute evidence of a misidentification.

Let's talk a little bit about what those eyewitnesses actually said. And specifically, we'll start with Guyadeen Boodhoo. Guyadeen Boodhoo, one thing he says is that the one man he saw, the one looked at Balo and said, "It's you we come for." And what does Christopher Sealey say that he said to Balram Maharaj right before he snatched him? "It's you we come for."

And then Zyroon Gajadhar, she's the only one who is outside the bar. She's the only one who sees two gunmen, and she's the only one who has the vantage point to see both of them approach. And what she says is that the second one, the one who followed, the one who came after the first one, he was the muscular one with the Rasta hat. The muscular one with the Rasta hat.

And the reason that that doesn't sound like Christopher Sealey, ladies and gentlemen, is because it's not. It's Kevin Nixon. And he doesn't look so far off from Shawn the investigator in terms of his muscular build, does he? That's what she told you: He looked like a guy who lifted weights. Shawn looks like a guy who lifts weights. Kevin Nixon looks like a guy who lifts weights. He certainly looks more like that than Christopher Sealey does. . . .

Id. at 8004-05. This rebuttal was consistent with the government's initial closing quoted

earlier -- Sealey entered the bar first, and Nixon (wearing a Rasta hat) came in second; Sealey

was the closer of the two, holding a gun in the victim's back and saying "it's you we come for";

and both gunmen forced the victim out of the bar and into the vehicle. Sealey's contention that

the government's rebuttal closing "wholeheartedly abandoned" the initial closing -- which he

incorrectly characterizes as arguing that Sealey was the lone snatcher -- is simply not borne out

by the record.

To the extent that there was any tension between the government's initial closing argument and the rebuttal argument, the Court has considered whether, under Darden v. Wainwright, 477 U.S. 168, 181 (1986), the arguments "so infected the trial with unfairness as to make the resulting conviction a denial of due process," and has determined that the answer is a firm no. There was no "misstatement of the evidence," and the content objected to was an appropriately limited response to the summation given by defense counsel. See id. at 182. Moreover, the Court instructed the jury that its decision was to be based on the evidence alone, and that the arguments of counsel were not evidence. See Jury Instructions at 6, 8, 9; see also Darden, 477 U.S. at 182 (weighing jury instructions as a factor in determining whether there were any errors during closing arguments). Having fully considered the transcripts of the closing arguments and the relevant testimony, the Court finds that Sealey's contentions are unfounded and, in any event, raise no error causing the Court to doubt the fairness of the closing arguments.

**VII.    Sufficiency of the Evidence**

**A.    Sufficiency of the Evidence -- Issues Common to All Defendants**

Each of the defendants orally made a motion for judgment of acquittal at the end of the government's case, which the Court took under advisement, reserving ruling pending presentation of defendants' evidence and return of the verdict. See Trial Tr. at 5801-22 (July 6, 2009). In those motions, the defendants renewed most of their pretrial motions and trial objections concerning severance, prejudice from other crimes evidence, Brady violations, and exclusion of their evidence attacking Maharaj's eligibility for citizenship. They also raised three issues common to all of them: first, the cooperating witnesses were not credible and, hence, there was

insufficient evidence to support conviction of any defendant; second, the government's own evidence failed to prove that Maharaj was a U.S. citizen; and third, the government had failed to prove that the hostage taking caused Maharaj's death.  Id.  The Court already has effectively resolved the first two issues in Sections III.A and III.B above.  To summarize, the Court considered defendants' contention that the cooperating witnesses provided false testimony and held that the jury was entitled to decide whether to credit that testimony based on, inter alia, the inconsistencies in the testimony, their plea agreements, and their interests in obtaining leniency at sentencing.  The jury was clearly entitled to make those credibility determinations and, based on the verdicts, it is apparent that they credited the testimony of the cooperating witnesses. The Court has found no basis to reject those credibility determinations.

With respect to the government's proof of Maharaj's citizenship, the government presented his naturalization certificate and a U.S. passport dated September 28, 2000. Defendants attempted to argue that the certificate was not sufficient to prove Maharaj's citizenship because it was unsigned, and the passport was invalid because it was based on an earlier unsigned passport.  However, as discussed earlier in Section III.A., the government's witness from the U.S. Citizenship and Immigration Service testified that an unsigned certificate of naturalization is valid, and furthermore, that the certificates in their official files are typically unsigned because the original certificates are signed at the naturalization ceremony and kept by the naturalized citizen.  See Trial Tr. at 206-07 (May 27, 2009).  That is sufficient to prove Maharaj's citizenship beyond a reasonable doubt.  The Court also held that defendants had no right to present evidence that Maharaj was ineligible for citizenship at the time of his application for naturalization or that he obtained citizenship through fraud and misrepresentation.  Congress

has provided a single exclusive process for declaring the citizenship of naturalized U.S. citizens void pursuant to 8 U.S.C. § 1451(a), and one's citizenship remains valid until an order setting aside citizenship has been issued in compliance with § 1451(a).

This leaves, then, the issue whether the government submitted evidence sufficient to prove that the hostage taking was a cause-in-fact of Maharaj's death. The evidence established that Maharaj had diabetes (among other conditions) and was prescribed several medicines for the treatment of diabetes, including Metformin. See Trial Tr. at 221-23 (May 27, 2009); Trial Tr. at 316, 462-67 (May 28, 2009). Dr. Hughvon Des Vignes, an expert in forensic pathology, testified that a diabetic who was deprived of such medication would experience a progressive rise in his blood sugar level, would start to look pale and sick and start breathing very deeply, and eventually would go into a diabetic coma. Trial Tr. at 5498-5502 (July 1, 2009). He further testified that anxiety would aggravate the condition, and that such an individual, if left untreated, would die within 24 hours thereafter. Id. There was an abundance of testimony concerning the decline in Maharaj's health during his period of captivity, consistent with the symptoms described by Dr. Des Vignes. See, e.g., Trial Tr. at 696-98 (May 29, 2009) (Joseph's testimony that the victim was "breathing heavy," said he needed medication, and subsequently the victim had "gotten worse," "breathing really heavy, couldn't speak at all"); Trial Tr. at 3206 (June 16, 2009) (Gittens' testimony that Pierre told him the victim was sick and wanted medicine); Trial Tr. at 4226-28 (June 23, 2009) (Clauss's testimony summarizing Clarke's confession, including Clarke's statements that, as the days passed, the victim was "getting sicker," was "turning blue," was having trouble talking, and his lungs were "closing up"); Trial Tr. at 4690-91 (June 25, 2009) (Park's testimony concerning Demerieux's confession, including Demerieux's statement

137

that, when he returned to the campsite on April 12th after a four-day absence, Maharaj was

"looking pale sick," and "like the man wouldn't make it"). This testimony further established that

the defendants were aware that Maharaj's physical condition was rapidly deteriorating and were

concerned that he might die.[47] Collectively, this evidence established the common sense

proposition that being held hostage without access to diabetes medication for a week was the

cause of Maharaj's death.

**B.** **Sufficiency of the Evidence -- Evidence Supporting Each Defendant's Convictions**[48]

**1.** **Anderson Straker**

The principal evidence against Straker consisted of his confession to the FBI on July 29,

2008, and the testimony of Nurse, Percival, and Gittens, which corroborated his confession. In

---

[47] Indeed, several witnesses testified that the defendants were aware of Maharaj's need for diabetes medications from the widespread media coverage of the abduction. See, e.g., Trial Tr. at 3175 (June 16, 2009). However, under 18 U.S.C. § 1203, the government is required to establish only that the hostage taking was a cause-in-fact of the victim's death, in contrast to proving that the death was reasonably foreseeable. This is because the operative language in § 1203 -- the provision for life imprisonment "if the death of any person results" -- has been construed in other federal criminal statutes as requiring only cause-in-fact, rather than proximate cause. See United States v. Houston, 406 F.3d 1121, 1122-24 (9th Cir. 2005) (explaining that where Congress provides for a heightened sentence where "death or serious bodily injury results" from the offense, "'Congress has elected to enhance a defendant's sentence regardless of whether the defendant knew or should have known that death would result'") (citation omitted); accord United States v. McIntosh, 236 F.3d 968, 972 (8th Cir. 2001); United States v. Patterson, 38 F.3d 139, 145 (4th Cir. 1994); United States v. Robinson, 167 F.3d 824, 831 (3d Cir. 1999).

[48] Demerieux is the only defendant who has made a record-based challenge to the sufficiency of the evidence against him with respect to his participation in the conspiracy and the substantive offense of hostage taking resulting in death under 18 U.S.C. § 1203. See Demerieux's Mot. For J. of Acquittal, ECF #589 ("Demerieux's Rule 29 Mem."); Demerieux's Supplement to Mot. for J. of Acquittal, ECF # 693 ("Demerieux's Suppl. Mem."). However, for completeness of the record, and considering that each defendant orally made a motion for judgment of acquittal, albeit with little factual argumentation, the Court will review the sufficiency of the evidence as to each defendant.

his confession, Straker admitted to being one of the two originators of the plan to take Maharaj hostage for a $3 million Trinidad dollar ransom. See Trial Tr. at 5311 (July 1, 2009). He stated that he had been approached with the kidnapping idea by a woman (now known to be Doreen Alexander) with whom he had shared a residence, who also was the mother of Maharaj's son. Id. Straker admitted that he then took that plan to a person whom he knew to be involved in kidnappings (Leon Nurse, according to Nurse's testimony). Id. at 5313. Straker then described his involvement in the unfolding hostage taking conspiracy.

> [T]hat person introduced Straker to another man who was introduced as the man who 'gets things done.' And the one 'in charge of the scene.' That person and one other were respected by the others. They influenced the others to do things.

> Straker met with the person who gets things done on two occasions. The first meeting was in Arima, Trinidad. . . . Straker later introduced the woman to that person, to discuss the plan to kidnap Maharaj . . . Straker said that money was the object.

> . . . He said that prior to the kidnapping the woman showed Straker a photograph of Mr. Maharaj so that Straker could identify him to the others.

> Straker took several other people to a bar . . . where Mr. Maharaj was known to frequent. . . . At the bar Straker identified Mr. Maharaj to the others.

Id. at 5313-14. Straker further acknowledged that, on the day of the kidnapping, he attended a meeting at the Mellow Moods bar where he learned that the kidnapping had occurred as planned. Id. at 5315. He also admitted that, during the period of captivity, Straker was told by one of the co-conspirators "to go into the bush where Mr. Maharaj was being held" and confirm that they had the right person. Id. A co-conspirator took Straker into the bush, and Straker confirmed that it was Maharaj. Id. at 5316.

Nurse's testimony corroborated Straker's confession.  He testified that Straker -- a longtime friend -- came to him with a kidnapping plan proposed by Straker's "lady friend," with the purpose being to get Maharaj's "millions" in ransom.  Trial Tr. at 1427-37 (June 4, 2009).  Nurse's account of events differed slightly from Straker's -- he recalls that the initial target of the kidnapping plan was Maharaj's son, and the co-conspirators changed the target to Maharaj at a meeting soon thereafter.  Id. at 1432-36.  But Nurse's testimony corroborated Straker's confession in almost all other material respects: Nurse testified that he had told Straker of his involvement in another kidnapping, corroborating Straker's statement that he brought the kidnapping plan to someone experienced in kidnappings (1427-28); Nurse testified that he met with Straker and his lady friend soon after Straker brought the idea to him, just as Straker said (1433-34); and Nurse further testified that he then brought the plan to Percival, through DeFour (1441-43), and that Straker told Percival that he wanted Percival to "handle it" -- all of which is consistent with Straker's statement that he was introduced to a man "who gets things done" and "is in charge of the scene" (1443-44).

Percival's testimony provided further corroboration.  He testified that he had conversations with Nurse and DeFour about Straker's and Alexander's idea to kidnap Maharaj, in which he received reassurances that Straker had confirmed that Maharaj had money to pay a ransom.  Trial Tr.at 2051-52 (June 9, 2009).  He further testified that, just as Straker described, shortly before the hostage taking, he met with Straker, Nurse, DeFour, and Joseph at the Mellow Moods Bar, and then drove to a bar where Maharaj was drinking, "where he [Straker] pointed out Mr. Balram [Maharaj] sitting in the corner."  Id. at 2055-56.  He also testified, consistent with Straker's account, that Straker went into the bush where Maharaj was held to personally question

him, to ensure that "the man could not give him any false information." <u>Id.</u> at 2108-09.

Joseph's testimony provided further reinforcement of Straker's involvement and corroborated Straker's confession. Joseph testified that he was the one who "took Straker up to the campsite," where Straker questioned Maharaj, and also attempted to obtain a proof of life recording to use in ransom negotiations. Trial Tr. at 691-93 (May 29, 2009). Joseph further recalled that "I told him that I think we took the wrong person. I don't think that guy got any money. And he said that guy [Maharaj] . . . He's lying. The man got real money." <u>Id.</u> at 693.

Furthermore, there are phone records that show communications between Straker and Alexander during the relevant time period, as well as communications between Straker, Percival, and others involved in the conspiracy. Collectively, this evidence is more than sufficient to sustain Straker's conviction for conspiracy to commit hostage taking resulting in death and the substantive offense of hostage taking resulting in death.

### 2. Ricardo DeFour

The Court earlier discussed the overwhelming evidence of DeFour's guilt on the conspiracy and hostage taking charges, in the context of deciding whether any <u>Brady</u> violation was prejudicial. <u>See</u> Section II.C.2, <u>supra</u>. To highlight the most salient pieces of evidence, DeFour's confession to Trinidad police on January 27, 2006, established that he participated in the planning of Maharaj's abduction and also served as the driver of the lead car that cleared the roads on the date of the hostage taking. Trial Tr. at 4534-41 (June 25, 2009). DeFour's confession was corroborated by the testimony of three cooperators -- Nurse, Joseph, and Percival. Both Nurse and Percival testified that it was DeFour who initiated contact with Percival to get the hostage taking plan put into action. As to DeFour's role as driver of the "clearing car,"

Percival and Joseph both testified, based on personal observation, that DeFour served that role. Percival testified extensively on his personal knowledge of DeFour's involvement on the date of the hostage taking. Trial Tr. at 2058-96 (June 9, 2009). This included meeting with DeFour at the Mellow Moods Bar, observing DeFour receive two guns -- the 9 mm and the .357 -- from Kenneth Pierre, caravaning with DeFour to find Maharaj at the Open House Bar and later the Samaan Tree Bar, observing DeFour pass the guns to Nixon and Sealey right before the abduction, and sitting in DeFour's silver Elantra afterwards as DeFour drove the clearing car. Id. Joseph testified to substantially the same version of events. See Trial Tr. at 675-79 (May 29, 2009). Additionally, DeFour's cellular telephone records show that he communicated with Percival on April 6, 2005, consistent with DeFour's January 2006 confession to Trinidad police about calls to and from Percival that day. Based on the foregoing, the Court finds that the evidence was more than sufficient to sustain his conviction on both the conspiracy count and the substantive offense of hostage taking resulting in death.

### 3. Wayne Pierre

The evidence was sufficient to sustain Pierre's conviction as well. Percival, Joseph, and Gittens attested to Pierre's leadership role in the hostage taking conspiracy, and Nurse's testimony -- though less detailed with respect to Pierre -- further corroborated Pierre's participation in the hostage taking as a behind-the-scenes player. Jason Percival testified that, after meeting with his cousin, Ricardo Stevenson, and Nurse about the initial plan to kidnap Maharaj's son, Stevenson asked him to have Wayne Pierre handle the kidnapping. Trial Tr. at 2044-45 (June 9, 2009). Percival contacted Pierre with the request, and Pierre agreed to handle the kidnapping, although expressing reservations about the plan to kidnap the child with the mother's involvement. Id. at

2046. Pierre, Percival, Nurse, and DeFour later had another meeting, apparently at Nurse's home, at which the plan shifted from kidnapping the child to kidnapping Maharaj. Id. at 2046-47; see also Trial Tr. at 3182 (June 16, 2009) (Gittens' testimony, also describing the meeting at Nurse's home). Pierre was present at other meetings at the Mellow Moods Bar and elsewhere during which the plan was further developed. Trial Tr. at 2050-51 (June 9, 2009) (Percival's testimony). Joseph, Gittens, and Nurse all testified to Pierre's participation in various meetings pertaining to how to handle the Maharaj kidnapping. See, e.g., Trial Tr. at 667-76 (Joseph) (testifying that, two weeks before the kidnapping, he heard about the kidnapping from Percival and Pierre, and describing planning meetings with Pierre at the river in Gran Curacaye and at the Mellow Moods Bar); Trial Tr. at 1450-52, 1458-61 (June 4, 2009) (Nurse's testimony that after obtaining the getaway car -- a gray Lancer -- he handed it over to Percival and Pierre, and also describing the meeting with Pierre and others concerning how to dispose of Maharaj's body).

Percival, Joseph, and Gittens described Pierre as having a key role in setting up the events of the day, despite Pierre's absence at the Samaan Tree Bar as the abduction was executed. Joseph testified that Pierre (along with Percival) had asked him at their first meeting to drive the getaway car. Trial Tr. at 674 (May 29, 2009). He also testified that Pierre (again, with Percival) made the decision that Maharaj should not be held in the cocoa field, and gave him instructions to change the location: "Wayne Pierre and Jason Percival thought that where the victim was being held was not safe enough for him. So they told me to go back along with Nixon to get the victim and take him back into our hole. . . . " Id. at 682-83. When Joseph returned to the Mellow Moods Bar that night, Pierre "directed [Joseph] to take food up to the campsite." Id. at 685. Joseph further testified that, after Maharaj died, it was Pierre who decided that the body should

be dismembered and buried -- "Wayne said no body, no evidence, no case" -- and that Pierre later informed Joseph that the body "was going to be buried in parts," giving him a cutlass (machete) to accomplish the task. Id. at 701-02.

Gittens -- a longtime friend of Pierre's -- testified that he was brought into the hostage taking conspiracy by Pierre ("Ninja") as well, at a meeting at Pierre's home. Trial Tr. at 3181 (June 16, 2009). Pierre initially assigned him the role of producing a stolen vehicle for use in the kidnapping (which Gittens decided not to do), and later assigned Gittens the role of ransom negotiator. Id. at 3181, 3197 ("I was told by Ninja to drive around with Jason Percival and make a ransom call $3 million to the victim's family."). Percival corroborated Gittens account, stating that Pierre had assigned the duty of ransom negotiations to Gittens, and provided Gittens the phone numbers to call. Trial Tr. at 2103 (June 9, 2009)

Gittens further testified that, at the planning meetings, it was Pierre who led the discussions on who would play the various roles in the kidnapping. Id. at 3192-93. In particular, he testified that:

> Wayne Pierre mentioned who would be the abductors. . . He indicated that one of the persons that would be the abductors is Boyie [Sealey], and the other person would be Shaka [Nixon]. . . . Weapons would be produced from him [Pierre] to give to the abductors. . . . Wayne Pierre [said] . . . that Ricardo DeFour would be given the weapons to carry to the location where the kidnapping would happen.

Trial Tr. at 3192-93 (June 16, 2009). Gittens gave other examples indicating Pierre's leadership role, including Pierre's instruction to him to "have my phone on and to be in a ready mode so that they can make contact with me if they need me immediately to help in this kidnapping." Id. at 3187. Consistent with Gittens' testimony, Percival testified that it was Pierre who called Sealey and Nixon on the day of the abduction, with those two then coming over to Pierre's house for

further preparation, and that the guns used in the abduction came from Pierre's home.  Trial Tr. at 2060-61, 2063-64 (June 9, 2009).

Gittens also corroborated Joseph's account of Pierre's leadership role in disposing of Maharaj's body.  Gittens went to Pierre's house the day after the burial, at which time Pierre told him what had happened.  Pierre "stated that he himself had asked the soldiers in assisting him to dispose of the body," but they refused to participate, and "Pierre said that he had to do it himself," using a cutlass.  Trial Tr. at 3245-50 (June 16, 2009).  Percival's testimony also corroborated this account of Pierre's leadership role in disposing of the body.  Trial Tr. at 2116-17 (June 9, 2009).

In addition to the cooperating witnesses, the other crimes evidence further buttresses the finding that Pierre played a significant role in the Maharaj kidnapping.  The testimony of Gittens, Joseph, and Percival established that Pierre was involved in three other hostage takings in the same time frame (a six-month span) as the Maharaj abduction and with several of the same participants.  Specifically, their testimony established that Pierre played a significant role in (1) the hostage taking of Dexter Jagdeo which began on Thursday, December 16, 2004, four months prior to the Maharaj abduction; (2) the hostage taking of Robin Ramadar, which began on March 4, 2005, the month before; and (3) the hostage taking of Sita Ragoonanan, which began on June 21, 2005, just two months later. See, e.g., Trial Tr. at 615-19 (Joseph's testimony on the Jagdeo kidnapping) (May 29, 2009); id. at 775-92 (June 2, 2009) (Joseph's testimony on the Ragoonanan kidnapping); id. at 3118-43 (June 16, 2009)(Gittens' testimony on the Jagdeo kidnapping); id. at 3144-55 (Gittens' testimony on the Ramadar kidnapping); id. at 1983-96, 2006-2039, 2130-31 (June 9, 2009) (Percival's testimony on the Jagdeo, Ramadar, and

Ragoonanan kidnappings)  The other crimes evidence showed how Pierre's relationships with the other co-conspirators developed and provided background for why Straker -- a stranger to Pierre -- as well as the other defendants were willing to trust Pierre with a leadership role in the implementation of the hostage taking plan.

### 4.    Christopher Sealey

Sealey, too, has failed to demonstrate that there was insufficient evidence to support his conviction.   Based on the Court's assessment of the evidence introduced at trial, the evidence of his guilt was overwhelming, as discussed earlier in Section II.C.2, supra.  The evidence included his detailed confession to Trinidad police of his involvement in the crimes, a separate confession to the FBI, and the testimony of Joseph and Percival, all of which overwhelmingly established his participation as one of the abductors at the Samaan Tree bar.  Sealey confessed that, on the date of the Maharaj abduction, he met several other co-conspirators at the Mellow Moods Bar, accepted a gun, and then departed to Aranguez where the abduction took place.  His two confessions were detailed and explicit.  In the one to Trinidad police, he stated that "after we reach in the bar, I end up sticking the man up," "I walk in and tell the man that we come for him," and "I had the gun in my hand."  Trial Tr. at 4813-15 (June 29, 2009).  In the statement to the FBI, he said that he "approached the victim and stated, '[w]e come for you,'" and "pointed the gun into the victim's back" as he walked him to the car.  Id. at 4909-10 (June 29, 2009).  The consistency and coherency of Sealey's two confessions -- and the consistency with the confessions of the other co-conspirators who were in the vehicles that day -- DeFour, Joseph, and Percival -- render them powerful evidence of Sealey's guilt.

Percival's testimony provided persuasive corroboration of Sealey's confession.  See Trial

Tr. at 2083 (June 9, 2009) (describing the abduction as involving two vehicles, DeFour's role in providing guns to Sealey and Nixon, and Sealey and Nixon's entry into the Samaan Tree Bar to take Maharaj at gunpoint). Joseph's trial testimony also provided powerful corroboration of Sealey's two confessions. See Trial Tr. at 750-51 (June 2, 2009) (testifying that he drove Sealey and Nixon from Aranguez to the Samaan Tree Bar, that they entered the bar armed with guns, and that when they forced Maharaj out of the bar, he drove up to the bar where "Sealey was pulling the victim out of the bar, and Kevin Nixon opened the door, I went around to the other side, opened the other door while they pulled him into the car"). In light of the foregoing evidence, the Court finds that there is more than sufficient evidence to support Sealey's conviction on both counts of the indictment.

### 5.  Kevin Nixon

Nixon emphasizes that, unlike most of the other defendants, he did not make a statement to law enforcement that incriminates him. But as the Court explained earlier, there is other powerful evidence of his guilt. The evidence used to establish Nixon's role in the hostage taking came primarily from Russel Joseph and Jason Percival. Joseph provided detailed testimony establishing that he drove Nixon (along with Sealey) to the Samaan Tree Bar on the day of the abduction, that Nixon wore a Rasta hat and was armed with a gun, that Nixon entered the bar and then moments later opened the bar door while Sealey pulled the victim out, and that Nixon then helped Sealey force the victim into the back seat of the car, where Nixon sat next to him and instructed him to drive to a cocoa field in Upper Santa Cruz. See Trial Tr. at 675-695 (May 29, 2009); Trial Tr. at 749-52 (June 2, 2009). Joseph further testified that Nixon and Sealey walked the blindfolded victim into the field, and then he and Nixon drove back to the Mellow Moods bar

147

to meet with the other co-conspirators, at which time Percival and Pierre demanded that the victim be taken to a different location. Joseph testified that he and Nixon then returned to the cocoa field, that Nixon retrieved the victim while Joseph remained in the car, and that they drove to the end of Gran Curacaye Road where Nixon handed the victim over to Demerieux and Clarke. Trial Tr. at 682-83 (May 29, 2009).

Percival's testimony corroborated Joseph's account of Nixon's involvement in the abduction. He testified that the co-conspirators took three vehicles to the Samaan Tree Bar on the date of the abduction, that they obtained guns for Nixon and Sealey, that he saw Nixon in Joseph's car, and that he parked near the bar as the abduction took place so that he could see what was happening. Trial Tr. at 2080-83 (June 9, 2009). He testified that he saw Nixon exit Joseph's vehicle with Sealey, that he saw them walk towards the bar, observed Sealey grabbing the victim, and then saw Nixon and Sealey both forcing the victim into Joseph's car and driving away. Id. at 2083, 2086. Percival testified that later that night there was a meeting at the Mellow Moods bar with DeFour, Pierre and himself, to which Nixon and Joseph arrived late. Id. at 2096. At the meeting, Pierre demanded that the victim be taken to another location where Clarke was waiting for him, and Nixon, Joseph, and Percival then returned to the cocoa field to do so. Id. at 2097-98. Percival also corroborated the physical description of Nixon, noting, as Joseph did, that Nixon wore a Rasta hat on the date of the abduction. Trial Tr. at 2064-65, (June 9, 2009).

There was further corroboration of Nixon's involvement in the abduction from an array of other sources. Gittens testified that Wayne Pierre had informed him that the abductors on the day of the snatch would be "Shaka" (Nixon) and "Boyie" (Sealey), and that they would be provided weapons. See Trial Tr. at 3193 (June 16, 2009). An eyewitness at the Samaan Tree gave an

account of the abduction that matched the accounts provided by Joseph and Percival: two men entered the bar with guns, one of them wearing a Rasta hat colored red, green, and yellow; they grabbed the victim and pulled him out; one of the men signaled a car, and then the two men forced the victim into the back seat and sped away.  Trial Tr. at 356-59 (May 28, 2009).  Based on the foregoing, the Court readily concludes that there was sufficient evidence to support Nixon's conviction on both counts of the indictment.

### 6.  Zion Clarke

In Section II.C.4, supra, the Court reviewed the evidence pertaining to Clarke to determine whether he suffered any prejudice from a Brady violation, and concluded that there was overwhelming evidence of his guilt.  To summarize, that evidence included four exhaustive and detailed confessions to the Trinidad police and the FBI of his involvement in the crimes and the testimony of Joseph and Percival which solidly established his participation as one of the guards.  See Trial Tr. at 3995-4020 (June 22, 2009) (Lucas's testimony concerning Clarke's confession on January 5, 2006); Trial Tr. at 4195-4237 (June 23, 2009) (Clauss's testimony concerning Clarke's confession on January 4, 2006); Trial Tr. at 4244-59 (June 23, 2009) (Clauss's testimony concerning Clarke's confession on January 6, 2006); Trial Tr. at 5182-82 (June 30, 2009)  (Cruz's testimony concerning Clarke's confession on August 4, 2008).  In his confessions, Clarke provided a detailed description of how he became involved in the conspiracy, his extended role as a guard during the entire period of the victim's captivity, his observations of the victim's deteriorating health and death, and his participation in the burial of the victim's dismembered body parts.  See, e.g., Trial Tr. at 4195-4259 (June 23, 2009) (Clauss's testimony concerning Clarke's confessions on January 4 and 6, 2006); Trial Tr. at 3995-4020 (June 22,

2009) (Lucas's testimony concerning Clarke's confession on January 5, 2006). Furthermore, Lucas testified that he was with Clarke when Clarke took Trinidad police to the victim's burial site, and showed the police where the two containers with the body parts were located -- the same location that he had told the FBI. Id. at 4017-28.

Joseph provided testimony that corroborated the details of Clarke's confession. For example, he described his personal observations of Clarke acting as a guard during the period of captivity, the attempts to obtain proof of life from the victim, the victim's physical condition and need for medicine, and Clarke's role in the dismemberment and burial of the victim's body, including a description of the blue and white containers also described by Clarke. See Trial Tr. at 683-704 (May 29, 2009); Trial Tr. at 735-39 (June 2, 2009). Percival also provided corroborating testimony concerning Clarke's role as one of two guards, and his participation in meetings with the other co-conspirators prior to the abduction. Trial Tr. at 2849-50 (June 15, 2009).

Having considered the evidence against Clarke presented at trial, Court finds that there was more than sufficient evidence to support the verdict.

### 7.    Kevon Demerieux

Demerieux is the only defendant who has made a record-based challenge to the sufficiency of the evidence against him with respect to his participation in the conspiracy and the substantive offense of hostage taking resulting in death under 18 U.S.C. § 1203. See Demerieux's Rule 29 Mem., ECF #589; Demerieux's Suppl. Mem., ECF # 693. He does not dispute the evidence that shows that he was acting as a guard at the campsite where Maharaj was held captive, a fact readily established by the testimony of Percival, Joseph, and Gittens, and by

Demerieux's confessions to the Trinidad police and FBI on March 31, 2006, and April 1, 2006. Rather, Demerieux contends that the government's evidence established that he "participated in the offense under coercion and duress," and that this evidence "negates the element of the offense requiring that he acted intentionally, deliberately, knowingly, and voluntarily, or with the specific intent to advance or further the object of the conspiracy." Demerieux's Rule 29 Mem., ECF #589, at 4-5; Demerieux's Suppl. Mem., ECF #693, at 9. Demerieux highlights evidence indicating that he feared Percival, that he left the campsite for a period of days before being ordered to return, that armed people were around him during his participation in the offense, and that Percival had a reputation for violence and threatened Demerieux after Maharaj died in order to ensure Demerieux's silence. In response, the government argues that Demerieux is precluded from arguing a duress defense because he waived that defense at trial by representing to the Court that he would not argue a duress defense to the jury and objecting to any jury instruction on duress. See Gov't Mem., ECF #712, at 45. The government also contends that the evidence establishes that Demerieux acted knowingly and voluntarily, as evidenced by his days-long service as a guard at the campsite and his assistance in disposing of the victim's body. Id. In his reply, Demerieux insists that he is not arguing that a duress defense should have been allowed, but instead is arguing that the government's proof was lacking on the elements of wilfullness and voluntariness. See Demerieux's Reply, ECF #719, at 1.

Demerieux, in essence, argues that he should have been acquitted because the evidence shows he acted out of fear of serious bodily harm or death and, hence, his actions were not voluntary. But that is the very definition of a duress defense, and there are clear limitations to a duress defense under the law, which is presumably why Demerieux did not want the jury to be

instructed on it.  As the D.C. Circuit explained in United States v. Jenrette, 744 F.2d 817, 820-21

(D.C. Cir. 1984):  "The defense of duress excuses criminal conduct only where the defendant

committed the illegal action 'under an unlawful threat of imminent death or serious bodily

injury.'"  Id. at 820-21 (quoting United States v. Bailey, 444 U.S. 394, 409 (1980)); accord

United States v. Williams, 838 F. Supp. 1, 5 (D.D.C. 1993).  Furthermore, "[i]f the defendant had

any reasonable, legal alternative to committing the crime, the defense of duress will not obtain."

Jenrette, 744 F.2d at 821.  Demerieux cannot avoid these limitations simply by refusing to use

the term "duress," and instead characterizing his actions as warranting acquittal because he acted

out of fear of "serious bodily injury" at the hands of Percival or others.  Under the law, fear of

imminent death or serious bodily injury is duress.  See Jenrette, 744 F.2d a 820-21.  Demerieux

represented to the Court that he was not presenting a duress defense and objected to the

government's proposed instruction on duress on that basis; hence, the Court declined to instruct

the jury on duress.  Having made an affirmative decision not to pursue a duress defense at trial,

Demerieux has waived that defense and cannot rely on it in his motion for judgment of

acquittal -- whether under the label "fear of serious bodily harm" or its legal rubric, duress.

        In any event, even if Demerieux were allowed to argue for acquittal based on his fear of

death or serious bodily harm, he would fail.  First, criminal conduct will be excused in such

circumstances only where there is a threat of "imminent" death or serious bodily injury.  Jenrette,

744 F.2d at 820.  Nothing in the evidence indicates that, at the time Demerieux agreed to serve as

a guard -- or actually served as a guard -- he was facing any such imminent threat.  In his

confession to the FBI, there is no indication that he was threatened by anyone during the time he

served as a guard. Demerieux states that his participation in the hostage taking began just after

the abduction had occurred, when Percival found him at a bar and asked him for a flashlight and had Demerieux meet him at the river. See Trial Tr. at 5242-43 (June 30, 2009). Demerieux said it was there that Percival disclosed "[w]e now kidnap this man to get some money," handed Demerieux a rusty revolver, walked him to the campsite with another person, and told Demerieux to work in shifts guarding Maharaj. Id. at 5242-43. Demerieux stayed at the campsite watching over Maharaj through the next day and a half, looking for an opportunity to leave, which he did around noon of the second day. Id. He stayed away until April 12th, when Percival saw him in a store and instructed him to return to the campsite. Id. at 5247-48. Demerieux returned to the campsite, and except for one trip off-site to find Percival to discuss the victim's ill condition, he remained there until the victim died. Id. at 5252-54. Nothing in this account indicates that Percival or any other member of the conspiracy threatened Demerieux with death or serious bodily harm, or even implied to Demerieux that he would suffer such consequences if he did not participate. Furthermore, Demerieux's separate confession to Trinidad police contains substantially the same version of events -- again with no threats, express or implied, being made. See Trial Tr. at 4683-91 (June 25, 2009). To be sure, Demerieux said several times that he was scared of Percival, scared of the other guard, and scared of the situation he was in, and that after the hostage taking was over, someone threatened that he would be dead if he talked to anyone about the crime. But the fact remains that there is no evidence indicating that he agreed to serve as a guard because someone had threatened him with imminent death or serious bodily harm.

The second flaw in Demerieux's argument is that "if the defendant had any reasonable, legal alternative to committing the crime, the defense of duress will not obtain." Jenrette, 744

F.2d at 821. The record shows that Demerieux had a reasonable, legal alternative to committing the crime. He could have refused Percival's request to participate in the hostage taking and, as evidenced by his own behavior, he could have left the campsite at any time without putting his safety in serious jeopardy.

Percival and Joseph were the two cooperating witnesses who had the most direct contact with Demerieux. Their account of events corroborates Demerieux's statements to the FBI and police and further supports the finding that no one forced Demerieux to participate as a guard, through either an express or implied threat of harm. See Trial Tr. at 683-92 (May 29, 2009) (Joseph), Trial Tr. at 2097-98, 2108-13 (Percival).

The Court also has reviewed the evidence to determine whether there is any merit to Demerieux's contention that the evidence shows that he did not participate in the hostage taking knowingly and voluntarily in any other respect. Demerieux's claim is without merit. As discussed earlier, when Percival asked him to act as a guard, he agreed to do so, notwithstanding his unspoken fear of the situation he was in. See Trial Tr. at 5243-33 (June 30, 2009); Trial Tr. at 4684 (June 25, 2009). The circumstances of his guard duty indicate that he had the ability to leave the campsite, but he did not do so until the second day of guard duty. Trial Tr. at 5244-47 (June 30, 2009); Trial Tr. at 4688 (June 25, 2009). When instructed by Percival to return, he did so without hesitation after buying a pack of cigarettes. Trial Tr. at 5248 (June 30, 2009). Furthermore, he was present at Maharaj's death and assisted in the burial of the body, indicating his willingness to participate to the every end. Trial Tr. at 5254-59 (June 30, 2009); Trial Tr. at 735-40 (June 2, 2009). To be sure, the evidence indicates that Demerieux was not an instigator of the hostage taking, and was very nervous about his participation in it. But that falls far short

of rebutting the evidence showing that he knowingly and voluntarily participated in the offenses charged.

## **<u>CONCLUSION</u>**

For the foregoing reasons, the Court denies defendants' motions for judgment of acquittal, their motions for new trial, and their motions to dismiss the case. The Court also denies Clarke's motion for sanctions or other appropriate relief. A separate order accompanies this Memorandum Opinion.

_____
/s/
JOHN D. BATES
United States District Judge

Date:   March 2, 2011