# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>KEVIN NIXON,<br>ANDERSON STRAKER,<br>ZION CLARKE,<br>RICARDO DE FOUR,<br>KEVON DEMERIEUX,<br>WAYNE PIERRE, and<br>CHRISTOPHER SEALEY,<br><br>  Defendants. | Criminal Action No. 06-102 (JDB) |

## MEMORANDUM OPINION

  Defendants have moved for this Court to recuse itself from these habeas proceedings based on a telephone conversation between the Court and a former government prosecutor in the underlying criminal case. The call occurred in June 2016, long after the case (including appeals) had concluded. Defendants allege that recusal is required because the telephone conversation provided the Court with personal knowledge of disputed evidentiary issues, the Court expressed an opinion on a relevant matter, and an objective observer would reasonably question the Court's impartiality in these proceedings based on a statement the Court made during the call. The Court takes these allegations and its duty to determine whether recusal is required very seriously. For the reasons explained below, however, the Court concludes that recusal is not required based on the record as it currently stands. The Court recognizes that defendants could renew their request as the record further develops and additional facts are learned. But for now, defendants' motion will be denied without prejudice to later renewal.

1

# I. BACKGROUND

## A. Case Background

In April 2005, defendants and their coconspirators kidnapped Balram Maharaj, a naturalized U.S. citizen who was visiting his family in Trinidad and Tobago. Maharaj was held in a remote forest camp while defendants attempted to extort a ransom from his family. After six days in captivity, he slipped into a diabetic coma and died. In an attempt to conceal the crime, defendants dismembered Maharaj, packed his remains into Styrofoam containers, and buried the containers in the woods. With assistance from the FBI, the Trinidadian police uncovered evidence of Maharaj's death.

All defendants were extradited to the U.S. and charged with conspiracy to commit hostage taking and hostage taking resulting in death, in violation of 18 U.S.C. §§ 2, 1203(a). Four entered into cooperation agreements with the government and pled guilty before this Court: Russell Joseph on July 26, 2006, Winston Gittens on February 27, 2007, Jason Percival on November 16, 2007, and Leon Nurse on April 15, 2009. The remaining seven (the defendants here)—Anderson Straker, Wayne Pierre, Zion Clarke, Ricardo De Four, Kevon Demerieux, Christopher Sealey, and Kevin Nixon—were tried by a jury before this Court from May 27, 2009 to July 31, 2009. All four cooperators testified at defendants' trial, and all of the defendants were found guilty on both counts.

On June 10, 2011, this Court sentenced defendants Straker, Pierre, Clarke, De Four, Demerieux, Sealey, and Nixon, to concurrent terms of life imprisonment on each count, as required by statute. On May 2, 2014, this Court sentenced cooperating defendants Gittens, Nurse, Joseph, and Percival to 120, 126, 132, and 156 months' imprisonment, respectively. The four cooperators received credit for time served back to 2006.

Defendants appealed and their convictions were affirmed by the D.C. Circuit on September 1, 2015. See United States v. Straker, 800 F.3d 570, 581 (D.C. Cir. 2015). In February 2016, the U.S. Supreme Court denied defendants' petition for a writ of certiorari. United States v. Straker, 136 S. Ct. 1170 (Feb. 29, 2016). Thereafter, defendants began filing petitions to vacate their sentences pursuant to 28 U.S.C. § 2255.[1]

Defendant Straker filed the first § 2255 petition in June 2016. See Mot. to Vacate (Straker) [ECF No. 889]. Shortly thereafter, defendant Pierre filed his § 2255 petition in September 2016. See Mot. to Vacate (Pierre) [ECF No. 904]. After these two petitions were filed, the government began disclosing information concerning certain actions taken by the lead prosecutor on the case, Bruce Hegyi. Hegyi represented the government throughout the investigation, trial, sentencing, and appeal in this case.[2]

### B. Government's Disclosures

The disclosures revealed that the government was conducting an investigation into certain actions taken by Hegyi and reported that the investigation was in the "very early stages."[3] Gov't's Notice, Sept. 7, 2016 at 3. The disclosures indicated that Hegyi was "concerned about the security of the cooperating witnesses for various reasons and took steps both before and after sentencing to attempt to ensure the[ir] safety." Id. at 2. The government specifically described additional actions that Hegyi took on behalf of defendant Gittens after he was sentenced in May 2014. In October or November 2014, after Gittens completed his sentence and was transferred to the custody of

---

[1] Each of these defendants filed an initial § 2255 petition pro se. The Court appointed counsel to represent each defendant in these proceedings. Defendants' amended petitions—which have not yet been filed—are due by December 15, 2017. See Scheduling Order [ECF No. 957].

[2] According to the government, Hegyi left the D.C. U.S. Attorney's Office in 2012 and took a position as a Trial Attorney in the Capital Case Section of the Criminal Division of the Justice Department. Gov't's Notice, Sept. 7, 2016 [ECF No. 907-2] at 2 n.3.

[3] The government should promptly inform the Court and defendants of the current status of its investigation, including whether further disclosures are forthcoming.

3

Immigration and Customs Enforcement (ICE), Hegyi put Gittens in touch with his former law firm to assist with Gittens' deportation hearing.[4] Id. Hegyi visited Gittens while he was in ICE custody in Williamsburg, Virginia, and provided Gittens with books on soccer and morality that Hegyi purchased online. Ex. 1 to Defs.' Mot. for Recusal at 3, 5. Hegyi also made several deposits into Gittens' inmate account, totaling approximately $150, when Gittens was in ICE custody. Gov't's Supp. Notice, Jan. 24, 2017 [ECF No. 919-2] at 1. In July 2015, Hegyi testified on behalf of Gittens at an immigration hearing. Gov't's Notice, Sept. 7, 2016 at 2–3. As a result of that hearing, Gittens' deportation was deferred and he was released from ICE custody shortly thereafter. Id. at 3.

Following his release from ICE custody, Gittens called Hegyi from a bus station in Washington, D.C. According to Hegyi, he was concerned that Gittens had no resources, no permanent place to live, and no relatives he could turn to, so Hegyi invited Gittens to stay at his home for a weekend in order to develop a long-term plan for Gittens. Id. At the conclusion of that weekend, Hegyi invited Gittens to reside at his home indefinitely. Id. Hegyi notified the U.S. Probation Office of this arrangement and explained that he was the prosecutor in Gittens' case. Ex. 1 to Defs.' Mot. for Recusal at 4. Gittens apparently obtained permission from his probation officer to reside with Hegyi. Id.

Gittens lived with Hegyi (and Hegyi's wife) from approximately August 2015 to March 2017. Gov't's Opp'n [ECF No. 973] at 5 & n.3. During this time, Hegyi helped Gittens obtain a volunteer position, paid $465 for a work authorization card for Gittens, assisted Gittens with obtaining his birth certificate, and tried to help Gittens obtain a non-driving identification card. Gov't's Notice, Sept. 7, 2016 at 3. At some point after their sentencing, Hegyi requested one-time

---

[4] Hegyi's former law firm agreed to represent Gittens pro bono in his immigration case. Ex. 1 to Defs.' Mot. for Recusal [ECF No. 964-1] at 3.

4

payments from the FBI for defendants Gittens and Nurse. Gov't's Supp. Notice, Jan. 24, 2017 at 1. Nurse and Gittens received $5,000 payments from the FBI in June and December 2015, respectively.[5] Id.

In February and March of 2017, the government released to defense counsel two documents: a memorandum summarizing an August 12, 2016 interview of Hegyi by two attorneys from the D.C. U.S. Attorney's Office and the Criminal Division of the Justice Department; and an August 13, 2016 email from Hegyi clarifying certain details from that interview. See Exs. 1 and 2 to Defs.' Mot. for Recusal [ECF Nos. 964-1 & 964-2]. During that interview, Hegyi described in detail the actions that he took on behalf of Gittens. He also indicated that "there were no promises made to Gittens prior to his testimony or in connection with the trial" and that "[t]he circumstances that led to Gittens residing with Hegyi occurred after Gittens was sentenced." Ex. 1 to Defs.' Mot. for Recusal at 5.

### C. Hegyi's Telephone Call with the Court

Hegyi also described a telephone call that he had with the Court on June 16, 2016, which is the basis for defendants' motion for recusal. Hegyi's account of that conversation, which the Court accepts as accurate at this point unless otherwise noted, is as follows. Hegyi contacted the Court to inquire whether the Court would be "agreeable to serve as a[n employment] reference for [Hegyi]."[6] Ex. 2 to Defs.' Mot. for Recusal at 1. During the call, the Court asked Hegyi whether he was aware of defendant Straker's § 2255 petition, which had been filed earlier that day. Hegyi responded that he was aware of Straker's petition, but he had not read it. Id. The Court then asked

---

[5] Hegyi requested a similar payment for defendant Joseph; this request was "approved but not transmitted." Gov't's Supp. Notice, Jan. 24, 2017 at 1.

[6] According to Hegyi, the Court was a "logical potential reference" because he worked in the Civil Division of the D.C. U.S. Attorney's Office for several years and he had tried two international hostage taking cases before the Court. Ex. 2 to Defs.' Mot. for Recusal at 1.

5

Hegyi whether the D.C. U.S. Attorney's Office was aware of Straker's petition. Hegyi responded that he did not know, but he would forward a copy to the U.S. Attorney's Office. Id.

After that, Hegyi told the Court "about Gittens' current immigration status," including that Gittens was living with Hegyi, how Gittens was doing, and that Gittens had used the one-time source payment that he received from the FBI to pay his Court-imposed costs and to send money to his mother in Trinidad. Id. Hegyi indicated that Gittens wanted to come and thank the Court "for the second chance he had been given." Id. According to Hegyi, the Court "relayed that he would be happy to have Gittens come before him, with the understanding that [the Court] would step Gittens back if necessary." Ex. 1 to Defs.' Mot. for Recusal at 5. Also according to Hegyi, the Court "commended Hegyi for what he was doing for Gittens." Id.

## II. LEGAL STANDARD

A court has broad discretion in considering the sufficiency of a motion to recuse pursuant to 28 U.S.C. § 455. Doe v. Cabrera, 134 F. Supp. 3d 439, 444–46 (D.D.C. 2015). Section 455 "imposes a duty directly upon the judge to evaluate his own conduct." United States v. Heldt, 668 F.2d 1238, 1271 (D.C. Cir. 1981). A judge may be disqualified in three circumstances that are relevant to defendants' motion: (1) if "his impartiality might reasonably be questioned," 28 U.S.C. § 455(a); (2) "[w]here he has . . . personal knowledge of disputed evidentiary facts concerning the proceeding," id. § 455(b)(1); and (3) "[w]here he has served in governmental employment and in such capacity . . . expressed an opinion concerning the merits of the particular case in controversy," id. § 455(b)(3). Section 455(a) seeks to balance two competing policy considerations—that a judge must appear to be free from bias and "the fear that recusal on demand would provide litigants with a veto against unwanted judges." Philip Morris USA Inc. v. FDA, 156 F. Supp. 3d 36, 51 (D.D.C. 2016).

The D.C. Circuit has recognized that a motion to recuse should not be "lightly granted." United States v. Pollard, 959 F.2d 1011, 1023 (D.C. Cir. 1992). This hesitancy to recuse helps to ensure that the recusal process itself does not become a tool to undermine the legitimacy of the judicial system. Recusal when it is not necessary could allow a party to "manufacture recusal to delay proceedings," which would "threaten the public's confidence in judicial fairness that § 455(a) is supposed to safeguard." SEC v. Bilzerian, 729 F. Supp. 2d 19, 22 (D.D.C. 2010). And because this concern is about the recusal system as a whole, safeguarding the proper use of § 455 is important even when there is no specific fear that the moving party is attempting to manipulate the court.

Thus, in confronting a motion to recuse, "the Court must begin its analysis of the allegations supporting such a request with a presumption against disqualification." Cobell v. Norton, 237 F. Supp. 2d 71, 78 (D.D.C. 2003); Cabrera, 134 F. Supp. 3d at 444 (same); see also Bilzerian, 729 F. Supp. 2d at 22 ("[J]udges are presumed to be impartial."); United States v. Ali, 799 F.3d 1008, 1017 (8th Cir. 2015) ("A party introducing a motion to recuse carries a heavy burden of proof; a judge is presumed to be impartial and the party seeking disqualification bears the substantial burden of proving otherwise." (citation omitted)). To overcome this presumption, the moving party must demonstrate by clear and convincing evidence that a judge has conducted himself in a manner supporting disqualification. Walsh v. FBI, 952 F. Supp. 2d 71, 75 (D.D.C. 2013); Ramirez v. U.S. Dep't of Justice, 680 F. Supp. 2d 208, 211 (D.D.C. 2010); Cobell, 237 F. Supp. 2d at 78. "[T]he grounds asserted in a recusal motion must be scrutinized with care, and judges should not recuse themselves solely because a party claims an appearance of partiality." In re Aguinda, 241 F.3d 194, 201 (2d Cir. 2001). A judge should not grant a motion for recusal that is "based upon conclusory, unsupported or tenuous allegations." In re Kaminski, 960 F.2d 1062,

1065 n.3 (D.C. Cir. 1992) (per curiam). Ultimately, "[a] judge is as much obliged not to recuse himself when it is not called for as he is obliged to when it is." Cabrera, 134 F. Supp. 3d at 446 (quoting In re Drexel Burnham Lambert Inc., 861 F.2d 1307, 1312 (2d Cir. 1988)).

### III. DISCUSSION

Defendants do not contend that the Court has any actual bias in this case. See Defs.' Mot. for Recusal at 11. Rather, they allege that the "Court's role has been compromised by Mr. Hegyi's unusual actions," and that the Court must recuse itself because its impartiality might reasonably be questioned, it has personal knowledge of disputed evidentiary facts, and it has expressed an opinion about the merits of this case. Id. at 10–11. The Court addresses these three arguments below.

#### A. Whether Court's Impartiality Might Reasonably Be Questioned

Defendants first argue that recusal is required because "the Court's complimentary comments regarding [Hegyi's] actions creates the appearance of extrajudicial bias in favor of Mr. Hegyi, a key witness in the case, and one that the Court will be called upon to judge his credibility." Id. at 11. Section 455(a) provides that a judge shall "disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). "To be disqualifying, the appearance of bias or prejudice must stem from an extrajudicial source." United States v. Barry, 961 F.2d 260, 263 (D.C. Cir. 1992). Whether there is a basis to question a judge's impartiality under § 455(a) is determined by an objective standard. See United States v. Microsoft, 253 F.3d 34, 114 (D.C. Cir. 2001) (en banc) (per curiam) ("The question is whether a reasonable and informed observer would question the judge's impartiality."); SEC v. Loving Spirit Found. Inc., 392 F.3d 486, 493 (D.C. Cir. 2004) (same). The test is not that of a casual observer, but rather a reasonable and informed observer with full knowledge of all the facts and circumstances. See Sao

8

Paulo State of Federative Republic of Brazil v. Am. Tobacco Co., 535 U.S. 229, 232–33 (2002); United States v. Cordova, 806 F.3d 1085, 1092 (D.C. Cir. 2015) ("This standard requires that we take the perspective of a fully informed third-party observer who 'understand[s] all the relevant facts' and has 'examined the record and the law.'" (citation omitted)). The Court must consider how the facts would appear to a "well-informed, thoughtful and objective observer, rather than the hypersensitive, cynical, and suspicious person." Sensley v. Albritton, 385 F.3d 591, 599 (5th Cir. 2004) (citation omitted); see also In re Allied-Signal Inc., 891 F.2d 967, 970 (1st Cir. 1989) ("[W]hen considering disqualification, the district court is not to use the standard of 'Caesar's wife,' the standard of mere suspicion." (citation omitted)).

The question here is whether a reasonable and informed observer would question the Court's impartiality in these proceedings based on what Hegyi describes as a "complimentary comment" commending Hegyi's actions. The Court must assume that the reasonable observer is informed of all the facts and circumstances relating to the telephone call, including that: the call occurred well after this case was over (i.e., more than seven years after the trial, two years after the last defendants were sentenced, and after all defendants had exhausted their direct appeals); Hegyi contacted the Court to ask for a job reference,[7] not to discuss the case; although the Court asked about Hegyi's awareness of Straker's petition, the substance of the petition was not

---

[7] Defendants also argue that the Court's impartiality might reasonably be questioned because the Court will be called upon to make credibility findings on the statements and actions of Hegyi "undertaken during the very same period of time when the Court was apparently writing him a letter of reference." Defs.' Reply [ECF No. 977] at 5; see also id. at 7 ("If such a reference was made, as appears likely, this Court would now be placed in an untenable position"). This argument is based on the incorrect assumption that the Court provided Hegyi with a letter of reference. It did not. See Heldt, 668 F.2d at 1271 ("[T]here is no support for the position that the facts alleged in the papers submitted by a person relying on section 455 must in every case be accepted as true . . . . The very fact that [S]ection 455 is addressed directly to the judge makes it evident that some evaluation by the court of the facts giving rise to the motion is anticipated in most cases."); Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n, 872 F. Supp. 1346, 1349 (E.D. Pa. 1994) ("[A] judge need not accept as true the [recusal] motion's factual allegations, but may contradict them with facts drawn from his own personal knowledge." (citing United States v. Balistrieri, 779 F.2d 1191, 1202 (7th Cir.1985)), aff'd, 107 F.3d 1026 (3d Cir. 1997).

9

discussed; and Hegyi informed the Court about actions he took to help Gittens during and after his immigration hearing, all of which Hegyi described as happening <u>after</u> Gittens had completed his sentence (and hence long after the underlying criminal case was over). With this context, an objective observer would not reasonably consider the Court's alleged statement as a remark relating to these § 2255 proceedings or the underlying case; rather, it would be viewed as a simple compliment paid to Hegyi for doing nice things for Gittens, well after the case had ended.

Nor would a reasonable observer construe the Court's alleged comment as an expression of approval for any actions taken by Hegyi or any government agent before or during the trial—which may be a relevant issue in these § 2255 proceedings—because that was not something that was discussed on the call. It would also be unreasonable to assume that this issue was on the Court's mind when it commended Hegyi because the Court had just reviewed defendant Straker's § 2255 petition—in fact, that petition did not raise any allegations concerning the government's actions before, during, or after the trial. <u>See</u> Mot. to Vacate (Straker).

Of course, an observer taking a narrow view of the Court's comment, or one without a full understanding of the surrounding facts and circumstances, might perceive an appearance of bias in favor of Hegyi. But that is not the standard that the Court applies when evaluating a motion for recusal. <u>See</u> <u>In re Sherwin–Williams Co.</u>, 607 F.3d 474, 477–78 (7th Cir. 2010) ("That an unreasonable person, focusing on only one aspect of the story, might perceive a risk of bias is irrelevant. . . . In addition to being well-informed about the surrounding facts and circumstances, for purposes of our analysis, a reasonable person is a 'thoughtful observer rather than a hypersensitive or unduly suspicious person.'" (ellipses and citation omitted)). If such a standard were adopted, then judges could too easily be disqualified based on any cordial interaction with attorneys (even after the case was finished), which does not serve the interests of justice. The

objective informed observer standard strikes the appropriate balance by safeguarding the public's confidence in the impartiality of the judiciary, while also guarding against opportunistic litigants using recusal for tactical gain. See Bilzerian, 729 F. Supp. 2d at 22.

The Court must also assume that an objective observer would consider the import of the Court's subsequent statement to Hegyi that it "would step Gittens back if necessary." Ex. 1 to Defs.' Mot. for Recusal at 5; see Cabrera, 134 F. Supp. 3d at 453 n.3 ("A well-informed and reasonable observer cannot turn a blind eye to other relevant facts that refute [the] impression [that recusal-worthy activity occurred]."). The Court made this statement immediately after hearing about Hegyi's apparent fondness for Gittens. In this context, an objective observer would reasonably interpret the Court's simple warning to Hegyi that it would carry out its duty (and send Gittens back to jail if necessary) as evidence that the Court maintained impartiality as to Hegyi and Gittens. Defendants argue that this statement "[a]t most shows some skepticism about Gitten's compliance with conditions of his supervised release, it does not address the appearance of the Court's bias with regard to Mr. Hegyi." Defs.' Reply at 4. But defendants' argument lacks any support in the record—no compliance issue had been raised—and such speculation cannot support their request for recusal. Hinman v. Rogers, 831 F.2d 937, 939 (10th Cir. 1987) (a court should "not recuse [itself] on unsupported, irrational, or highly tenuous speculation").

Defendants also contend that the government's disclosures "objectively allow an inference that the Court has 'expressed an opinion' about Mr. Hegyi's credibility." Defs.' Mot. for Recusal at 11. The Court is unconvinced that a reasonable observer would equate the Court's remark to Hegyi about helping Gittens with an endorsement of Hegyi's credibility. Defendants cite Dee v. Institutional Networks Corp., 559 F. Supp. 1282, 1285 (S.D.N.Y. 1983), for the proposition that recusal is required "[w]hen a trial judge personally vouches for the credibility of a witness." Defs.'

Mot. for Recusal at 10. Dee, in turn, cites another case, Roberts v. Bailar, 625 F.2d 125 (6th Cir. 1980), for this same proposition.[8] In Roberts, the court determined that the judge should have recused himself in a sex discrimination case where he made the following remarks at a pre-trial hearing: "I know [the defendant], and he is an honorable man and I know he would never intentionally discriminate against anybody." 625 F.2d at 127. The court found that when the judge "expressed his ardent sentiments about [the defendant's] character, the objective appearance of impartiality vanished." Id. at 129–30. This Court's statement "commending" Hegyi's actions well after the underlying case had concluded is quite different than the judge's statements in Roberts, which occurred at a pre-trial hearing while the case was ongoing, described the defendant as an "honorable man," and expressed his belief that the defendant would never do the very act for which he stood accused. This Court did not describe Hegyi's character, nor did it express any opinion on whether or not Hegyi would ever make promises in exchange for testimony and then fail to disclose those promises to defense counsel. There is simply no comment on credibility at all. The Court is therefore unconvinced that a reasonable observer would find that the Court has expressed an opinion regarding Hegyi's credibility in these proceedings.[9]

Defendants cite several other cases to support their argument that the Court's impartiality might reasonably be questioned. See Defs.' Mot. for Recusal at 8. Each of these cases contains more extreme facts than those present here, and they simply do not support defendants' argument that recusal is required. In United States v. Kelly, 888 F.2d 732 (11th Cir. 1989), for example, the

---

[8] The Court focuses on Roberts rather than Dee, because although the court in Dee announced this proposition, it did not appear to analyze whether the judge had personally vouched for the credibility of a witness. And the court in Dee determined that there was no other basis for recusal. See 559 F. Supp. at 1284–87.

[9] Defendants also allege that "it will be impossible for the Court to ignore any conscious or unconscious impressions of Mr. Hegyi that it gained from this extrajudicial conversation." Defs.' Mot. for Recusal at 9. This is entirely conclusory and has no factual support in the record; it therefore does not provide a basis for removal. See In re Kaminski, 960 F.2d at 1065 n.3 (court should not grant motion for recusal "based upon conclusory, unsupported or tenuous allegations"). It is quite a stretch to be concerned with "impressions" the Court might have gained from a call with counsel that took mere minutes when the trial in this case took nine weeks.

court determined that a judge committed clear error when he failed to recuse himself from a criminal bench trial. 888 F.2d at 744–45. The judge suspected that the husband of his wife's close personal friend would be testifying as a defense witness. Id. at 738. When the judge saw the witness's wife in his courtroom several days into the trial, he invited her into his chambers and she confirmed the judge's suspicion. Id. The judge immediately informed the parties of the situation, expressed "near certainty" that he should recuse himself, and stated that he "never would have agreed to try [the] case" had he realized the situation. Id. at 738, 744. He did not recuse himself, however, because he was concerned a retrial would be barred by double jeopardy. Id. at 738. On several occasions, the judge stated that he blamed the defendant for putting him in this "difficult" position, and he commented that the defendant may have been abusing the recusal issue as his "ace in the hole." Id. at 738, 745. Based on these circumstances, the court concluded that a reasonable observer "would have doubts about any judge's impartiality." Id. at 745.

Unlike the judge in Kelly, this Court has not expressed any concerns about its ability to fairly preside over these § 2255 proceedings. Nor has this Court made any negative comments expressing animus toward any defendants, like the ones made by the judge in Kelly, that might lead a reasonable observer to question the Court's impartiality in these proceedings.

Defendants also cite Hadler v. Union Bank & Trust Co. of Greensburg, 765 F. Supp. 976 (S.D. Ind. 1991), a case in which the judge determined that he should recuse himself from a bench trial in which his long-time personal friend would be a key witness. The judge made clear that his close relationship to the witness was insufficient standing alone to require recusal. 765 F. Supp. at 978 ("To conclude that . . . any judge would ignore the law and his solemn oath in order to favor the testimony of a witness merely because of friendship with that witness one would have to engage in 'speculation.'"). But the judge's friend was no ordinary witness; he was essentially an interested

13

party. He was an officer and a stockholder in a company that was a defendant in the case, providing him with a financial interest in the outcome; his testimony was likely to be pivotal on the key liability issue; and the weight given to his testimony would turn on the court's assessment of his credibility. Id. On top of those factors, the two remaining parties agreed that recusal was appropriate. Id. at 978 n.2. These "additional factors" pushed the court to conclude that an objective observer might have "a significant doubt that justice would be done in the case." Id.

Here, in contrast, Hegyi and the Court are not close personal friends like the judge and witness in Hadler. Nor are there "additional factors" like those in Hadler that make Hegyi more like an interested party than an ordinary witness. And clearly, the parties do not agree that this Court should recuse in this case.

Likewise inapposite is United States v. O'Brien, 18 F. Supp. 3d 25 (D. Mass. 2014), a case that involved the criminal prosecution of state probation officials for allegedly running a corrupt hiring scheme. See 18 F. Supp. 3d at 27–28. Defendants planned to call as a witness another district court judge who was a colleague and personal friend of the trial judge. Id. at 28, 36. Defendants were calling the judge "to draw explicit parallels between what he did and what [defendants] are alleged to have done . . . the alleged import of [which], apparently, [being] that defendants' behavior cannot have been criminal because judges were engaged in similar behavior." Id. at 35. The defense sought to argue that "the pending indictment is simply the culmination of a long-standing power struggle between the judiciary and the legislature to control the hiring of probation officers." Id. at 36. The trial judge reasoned that one factor favoring recusal was that he would have to make rulings to "limit counsel to evidence and arguments that are legally valid," thus opening the trial judge "to criticism that [he] was excluding evidence not for proper reasons, but to shield [his] colleague from embarrassment." Id. Additional factors tipped the scale in favor

14

of recusal, including that two other district court judges, both colleagues and personal friends, might be called to testify, and the 179 names on defendants' witness list included many others with whom the judge had a connection. Id. at 36–37. Nonetheless, the judge had "considerable misgivings" about recusal. Id. at 37.

Quite simply, this case does not involve the unique circumstances that generated the need for recusal in O'Brien. Hegyi is neither a close personal friend of the Court nor a judicial colleague. His appearance as a witness does not create the risk that an observer might question whether the Court was attempting to shield another member of the judiciary. And unlike in O'Brien, this case does not involve the cumulative risk created by numerous potential witnesses having personal connections with the Court.

For all of these reasons, the Court concludes that an objective observer, fully informed of all the facts, would not reasonably question the Court's impartiality in these proceedings. Recusal is therefore not required under 28 U.S.C. § 455(a).

### B. Whether Court Has Personal Knowledge of Disputed Facts

Defendants next argue that recusal is required because the Court has "personal knowledge of disputed evidentiary facts regarding Mr. Hegyi's conduct." Defs.' Mot. for Recusal at 2. Under 28 U.S.C. § 455(b)(1), a judge must recuse himself when he "has . . . personal knowledge of disputed evidentiary facts concerning the proceeding." At this early stage in these proceedings—where defendants have yet to even file their amended § 2255 petitions—factual evidentiary disputes have not yet materialized. In that sense, defendants' argument is too speculative at this point to support the Court's recusal.

The parties appear to agree, however, that any disputed evidentiary issues would likely concern whether the government promised any benefits to Gittens or the other cooperators to

15

secure their trial testimony in this case and, if so, whether the government made appropriate disclosures to defendants' counsel.[10] See Defs.' Mot. for Recusal at 2 (stating defendants are entitled to investigate the "timing of the benefits," "whether the benefits were expressly or impliedly telegraphed to Gittens or others during the course of the prosecution of the case," and "whether appropriate disclosure were made or should have been made to defense and appellate counsel"); Defs.' Reply at 4–5 ("Hegyi's credibility with regard to whether his extraordinary actions to assist Gittens were a fulfillment of incentives relayed to Gittens before or during the trial and not disclosed to defense counsel will certainly be a key issue."); Gov't's Opp'n at 7 ("The factual evidentiary issue in dispute will be whether, to secure their testimony, Mr. Hegyi (or any government agent) made overt or implicit promises to Gittens or the other cooperators relating to the benefits they received after they were sentenced. The legal issue will likely concern whether the government violated [its disclosure obligations]."). But there is nothing in the record that defendants can point to that shows that the Court has any personal knowledge of this evidentiary issue. According to Hegyi's description of the telephone call, he told the Court about certain actions that he took to help Gittens during and after his immigration case, which occurred after he completed his sentence. There is nothing indicating that Hegyi's telephone call with the Court involved any discussion of whether the government made promises to Gittens or to the other cooperators to secure their trial testimony.[11] Based on the record at this time, then, defendants have failed to provide clear evidence that the Court has personal knowledge of any disputed evidentiary facts and therefore recusal is not required under 28 U.S.C. § 455(b)(1).

---

[10] At this juncture, there does not appear to be a dispute about the substance of the benefits that Hegyi provided to Gittens. The government has disclosed that information to defendants and the Court expects it will continue to supplement its disclosures as its investigation into Hegyi's actions continues.

[11] The government also points out that Hegyi's call with the Court occurred in June 2016, several years after the relevant time period when the government could have made any promises to the cooperators that could have affected their trial testimony. See Gov't's Opp'n at 8.

Defendants also assert that recusal is required because "Hegyi has . . . caused the Court to become a likely witness" and the Court "<u>may</u> be called to testify regarding the tenor and tone of Mr. Hegyi's statements—such as whether he sounded guarded or nervous—since such subtle indicators <u>may</u> be relevant to assess the credibility of any subsequent denials by Mr. Hegyi that he promised these benefits to Mr. Gittens before trial." <u>See</u> Defs.' Mot. for Recusal at 10 (emphasis added); <u>see also</u> <u>id.</u> at 5 (Hegyi "placed [the] Court in the position of a potential witness"). But, as explained above, the record does not show that Hegyi discussed with the Court whether he made any promises to Gittens or when any promises occurred. There is therefore no basis to believe that the Court would have anything to say about the tone and tenor of Hegyi's voice when describing whether he made any such promises. At bottom, defendants' allegation that the Court is a "likely" or "potential" witness or "may be called to testify" is unsupported speculation and therefore provides no basis for granting defendants' recusal motion. <u>In re Kaminski</u>, 960 F.2d at 1065 n.3; <u>Hinman</u>, 831 F.2d at 939; <u>United States v. DeTemple</u>, 162 F.3d 279, 287 (4th Cir.1998).[12] Should further proceedings reveal that there is a factual dispute about which the Court has personal knowledge, defendants may renew their motion based on the new information available at that time.

### C. Whether Court Expressed an Opinion on the Merits of the Case

Defendants finally allege that recusal is mandated because "the Court has expressed an opinion concerning the merits of the particular case and circumstances in controversy." Defs.' Mot. for Recusal at 2. Under 28 U.S.C. § 455(b)(3), a judge must recuse himself "[w]here he has served in governmental employment and in such capacity . . . expressed an opinion concerning the

---

[12] In their reply brief, defendants assert that Hegyi's conduct "raises many questions that will certainly need to be answered in this proceeding," and then include a laundry list of questions. Defs.' Reply at 3. Outside of the first question—"[h]ow and when did Mr. Hegyi inform the Court that Gittens was a member of the Hegyi household"—none are questions as to which the Court has personal knowledge. And as yet, there is no dispute on that first question.

17

merits of the particular case in controversy."[13] But the Court did not express any opinion about the merits of "the particular case in controversy," i.e., the merits of these defendants' § 2255 petitions. At the time of the call only defendant Straker had filed a § 2255 petition. And according to Hegyi's account of the telephone call, the Court merely asked whether Hegyi or the D.C. U.S. Attorney's Office were aware of defendant Straker's § 2255 petition. The Court did not in any way opine on the substance of the petition. The alleged comment by the Court commending Hegyi's treatment of Gittens after he had served his sentence cannot be construed as an opinion on the merits of defendants' § 2255 claims.

The only case cited by defendants to support this argument is In re Mohammad, 866 F.3d 473 (D.C. Cir. 2017). See Defs.' Reply at 10. There, the D.C. Circuit granted a writ of mandamus disqualifying a military commission judge presiding over the trial of a detainee at Guantanamo Bay. 866 F.3d at 477. The D.C. Circuit analyzed whether recusal was required under Rule of Military Commissions 902(b)(3), which is analogous to 28 U.S.C. § 455(b)(3), and provides that recusal is required where "the military judge . . . , except in the performance of duties as military judge in a previous trial of the same or a related case, has expressed an opinion concerning the guilt or innocence of the accused." Id. at 475. The D.C. Circuit found that recusal was appropriate because the military commission judge gave an interview before he took the bench in which he clearly "expressed an opinion that [the defendant] is guilty of the very crimes of which he is accused." Id. at 475–76. Defendants have not pointed to a similar statement by this Court regarding any defendant's § 2255 petition. Recusal is therefore not required under § 455(b)(3).

---

[13] It is questionable whether § 455(b)(3) even applies to the circumstances at issue in this case. In Rahman v. Johanns, 501 F. Supp. 2d 8 (D.D.C. 2007), this Court explained that recusal is required under § 455(b)(3) "where the judge, in his former position, '. . . expressed an opinion concerning the merits of the particular case or controversy.'" Id. at 14 (emphasis added). In other words, the opinion must have been expressed when the judge was serving in governmental employment, prior to becoming a judge. That is not the case here. The Court will nevertheless analyze defendants' allegations as though this section applies.

18

## CONCLUSION

For the foregoing reasons, the Court concludes that, based on the current record, recusal is not required. Defendants' motion will accordingly by denied without prejudice to later renewal.

/s/
JOHN D. BATES
United States District Judge

Dated: September 15, 2017